No. 23-12155

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

◆

AUGUST DEKKER et al.,
*Plaintiffs-Appellees*,

v.

SECRETARY, FLORIDA AGENCY FOR
HEALTH CARE ADMINISTRATION, et al.,
*Defendants-Appellants*.

◆

On Appeal from the United States District Court for the
Northern District of Florida, No. 4:22-cv-325-RH-MAF

## BRIEF OF ALABAMA, ARKANSAS, TENNESSEE, AND 15 OTHER STATES AS *AMICI CURIAE* SUPPORTING APPELLANTS AND REVERSAL

Steve Marshall
 *Attorney General*
Edmund G. LaCour Jr.
 *Solicitor General*
A. Barrett Bowdre
 *Principal Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Ave.
Montgomery, AL 36130
(334) 242-7300

Jonathan Skrmetti
 *Attorney General & Reporter*
Steven J. Griffin
 *Senior Counsel for Strategic Litiga-
 tion & Assistant Solicitor General*
OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
(615) 253-5642

Tim Griffin
 *Attorney General*
Nicholas J. Bronni
 *Solicitor General*
Dylan L. Jacobs
 *Deputy Solicitor General*
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302

*Additional Counsel Listed on
Signature Page*

*Dekker v. Sec'y, Fla. Agency for Health Care Admin.*, No. 23-12155

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1(a)(1) and 26.1-2(b), the undersigned counsel certifies that, in addition to the persons and entities listed in the Appellants' Initial Brief, the following listed persons and parties may have an interest in the outcome of this case:

1. Bailey, Andrew – *Counsel for Amicus Curiae*;

2. Bird, Brenna – *Counsel for Amicus Curiae*;

3. Bowdre, A. Barrett – *Counsel for Amicus Curiae*;

4. Bronni, Nicholas J. – *Counsel for Amicus Curiae*;

5. Cameron, Daniel – *Counsel for Amicus Curiae*;

6. Carr, Chris – *Counsel for Amicus Curiae*;

7. Commonwealth of Kentucky – *Amicus Curiae*;

8. Commonwealth of Virginia – *Amicus Curiae*;

9. Fitch, Lynn – *Counsel for Amicus Curiae*;

10. Griffin, Steven J. – *Counsel for Amicus Curiae*;

11. Griffin, Tim – *Counsel for Amicus Curiae*;

12. Hilgers, Michael T. – *Counsel for Amicus Curiae*;

13. Jacobs, Dylan L. – *Counsel for Amicus Curiae*;

14. Knudsen, Austin – *Counsel for Amicus Curiae*;

15. Kobach, Kris W. – *Counsel for Amicus Curiae*;

*Dekker v. Sec'y, Fla. Agency for Health Care Admin.*, No. 23-12155

16. Labrador, Raúl R. – *Counsel for Amicus Curiae*;

17. LaCour, Edmund G. Jr. – *Counsel for Amicus Curiae*;

18. Marshall, Steve – *Counsel for Amicus Curiae*;

19. Miyares, Jason - *Counsel for Amicus Curiae*;

20. Morrisey, Patrick - *Counsel for Amicus Curiae*;

21. Paxton, Ken – *Counsel for Amicus Curiae*;

22. Reyes, Sean - *Counsel for Amicus Curiae*;

23. Rokita, Theodore E. – *Counsel for Amicus Curiae*;

24. Skrmetti, Jonathan – *Counsel for Amicus Curiae*;

25. State of Alabama – *Amicus Curiae*;

26. State of Arkansas – *Amicus Curiae*;

27. State of Georgia – *Amicus Curiae*;

28. State of Idaho – *Amicus Curiae*;

29. State of Indiana – *Amicus Curiae*;

30. State of Iowa – *Amicus Curiae*;

31. State of Kansas – *Amicus Curiae*;

32. State of Mississippi – *Amicus Curiae*;

33. State of Missouri – *Amicus Curiae*;

34. State of Montana – *Amicus Curiae*;

35. State of Nebraska – *Amicus Curiae*;

*Dekker v. Sec'y, Fla. Agency for Health Care Admin.*, No. 23-12155

36. State of South Carolina – *Amicus Curiae*;

37. State of Tennessee – *Amicus Curiae*;

38. State of Texas – *Amicus Curiae*;

39. State of Utah – *Amicus Curiae*;

40. State of West Virginia – *Amicus Curiae*;

41. Wilson, Alan – *Counsel for Amicus Curiae.*

Respectfully submitted this 13th day of October 2023.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

Certificate of Interested Persons ............................................................ C-1

Table of Contents ................................................................................... i

Table of Authorities ............................................................................... ii

Interests of Amici Curiae and Summary of Argument ........................... 1

Argument................................................................................................. 5

    I.    Regulations Of Gender-Transition Procedures Do Not Trigger Heightened Scrutiny .................................................. 5

        A.    Regulations of Gender-Transition Procedures Do Not Discriminate Based on Sex ........................... 6

        B.    *Bostock* Does Not Control ...................................... 12

    II.    Gender-Transition Procedures Are Experimental ............................ 13

    III.    The Court Should Not Defer To Plaintiffs' Preferred Medical Interest Groups .................................................. 17

        A.    AAP.................................................................... 20

        B.    WPATH .............................................................. 22

        C.    Endocrine Society ............................................... 28

Conclusion ............................................................................................. 29

Certificate of Compliance ..................................................................... 32

Certificate of Service ............................................................................. 33

# TABLE OF AUTHORITIES

## Cases

*Abigail All. For Better Access to Developmental Drugs v. von Eschenbach*,
  495 F.3d 695 (D.C. Cir. 2007)..............................................................................1

*Boe v. Marshall*,
  No. 2:22-cv-184-LCB (N.D. Ala.)....................................................................20

*Bostock v. Clayton County*,
  140 S. Ct. 1731 (2020)............................................................................... 12, 13

*Dent v. West Virginia*,
  129 U.S. 114 (1889)..............................................................................................1

*Dobbs v. Jackson Women's Health Org.*,
  142 S. Ct. 2228 (2022)............................................................................ 2, 6, 8, 9

*Eknes-Tucker v. Governor of Ala.*,
  80 F.4th 1205 (11th Cir. 2023) ................................................................. *passim*

*Geduldig v. Aiello*,
  417 U.S. 484 (1974)..........................................................................................6, 8

*Gibson v. Collier*,
  920 F.3d 212 (5th Cir. 2019) ............................................................................23

*Kosilek v. Spencer*,
  774 F.3d 63 (1st Cir. 2014)........................................................................ 22, 23

*L.W. v. Skrmetti*,
  -- F.4th --, 2023 WL 6321688 (6th Cir. Sept. 28, 2023) ........................... *passim*

*Otto v. City of Boca Raton*,
  981 F.3d 854 (11th Cir. 2020) ............................................................................4

*Poe v. Drummond*,
  No. 23-CV-177-JFH-SH, 2023 WL 6516449 (N.D. Okla. Oct. 5, 2023) ..........14

*Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*,
    143 S. Ct. 2141 (2023)......................................................................12

*Washington v. Glucksberg*,
    521 U.S. 702 (1997)........................................................................4, 5

**Statutes**

Miss. Code Ann. §41-41-191 .............................................................7

**Regulations**

85 Fed. Reg. 37160, 37198 (June 19, 2020) ..........................................23

**Other Authorities**

Aaron Devor, WPATH, *History of the Association*, https://perma.cc/SF7Y-SD3W
    (last accessed Oct. 10, 2023) ...........................................................28

