No. 23-12155-J

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

AUGUST DEKKER, et al.,
*Plaintiffs-Appellees*

v.

SECRETARY, FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION, et al.,
*Defendants-Appellants*

On Appeal from the United States District Court
for the Northern District of Florida, No.: 4:22-cv-00325-RH-MAF

## BRIEF FOR AMICI CURIAE AMERICAN COLLEGE OF PEDIATRICIANS IN SUPPORT OF DEFENDANTS-APPELLANTS SEEKING REVERSAL

Ricky L. Polston
Benjamin J. Gibson
Daniel E. Nordby
Alyssa L. Cory
**SHUTTS & BOWEN LLP**
215 S. Monroe St., Ste. 804
Tallahassee, FL 32301
Tel. (850) 241 -1717
*rpolston@shutts.com*
*bgibson@shutts.com*
*dnordby@shutts.com*
*acory@shutts.com*

*Counsel for Amici Curiae*

DEKKER V. AHCA
CASE NO. 23-12155-J

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Per Rule 26.1 and Circuit Rule 26.1, and Eleventh Circuit Rule 26.1-1(a)(3), 26.1-2(b), and 26.1-3, the undersigned counsel certifies that the following listed persons and parties not already included in the CIP contained in the first brief and in any other brief filed have an interest in the outcome of this case:

1. American College of Pediatricians (Amicus Curiae);

2. Cory, Alyssa L. (Counsel for Amicus Curiae);

3. Gibson, Benjamin J. (Counsel for Amicus Curiae);

4. Nordby, Daniel E. (Counsel for Amicus Curiae);

5. Polston, Ricky L. (Counsel for Amicus Curiae).

## CORPORATE DISCLOSURE STATEMENT

*Amicus Curiae* American College of Pediatricians is a non-profit 501(c)(3) organization and has no corporate parent and is not owned in whole or in part by any publicly held corporation.

*/s/ Benjamin J. Gibson*

Counsel for *Amicus Curiae*

## <u>TABLE OF CONTENTS</u>

<u>**Pages**</u>

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
      DISCLOSURE STATEMENT ........................................................... C-1

TABLE OF AUTHORITIES ............................................................... ii

IDENTITY AND INTEREST OF AMICUS CURIAE ............................... 1

ARGUMENT ....................................................................................... 2

I.      REPUTABLE MEDICAL ASSOCIATIONS DO NOT SUPPORT
        TREATMENT OF TRANSGENDER PATIENTS WITH PUBERTY
        BLOCKERS AND CROSS-SEX HORMONES AS A GENERALLY
        ACCEPTED STANDARD OF CARE ............................................... 3

        A. ACPeds is a Reputable Medical Organization that Supports Evidence-
        Based Treatment for Gender Dysphoria ......................................... 3

               1. ACPeds focus on evidence-based guidelines for identifying the
               appropriate treatment recommendations for gender dysphoric
               youth ..................................................................................... 4

               2. The district court relied on treatment recommendations for
               gender dysphoric youth that are not evidence based ..................... 8

        B. Reputable Medical Organizations outside the United States Support
        Evidence-Based Treatment for Gender Dysphoria ........................... 14

CONCLUSION ................................................................................... 17

CERTIFICATE OF COMPLIANCE ..................................................... 18

CERTIFICATE OF SERVICE ............................................................. 18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Eknes-Tucker v. Governor of Alabama,*
    80 F.4th 1205 (11th Cir. 2023) ........................................................... 8, 13

*Gibson v. Collier,*
    920 F.3d 212 (5th Cir. 2019) .................................................................. 9

*Gonzales v. Carhart,*
    550 U.S. 124 (2007) ........................................................................ 13, 14

*Kosilek v. Spencer,*
    774 F.3d 63 (1st Cir. 2014) ...................................................................... 9

*L.W. v. Skrmetti,*
    73 F.4th 408, 418 (6th Cir. 2023) ...................................................... 7, 8

*L.W. v. Skrmetti,*
    Nos. 23-5600, 23-5600, 2023 WL 6321688 (6th Cir. Sept. 28, 2023) ..................... 13

*New York v. Ferber,*
     458 U.S. 747, 756-57(1982) ................................................................. 14

*Otto v. City of Boca Raton,*
    981 F.3d 854 (11th Cir. 2020) ............................................................... 14

*Rush v. Parham,*
    625 F.2d 1150 (5th Cir. 1980) ............................................................... 14

**Statutes**

Fla. Stat. § 409.905............................................................................... 2

Fla. Stat. § 409.902(1) ......................................................................... 2

