No. 23-12155

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

AUGUST DEKKER, *ET AL.*,

PLAINTIFFS-APPELLANTS,

v.

SECRETARY, FLORIDA AGENCY FOR HEALTH CARE
ADMINISTRATION *ET AL.*,

DEFENDANTS-APPELLEES.

On Appeal from the United States District Court
for the Northern District of Florida,

Case No. 4:22-cv-325 (Hinkle, J.)

## BRIEF OF *AMICI CURIAE* WALT HEYER,
## TED HALLEY, AND CLIFTON FRANCIS BURLEIGH, JR.,
## IN SUPPORT OF DEFENDANTS-APPELLANTS
## AND REVERSAL

ERIC N. KNIFFIN
ETHICS & PUBLIC POLICY CENTER
1730 M Street, N.W.
 Suite 910
Washington, DC 20036
(202) 682-1200
ekniffin@eppc.org

*Counsel for* Amici Curiae

October 13, 2023

**23-12155 – August Dekker, et al., v. Secretary, Florida Agency for Health Care Administration et al.**

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Eleventh Circuit Rule 25.1, undersigned counsel certifies that the following listed persons and parties not already listed in the CIP contained in the Defendants-Appellants' initial brief and in any other brief filed have an interest in the outcome of this case:

1.  Walt Heyer, *amicus curiae*;

2.  Ted Halley, *amicus curiae*;

3.  Clifton Francis Burliegh, Jr., *amicus curiae*; and

4.  Eric Nieuwenhuis Kniffin, counsel for *amici curiae.*

Dated: October 13, 2023

> s/ Eric N. Kniffin
> Eric N. Kniffin
> *Counsel for* Amici Curiae

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................ 1

STATEMENT OF INTEREST OF *AMICI CURIAE* ............................... 3

INTRODUCTION AND SUMMARY OF ARGUMENT ........................... 5

ARGUMENT ...................................................................................... 9

    I.  *Amici* learned the hard way that "gender-affirming care" was not the best treatment for their dysphoria............................ 9

        A.  Walt Heyer ...................................................................... 10

        B.  Ted Halley .......................................................................13

        C.  Billy Burleigh....................................................................16

    II. *Amici's* testimony puts the Plaintiffs-Appellees' claims in context.................................................................................20

        A.  *Amici* have the benefit of life experience and perspective.....21

        B.  *Amici* show that short-term satisfaction with gender transition is not conclusive. ...................................................23

        C.  *Amici* demonstrates that there are permanent consequences to forgoing *and* to undertaking gender transition interventions. .........................................................................26

CONCLUSION ...................................................................................28

CERTIFICATE OF COMPLIANCE.......................................................29

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

*Amici* Walt Heyer, Ted Halley, and Billy Burleigh are biological males that are like the Plaintiffs-Appellees in many ways. Each suffered from an early age deep confusion and distress regarding his gender identity. Each was convinced by licensed healthcare professionals that "gender-transition" interventions would resolve his dysphoria and permit him to live a healthy, well-adjusted life. At some point in each of their lives, Walt, Ted, and Billy would likely have been right alongside Plaintiffs-Appellees, fighting anything that might get in the way of his pursuit of hormonal therapies and radical surgeries he thought would bring him the happiness and peace he had long sought.

Where *Amici* differ from Plaintiffs-Appellees is that they have gone through the gender transition process and come out the other side. They had hormone therapy. They endured cosmetic surgeries to make them look more like women. They let doctors amputate their male reproductive organs. They transitioned socially and for years presented themselves as

---

[1] All parties received timely notice to the filing of this brief and have given their consent. No party's counsel authored any part of this brief and no person other than *amici* made a monetary contribution to fund its preparation or submission.

though they were females. And they found that transitioning did not make them happy. It did not solve their confusion and depression; in fact, transitioning made it worse.