Aaron Sibarium, *The Hijacking of Pediatric Medicine*,
    THE FREE PRESS (Dec. 7, 2022), https://perma.cc/YF6E-9UT8 ........................21

Abigail Shrier, *Top Trans Doctors Blow the Whistle on "Sloppy" Care*,
    THE FREE PRESS (Oct. 4, 2021), https://perma.cc/R7M3-XTQ3 ................ 25, 26

Adam Cohen, *Imbeciles: The Supreme Court, American Eugenics, and the
Sterilization of Carrie Buck* (2016) ...................................................5

Amanda Prestigiacomo, *'Huge Money Maker': Video Reveals Vanderbilt's
Shocking Gender 'Care,' Threats Against Dissenting Doctors*,
    THE DAILYWIRE (Sept. 20, 2022), https://perma.cc/7ZGW-NDY4....................19

Andrew Gelman & Eric Loken, *The Statistical Crisis in Science*,
    102 AMERICAN SCIENTIST (2014), https://perma.cc/TB72-287Q ......................19

Anna Smith Haghighi, *What To Know About Estrogen in Men*,
    MEDICAL NEWS TODAY (Nov. 9, 2020), https://perma.cc/B358-S7UW ............11

Azeen Ghorayshi, *Britain Limits Use of Puberty-Blocking Drugs to Research Only*, N.Y. TIMES (June 9, 2023), https://perma.cc/Z74M-ED6R......15

Azeen Ghorayshi, *Medical Group Backs Youth Gender Treatments, but Calls for Research Review*, N.Y. TIMES (Aug. 3, 2023), https://perma.cc/N3BJ-TB9J........................................................ 18, 22

Azeen Ghorayshi, *More Trans Teens Are Choosing 'Top Surgery,'* N.Y. TIMES (Sept. 26, 2022), https://perma.cc/2K79-A7S8.................... 7, 20, 27

Claire Sissions, *Typical Testosterone Levels in Males and Females*, MEDICAL NEWS TODAY (Jan. 6, 2023), https://perma.cc/M98N-4WG4 ...........11

*Correction*, 23 INT'L J. OF TRANSGENDER HEALTH S259 (2022), https://perma.cc/4342-KFEN.............................................................27

E. Coleman et al., *WPATH Standards of Care for the Health of Transgender & Gender Diverse People, Version 8*, INT'L J. OF TRANSGENDER HEALTH (Sept. 15, 2022) ........................ 4, 26, 27, 28

Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. TIMES MAGAZINE (June 15, 2022), https://www.nytimes.com/2022/06/15/magazine/gender-therapy.html ........................................................ 23, 24, 25, 26

Erica Ciszek et al., *Discursive Stickiness: Affective Institutional Texts and Activist Resistance*, 10 PUBLIC RELATIONS INQUIRY, No. 3 (2021)............. 24, 25

Genevieve Gluck, *Top Trans Medical Association Collaborated With Castration, Child Abuse Fetishists*, REDUXX (May 17, 2022), https://perma.cc/5DWF-MLRU ...................................................................................28

Hilary Cass, Letter to Director of Specialized Commissioning (Jul. 19, 2022), https://perma.cc/KS4N-V2GX.........................................................15

Hilary Cass, *The Cass Review: Interim Report* (Feb. 2022), https://perma.cc/RJU2-VLHT.........................................................15

James M. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, 46 J. SEX & MARITAL THERAPY (2019), https://doi.org/10.1080/0092623X.2019.1698481 .......................22

Jason Rafferty, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142(4) PEDIATRICS (2018)............21

Jayne Leonard, *What Causes High Testosterone in Women?*, MEDICAL NEWS TODAY (Jan. 12, 2023), https://perma.cc/BT38-L79X.............11

Jennifer Block, *Gender Dysphoria in Young People is Rising—and so is Professional Disagreement*, THE BMJ (Feb. 23, 2023), https://perma.cc/QKB6-5QCR.....................................................................13, 28

Jennifer Block, *Norway's Guidance on Paediatric Gender Treatment is Unsafe, Says Review*, THE BMJ (Mar. 23, 2023), https://perma.cc/9FQF-MJJ9.............17

Johanna Olson-Kennedy et al., *Impact of Early Medical Treatment for Transgender Youth: Protocol for the Longitudinal, Observational Trans Youth Care Study*, JMIR RES. PROTOC. (2019), https://perma.cc/K5GU-SNCF.............................................................................14

Joint Letter from USPATH and WPATH (Oct. 12, 2022), https://perma.cc/X7ZN-G6FS..........................................................................26

Joshua Safer, *State of the Art: Transgender Hormone Care* (Feb. 15, 2019), https://www.youtube.com/watch?v=m7Xg9gZS_hg (at 5:38-6:18).................29

Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, WALL ST. JOURNAL (Apr. 17, 2022), https://www.wsj.com/articles/the-american-academy-of-pediatrics-dubious-transgender-science-jack-turban-research-social-contagion-gender-dysphoria-puberty-blockers-uk-11660732791...................................................21

Laura Edwards-Leeper & Erica Anderson, *The Mental Health Establishment is Failing Trans Kids*, WASH. POST (Nov. 24, 2021), https://www.washingtonpost.com/outlook/2021/11/24/trans-kids-therapy-psychologist/ ................................................................................25

Lisa Selin Davis, *Kid Gender Guidelines Not Driven by Science*, N.Y. Post (Sept. 29, 2022), https://perma.cc/S3FF-Q66A ..................................................27

Maria Vogiatzi et al., *Testosterone Use in Adolescent Males*, 5 J. ENDOCRINE SOC'Y (2021), https://perma.cc/E3ZQ-4PZV ..........................11

Mayo Clinic, *Precocious Puberty*, https://perma.cc/58SA-ESRV
(last visited Oct. 10, 2023) .............................................................................8, 10

Michelle Conlin et al., *Gender Imbalance Emerges Among Trans Teens Seeking Treatment*, REUTERS (Nov. 18, 2022), https://perma.cc/Z4QW-CXR3 ...............3

Nat'l Inst. for Health & Care Excellence, *Evidence Review: Gender-affirming hormones for children and adolescents with gender dysphoria* (Mar. 11, 2021), https://perma.cc/M8J5-MXVG ...............................................15

Nat'l Inst. for Health & Care Excellence, *Evidence Review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria* (Mar. 11, 2021), https://perma.cc/93NB-BGAN........................ 11, 15

NIH, *How Do Healthcare Providers Diagnose Precocious Puberty & Delayed Puberty?*, https://perma.cc/3LGJ-TSV4 (last visited Oct. 10, 2023) .................10

NHS England, *Interim Service Specification* (June 9, 2023),
https://perma.cc/YE3E-AE3H .............................................................................15

Palveluvalikoima, *Recommendation of the Council for Choices in Health Care in Finland* (2020), https://perma.cc/VN38-67WT........................................... 16, 17

Roy Eappen & Ian Kingsbury, *The Endocrine Society's Dangerous Transgender Politicization*, WALL ST. JOURNAL (June 28, 2023),
https://www.wsj.com/articles/the-endocrine-societys-dangerous-politicization-endocrinologists-gender-affirming-care-arkansas-dac768bd............................28

Sweden National Board of Health and Welfare Policy Statement, Socialstyrelsen, *Care of Children and Adolescents with Gender Dysphoria: Summary* (2022),
https://perma.cc/FDS5-BDF3 ..............................................................................16

Victoria Pelham, *Puberty Blockers: What You Should Know*,
Cedars Sinai (Jan. 16, 2023), https://perma.cc/H83F-4ZR7 ...............................8

Videorecording of Dr. Tishelman's WPATH presentation,
https://twitter.com/SwipeWright/status/1571999221401948161.......................27

Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*, 102(11) J. CLINICAL ENDOCRINOLOGY & METABOLISM 3869 (Nov. 2017), https://perma.cc/TYE5-AQB9 ..................................... 28, 29

Yuval Levin, *A Time to Build: From Family and Community to Congress and the Campus, How Recommitting to our Institutions Can Revive the American Dream* (2020) .................................................................................................19

## INTERESTS OF AMICI CURIAE AND SUMMARY OF ARGUMENT

Amici curiae are the States of Alabama, Arkansas, Tennessee, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Mississippi, Missouri, Montana, Nebraska, South Carolina, Texas, Utah, Virginia, and West Virginia.