**Other Authorities**

E. Abbruzzese, et al., *The Myth of "Reliable Research" in Pediatric Gender
    Medicine: A critical evaluation of the Dutch Studies-and research that has
    followed*, Journal of Sex & Marital Therapy (Jan. 2, 2023).......................... 10

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

American College of Pediatricians, *Gender Dysphoria in Children*,
https://acpeds.org/position-statements/gender-dysphoria-in-
children (Nov. 2018). .......................................................................... 4, 5

American College of Pediatricians, https://acpeds.org/about/faq (last
visited Oct. 13, 2023).............................................................................. 5

Jasmine Andersson & Andre Rhoden-Paul, *NHS to close Tavistock child
gender identity clinic*, BBC News (July 28, 2022),
https://www.bbc.com/news/uk-62335665................................................ 16

Kjell Asplund, https://www.transgendertrend.com/wp-
content/uploads/2019/04/SMER-National-Council-for-Medical-
Ethics-directive-March-2019.pdf (Apr. 4, 2019)......................................... 15

Howard Balshem et al., *GRADE guidelines: 3. Rating the quality of evidence*,
64 J. Clinical Epidemiology 401, 404 (2011) .............................................. 10

Emily Bazelon, *The Battle Over Gender Therapy*, New York Times (June 15,
2022), https://www.nytimes.com/2022/06/15/magazine/gender-
therapy.html........................................................................................ 15

Jennifer Block, *Gender dysphoria in young people is rising-and so is professional
disagreement*, BMJ2023;380:p382. doi:10.1136/bmj.p382
pmid:36822640, https://doi.org/10.1136/bmj.p382 (Feb. 23, 2023) ................. 12

Jennifer Block, *US paediatric leaders back gender affirming approach while also
ordering evidence review*,
https://www.bmj.com/content/382/bmj.p1877, BMJ 2023; 382 doi:
https://doi.org/10.1136/bmj.p1877 (Aug. 14, 2023)..................................... 6

James M. Cantor, Transgender and Gender Diverse Children and
Adolescents: Fact-Checking of AAP Policy, Journal of Sex & Marital
Therapy (Dec. 14, 2019), DOI:10.1080/0092623X. 2019.1698481 ....................6-7

Hilary Cass, Independent review of gender identify services for children
and young people: Interim report, The Cass Review (Feb 2022),
https://cass.independent-review.uk/punblications/interim-report/. .................... 16

TABLE OF AUTHORITIES
(continued)

**Page(s)**

Michael Cook, *Australia launches inquiry into safety and ethics of transgender medicine*, BioEdge.org, 18 Aug 2019. https://www.bioedge.org/bioethics/australia-launches-inquiry-into-safety-and-ethics-of-transgender-medicine/13182 (Aug. 12, 2019). ........................ 14

Amanda D'Ambrosio, *AAP Stands by Policy on Gender Affirming Care for Trans Youth-Small group of pediatricians who called for evidence review charge they're being sideliend*, WALL ST. JOURNAL (Aug. 23, 2022)...................................... 6

Sara Dahlen et al., *International Clinical Practice Guidelines for Gender Minority/Trans People: Systematic Review and Quality Assessment*, 11 BMJ Open 1, 8 (2021), https://pubmed.ncbi.nlm.nih.gov/33926984/ .......................... 12

Tine Dommerud, *Want safer treatment for children who want to change sex.- Insufficient knowledge of the risk*, Aftenpften (Mar. 9, 2023), https://tavistockandprotman.nhs.uk/about-us/new/stories/regionalmodel-for-gender-care-announced-for-children-and-young-people/. ........................................................................ 15

Wylie C. Hembree et al*., Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism (2017), https://academic.oup.com/jcem/article/102/11/3869/415755. .......................... 12

Edwards-Leeper & Norman P. Spack, *Psychological Evaluation and Medical Treatment of Transgender Youth in an Interdisciplinary "Gender Management Service"* (GeMS) in a Major Pediatric Center, 59 J. Homosexuality 321, 323 (2012), https://pubmed.ncbi.nlm.nih.gov/22455323/..................................... 11

Robert Withers, *Transgender medicalization and the attempt to evade psychological distress*, The Journal of Analytical Psychology, 65(5), 865–889. https://doi.org/10.1111/1468-5922.12641, (Nov. 2020) ........................................ 13

Royal College of General Practitioners, *Transgender care*, https://www.rcgp.org.uk/-/media/Files/Policy/A-Z-policy/2019/RCGP-position-statement-providing-care-for-gender-transgender-patients-june-2019m, (June 2019). ........................................................ 15