*Amici* are interested in this case because they believe that the challenged Florida rule is good policy. They believe the rule looks out for the best interests of vulnerable people suffering from gender dysphoria. *Amici* hope that through sharing their painful journeys the Court will better understand the issues at stake in this case. *Amici* hope the challenged Florida rule is upheld. It is too late for them, but *Amici* hope that this policy will help others confused about their gender identity pause and reconsider before they make the same irreversible and life-altering harmful mistakes that they did.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs-Appellees claim the verdict is in. They claim that the medical establishment knows so much about gender dysphoria and how to treat it that anyone who stands in the way—as the Florida Agency for Health Care Administration and its Secretary did in adopting Rule 59G-1.050(7) (the "Florida rule")—must have bad (indeed, they allege unconstitutional and illegal) motives.

In their briefing below, Plaintiffs-Appellees make strong claims about this alleged consensus. They assert that one's "[g]ender identity is innate, immutable, . . . and cannot be altered." Docket Entry ("DE") 11 at 5. They claim the best way "to eliminate the distress of gender dysphoria" is by taking steps to "align[] a person's body and presentation with their gender identity." *Id*. at 7. They claim that "gender-affirming care," which includes puberty blockers, cross-sex hormones, and "sex reassignment surgeries," is "medically necessary." *Id*. at 9. They say that treating gender dysphoria with "gender-affirming care" is the "opposite" of "experimental." *Id*. at 26. They claim that failure to treat gender dysphoria this way leads to "serious" consequences, "including irreversible and harmful physical changes and irreparable mental harm,"

5

leading to "higher levels of stigmatization, discrimination, and victimization." *Id*.

Plaintiffs-Appellees claim that because these "facts" are so well established, the Florida rule "cannot even withstand deferential 'rational basis' review." *Id*. at 28. They ask the Court to conclude that the Florida rule reflects a "bare desire to harm a politically unpopular group," namely people who identify as transgender. *Id*. at 20. Plaintiffs-Appellees say the Court should conclude that Defendants-Appellants passed the rule "with the intent of discriminating against transgender beneficiaries." *Id*. at 35. The Florida rule, they claim, "sends to transgender people a discriminatory message: That they are not worthy of protection and their health care needs may be disregarded." *Id*. at 34.

*Amici* Walt Heyer, Ted Halley, and Billy Burleigh recognize that the Defendants-Appellants and other amicus have already provided the Court with ample legal and medical evidence to grant summary judgment in the Defendants-Appellants' favor. But *amici* submit this brief to offer their perspective as individuals who formerly identified as transgender and underwent medicalized transition. Their stories are heartbreaking, inspiring, and hopeful. *Amici* are testaments to strength

of the human spirit, the ability to grow and forgive, and the ability to thrive despite deep scars—both emotional and, due to the "treatment" they received, physical.

This brief highlights *Amici*'s hard-fought wisdom, shows how their perspective contrasts with that of the Plaintiffs-Appellees, and explains why *Amici*'s testimony is relevant to the key questions before the Court on Defendants-Appellants' motion for summary judgment.

Part I of this brief summarizes *Amici*'s personal stories. Walt, Ted, and Billy learned the hard way that "gender affirming care" is not the solution for everyone diagnosed with gender dysphoria. Cross-sex hormones and invasive surgeries did not make them happier; they only made things worse. The medical interventions they were talked into left them emotionally and physically scarred and delayed them from seeking out the psychological help they really needed.

Part II illustrates how *Amici*'s personal stories undercut Plaintiffs-Appellees' central claim that the Florida rule discriminates against and was motivated by animus toward transgender people. First, *Amici* have more life experience than Plaintiffs-Appellees. *Amici* recall that they too were once convinced that gender transition was their path toward

healing and happiness. But eventually Walt, Ted, and Billy each came to see his gender transition as a dead end. *Amici* recognize that safeguards like the Florida rule could have saved them a lot of pain and heartache. That is why *Amici* are hopeful that the rule will help those who experience gender dysphoria or identify as transgender pause and explore other options before fully committing to a gender transition.

Second, *Amici*'s stories show that short-term happiness after a gender transition does not always last. Their perspective can help the Court understand why the Plaintiffs-Appellees' testimony and other studies that measure short-term happiness after gender transition interventions are not the best measure of whether the Florida rule works against transgender-identifying persons' best interests.