"[F]rom time immemorial," amici have exercised their authority to enact health and safety measures—regulating the medical profession, restricting access to potentially dangerous medicines, and banning treatments that are unsafe or unproven. *Dent v. West Virginia*, 129 U.S. 114, 121-24 (1889); *see Abigail All. For Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 703-05 (D.C. Cir. 2007) (en banc). Indeed, independently weighing the harms and benefits of proposed treatments is an important role of government. That is why the FDA exists.

That longstanding authority gives rise to this case and *amici*'s interest in it. After commissioning a systematic review of the literature and consulting with experts, the Florida Agency for Health Care Administration (AHCA) determined that current evidence does not support using puberty blockers, cross-sex hormones, and surgeries to treat gender dysphoria. It thus promulgated a rule excluding Medicaid coverage for these procedures, and the legislature later adopted a similar law.

Those determinations were due deference. As this Court just recently held, "regulation[s] of the use of puberty blockers and cross-sex hormone treatment" are

"subject only to rational basis review." *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1224 (11th Cir. 2023); *see L.W. v. Skrmetti*, -- F.4th --, 2023 WL 6321688, at *14 (6th Cir. Sept. 28, 2023) (same). Yet rather than accord Florida's "health and welfare laws" a "strong presumption of validity," *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2284 (2022) (citation omitted), the district court erroneously applied heightened scrutiny and treated certain medical interest groups as the *real* regulators, authoring standards that no mere State could contradict. *See* Doc. 246 at 16-19. According to the district court, American medical organizations endorse the Standards of Care promulgated by the World Professional Association for Transgender Health (WPATH) and the Endocrine Society, so it is *those* standards the Constitution purportedly mandates. *Id.*

This was error on many fronts. First, the district court's decision to apply heightened scrutiny hinges on the proposition that providing natural amounts of testosterone to a boy with a testosterone deficiency while declining to give unnatural amounts of testosterone to a girl seeking to transition denies the girl equal protection. *See id.* at 34-36. That argument fails because these are different treatments for different conditions with dramatically different risks. The fact that a patient's sex affects the nature of a treatment does not mean anyone is denied equal protection. *See Eknes-Tucker*, 80 F.4th at 1228. A doctor offering testicular exams only to boys or pap smears only to girls does not violate the Constitution, nor does a fertility clinic

that refuses to implant fertilized eggs inside males. Likewise, Florida's regulations permissibly account for the reality that certain interventions are different treatments depending on the patient's sex.

Second, Florida's determination that gender reassignment treatments are experimental is reasonable because it fits comfortably within the mainstream of medical opinion that has conducted or reviewed systematic assessments of the evidence. Perhaps unsurprisingly, the entities that have done this are *not* the medical interest groups on which the district court relied, but governmental medical authorities in countries such as the United Kingdom, Sweden, Finland, and Norway. Based on the evidence reviews they conducted, healthcare authorities in these countries have called for curtailing the availability of transitioning treatments for minors. As the council responsible for the assessment of public healthcare services in Finland put it, "[i]n light of available evidence, gender reassignment of minors is an experimental practice."[1] That is just what Florida determined.

Finally, the district court erred when it relied on the imprimatur of medical interest groups to find that Florida's coverage decision was unlawful. *See* Doc. 246 at 18-19. For one, "expert consensus, whether in the medical profession or elsewhere, is not the North Star" of constitutional interpretation, "lest judges become

---

[1] Michelle Conlin et al., *Gender Imbalance Emerges Among Trans Teens Seeking Treatment*, Reuters (Nov. 18, 2022), https://perma.cc/Z4QW-CXR3.

3

spectators rather than referees in construing our Constitution." *L.W.*, 2023 WL 6321688, at *12; *see Otto v. City of Boca Raton*, 981 F.3d 854, 869 (11th Cir. 2020) (explaining that the "institutional positions" of medical interest groups "cannot define the boundaries of constitutional rights").

For another, medical interest groups, composed of physicians self-interested in Medicaid coverage, are not neutral arbiters of "medical opinion." And one could scarcely dream up a more radical organization to outsource the regulation of medicine to than WPATH. While "Americans are engaged in an earnest and profound debate about" how best to help those suffering from gender dysphoria, *cf. Washington v. Glucksberg*, 521 U.S. 702, 735 (1997), WPATH has taken its gender ideology to the extreme and included in its latest Standards an entire chapter on self-identified "eunuchs"—individuals "assigned male at birth" who "wish to eliminate masculine physical features, masculine genitals, or genital functioning."[2] Because eunuchs "wish for a body that is compatible with their eunuch identity," the Standards say, some will need "castration to better align their bodies with their gender identity."[3] WPATH thus deems castration "medically necessary gender-affirming care" for eunuchs to "gain comfort with their gendered self."[4]

---

[2] E. Coleman et al., *WPATH Standards of Care for the Health of Transgender & Gender Diverse People, Version 8*, INT'L J. OF TRANSGENDER HEALTH (Sept. 15, 2022), S88 ("SOC 8").

[3] *Id.* at S88-89.

[4] *Id.*

By the district court's logic, WPATH's horrifying position means that Florida must now pay for self-identified eunuchs to be castrated. The Constitution mandates no such thing. States did not have to defer to the medical establishment when it "with near unanimity" advocated for "eugenic sterilization" at the turn of the last century,[5] and they do not have to defer to the organizations now that they advocate sterilization for other reasons. The district court erred when it substituted WPATH's year-old Standards, rejected abroad and in numerous States, for the judgment of Florida's elected representatives and its healthcare administration. The government regulates the medical profession, not the other way around. *See Glucksberg*, 521 U.S. at 731. *Amici* States submit this brief in support of Florida's longstanding authority to do just that.

## ARGUMENT

### I. Regulations Of Gender-Transition Procedures Do Not Trigger Heightened Scrutiny.

Florida's decision not to provide Medicaid funding for gender-transition procedures was subject only to rational-basis review. *Eknes-Tucker*, 80 F.4th at 1224. That is the law of this Circuit. The district court's faulty reasoning cannot get around that.

---

[5] Adam Cohen, *Imbeciles: The Supreme Court, American Eugenics, and the Sterilization of Carrie Buck* 66 (2016).