# TABLE OF AUTHORITIES
## (continued)

Page(s)

NHS England, Public Consultation: Interim service specification for
    specialist gender dysphoria services for children and young people,
    (Oct. 20, 2022), https://www.engage.england.nhs.uk/specialised-
    commissioning/gender-dsyphoira-services/useruploads/bl937-ii-
    interim-service-specification-for-specialistgender-dsyphoriaservices-
    for-children-and-young-people-22.pdf. ........................................................ 16

Society for Evidence Based Gender Medicine, https://segm.org/faq
    (last visited Oct. 13, 2023). ......................................................................... 17

Society for Evidence Based Gender Medicine,
    https://segm.org/Finland_deviates_from_WPATH_prioritizing_psy
    chotherapy_no_surgery_for_minors (last visited Oct. 13, 2023). ............................ 17

The Tavistock and Portman NHS Foundation Trust, *Regional model for
    gender care announced for children and young people*, (July 28, 2022),
    https://tavistockandportman.nhs.uk/about-
    us/news/stories/regionalmodel-for-gender-care-announced-for-
    children-and-young-people/. ........................................................................ 16

World Prof'l Ass'n for Transgender Health, *Standards of Care for the Health
    of Transsexual, Transgender, and Gender Nonconforming People* Version 7 13
    (2012), https://www.wpath.org/publications/soc. (last visited Oct.
    13, 2023)..................................................................................................... 11

Allyson Sylaski Wycoff, *AAP reaffirms gender-affirming care policy, authorizes
    systematic review of evidence to guide update*,
    https://publications.aap.org/aapnews/news/25340/AAP-reaffirms-
    gender-affirming-care-policy (Aug. 4, 2023)................................................ 7

## IDENTITY AND INTEREST OF AMICUS CURIAE[1]

*Amicus curiae* The American College of Pediatricians ("ACPeds") is a national medical professional organization that represents pediatricians and other health care professionals dedicated to the health and well-being of children. ACPeds' Board of Directors includes board-certified pediatricians, pediatric sub-specialists, internal medicine-pediatric specialists, and family practice physicians, with the vast majority of its membership comprising of board-certified pediatricians in active practice.

Formed in 2002, ACPeds seeks to produce evidence-based policy recommendations and advocate for laws that are based on best available research—without influence from political or societal opinion. ACPeds has an interest in protecting the health and well-being of children, and is concerned about the use of puberty blockers and cross-sex hormones as the standard of care for treatment of children with gender dysphoria.

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than amicus and its counsel made any monetary contribution intended to fund the preparation or submission of this brief. *See* Fed. R. App. P. 29(a)(4)(E). All counsel were timely notified of this brief and consented to its filing. *See* Fed. R. App. P. 29(a)(2).

## ARGUMENT

Plaintiffs ask this Court to hold that the treatment of gender dysphoric patients with GnRH agonists ("puberty blockers") and cross-sex hormones is consistent with established "standards of care" for gender dysphoria, and, as such, "there is no rational basis for a state to categorically ban these treatments or to exclude them from the state's Medicaid coverage." DE 246 at 21. Florida's Agency for Health Care Administration ("AHCA") is designated as the single state agency responsible for administration of the State's Medicaid program. Fla. Stat. § 409.902(1). In Florida, Medicaid coverage is limited to services that are "medically necessary," and does not extend to services that are "clinically unproven, experimental, or for purely cosmetic purposes." Fla. Stat. § 409.905. For beneficiaries under age 21, Medicaid coverage extends to "all services determined by [AHCA] to be medically necessary for the treatment, correction or amelioration of" any "physical and mental problems and conditions." Fla. Stat. § 409.905(2).

Because viewpoints from reputable medical organizations highlight the lack of evidence to support the treatment of gender dysphoric youth with puberty blockers and cross-sex hormones as an established standard of care, ACPeds supports Florida's request that this Court reverse the ruling below and uphold the State's limitations on Medicaid coverage.

I.    **REPUTABLE MEDICAL ASSOCIATIONS DO NOT SUPPORT TREATMENT OF TRANSGENDER PATIENTS WITH PUBERTY BLOCKERS AND CROSS-SEX HORMONES AS A GENERALLY ACCEPTED STANDARD OF CARE**

In concluding the "[o]verwhelming weight of medical authority supports treatment of transgender patients with puberty blockers and cross-sex hormones in appropriate circumstances," the district court explained that "not a single reputable medical association has taken a contrary position." DE 246 at 18-19. But AHCA and the Florida Legislature's decision to deny Medicaid coverage for puberty blockers and cross-sex hormones under these circumstances reflects the need for research-backed evidence to support treatment as a medically necessary service. The gender-transition procedures outlined as "standards of care" by the district court are not in line with evidence-based care for gender dysphoric youth.