Third, though Plaintiffs-Appellees have stressed that an inability to pay for "medically necessary" hormonal and surgical procedures would lead to "irreversible and harmful physical changes and irreparable mental harm," DE 11 at 9, *Amici* offer a potent reminder of the irreversible effects of gender transition interventions.

**ARGUMENT**

### I. *Amici* learned the hard way that "gender-affirming care" was not the best treatment for their dysphoria.

*Amici* are sympathetic with the Plaintiffs-Appellees' personal testimonies. Their declarations sound much like where each of the *Amici* were at one point: they were confused, depressed, and desperate, and were excited when doctors they trusted told them that a gender transition was the silver bullet solution to their dysphoria.

But after years of fully committing to their gender transitions, Walt, Ted, and Billy came to see that gender transition interventions were not the answer to their problems. Thankfully, they found others who gave them different advice. Walt, Ted, and Billy worked through their childhood trauma and their gender dysphoria resolved, and today they are today happier and healthier than they ever were when they were presenting as women.

All the same, *Amici* regret that healthcare professionals were able to push them down the wrong and harmful path so easily. They are enthusiastically in favor of the Florida rule. Unlike Plaintiffs-Appellees, they believe that the cautious approach Florida has chosen is a better

way to care for the best interest of people suffering from gender dysphoria.[2]

### A.    Walt Heyer

Walt Heyer wanted to be a girl from the age of four. He participated in lots of typical boy activities growing up, but he was cross-dressing in secret. As an adult he fell in love and got engaged. Walt worked up the courage to share his secret with his fiancée. Fortunately, Walt's fiancée was undaunted; they got married in 1962. By 1968 Walt and his wife had two children and his career was going well; but he was unhappy. The desire to be a girl never went away, not for a single day.

When Walt was in his thirties, he started frequenting cross-dressing bars in San Francisco, where he learned about a doctor that gave people like him cross-sex hormones. Walt connected with a leading expert on gender identity disorder, who gave him a positive diagnosis and encouraged him to pursue cross-sex hormones. After two years on cross-sex hormones, Walt's doctor convinced him to let a surgeon remove his

---

[2] The testimony that follows is based on declarations from each of the *amici* that are in undersigned counsel's possession and available upon request.

testicles and invert his penis into a pouch. Walt changed his legal name to "Laura" and lived as a woman for eight years.

Walt was happy with the gender transition at first, but as the years passed, his dysphoria reemerged. He was more confused than ever, depressed, and suicidal. He sought help from healthcare professionals, but though professionals had pushed him into cross-sex hormones and radical surgery, he was now advised that he needed to "give it time"; he was told that "adapting to being 'Laura'" would take more time, even years.

Fortunately, another psychiatrist Walt met through work pulled him aside and asked Walt some questions about his childhood. That psychiatrist helped Walt understand that he needed to work through issues from his childhood that had sparked his gender identity issues.

Through psychotherapy Walt was diagnosed with dissociative disorder, which had likely come about through the trauma of Walt's grandmother dressing him up as a girl when he was between four and six years old. Further psychotherapy helped Walt work through his dissociative disorder; as he healed from his disorder, his feelings of

wanting to be a female went away. Walt returned to living as a male in 1991 and has found the happiness he had sought his whole life.

Today Walt is 82. He has spent decades listening to and helping others who, like him, found that gender transitions did not resolve their root problems and decided to embrace their biological sex. His leadership was recently recognized with his appointment as a senior fellow with the Family Research Council. Walt intends to use this platform to continue to share his story, which he hopes will "bring healing to those who have experienced the same pains I have."[3]

Based on his own experiences and those of others he has walked alongside, Walt strongly believes that the Florida rule is the right approach. Walt believes that government acts in the best interests of those who identify as transgender when it takes steps to protect vulnerable people, especially children, from irreversible medical and surgical interventions that can cause life-long harm. Walt agrees with Plaintiffs-Appellees that access to quality, scientifically proven medical

---

[3] Press Release, Family Research Council, Family Research Council Welcomes Walt Heyer as New Senior Fellow (Oct. 5, 2023), https://www.frc.org/newsroom/family-research-council-welcomes-walt-heyer-as-new-senior-fellow.

care is critical. However, he believes that the hormonal and surgical interventions covered by the Florida rule cause a great deal of harm and do not effectively treat gender dysphoria.