### A.    Regulations of Gender-Transition Procedures Do Not Discriminate Based on Sex.

The district court reasoned that Florida's regulations were subject to heightened scrutiny because "one must know the sex of a person to know whether or how a provision applies to the person." Doc. 246 at 30. According to the court, such a provision *always* "draws a line based on sex." *Id.*

That cannot be right. Consider what it would mean if any law, regulation, or policy that uses the words sex, gender, male, female, man, woman, boy, or girl automatically triggers heightened review. In that world, the Constitution would look askance at any public hospital offering testicular exams only to men or c-sections only to women. It would also mean that a law restricting abortions would face heightened scrutiny. The Supreme Court squarely rejected this reasoning, explaining that "[t]he regulation of a medical procedure that only one sex can undergo does not trigger heightened constitutional scrutiny unless the regulation is a 'mere pretext designed to effect an invidious discrimination against members of one sex or the other.'" *Dobbs*, 142 S. Ct. at 2245-46 (cleaned up) (quoting *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974)).

Plaintiffs' attempt to turn the Equal Protection Clause into a prohibition on explicitly gendered terms thus runs headlong into *Dobbs*. Virtually every abortion regulation, including the one at issue in *Dobbs*, uses gendered terms or references the unique characteristics of the female reproductive system. *See* Miss. Code Ann.

6

§41-41-191 (calculating gestational age "from the first day of the last menstrual period of the pregnant woman"). Or say that plastic surgeons started using TikTok to market to minors an experimental surgery that uses skin grafts to change one's racial appearance. (Disturbingly, not a far cry from current trends like #NipRevealFriday and "Yeet the Teet" that some surgeons use to sell transitioning mastectomies to children.[6]) If Florida decided it would not pay for skin grafts performed for the sole purpose of changing a patient's racial appearance, would strict scrutiny apply simply because the statute uses "racial terms"? Of course not. Such a law would not impose a race-based classification under the Equal Protection Clause. So here.

It does not matter that Florida's regulations use or otherwise rely on the concept of "sex." "[H]ow could they not? The point of the hormones is to help a minor transition from one gender to another, and laws banning, permitting, or otherwise regulating them all face the same linguistic destiny of describing the biology of the procedures." *L.W.*, 2023 WL 6321688, at *14. In other words, the regulations depend on "sex only because the medical procedures that [they] regulate[]—puberty blockers and cross-sex hormones as a treatment for gender dysphoria—are themselves sex-based." *Eknes-Tucker*, 80 F.4th at 1228. "If a law restricting a medical procedure that applies only to women does not trigger heightened scrutiny, as in

---

[6] *See* Azeen Ghorayshi, *More Trans Teens Are Choosing 'Top Surgery,'* N.Y. TIMES (Sept. 26, 2022), https://perma.cc/2K79-A7S8.

*Dobbs and Geduldig*, these laws, which [regulate] medical procedures unique to each sex, do not require such scrutiny either." *L.W.*, 2023 WL 6321688, at * 14.

The district court tried to get around this truth by finding that the law applied unequally to one sex as compared to the other. When determining whether a testosterone treatment is covered by Medicaid, for example, the district court reasoned that "[i]f the adolescent is a natal male, the treatment is covered," but "[i]f the adolescent is a natal female, the treatment is not covered." Doc. 246 at 30-31.

This pathway does not evade *Dobbs*, either. For healthy development, males naturally need higher levels of testosterone than females, and females need higher levels of estrogen than males. The lower court's reasoning is akin to subjecting an abortion regulation to heightened scrutiny because men can access "reproductive healthcare," while only women's access to abortion is restricted. It defines the procedure at too high a level of generality (though there would be no asymmetry here because neither males *nor* females can receive Medicaid coverage for gender-transition procedures). What matters are the individual procedures at issue.

Here, there are three. The first is puberty blocker transitioning treatment. Puberty blockers work the same way in males and females. Sex has no bearing on their prescription or dosage, whether for treating precocious puberty or for transitioning.[7]

---

[7] *See* Victoria Pelham, *Puberty Blockers: What You Should Know*, Cedars Sinai (Jan. 16, 2023), https://perma.cc/H83F-4ZR7; Mayo Clinic, *Precocious Puberty*, https://perma.cc/58SA-ESRV (last visited Oct. 10, 2023).

So regulating their use in gender-transition procedures does not draw any line based on sex. Girls and boys are treated identically: both may receive Medicaid coverage for puberty blockers to treat precocious puberty, but not to transition.

The second treatment is testosterone transitioning treatment. Unlike puberty blockers, testosterone transitioning treatments can be used *only* in females. "Testosterone transitions a minor from female to male, never the reverse. That means only females can use testosterone as a transition treatment." *L.W.*, 2023 WL 6321688, at *14 .

The third treatment is estrogen transitioning treatment, which works the inverse as testosterone transitioning treatment. It can be given only to males to transition. *Id.*

Because biology dictates that only males can take estrogen *to transition*, and only females can take testosterone *to transition*, testosterone transitioning treatments and estrogen transitioning treatments are "medical procedure[s] that only one sex can undergo." *Dobbs*, 142 S. Ct. at 2245-46. Rational-basis review thus applies to laws regulating the procedures. *Id.*; *see Eknes-Tucker*, 80 F.4th at 1227. Just as States can enact laws concerning female genital mutilation, prostate cancer, breastfeeding, cervical cancer, and in-vitro fertilization without those laws being deemed "presumptively unconstitutional," so can they regulate experimental transitioning treatments. *L.W.*, 2023 WL 6321688, at *14 (collecting examples).

9

Nor does it matter that Florida allows these same drugs—puberty blockers, testosterone, and estrogen—to be covered by Medicaid when used for some purposes but not for transitioning. The distinctions the State drew make sense because the different uses of the drugs have different diagnoses, different goals, and different risks. That makes them different treatments. This distinction is normal. States routinely allow drugs to be used for some treatments (morphine to treat a patient's pain) but not others (morphine to assist a patient's suicide). Indeed, distinguishing between treatments that use the same drug is not just rational, but necessary. To the diabetic patient, injecting insulin is lifesaving. To the hypoglycemic patient, it can be life ending. Same drug, different treatments.

Puberty blockers prove the point. They are ordinarily prescribed to treat precocious puberty, in which a child begins puberty at an unusually early age.[8] Unlike gender dysphoria, precocious puberty is a physical abnormality that can be diagnosed through medical tests.[9] And the goal of using puberty blockers to treat precocious puberty is to ensure children develop at "the normal age of puberty"[10]—the exact opposite goal as when doctors use them to treat gender dysphoria by *halting* normal puberty. This distinction alters the risk calculus as well: using puberty

---

[8] Mayo Clinic, *Precocious Puberty*, *supra*.

[9] *See* NIH, *How Do Healthcare Providers Diagnose Precocious Puberty & Delayed Puberty?*, https://perma.cc/3LGJ-TSV4 (last visited Oct. 10, 2023).

[10] Mayo Clinic, *Precocious Puberty*, *supra*.

blockers to treat gender dysphoria well beyond the normal pubertal age may risk diminished bone growth and social development.[11]

The same distinctions hold for the hormone treatments regulated by Florida. Males and females normally have very different amounts of naturally occurring testosterone and estrogen.[12] And these hormones serve very different purposes in the different sexes. In females, excess testosterone can *cause* infertility[13]; in males, testosterone is prescribed to *alleviate* fertility problems.[14] The inverse is true of estrogen.[15] This makes the use of the same hormones in the different sexes different treatments.

Accordingly, "the right question under the Equal Protection Clause" is whether the two groups seeking the different treatments—"those who want to use these drugs to treat a discordance between their sex and gender identity and those who want to use these drugs to treat other conditions"—are "similarly situated."