A.    **ACPeds is a Reputable Medical Organization that Supports Evidence-Based Treatment for Gender Dysphoria**

ACPeds is a scientific medical association of healthcare professionals that advocates for policies that promote the optimal health and well-being of children. Formed in 2002, ACPeds is a growing medical association of more than 600 physicians and other healthcare professionals from across the nation. ACPeds currently has members in 46 states and five foreign nations. Indeed, more than 70% of ACPeds' members are board-certified pediatricians in active practice.

It is also worth noting that ACPeds is not a religious or political organization.

Nor does ACPeds ask about or use an individual's religious[2] or political identification as a criterion for membership. Although the district court emphasized that "[d]og whistles ought not be tolerated" (DE 246 at 5), ACPeds and its physician members are committed to compassionately caring for all children regardless of their family structure, race, ethnicity, religion, ideology, sexual attractions, and gender identity.

### 1. ACPeds focuses on evidence-based guidelines for identifying the appropriate treatment recommendations for gender dysphoric youth.

As an association, ACPeds seeks to enable children to reach their optimal physical and emotional health and well-being. To further this end, ACPeds produces position and policy statements, based on the best available research, on matters unique to the child and the family. ACPeds' position statements assist parents, policymakers, legislators, and society in advocating what is best for children, adolescents, and their families. For example, ACPeds currently has position statements in areas of life matters, parenting, marriage and family matters, sexuality issues of youth, adolescence, immunization and medical practice. Specific to gender dysphoria, ACPeds published a position statement in August 2016, updated in November 2018, that addressed the lack of evidence to support treatment of children with gender dysphoria with puberty blockers and cross-sex hormones.[3] The position statement additionally addressed the

---

[2] Even so, viewpoints of physicians holding religious values should not be inherently discredited.

[3] American College of Pediatricians, *Gender Dysphoria in Children*, https://acpeds.org/position-statements/gender-dysphoria-in-children (Nov. 2018).

risks associated with a treatment protocol that includes puberty blockers and cross-sex hormones in children.[4]

ACPeds has a defined process for producing policy statements to provide evidence and comment on issues concerning the health and well-being of children. First, a lead author produces a draft that is evaluated by a small committee, the ACPeds Scientific Policy Committee, followed by a review of the Board of Directors. Proposed policies that are supported by a large super-majority (75%) of the Board of Directors are then passed and published. ACPeds then sends its draft policies to every Fellow member of the organization—first for suggested edits, and then for a vote.[5] If more than 25% of the ACPeds membership disapproves of the statement, it is not published.

This evidence-based policy formation method is distinguishable from the production of policy statements from the American Academy of Pediatrics ("AAP").[6] The AAP's process for producing a policy recommendation ends at the small committee review, with at most 30-35 pediatricians producing a policy that supposedly speaks for the organization's 60,000 members. As a result, none of the other thousands of members have any input on (and may not even support) a policy statement made on

---

[4] *Id.*

[5] American College of Pediatricians, https://acpeds.org/about/faq (last visited Oct. 13, 2023).

[6] The district court pointed to the AAP as an organization that supports treatment of gender dysphoric youth with puberty blockers and cross-sex hormones for gender dysphoria. DE 246 at 18.

behalf of AAP. The discord from AAP's own membership on the lack of evidence-based medicine to support its policies and recommendations is evidenced by the fact that, for two years in a row, AAP members have submitted a formal resolution to the AAP executive board seeking a commitment to evidence-based medicine as the basis for its recommendations.[7]

The district court's reliance on the views of organizations who themselves rely on unsettled expert opinion to drive policy recommendations, at the cost of clinical trials and evidence-based science, is misplaced—especially when defining standards of care for gender dysphoric youth. Indeed, the AAP has been criticized for policies that promote treatment whose outcomes lack the certainty afforded by a systemic review of evidence. For example, Dr. James Cantor, a University of Toronto gender identity psychologist, reviewed AAP's 2018 policy, and largely discredited the policy findings, describing the AAP's approach as "a systematic exclusion and misrepresentation of entire literatures."[8] Dr. Cantor explained that the AAP misrepresented references that actually contradicted its recommended transition policy and, instead, advised watchful

---

[7] Jennifer Block, *US paediatric leaders back gender affirming approach while also ordering evidence review*, https://www.bmj.com/content/382/bmj.p1877, BMJ 2023; 382 doi: https://doi.org/10.1136/bmj.p1877 (Aug. 14, 2023); Amanda D'Ambrosio, *AAP Stands by Policy on Gender Affirming Care for Trans Youth-Small group of pediatricians who called for evidence review charge they're being sideliend*, WALL ST. JOURNAL (Aug. 23, 2022).