Looking back now, Walt believes that when he was diagnosed with gender dysphoria his medical providers would have cared for him better if they would have encouraged him to explore the possible psychological roots of his desire to escape into a female persona, instead of encouraging him to take hormones and submit to surgery. But no one told him that he might find peace through counseling and psychotherapy until it was too late, until he had lost years of his life and mutilated his body through surgeries.

Based on his experience, Walt believes children today need to be protected by good laws like the Florida rule challenged here because children, especially children with mental health problems and who have suffered trauma, are easy to manipulate. They are soft targets in raging political and cultural fight over what it means to be human.

## B.    Ted Halley

Ted Halley experienced distress about his sex as a pre-teen. He asked God to make him a girl and fantasized about dressing up in his

13

mother's clothes. He struggled with his gender identity for decades but tried his best to be a man. Ted got married, he and his wife had five children, and he was an active-duty member of the Air Force. Yet his desire to be a woman never went away.

At the age of fifty Ted started attending a heterosexual cross-dressing group and through that experience decided to pursue a gender transition. Ted started cross-sex hormones and underwent several surgeries, including facial feminization surgeries, "genital reassignment surgery," and breast augmentation. He legally changed his name to "Theresa," changed the gender marker on his birth certificate, and transitioned to a female identity at work.

For years Ted was happy with his transition. But after twelve years living as a female, Ted began to question what he had done. He became severely depressed and suicidal. If he hadn't been caring for his granddaughter and if he hadn't had his faith in God, Ted probably would have killed himself.

Ted saw that what he had been pretending to be—a woman—wasn't real. In March 2021 Ted decided to detransition. He reconnected with his male identity and developed friendships with other men as a man.

Today Ted is in his mid-60s. He has no regrets about detransitioning and wishes he had done it sooner. Ted believes that detransitioning has literally saved his life. He regrets having wasted years of his life pursuing a lie that did not make him happy. He regrets the damage that doctors have inflicted on his body, including the permanent loss of parts of his body and natural expressions of his true self as a male. Ted also regrets the relationships he has damaged and the pain he caused others because of his attempted gender transition.

Ted sees himself as a living example that gender identity is not innate or immutable, like one's sex, race, or ethnicity. He had been convinced that he was a "female" born in a male body; he had felt that way since childhood. Based on that consistent and persistent conviction, Ted fully transitioned in every possible way to live and appear as a woman. Now Ted realizes that it was all a lie, a mental state of mind that was subject to change, and that transitioning did not solve his internal consternation and his deeper emotional problems.

Based on Ted's personal experience, he knows that children and adolescents with gender dysphoria are incapable of properly understanding what it means to have your penis removed, to voluntarily

15

acquire a permanent sexual dysfunction, and to modify your body so that it does not reflect your biological sex.

Ted believes that laws like the Florida rule are the best way for the government to show that it cares about and is looking out for the best interests of people suffering from gender dysphoria.

### C.    Billy Burleigh

Billy first remembers being uncomfortable with his sex when he was in first grade. He kept thinking to himself, "God made a mistake. I am a girl." Billy prayed that God would perform a miracle and that he would wake up the next morning a girl.

These feelings persisted throughout Billy's childhood and into his college years. After Billy finished undergraduate studies, he sought out a gender therapist for help. He went to therapy hoping it would help him be free of the thought that he was a woman. But his counselor told him that the only way for him to be happy was to change his body to match what his mind was telling him. After five or six years of gender therapy, Billy's depression deepened, and he started having suicidal ideation. Billy's therapist convinced him he needed to start cross-sex hormones.

Starting cross-sex hormones made Billy excited. He had started down a road his therapist had convinced him was going to make him happy!