---

[11] *See* Nat'l Inst. for Health & Care Excellence (NICE), *Evidence review: Gonadotrophin releasing hormone analogues for children and adolescents with gender dysphoria*, (Mar. 11, 2021), https://perma.cc/93NB-BGAN, at 26-32 ("NICE Puberty Blocker Evidence Review").

[12] *E.g.*, Claire Sissions, *Typical Testosterone Levels in Males and Females*, MEDICAL NEWS TODAY (Jan. 6, 2023), https://perma.cc/M98N-4WG4.

[13] Jayne Leonard, *What Causes High Testosterone in Women?*, MEDICAL NEWS TODAY (Jan. 12, 2023), https://perma.cc/BT38-L79X.

[14] Maria Vogiatzi et al., *Testosterone Use in Adolescent Males*, 5 J. ENDOCRINE SOC'Y 1, 2 (2021), https://perma.cc/E3ZQ-4PZV.

[15] Anna Smith Haghighi, *What To Know About Estrogen in Men*, MEDICAL NEWS TODAY (Nov. 9, 2020), https://perma.cc/B358-S7UW.

*Eknes-Tucker*, 80 F.4th at 1233 (Brasher, J., concurring). The question answers itself. The Equal Protection Clause does not look askance on regulations that treat different procedures differently.

### B.    *Bostock* Does Not Control.

Nor does *Bostock* say otherwise. First, *Bostock v. Clayton County* concerned only Title VII's prohibition on sex-based employment discrimination. 140 S. Ct. 1731, 1737 (2020). The Supreme Court expressly cabined *Bostock*'s reasoning to that context. *See id.* at 1753. As Justice Gorsuch, the author of *Bostock*, recently explained, that is because the protections of Title VII go "*beyond*" those of "the Equal Protection Clause." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 143 S. Ct. 2141, 2220 (2023) (emphasis added) (Gorsuch, J., concurring). Hence why "[t]itle VII covers disparate impact claims, and the Fourteenth Amendment does not." *L.W.*, 2023 WL 6321688, at *16 (citations omitted). "Because *Bostock* therefore concerned a different law (with materially different language) and a different factual context, it bears minimal relevance to the instance case." *Eknes-Tucker*, 80 F.4th at 1229.

Second, even if *Bostock*'s reasoning applied to the Equal Protection Clause, Plaintiffs' claims still would fail. In *Bostock*, the Court held that an employer that "penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth" discriminates based on sex under Title

VII. 140 S. Ct. at 1741. At the core of the Court's reasoning was a "simple test": "if changing the employee's sex would have yielded a different choice by the employer," the employer has treated the employee differently "because of sex." *Id.*

*Bostock* applied this test to workplace hiring and firing decisions based on gender stereotypes. The Court held that those decisions should be sex blind. But it makes no sense to apply the same test to medicine, where males and females are *not* similarly situated and decisions should *not* be sex blind. *See Eknes-Tucker*, 80 F.4th at 1228-29; *L.W.*, 2023 WL 6321688, at *16. Again, a fertility clinic would not discriminate on the basis of sex by deciding to implant fertilized eggs only in females, even though "changing the [patient's] sex would have yielded a different choice by the [clinic]." *Bostock*, 140 S. Ct. at 1741. The same is true for gender-transition procedures, which also depend on biology, not stereotype.

## II. Gender-Transition Procedures Are Experimental.

While Plaintiffs' medical interest groups proclaim a false consensus in the United States, "[i]nternationally, … governing bodies have come to different conclusions regarding the safety and efficacy of medically treating gender dysphoria."[16] Indeed, in recent years, medical authorities in the UK, Finland, Sweden, and Norway

---

[16] Jennifer Block, *Gender Dysphoria in Young People is Rising—and so is Professional Disagreement*, The BMJ (Feb. 23, 2023), https://perma.cc/QKB6-5QCR.

have all looked at the evidence and determined—as Florida did—that transitioning treatments for minors are experimental.

In fact, it is worse than that. "Experimental" implies that experiments are being conducted. But as another court recently found, by and large this area remains *pre*-experimental because "experiments and scientific studies of the sort generally seen in the medical field *have not been done* in this area." *Poe v. Drummond*, No. 23-CV-177-JFH-SH, 2023 WL 6516449, at *13 (N.D. Okla. Oct. 5, 2023). The Department of Health and Human Services seems to have implicitly come to the same conclusion. It is only now funding an ongoing observational study—an "experiment"—of transitioning treatments due to "the paucity of empirical research, particularly in the US setting."[17]

*1. United Kingdom.* In 2020, Britain's National Health Service (NHS) commissioned Dr. Hilary Cass, the former president of the Royal College of Paediatrics and Child Health, to chair an independent commission examining the use of puberty blockers and cross-sex hormones to treat gender dysphoria in minors. As part of the review, the National Institute for Care and Excellence (NICE) conducted two systematic reviews of the published scientific literature concerning the safety and efficacy of using gender-modification procedures to treat children and adolescents with

---

[17] *E.g.*, Johanna Olson-Kennedy et al., *Impact of Early Medical Treatment for Transgender Youth: Protocol for the Longitudinal, Observational Trans Youth Care Study*, JMIR RES. PROTOC. (2019), https://perma.cc/K5GU-SNCF.

gender dysphoria.[18] The results are striking. The literature reviews concluded that there are no "reliable comparative studies" on the "effectiveness and safety of [puberty blockers],"[19] and that the safety of testosterone and estrogen transitioning treatments was similarly unknown.[20] Dr. Cass determined that "the available evidence was not strong enough to form the basis of a policy position,"[21] and thus called for experiments to *start* being conducted.[22]

On June 9, 2023, NHS published an interim service specification officially adopting many of Dr. Cass's recommendations. Unlike American medical interest groups, NHS now prioritizes psychological—not hormonal or surgical—care for the treatment of gender dysphoria in youth and will consider prescribing puberty blockers to minors *only* as part of a formal research protocol. Recruitment for that research study is expected to *begin* in 2024. Until then, puberty blockers will ordinarily not be prescribed by NHS physicians as a treatment for gender dysphoria.[23]

---

[18] *See* Nat'l Inst. for Health & Care Excellence (NICE), *Evidence review: Gender-affirming hormones for children and adolescents with gender dysphoria*, (Mar. 11, 2021), https://perma.cc/M8J5-MXVG ("NICE Cross-Sex Hormone Evidence Review"); NICE Puberty Blocker Evidence Review, *supra*.

[19] NICE Puberty Blocker Evidence Review at 12.

[20] NICE Cross-Sex Hormone Evidence Review at 14.

[21] Hilary Cass, *The Cass Review: Interim Report* 37 (Feb. 2022), https://perma.cc/RJU2-VLHT.

[22] Hilary Cass, Letter to Director of Specialized Commissioning (Jul. 19, 2022), https://perma.cc/KS4N-V2GX.

[23] *See* Azeen Ghorayshi, *Britain Limits Use of Puberty-Blocking Drugs to Research Only*, N.Y. Times (June 9, 2023), https://perma.cc/Z74M-ED6R; NHS England, *Interim Service Specification* (June 9, 2023), https://perma.cc/YE3E-AE3H.