[8] James M. Cantor, *Transgender and Gender Diverse Children and Adolescents: Fact-Checking of AAP Policy*, Journal of Sex & Marital Therapy (Dec. 14, 2019), DOI:10.1080/0092623X. 2019.1698481

waiting.[9] The AAP's recent reaffirmance of its pro-transition policy supporting the gender affirming model of care came with the caveat that the AAP would commission a systemic review of the evidence and "develop an expanded set of guidance" on medical treatment in minors.[10] Thus, even though ACPeds has a smaller overall membership than other medical associations referred to by the district court, far more pediatricians have input into the ACPeds' policy/position statements as compared with the AAP. The district court placed disproportionate reliance on the AAP's current pro-transition policy as establishing the applicable standard of care.

The lack of evidence to support treatment of gender dysphoric youth with puberty blockers and cross-sex hormones is also highlighted by the lack of FDA approval of these products for the treatment of gender dysphoria. The district court excused the lack of FDA approval, pointing to off-label use as commonplace. *See* DE 246 at 49-50. But the lack of FDA approval cannot appropriately be ignored when evaluating the experimental nature of these treatment guidelines.

In permitting Tennessee's prohibition on hormone replacement treatment for gender dysphoria in minors to go into effect, the Sixth Circuit, in *L.W. v. Skrmetti*, addressed the off-label use of FDA-approved drugs in gender-affirming treatment. 73

---

[9] *Id.*

[10] Allyson Sylaski Wycoff, *AAP reaffirms gender-affirming care policy, authorizes systematic review of evidence to guide update*, https://publications.aap.org/aapnews/news/25340/AAP-reaffirms-gender-affirming-care-policy (Aug. 4, 2023).

F.4th 408, 418 (6th Cir. 2023). The Sixth Circuit reasoned that "it is difficult to maintain that the medical community is of one mind about the use of hormone therapy for gender dysphoria when the FDA is not prepared to put its credibility and careful testing protocols behind the use." *Id.* In concluding that support from the medical community for hormone treatment for gender dysphoria is "not dispositive," the Sixth Circuit explained "the medical and regulatory authorities are not of one mind about using hormone therapy to treat gender dysphoria. Else, the FDA would by now have approved the use of these drugs for these purposes." *Id.* at 416; *see also Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1234 (11th Cir. 2023) (Brasher, J. concurring opinion) ("[T]he record reflects that other countries are regulating the drugs differently for these purposes, and the FDA has not approved them for this purpose although it has for others.").

Given the lack of quality evidence on the safety and effectiveness of using puberty blockers and cross-sex hormones for treatment of gender dysphoric youth—highlighted by the lack of FDA approval—a rational basis certainly exists for the State to refuse Medicaid coverage for this treatment.

### 2. The district court relied on treatment recommendations for gender dysphoric youth that are not evidence based.

Gender transition procedures are not the "standard of care" for gender dysphoria, and there is no consensus within the medical profession regarding a standard of care for gender dysphoria. Rejecting AHCA's concerns about the unproven and

irreversible medical intervention that results from the use of puberty blockers and cross-sex hormones, the district court placed value on the organizations who have formally recognized that treatment of gender dysphoric patients with puberty blockers and cross-sex hormones is an appropriate standard of care. DE 246 at 18-19. But the district court's reliance on "well-established standards of care for treatment of gender dysphoria" (DE 246 at 16) derive from non-scientific, non-medical advocacy organizations—the Endocrine Society and the World Professional Association for Transgender Health ("WPATH").

The Fifth Circuit has recognized that "the WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate over sex reassignment surgery." *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019). And the First Circuit has explained that "[p]rudent medical professionals . . . do reasonably differ in their opinions regarding [WPATH's] requirements. *Kosilek v. Spencer*, 774 F.3d 63, 88 (1st Cir. 2014). According to Dr. Stephen Levine, who helped author the fifth version of the WPATH Standards of Care, in drafting these standards of care "WPATH aspires to be both a scientific organization and an advocacy group for the transgendered" noting the inherent limitations of the applicability of the Standards of Care are due to "the lack of rigorous research in the field." *Id.* at 78. Given the self-described purpose of these organizations, the treatment recommendations adopted by the Endocrine Society and WPATH cannot be viewed as representing an uncontested scientific and medical consensus on the correct treatment recommendations for gender dysphoria.