About three years after starting hormones, Billy embarked on the surgical part of his transition. He underwent a penile inversion, an Adam's apple shave, and a brow shave. The surgery was tough, and doctors had a hard time stopping the bleeding from the "new vagina" they had created. Over the next three years Billy went back for a second surgery on his artificial vagina, a second Adam's apple shave, nose feminization surgery, and a hair transplant.

Seven years after Billy had started presenting as female, he found he had more problems than before he had begun. He had jumped through all the hoops that therapists and medical professionals had recommended and had done everything he was told to do to change his presentation from male to female. But despite all the surgeries he had undergone, he knew he was not a woman: he knew that he was still a man. Every time Billy looked in the mirror he still saw a man staring back at him.

Billy found that changing his body had not resolved his internal conflict and had not made him happy. Billy had endured many surgeries

and tried many lifestyle changes, but they had not helped him. The process had left him with a deformed, scarred body. Depression began to set back in and suicide was again coming to seem like more of an option.

Around the age of 40 Billy began to detransition. Today Billy is fifty-six. His thoughts are clear, and he has the peace of mind he had sought his whole life. His faith in Jesus and the discipleship he has received through mentors at his church have helped him tremendously. Billy is now happily married with two beautiful stepdaughters.

Like Walt and Ted, Billy has found peace through embracing his biological sex. But like his fellow *Amici*, Billy looks back at his life with a lot of regret at what his gender transition has cost him. And his experience shapes the way he looks at the Florida rule.

With the benefit of age and experience, Billy recognizes that the healthcare he received failed him in several critical areas. First, no mental health professional counseled him that everyone has a continuing need for acceptance, significance, and security. As a child he had thought that, by being a girl, his psychological needs would be fulfilled. Billy learned the hard way that was not true.

Second, the mental health professionals that Billy went to for help when he was in his twenties simply assumed that the only way he could be mentally healthy was to pursue the thought that he should have been, and therefore was, a girl and woman. But that was also wrong. The many medical and surgical procedures he endured left him worse off than when he began.

Third, Billy had a number of childhood issues that the mental health professionals failed to uncover and adequately address. Had those issues—including a speech impediment, a learning disability, and childhood sexual abuse—been properly dealt with, Billy might not have gone down the painful road he traveled.

Billy has great compassion for children and teenagers who struggle with gender dysphoria today. Just like all kids, they look to their parents and health care professionals to help them. Even as an adult, Billy relied on the mental health counseling he received in deciding to pursue gender transition. But in his experience, the mental health profession is so quick to "affirm" what is perceived to be a transgender identity that a gender transition is presented as the only real solution for those struggling with

gender dysphoria. The doctors and surgeons then simply provide the requested hormones and surgeries.

Based on his personal experience, Billy believes that the Florida rule is necessary and essential because it will give gender dysphoric young people (and even older adults struggling with their gender identity) a chance to work through their feelings, which can be overwhelming and deeply confusing, and address their underlying issues effectively without being pulled into a series of treatment that will permanently disform and disable their bodies without addressing the underlying reasons for their confusion and emotional pain.

## II.    *Amici's* testimony puts the Plaintiffs-Appellees' claims in context.

As noted above, Walt, Ted, and Billy are sympathetic with what Plaintiffs-Appellees describe in their declarations. They understand how Plaintiffs-Appellees might have concluded that cross-sex hormones and invasive surgery is the answer to the pain and confusion they have been living with. *Amici* have walked down that road too.

But Walt, Ted, and Billy have the benefit of experience and perspective. They pursued gender transitions with zeal and have now seen the other side. They remember that they too were once enthusiastic

about their "gender transitions," but also remember how that sense of elation changed into depression, suicidal ideation, and regret. Finally, while Plaintiffs-Appellees stress the permanent consequences of forgoing gender transition therapies, *Amici* urge the Court to keep in mind that cosmetic surgeries and penectomies are permanent too.

*Amici* do not ask the Court to decide that they are "right" and the Plaintiffs-Appellees are "wrong." They *do* hope that their perspective helps the Court understand why the Plaintiffs-Appellees' arguments that the Florida rule *must* be discriminatory and *must* be motivated by animus are legally and factually incorrect. Walt, Ted, and Billy believe the Florida rule represents good public policy motivated by a desire to help those like them and Plaintiffs-Appellees avoid the regret and harm of irreversible gender transition interventions.