*2. Sweden.* In February 2022, following an extensive literature review, Sweden's National Board of Health and Welfare concluded that "the risk of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits."[24] Concerned that there is no "reliable scientific evidence concerning the efficacy and the safety of both treatments," that "detransition occurs among young adults," and that there has been an "unexplained increase" in minors identifying as transgender, the National Board restricted the use of puberty blockers and cross-sex hormones to strictly controlled research settings or "exceptional cases."[25]

*3. Finland.* In June 2020, Finland's Council for Choices in Healthcare in Finland also suggested changes to its treatment protocols.[26] Though allowing for some hormonal interventions under certain conditions, the Council lamented the lack of evidence and urged caution in light of severe risks associated with medical intervention. "As far as minors are concerned," the Council found, "there are no medical treatment[s] [for gender dysphoria] that can be considered evidence-based," and "it is critical to obtain information on the benefits and risks of these treatments in

---

[24] Sweden National Board of Health and Welfare Policy Statement, Socialstyrelsen, *Care of Children and Adolescents with Gender Dysphoria: Summary* 3 (2022), https://perma.cc/FDS5-BDF3.
[25] *Id.* at 3-4.
[26] *See* Palveluvalikoima, *Recommendation of the Council for Choices in Health Care in Finland* (2020), https://perma.cc/VN38-67WT.

rigorous research settings."[27] The Council concluded: "[N]o decisions should be made that can permanently alter a still-maturing minor's mental and physical development."

    *4. Norway.* In March 2023, the Norwegian Healthcare Investigation Board (Ukom) released a report finding that its national guidelines for treating gender dysphoria were inadequate.[28] The existing 2020 guidelines had not been based on a literature review, and the new report found "insufficient evidence for the use of puberty blockers and cross sex hormone treatments in young people, especially for teenagers who are increasingly seeking health services."[29] Ukom "recommended that updated guidelines should be based on a new commissioned review or existing international up-to-date systematic reviews."[30] Ukom thus "defines such treatments as utprøvende behandling, or 'treatments under trial,'"[31]—that is, experimental.

## III. The Court Should Not Defer To Plaintiffs' Preferred Medical Interest Groups.

    The district court discounted the European experience because the treatments have not been banned in those countries and are still available under limited conditions. Doc. 246 at 46. But if the treatments are experimental, what does it matter if

---

[27] *Id.*

[28] Jennifer Block, *Norway's Guidance on Paediatric Gender Treatment is Unsafe, Says Review*, THE BMJ (Mar. 23, 2023), https://perma.cc/9FQF-MJJ9.

[29] *Id.*

[30] *Id.*

[31] *Id.*

England chooses to conduct the experiments? The Constitution does not require Florida to pay for its children to be guinea pigs rather than waiting on results of the ongoing experiments elsewhere.

The district court's answer is that Florida cannot await the results because American medical organizations like the American Academy of Pediatrics (AAP), the American College of Obstetricians and Gynecologists, the American Medical Association, "and at least a dozen more" organizations have not done so. *Id.* at 18-19. Indeed they haven't. While healthcare authorities in Europe have curbed access to pediatric gender-transition procedures, American medical organizations have run in the opposite direction, advocating unfettered access to transitioning treatments even as they admit that more research is needed.[32]

In some ways, it is unsurprising that, until recent decisions by this Court and the Sixth Circuit, courts repeatedly deferred to these organizations. One would think that medical societies like the AAP, the Endocrine Society, and WPATH would be honest brokers, reviewing the evidence as Europe has done and responding accordingly. And one would hope that organizations like the American Medical Association—which has not published guidelines on this topic but supports the WPATH Standards of Care—would use their institutional goodwill, built up over time, to be the voice of reason and put the safety of children first.

---

[32] *E.g.*, Ghorayshi, *Medical Group Backs Youth Gender Treatments*, *supra*.

Sadly, this has not happened. As with other institutions, American medical organizations have become increasingly "performative," treated by their leaders as platforms for advancing the current moment's cause célèbre.[33] Add to this a replication crisis in scientific literature and the ability of researchers to use statistics to make findings appear significant when they are not,[34] and it is no wonder that medical organizations find it easier to just go with the zeitgeist. Science is *hard*, and there is no reward in the current climate for any organization that questions the safety and efficacy of using sterilizing gender-transition procedures on children.

Then there is the financial conflict. Whether cognizant or not, the medical interest groups that endorse gender-transition procedures have a strong incentive *not* to raise the flag of caution if doing so would slow financial payments to their members. And those payments can be significant. As one physician at Vanderbilt University Medical Center's Clinic for Transgender Health bragged, transitioning services are a "big money maker."[35] According to the *New York Times*, double

---

[33] *See generally* Yuval Levin, *A Time to Build: From Family and Community to Congress and the Campus, How Recommitting to our Institutions Can Revive the American Dream* (2020).

[34] *E.g.*, Andrew Gelman & Eric Loken, *The Statistical Crisis in Science*, 102 AMERICAN SCIENTIST 460, 460-65 (2014), https://perma.cc/TB72-287Q (noting "statistical significance" can "be obtained even from pure noise" by various tricks of the trade).

[35] Amanda Prestigiacomo, *'Huge Money Maker': Video Reveals Vanderbilt's Shocking Gender 'Care,' Threats Against Dissenting Doctors*, THE DAILYWIRE (Sept. 20, 2022), https://perma.cc/7ZGW-NDY4.

mastectomies—euphemistically called "top surgeries"—"cost[] anywhere from $9,000 to $17,000, depending on facility and anesthesia fees."[36]

So there are reasons to be skeptical that medical organizations always put the interests of their members' patients first and foremost. As WPATH recently admitted, they are "advocacy organizations" for their members. *Boe v. Marshall*, No. 2:22-cv-184-LCB (N.D. Ala.), Doc. 208. And here, there are particular reasons to be skeptical of the three main organizations promulgating "standards" for transitioning treatments: AAP, WPATH, and the Endocrine Society.

## A.    AAP

It would be one thing if AAP's 2018 position statement supporting transitioning treatments truly reflected either the state of the science or its membership's views. Instead, the organization has apparently suppressed its membership's desire for an updated statement accurately reflecting the science. Last year, a resolution "submitted to the AAP's annual leadership forum to inform the academy's 67,000 members about the growing international skepticism of pediatric gender transition" was quashed by "the AAP's leadership," "[e]ven though the resolution was in the top five of interest based on votes by members cast."[37] AAP "decried the resolution

---

[36] Ghorayshi, *More Trans Teens Are Choosing 'Top Surgery,' supra.*

[37] Julia Mason & Leor Sapir, *The American Academy of Pediatrics' Dubious Transgender Science*, WALL ST. JOURNAL (Apr. 17, 2022), https://www.wsj.com/articles/the-american-academy-of-pediatrics-dubious-transgender-science-jack-

as transphobic and noted that only 57 members out of 67,000 had endorsed it," but allowed a motion supporting "affirming" interventions to go through the next week with only 53 members supporting it.[38] As AAP member Dr. Julia Mason concluded, "AAP has stifled debate on how best to treat youth in distress over their bodies, shut down efforts by critics to present better scientific approaches at conferences, used technicalities to suppress resolutions to bring it into line with better-informed European countries, and put its thumb on the scale … in favor of a shoddy but politically correct research agenda."[39]

Other reporting supports Dr. Mason's concerns. The AAP statement endorsing transitioning treatments was "written by a single doctor," who "'conceptualized,' 'drafted,' 'reviewed,' 'revised,' and 'approved' the manuscript himself."[40] "By 2019," the position statement "was eliciting quiet concern among rank-and-file doctors affiliated with the AAP."[41] And as one researcher explained, the few "references that AAP cited as the basis of [its] policy instead outright contradicted that policy,"

---

turban-research-social-contagion-gender-dysphoria-puberty-blockers-uk-11660732791.