The practice of performing gender transitions on youth through treatment involving puberty blockers and/or cross-sex hormones are components of "the Dutch Protocol," premised on two studies originating in the Netherlands.[11] But, recent research on the Dutch Protocol highlights that those studies are "methodologically flawed."[12] Through systemic review of the evidence, the growing view is that the practice of gender transition in youth is based on "low to very low quality evidence."[13]

Indeed, the district court recognized the GRADE method, a widely accepted method for rating available medical evidence, identified "low" or "very low" quality evidence supporting treatment in the manner it identified as the controlling "standard of care" for gender dysphoria. *See* DE 246 at 38-41. In the GRADE method, low-quality evidence means the "true effect may be substantially different from the estimate" and very-low quality evidence means the "true effect is likely to be substantially different form the estimate."[14]

The treatment guidelines the district court approved as "generally accepted" contain no comprehensive literature review and are not evidence based, relying on the

---

[11] *See* E. Abbruzzese, et al., *The Myth of "Reliable Research" in Pediatric Gender Medicine: A critical evaluation of the Dutch Studies-and research that has followed*, Journal of Sex & Marital Therapy (Jan. 2, 2023).

[12] *Id.*

[13] *Id.*

[14] Howard Balshem et al., *GRADE guidelines: 3. Rating the quality of evidence*, 64 J. Clinical Epidemiology 401, 404 (2011).

discredited Dutch studies as support for their recommendations.[15] No professional medical organization recommended medically treating gender dysphoric youth until 2009.[16] And it was not until 2012 that the WPATH Standards of Care removed age restrictions for medical and surgical interventions.[17] Yet, in 2012, even WPATH noted that adoption of medical treatment for gender dysphoric youth "differs among countries and centers. Not all clinics offer puberty suppression. . . . The percentages of treated adolescents are likely influenced by the organization of heath care, insurance aspects, cultural differences, opinions of heath professionals, and diagnostic procedures offered in different settings."[18] The 2017 Endocrine Society guidelines—the first from a medical organization—include a disclaimer that "[t]he guidelines cannot guarantee

---

[15] *See* World Prof'l Ass'n for Transgender Health, Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People Version 7 13 (2012), https://www.wpath.org/publications/soc. (last visited Oct. 13, 2023).

[16] Edwards-Leeper & Norman P. Spack, *Psychological Evaluation and Medical Treatment of Transgender Youth in an Interdisciplinary "Gender Management Service"* (GeMS) in a Major Pediatric Center, 59 J. Homosexuality 321, 323 (2012), https://pubmed.ncbi.nlm.nih.gov/22455323/.

[17] *Compare* Standards of Care for Gender Identity Disorders 10 (6th ed. 2001) (setting threshold of "as early as age 16"), *with* Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People 20 (7th ed. 2012) (removing age limit).

[18] World Prof'l Ass'n for Transgender Health, *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* Version 7 13 (2012), https://www.wpath.org/publications/soc. (last visited Oct. 13, 2023).

any specific outcome; nor do they establish a standard of care."[19]

Moreover, a 2021 first of-its-kind "systemic review and quality assessment" of international clinical practice guidelines published in the British Medical journal identified that the medical guidelines written by the Endocrine Society and WPATH fail to meet the standard for clinical practice guidelines.[20] The 2021 BMJ review gave the Endocrine Society Clinical Practice Guidelines for the Treatment of Gender Dysphoria guidelines a quality score of *one out of six*. Similarly, the WPATH Standards of Care, version 7 was rated with a quality score of *zero out of six*. Indeed, "trustworthy guidelines" follow systemic reviews, not the other way around.[21]

Ultimately these "standards of care" promote extreme interventions that serve as a permanent "cure" for an oftentimes temporary condition. There are no long-term studies demonstrating the safety or efficacy of puberty blockers or cross-sex hormones for gender dysphoric youth, and Plaintiffs-Appellees have not established otherwise. Meanwhile, decades of studies confirm that a diagnosis of gender dysphoria carries with

---

[19] Wylie C. Hembree et al*., Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clinical Endocrinology & Metabolism (2017), https://academic.oup.com/jcem/article/102/11/3869/415755.