### A.    *Amici* have the benefit of life experience and perspective.

The most striking difference between Plaintiffs-Appellees and *Amici* is their ages. Plaintiffs-Appellees are twelve years old (Doe and K.F.), twenty years old (Rothstein), and twenty-eight years old (Dekker). *Dekker v. Weida*, No. 4:22CV325-RH-MAF, 2023 WL 4102243, at *8–10 (N.D. Fla. June 21, 2023). By contrast, Walt is in his eighties, Ted is in

his mid-sixties, and Billy is in his mid-fifties. Each of the *Amici* has spent more time on cross-sex hormones than Plaintiffs-Appellees, has spent more time presenting as the other sex than Plaintiffs-Appellees, and has had more extensive "gender transition" surgeries than Plaintiffs-Appellees.

*Amici* do not doubt that Plaintiffs-Appellees sincerely believe that they "are" transgender and that the only way for them to resolve their gender dysphoria is for them to "eliminate the distress of gender dysphoria by aligning a patient's body and presentation with their gender identity." *Id*. at 7. *Amici* get it. They were there too. But *Amici*'s perspective changed over time.

*Amici* do not suggest that Plaintiffs-Appellees will all come around and embrace their biological sex.[4] But regardless of what path Plaintiffs-Appellees take in the future, *Amici* remember that they were once as certain as Plaintiffs-Appellees are today that cross-sex hormones and having doctors surgically remove their reproductive organs was their

---

[4] Given that Plaintiffs-Appellees Doe and K.F. are only 12, there is a strong statistical likelihood that their gender dysphoria will go away in the next decade. *See* DE 49 at 3 (61-88% of prepubescent children who experience gender dysphoria accept their biological sex by the time they reach adulthood).

best chance at happiness. But *Amici* came to recognize that that was not true for them. If they could go back in time, they would tell themselves to put off hormones and surgeries and find a good therapist to help them understand and work through the trauma that contributed to their gender dysphoria. Their hope and prayer is that children and young people today will be given that chance *before* harmful and irreversible gender transition interventions. They believe that the Florida rule is a good policy that will give impressionable adolescents with gender dysphoria more time and space to consider non-invasive and -irreversible options.

### B. *Amici* show that short-term satisfaction with gender transition is not conclusive.

A*mici*'s experiences tell them that Plaintiffs-Appellees' confidence that their gender transitions are working may not be the whole story. Plaintiffs-Appellees have started pursuing gender transitions, and believe things are going well for them Plaintiffs-Appellees understandably want to keep heading down a path that they believe has been good for them so far. Their current state of mind leads them to conclude that their well-being will suffer if the Florida rule keeps the

23

government from paying for the next intervention on their path to transitioning.

Plaintiff Dekker, a biological female, started presenting as a male eight years ago (2015) at about the age of twenty and started cross-sex hormones six years ago (2017) at about the age of twenty-two. Doctors amputated Dekker's breasts last year (April 2022). DE 11 at 15-16. Plaintiff Dekker fears that if Florida stops paying for cross-sex hormones, Dekker will suffer "psychological distress" and increased risk of "discrimination and violence." *Id*. at 16.

Plaintiff Rothstein, a biological female, started taking cross-sex hormones around three years ago at the age of seventeen. In January 2022 Rothstein met with a doctor who agreed to amputate Rothstein's breasts, but as of last September the surgery had not yet taken place. *Id*. at 16-17. Plaintiff Rothstein fears that if Florida will not pay a doctor to amputate Rothstein's breasts Rothstein will suffer "intense gender dysphoria" and "increased discrimination, harassment, and violence." *Id*. at 17.

Plaintiff Doe, a biological male, started presenting as a female six years ago (2017) at about the age of six. Doe started puberty-blocking

medication (Lupron) less than three years ago (July 2020) and plans on starting cross-sex hormones in the next year or two. *Id*. at 17-18. Plaintiff Doe states that if Florida does not continue to pay for puberty-blocking medication, Doe will be "devastated," as "endogenous puberty would be torture" and would also be "devastating" for Doe's parents. *Id*. at 18.