[38] *Id.*

[39] *Id.*

[40] Aaron Sibarium, *The Hijacking of Pediatric Medicine*, THE FREE PRESS (Dec. 7, 2022), https://perma.cc/YF6E-9UT8; *see* Jason Rafferty, *Ensuring Comprehensive Care and Support for Transgender and Gender-Diverse Children and Adolescents*, 142(4) PEDIATRICS (2018).

[41] Sibarium, *supra*.

and AAP "left out" "the actual outcomes [of] research on [gender dysphoric] children"—disregarding 10 of the 11 studies on this cohort.[42]

A few months ago, the AAP finally acknowledged that there are no systematic reviews supporting the treatments it for years endorsed and finally promised to conduct an initial review. Even this news is not all good, though. The organization has stated that it will continue to recommend the treatments while awaiting evidence of their safety and efficacy—a move Dr. Gordon Guyatt, the father of evidence-based medicine, noted "puts the cart before the horse."[43]

## B.    WPATH

Things are, if anything, only worse at WPATH. As Dr. Stephen Levine, a psychiatrist who "helped to author the fifth version of the [WPATH] Standards of Care," has testified, "WPATH aspires to be both a scientific organization and an advocacy group for the transgendered," and "[t]hese aspirations sometimes conflict." *Kosilek v. Spencer*, 774 F.3d 63, 78 (1st Cir. 2014). According to Dr. Levine, "[s]kepticism and strong alternative views are not well tolerated" at WPATH and "have been known to be greeted with antipathy." *Id.* (alteration omitted). This and other testimony led the First and Fifth Circuits—and, until recently, the U.S.

---

[42] James M. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, 46 J. Sex & Marital Therapy 307, 307-13 (2019), https://doi.org/10.1080/0092623X.2019.1698481

[43] Azeen Ghorayshi, *Medical Group Backs Youth Gender Treatments, but Calls for Research Review*, N.Y. Times (Aug. 3, 2023), https://perma.cc/N3BJ-TB9J.

Department of Health and Human Services—to find that "the WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate."[44]

Dr. Ken Zucker was one such professional "greeted with antipathy" by activists at WPATH and its U.S. affiliate, USPATH. Zucker is "a psychologist and prominent researcher who directed a gender clinic in Toronto" and headed the committee that developed the American Psychiatric Association's criteria for "gender dysphoria" in the DSM-5.[45] The 2012 WPATH Standards of Care—SOC 7—"cited his work 15 times."[46] In his nearly forty years of research, Zucker discovered "that most young children who came to his clinic stopped identifying as another gender as they got older."[47] Instead, "[m]any of them would go on to come out as gay or lesbian or bisexual, suggesting previous discomfort with their sexuality, or lack of acceptance."[48] Zucker became concerned that socially transitioning children could entrench gender dysphoria that would otherwise resolve.

---

[44] *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019); *see Kosilek*, 774 F.3d at 90; Nondiscrimination in Health and Health Education Programs or Activities, Delegation of Authority, 85 Fed. Reg. 37160, 37198 (June 19, 2020) (warning of "rel[ying] excessively on the conclusions of an advocacy group (WPATH) rather than on independent scientific fact-finding").

[45] Emily Bazelon, *The Battle Over Gender Therapy*, N.Y. TIMES MAGAZINE (June 15, 2022), https://www.nytimes.com/2022/06/15/magazine/gender-therapy.html.

[46] *Id.*

[47] *Id.*

[48] *Id.*

Zucker's position was not popular with activists at WPATH. In 2017, when USPATH hosted its inaugural conference, Zucker submitted research, "his research passed the peer review process," and he was invited to present.[49] When his panel discussion began, though, protestors "used their voices to drown out Zucker's presentation."[50] "That evening, at a meeting with the conference leaders, a group of advocates led by transgender women of color read aloud a statement in which they said the 'entire institution of WPATH' was 'violently exclusionary' because it 're-mains grounded in cis-normativity and trans exclusion.'"[51] "Activists demanded Zucker's symposium be cancelled and for the WPATH Executive Board to provide an explanation and apology for his presence."[52] "Additionally, activists demanded" "that gender transgressive persons" "be given seats on WPATH committees, includ-ing the scientific committees that decide which academic papers are accepted for conferences."[53]

The disruption worked. "Th[e] uprising resulted in the cancellation of Zucker's panels," and "[c]onference organizers and board members publicly

---

[49] Erica Ciszek et al., *Discursive Stickiness: Affective Institutional Texts and Activist Resistance*, 10 PUBLIC RELATIONS INQUIRY, No. 3, pp. 295-310 (2021), at 302.

[50] *Id.*

[51] Bazelon, *supra.*

[52] Ciszek, *supra*, at 302.

[53] *Id*; *see* Videorecording of meeting, https://www.youtube.com/watch?v=rfgG5TaCzsk.

apologized for Zucker's presence at the conference."[54] They also "promised to incorporate transgender women of color into each level of WPATH's organization." *Id.* The public apology ended with the activist protesters on stage, surrounded by "supporters[] and allies" chanting "'Trans Power!'"[55] "After th[e] controversy, other providers were on notice that Zucker's methods were no longer acceptable," and "[h]is approach was likened to conversion therapy."[56]

A few years later, in the fall of 2021, a number of articles by and about three WPATH leaders exposed further fissures in the organization. Dr. Marci Bowers, a world-renowned vaginoplasty specialist who currently serves as president of WPATH; Dr. Erica Anderson, a clinical psychologist and a former president of USPATH; and Dr. Laura Edwards-Leeper, the founding psychologist at the first hospital-based children's gender clinic in the United States, voiced their concern that medical providers in America were transitioning minors without proper gender exploratory psychotherapy and other safeguards.[57]

---

[54] Ciszek, *supra*, at 304.

[55] *Id.*

[56] Bazelon, *supra*.

[57] *See, e.g.*, Abigail Shrier, *Top Trans Doctors Blow the Whistle on "Sloppy" Care*, THE FREE PRESS (Oct. 4, 2021), https://perma.cc/R7M3-XTQ3; Laura Edwards-Leeper & Erica Anderson, *The Mental Health Establishment is Failing Trans Kids*, WASH. POST (Nov. 24, 2021), https://www.washingtonpost.com/outlook/2021/11/24/trans-kids-therapy-psychologist/.

When Anderson, Bowers, and Edwards-Leeper went public with their concerns, they knew their colleagues at WPATH would not welcome the open discussion.[58] As Anderson put it: "[T]his is going to earn me a lot of criticism from some colleagues, but … I'm worried that decisions will be made that will later be regretted by those making them."[59] Bowers lamented: "There are definitely people who are trying to keep out anyone who doesn't absolutely buy the party line that everything should be affirming…."[60] Sure enough, in October, USPATH and WPATH released a joint statement condemning "the use of the lay press … as a forum for the scientific debate" over "the use of pubertal delay and hormone therapy for transgender and gender diverse youth."[61] "In early November, the board of USPATH privately censured Anderson, who served as a board member. In December, the board imposed a 30-day moratorium on speaking to the press for all board members. That month, Anderson resigned."[62]

The following year, WPATH released its updated 8th edition of its Standards of Care. SOC 8 initially retained (some) age requirements for transitioning minors—14 years old for cross-sex hormones (down from 16 in SOC 7), 15 for mastectomies,

---

[58] Shrier, *supra.*
[59] *Id.*
[60] *Id.*
[61] *See* Joint Letter from USPATH and WPATH (Oct. 12, 2022), https://perma.cc/X7ZN-G6FS.
[62] Bazelon, *supra.*