[20] Sara Dahlen et al., *International Clinical Practice Guidelines for Gender Minority/Trans People: Systematic Review and Quality Assessment*, 11 BMJ Open 1, 8 (2021), https://pubmed.ncbi.nlm.nih.gov/33926984/ (describing an overall "paucity" of "high quality" clinical guidance pertaining to gender dysphoria and transitioning treatments).

[21] Jennifer Block, *Gender dysphoria in young people is rising-and so is professional disagreement*, BMJ2023;380:p382.          doi:10.1136/bmj.p382          pmid:36822640, https://doi.org/10.1136/bmj.p382 (Feb. 23, 2023).

it the overwhelming likelihood of underlying mental health problems that predate the onset of gender dysphoria.[22] There is thus, at minimum, a call for mental health intervention, not blanket "gender-affirming" intervention without appropriate evidence-based support.

The Sixth Circuit in *L.W. v. Skrmetti* examined the development over the last few decades of treatment guidelines, through standards of care, for gender dysphoria. Nos. 23-5600, 23-5600, 2023 WL 6321688, *1-2 (6th Cir. Sept. 28, 2023). In supporting an exercise of regulatory caution in approaching gender dysphoria treatments, the Sixth Circuit identified "the shifting standards of care over the last two decades" and the fact that "these drug treatments come with 'both risks and benefits.' " *Id.* at *10. Likewise, this Court in *Eknes-Tucker v. Governor of Alabama*, referred to the WPATH Standards of Care to explain that "the earliest-recorded uses of puberty blocking medication and cross-sex hormone treatment for purposes of treating the discordance between an individual's biological sex and sense of gender identity did not occur until well into the twentieth century." 80 F.4th 1205, 1220-21 (11th Cir. 2023).

States play a "significant role to play in regulating the medical profession." *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007). Consequently, because of the ever-evolving nature of the appropriate use of gender affirming interventions as treatment for gender

---

[22] Robert Withers, *Transgender medicalization and the attempt to evade psychological distress*, The Journal of Analytical Psychology, 65(5), 865–889. https://doi.org/10.1111/1468-5922.12641, (Nov. 2020) ("[T]rans-identification and its associated medical treatment can constitute an attempt to evade experiences of psychological distress.").

dysphoria, deference should be given to legislators in safeguarding children from experimental drugs. *See Gonzales*, 550 U.S. at 163 (Courts give "state and federal legislatures wide discretion to pass legislation in areas where there is medical and scientific uncertainty."); *see also Otto v. City of Boca Raton*, 981 F.3d 854, 868 (11th Cir. 2020) (quoting *New York v. Ferber*, 458 U.S. 747, 756-57(1982) ("It is indisputable 'that a State's interest in safeguarding the physical and psychological well-being of a minor is compelling.' "). The consensus among experts is that more studies are needed to determine the appropriate treatment method. As such, Florida's evidence-based determination based on current medical knowledge that these treatments are experimental is reasonable. *Rush v. Parham*, 625 F.2d 1150 (5th Cir. 1980).

### B. Reputable Medical Organizations outside the United States Support Evidence-Based Treatment for Gender Dysphoria

ACPeds is not the only medical organization to support evidence-based treatment for gender dysphoria. Medical organizations around the world, including the Australian College of Physicians,[23] the Royal College of General Practitioners in the

---

[23] Michael Cook, *Australia launches inquiry into safety and ethics of transgender medicine*, BioEdge.org, 18 Aug 2019. https://www.bioedge.org/bioethics/australia-launches-inquiry-into-safety-and-ethics-of-transgender-medicine/13182 (Aug. 12, 2019).

United Kingdom,[24] and the Swedish National Council for Medical Ethics,[25] have characterized transgender interventions for children as experimental and dangerous.

And this caution is supported by the course correction of medical institutions of the UK, Sweden, Finland, Norway, and France that have rejected gender transition in favor of emphasizing extended mental health evaluation and support. The existing systemic reviews of the evidence have prompted countries (including the UK, Finland, and Sweden) to prioritize psychotherapy for the treatment of gender dysphoria in minors and to restrict the use of puberty blockers to clinical trials. Public health authorities from Finland, Sweden, England, and Norway are pulling back from WPATH's treatment recommendations, drastically restricting the availability of gender transition drugs to minors.[26]

Some of these countries have also concluded that the experimental treatment affirmed by the WPATH guidelines is inconclusive in its results. For example, England's

---

[24] Royal College of General Practitioners, *Transgender care*, https://www.rcgp.org.uk/-/media/Files/Policy/A-Z-policy/2019/RCGP-position-statement-providing-care-for-gender-transgender-patients-june-2019m, (June 2019).