Plaintiff K.F., a biological female, started presenting as a male before entering second grade (2015). In 2020, K.F. started taking medication to prevent puberty. *Id*. at 18-19. K.F.'s motion testifies that if Florida will not pay for ongoing puberty blockers and cross-sex hormones, "K.F.'s mental health will suffer tremendously." *Id*. at 19.

Again, while *Amici* do not intend to dismiss Plaintiffs-Appellees' experience, they recall that they too were once happy with their transitions and hopeful for the future. Walt pursued his transition with vigor and lived as "Laura" for eight years. Ted lived as "Theresa" for twelve years. Billy presented as female for seven years. For each of the *Amici*, it was not until they had done everything their doctors had recommended to them that they realized they had chosen the wrong path. They pursued their transitions as far as they could, but it was not enough.

The Plaintiffs-Appellees may find that fully pursuing gender transitions, as each of the *Amici* did, will make them as happy as they hope it will. But even if that turns out to be the case, that would not be enough to prove that the Plaintiffs-Appellees should win this case. Walt, Ted, and Billy know from experience that at least a significant number of people with gender dysphoria will one day regret their gender transition interventions. These destransitioners, like *Amici*, will wish that the government had tapped the brakes and pushed them to seek out counseling instead of signing up for harmful and irreversible hormones and surgeries. The divergence of perspectives and outcomes among people diagnosed with gender dysphoria is itself grounds to find that the Florida rule is a legitimate and non-discriminatory exercise of the State's responsibility to pass laws concerning public health and welfare.

### C.   *Amici* demonstrates that there are permanent consequences to forgoing *and* to undertaking gender transition interventions.

Finally, *Amici*'s experience proves beyond all doubt that Plaintiffs-Appellees' concerns about the effects of *not* pursuing gender transitions are not the only long-term consequences that people with gender dysphoria or a state seeking their well-being need to keep in mind.

Plaintiffs-Appellees claim that the Florida rule, by not paying for hormonal and surgical interventions to prevent or remove primary or secondary sexual characteristics, will lead to "serious" consequences for persons with gender dysphoria, "including irreversible and harmful physical changes and irreparable mental harm," leading to "higher levels of stigmatization, discrimination, and victimization." DE 11 at 9.

*Amici* appreciate that Plaintiffs-Appellees' fears are sincere. But they know from experience that there are also daunting permanent consequences of getting all the gender transition interventions one had hoped for. Though Walt, Ted, and Billy have embraced their biological sex and stopped cross-sex hormones, they cannot undo the effects of the hormones and feminization surgeries they have undertaken, including the removal of their reproductive organs.

While it would be reasonable for Defendants-Appellants to consider the burden their rule would place on people that want to prevent or eliminate expressions of their biological sex, Florida must also consider the emotional and physical consequences of a public policy that provides subsidies for puberty blockers, cross-sex hormones, and surgeries to remove healthy reproductive organs.

## CONCLUSION

*Amici* Walt, Ted, and Billy offer their testimony to offer the Court a different perspective on how people that are struggling or who have struggled with their gender identity might view and welcome the challenged Florida rule. The Plaintiffs-Appellees' perspectives are their own, but their view is not the way all people with a history of gender dysphoria view the moderate state funding restrictions Florida has adopted. *Amici* wish government had done more decades ago to protect their interests and emotional and physical wellbeing; they are glad that Florida has adopted these protections for others today.

The Court should find for the Defendants-Appellants and reverse the decision below.

Respectfully submitted,

s/ Eric N. Kniffin
ERIC N. KNIFFIN
ETHICS & PUBLIC POLICY CENTER
1730 M Street, N.W.
 Suite 910
Washington, DC 20036
(202) 682-1200
ekniffin@eppc.org

*Counsel for* Amici Curiae

October 13, 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 29(a)(5) because this brief contains 4,908 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Microsoft Word Version 2309 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: October 13, 2023

s/ Eric N. Kniffin
Eric N. Kniffin
*Counsel for* Amici Curiae