"and vaginoplasty and hysterectomy at 17."[63] Though SOC 8 had been in development for years, WPATH issued a "correction" shortly after publication *removing* the minimum age requirements.[64] Why? According to Dr. Tishelman, lead author of the chapter on children, it was to "bridge th[e] considerations" regarding the need for insurance coverage with the desire to ensure that doctors would not be held legally liable for malpractice if they deviated from the standards.[65] Plus, according to WPATH's president, to "propose" surgeries at defined "younger age[s]" would require "a better political climate."[66]

In addition, as noted above, SOC 8 contains an entire chapter on self-identified "eunuchs" and suggests that castration can be "medically necessary gender-affirming care" for eunuchs."[67] How did WPATH learn that castration constitutes "medically necessary gender-affirming care"? From the Internet of course—specifically from a "large online peer-support community" called the "Eunuch Archive," which WPATH reports hosts "the greatest wealth of information about

---

[63] Lisa Selin Davis, *Kid Gender Guidelines Not Driven by Science*, N.Y. Post (Sept. 29, 2022), https://perma.cc/S3FF-Q66A.

[64] *See Correction*, 23 INT'L J. OF TRANSGENDER HEALTH S259 (2022), https://perma.cc/4342-KFEN. Remarkably, this correction has itself since been removed. *See* https://bit.ly/3qSqC9b.

[65] Videorecording of Dr. Tishelman's WPATH presentation, https://twitter.com/SwipeWright/status/1571999221401948161

[66] Ghorayshi, *More Trans Teens Are Choosing 'Top Surgery,' supra*.

[67] *See* SOC 8, *supra*, at S88.

contemporary eunuch-identified people."[68] WPATH did *not* report that the Archive also hosts thousands of stories that "focus on the eroticization of child castration" and "involve the sadistic sexual abuse of children."[69] These are the Standards of Care the district court held that Florida could not contradict.

## C.    Endocrine Society

Similar concerns have been raised about the Endocrine Society,[70] whose guidelines for treating gender dysphoria the *British Medical Journal* recently exposed as having "serious problems" because—remarkably—the "systematic reviews" the guidelines were based on "didn't look at the effect of the interventions on gender dysphoria itself."[71] Perhaps unsurprisingly, the authorship of the Endocrine Society guidelines was composed almost entirely of WPATH leaders, and WPATH itself is an official co-author.[72]

---

[68] *Id.* at S88.

[69] Genevieve Gluck, *Top Trans Medical Association Collaborated With Castration, Child Abuse Fetishists*, REDUXX (May 17, 2022), https://perma.cc/5DWF-MLRU.

[70] *E.g.*, Roy Eappen & Ian Kingsbury, *The Endocrine Society's Dangerous Transgender Politicization*, WALL ST. JOURNAL (June 28, 2023), https://www.wsj.com/articles/the-endocrine-societys-dangerous-politicization-endocrinologists-gender-affirming-care-arkansas-dac768bd.

[71] Block, *Gender dysphoria in young people is rising*, *supra*.

[72] *See generally* Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons*, 102(11) J. CLINICAL ENDOCRINOLOGY & METABOLISM 3869 (Nov. 2017), https://perma.cc/TYE5-AQB9 (Endocrine Society Guidelines); Aaron Devor, WPATH, *History of the Association*, https://perma.cc/SF7Y-SD3W (last accessed Oct. 13, 2023).

The Endocrine Society knows that plaintiffs in cases like this one bandy about its Guidelines to justify the procedures its members profit from. But the fine print at the end of these Guidelines shows how unauthoritative they are: "The Endocrine Society makes no warranty, express or implied, regarding the guidelines," "nor do they establish a standard of care."[73] One member of the Guidelines authoring committee acknowledged, when not testifying in court against the States, that the Endocrine Society did not even have "some little data"—they "had none"—to justify the language allowing prescription of cross-sex hormones prior to age 16, a change that gave "cover" to doctors to do so.[74]

\* \* \*

These vignettes are necessarily incomplete, and much more could be said. But the point is a simple one: AAP, WPATH, the Endocrine Society, and Plaintiffs' other preferred medical interest groups are not neutral arbiters of science or medical opinion. They are *interest groups*, composed of practitioners whose livelihoods depend on being paid for the treatments at issue. The Court should keep that in mind when reviewing their statements.

## CONCLUSION

The Court should reverse.

---

[73] Endocrine Society Guideline, *supra*, at 3895.

[74] Joshua Safer, *State of the Art: Transgender Hormone Care* (Feb. 15, 2019), https://www.youtube.com/watch?v=m7Xg9gZS_hg (at 5:38-6:18).

Dated: October 13, 2023

Steve Marshall
  *Attorney General*
<u>s/ Edmund G. LaCour Jr.</u>
Edmund G. LaCour Jr.
  *Solicitor General*
A. Barrett Bowdre
  *Principal Deputy Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, AL 36130-0152
(334) 242-7300
Edmund.LaCour@AlabamaAG.gov

Jonathan Skrmetti
  *Attorney General & Reporter*
Steven J. Griffin
  *Senior Counsel for Strategic Litigation
& Assistant Solicitor General*
OFFICE OF THE TENNESSEE
ATTORNEY GENERAL & REPORTER
P.O. Box 20207
Nashville, TN 37202
(615) 253-5642
Steven.Griffin@ag.tn.gov

Respectfully submitted,

Tim Griffin
  *Attorney General*
Nicholas J. Bronni
  *Solicitor General*
Dylan L. Jacobs
  *Deputy Solicitor General*
OFFICE OF THE ARKANSAS ATTORNEY
GENERAL
323 Center Street, Suite 200
Little Rock, AR 72201
(501) 682-6302
Dylan.Jacobs@ArkansasAG.gov

*Additional Counsel for Amici Curiae Listed on Next Page*

30

## ADDITIONAL COUNSEL

CHRIS CARR
Attorney General
State of Georgia

AUSTIN KNUDSEN
Attorney General
State of Montana

RAÚL R. LABRADOR
Attorney General
State of Idaho

MICHAEL T. HILGERS
Attorney General
State of Nebraska

THEODORE E. ROKITA
Attorney General
State of Indiana

ALAN WILSON
Attorney General
State of South Carolina

BRENNA BIRD
Attorney General
State of Iowa

KEN PAXTON
Attorney General
State of Texas

KRIS W. KOBACH
Attorney General
State of Kansas

SEAN REYES
Attorney General
State of Utah

DANIEL CAMERON
Attorney General
Commonwealth of Kentucky

JASON MIYARES
Attorney General
Commonwealth of Virginia

LYNN FITCH
Attorney General
State of Mississippi

PATRICK MORRISEY
Attorney General
State of West Virginia

ANDREW BAILEY
Attorney General
State of Missouri

31

## **CERTIFICATE OF COMPLIANCE**

1.      I certify that this brief complies with the type-volume limitations set forth in Fed. R. App. P. 29(a)(5). This brief contains 6,480 words, including all headings, footnotes, and quotations, and excluding the parts of the response exempted under Fed. R. App. P. 32(f).

2.      In addition, this response complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman font.

Dated: October 13, 2023

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.

**CERTIFICATE OF SERVICE**

I certify that on October 13, 2023, I electronically filed this document using the Court's CM/ECF system, which will serve all counsel of record.

s/ Edmund G. LaCour Jr.
Edmund G. LaCour Jr.
*Counsel for Amici Curiae*