[25] Kjell Asplund, https://www.transgendertrend.com/wp-content/uploads/2019/04/SMER-National-Council-for-Medical-Ethics-directive-March-2019.pdf (Apr. 4, 2019).

[26] Emily Bazelon, *The Battle Over Gender Therapy*, New York Times (June 15, 2022), https://www.nytimes.com/2022/06/15/magazine/gender-therapy.html; *see also* Tine Dommerud, *Want safer treatment for children who want to change sex.-Insufficient knowledge of the risk*, Aftenpften (Mar. 9, 2023), https://tavistockandprotman.nhs.uk/about-us/new/stories/regionalmodel-for-gender-care-announced-for-children-and-young-people/.

National Health Service ("NHS") recently closed the world's largest pediatric gender clinic, shifting to placement of gender-distressed youth in established clinical settings with a focus on psychological treatment.[27] NHS also published draft guidance based on a report by Dr. Hilary Cass, the former president of the Royal College of Pediatrics and Child Health.[28] Dr. Cass's report identified issues with the "affirmative" model, which "originated in the USA" and was "at odds with the standard process of clinical assessment and diagnosis" that those at the now-discontinued clinic were trained to use in clinical encounters.[29] Dr. Cass's report called for lengthy mental-health assessments before prescribing drugs.[30]

The Society for Evidence Based Gender Medicine is an international nonprofit group of over 100 clinicians and researchers representing a range of clinical disciplines whose mission is to promote safe, compassionate, ethical, and evidence-informed

---

[27] *See* Jasmine Andersson & Andre Rhoden-Paul, *NHS to close Tavistock child gender identity clinic*, BBC News (July 28, 2022), https://www.bbc.com/news/uk-62335665; The Tavistock and Portman NHS Foundation Trust, *Regional model for gender care announced for children and young people*, (July 28, 2022), https://tavistockandportman.nhs.uk/about-us/news/stories/regionalmodel-for-gender-care-announced-for-children-and-young-people/.

[28] Hilary Cass, *Independent review of gender identify services for children and young people: Interim report*, The Cass Review (Feb 2022), https://cass.independent-review.uk/punblications/interim-report/.

[29] *Id.*

[30] NHS England, *Public Consultation: Interim service specification for specialist gender dysphoria services for children and young people*, (Oct. 20, 2022), https://www.engage.england.nhs.uk/specialised-commissioning/gender-dysphoira-services/useruploads/bl937-ii-interim-service-specification-for-specalistgender-dsyphoriaservices-for-children-and-young-people-22.pdf.

health care for children, adolescents, and young adults with gender dysphoria.[31] The Society notes two areas for concern surrounding reliance on the WPATH guidelines: 1) the very-low quality of evidence to support the guidelines, as recognized by the guidelines themselves; and 2) the divergence of support from healthcare systems from WPATH recommendations.[32]

As outlined above, ACPeds and other reputable medical organizations both in the United States and abroad have adopted reasonable evidence-based positions contrary to the district court's conclusions regarding the supposed consensus behind the use of puberty-blockers and cross-sex hormones for the treatment of gender-dysphoric youth.

## CONCLUSION

This Court should reverse.

Respectfully Submitted,

By: */s/Benjamin J. Gibson*
Ricky L. Polston
Florida Bar No. 648906
*rpolston@shutts.com*
Benjamin J. Gibson
Florida Bar No. 58661
*bgibson@shutts.com*
Daniel E. Nordby

---

[31] Society for Evidence Based Gender Medicine, https://segm.org/faq (last visited Oct. 13, 2023).

[32] *Id.*; Society for Evidence Based Gender Medicine, https://segm.org/Finland_deviates_from_WPATH_prioritizing_psychotherapy_no_surgery_for_minors (last visited Oct. 13, 2023).

Florida Bar No. 14588
*dnordby@shutts.com*
Alyssa L. Cory
Florida Bar No. 118150
*acory@shutts.com*

**SHUTTS & BOWEN LLP**
*Counsel for Amicus Curiae*
215 S. Monroe St., Ste. 804
Tallahassee, FL 32301
Tel. (850) 241 -1717

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations set forth in Rule 29(a)(5) of the Federal Rules of Appellate Procedure. This brief contains 3,797 words, excluding the parts of the brief exempted by 11th Cir. R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief was prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Garamond font.

*/s/ Benjamin J. Gibson*

## CERTIFICATE OF SERVICE

I certify that on October 13, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, who will automatically serve a copy to all counsel of record.

*/s/ Benjamin J. Gibson*