No. 23-12155

# 𝕴𝖓 𝖙𝖍𝖊 𝖀𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘 𝖋𝖔𝖗 𝖙𝖍𝖊 𝕰𝖑𝖊𝖛𝖊𝖓𝖙𝖍 𝕮𝖎𝖗𝖈𝖚𝖎𝖙

AUGUST DEKKER, BRIT ROTHSTEIN, SUSAN DOE, by and through her parents and next friends, JANE DOE and JOHN DOE, and K.F., by and through his parent and next friend, JADE LADUE,

*Plaintiffs-Appellees*,

v.

SECRETARY, FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION, *et al.*,

*Defendants-Appellants*.

On Appeal from the U.S. District Court for the Northern District of Florida,
No. 4:22-cv-00325, Honorable Robert L. Hinkle, District Judge

## RESPONSE BRIEF FOR PLAINTIFFS-APPELLEES

Jennifer Altman
Shani Rivaux
PILLSBURY WINTHROP
SHAW PITTMAN, LLP
600 Brickell Avenue,
    Suite 3100
Miami, FL 33131
(786) 913-4900

Catherine McKee
NATIONAL HEALTH LAW
PROGRAM
1512 E. Franklin Street,
    Suite 110
Chapel Hill, NC 27514
(919) 968-6308

Simone Chriss
Chelsea Dunn
SOUTHERN LEGAL
COUNSEL, INC.
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890

Abigail Coursolle
NATIONAL HEALTH LAW
PROGRAM
3701 Wilshire Boulevard
    Suite 315
Los Angeles, CA 90010
(310) 736-1652

Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585

Katy DeBriere
FLORIDA HEALTH JUSTICE
PROJECT
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059

*Counsel for Plaintiffs-Appellees*
(Additional counsel listed on inside cover.)

William C. Miller
Gary J. Shaw
PILLSBURY WINTHROP
SHAW PITTMAN, LLP
1200 17th Street, NW
Washington, DC 20036
(202) 663-8000

Karen L. Loewy
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1776 K Street, NW, 8th Floor
Washington, DC 20006
(202) 804-6245

*Counsel for Plaintiffs-Appellees*

*August Dekker, et al. v. Secretary, Florida Agency for Health Care Administration*
No. 23-12155

## <u>CERTIFICATE OF INTERESTED PERSONS AND<br>CORPORATE DISCLOSURE STATEMENT</u>

Per Rule 26.1 and Circuit Rule 26.1, Plaintiffs-Appellees certify that the following have an interest in the outcome of this case:

1.    Academic Pediatric Association, *Amicus*

2.    Alstott, Anne, *Amicus*

3.    Altman, Jennifer, *Counsel for Plaintiffs*

4.    American Academy of Child and Adolescent Psychiatry, *Amicus*

5.    American Academy of Family Physicians, *Amicus*

6.    American Academy of Nursing, *Amicus*

7.    American Academy of Pediatrics, *Amicus*

8.    American College of Obstetricians and Gynecologists, *Amicus*

9.    American College of Osteopathic Pediatricians, *Amicus*

10.    American College of Pediatricians, *Amicus*

11.    American College of Physicians, *Amicus*

12.    American Medical Association, *Amicus*

13.    American Pediatric Society, *Amicus*

14.    American Psychiatric Association, *Amicus*

15.    Anderson, Barrett, *Counsel for Amicus*

16.    Antommaria, Armand, *Witness*

17.    Association of American Medical Colleges, *Amicus*

*August Dekker, et al. v. Secretary, Florida Agency for Health Care Administration*
No. 23-12155

18. Bailey, Andrew, *Counsel for Amicus*

19. Baker, Kellan, *Witness*

20. Bardos, Andy, *Counsel for Amicus*

21. Barnes, Brian, *Counsel for Amicus*

22. Beato, Michael, *Counsel for Defendants*

23. Biggs, Michael, *Witness*

24. Biomedical Ethics and Public Health Scholars, *Amicus*

25. Bird, Brenna, *Counsel for Amicus*

26. Boergers, Kathleen, *Counsel for Amicus*

27. Boulware, Susan, *Amicus*

28. Bowdre, Alexander Barrett, *Counsel for Amicus*

29. Brackett, John Matthew, *Witness*

30. Bronni, Nicholas J., *Counsel for Amicus*

31. Brown, Louis, Jr., *Amicus*

32. Burleigh, Clifton Francis, Jr., *Amicus*

33. Cameron, Daniel, *Counsel for Amicus*

34. Cantor, James, *Witness*

35. Carr, Chris, *Counsel for Amicus*

36. Charles, Carl, *Counsel for Plaintiffs*

37. Chriss, Simone, *Counsel for Plaintiffs*

38. Chuang, Ming, *Counsel for Amicus*

*August Dekker, et al. v. Secretary, Florida Agency for Health Care Administration*
No. 23-12155

39.    Clark, Kaila, *Counsel for Amicus*

40.    Commonwealth of Kentucky, *Amicus*

41.    Commonwealth of Massachusetts, *Amicus*

42.    Commonwealth of Virginia, *Amicus*

43.    Cory, Alyssa L., *Counsel for Amicus*

44.    Coursolle, Abigail, *Counsel for Plaintiffs*

45.    Dalton, Ann, *Witness*

46.    DeBriere, Katherine, *Counsel for Plaintiffs*

47.    Dekker, August, *Plaintiff*

48.    Ding, Michael, *Counsel for Witness/Third-Party Miriam Grossman*

49.    District of Columbia, *Amicus*

50.    Do No Harm, *Amicus*

51.    Doe, Jane, *Plaintiff*

52.    Doe, John, *Plaintiff*

53.    Doe, Susan, *Plaintiff*

54.    Donovan, Kevin, *Witness*

55.    Dunn, Chelsea, *Counsel for Plaintiffs*

56.    Edmiston, E. Kale, *Witness*

57.    Endocrine Society, *Amicus*

58.    English, Jeffrey, *Witness*

59.    Ethics and Public Policy Center, *Amicus*

*August Dekker, et al. v. Secretary, Florida Agency for Health Care Administration*
No. 23-12155

60.  Figlio, Erik, *Counsel for Amicus*

61.  Fitch, Lynn, *Counsel for Amicus*

62.  Florida Agency for Health Care Administration, *Defendant*

63.  Florida Chapter of the American Academy of Pediatrics, *Amicus*

64.  Florida Policy Institute, *Amicus*

65.  Florida Voices for Health, *Amicus*

66.  Gibson, Benjamin J., *Counsel for Amicus*

67.  Gonzalez-Pagan, Omar, *Counsel for Plaintiffs*

68.  Griffin, Steven J., *Counsel for Amicus*

69.  Griffin, Tim, *Counsel for Amicus*

70.  Grossman, Miriam, *Witness/Third-Party Discovery Producer*

71.  Halley, Ted, *Amicus*

72.  Hartnett, Kathleen, *Counsel for Amicus*

73.  Hasson, Mary Rice, *Counsel for Amicus*

74.  Helstrom, Zoe, *Counsel for Amicus*

75.  Heyer, Walt, *Amicus*

76.  Hilgers, Michael T., *Counsel for Amicus*

77.  Hinkle, Robert, *U.S. District Court Judge*

78.  Hruz, Paul William, *Witness*

79.  Hussein, Abdul-Latif, *Amicus*

80.  Hutton, Kim, *Witness*

*August Dekker, et al. v. Secretary, Florida Agency for Health Care Administration*
No. 23-12155

81.  Isasi, William, *Counsel for Amicus*

82.  Jacobs, Dylan L., *Counsel for Amicus*

83.  Janssen, Aron Christopher, *Witness*

84.  Jazil, Mohammad, *Counsel for Defendants*

85.  K.F., *Plaintiff*

86.  Kaliebe, Kristopher Edward, *Witness*

87.  Kamody, Rebecca, *Amicus*

88.  Kang, Katelyn, *Counsel for Amicus*

89.  Karasic, Dan, *Witness*

90.  Kiefel, Camille, *Witness*

91.  Kline, Robert, *Counsel for Amicus*

92.  Kniffin, Eric Nieuwenhuis, *Counsel for Amicus*

93.  Knudsen, Austin, *Counsel for Amicus*

94.  Kobach, Kris W., *Counsel For Amicus*

95.  Krasovec, Joseph, *Counsel for Amicus*

96.  Kuper, Laura, *Amicus*

97.  Labrador, Raúl R., *Counsel for Amicus*

98.  LaCour, Edmund G. Jr., *Counsel for Amicus*

99.  Lannin, Cortlin, *Counsel for Amicus*

100. Laidlaw, Michael, *Witness*

101. Lappert, Patrick, *Witness*

C-5

*August Dekker, et al. v. Secretary, Florida Agency for Health Care Administration*
No. 23-12155

102.   Ladue, Jade, *Plaintiff*

103.   Levine, Stephen, *Witness*

104.   Little, Joseph, *Counsel for Plaintiffs*

105.   Loewy, Karen L., *Counsel for Plaintiffs*

106.   Marshall, Steve, *Counsel for Amicus*

107.   Marstiller, Simone, *Former Defendant*

108.   Mauler, Daniel, *Counsel for Amicus*

109.   McCotter, R. Trent, *Counsel for Amicus*

110.   McKee, Catherine, *Counsel for Plaintiffs*

111.   McNamara, Meredithe, *Amicus*

112.   Meszaros, Marie Connelly, *Amicus*

113.   Miller, William, *Counsel for Plaintiffs*

114.   Miyares, Jason, *Counsel for Amicus*

115.   Mondry, Emily, *Counsel for Amicus*

116.   Morrisey, Patrick, *Counsel for Amicus*

117.   Morrison, Rachel N., *Amicus*

118.   Nangia, Geeta, *Witness*

119.   National Association of Pediatric Nurse Practitioners, *Amicus*

120.   Nordby, Daniel E., *Counsel for Witness/Third-Party Miriam Grossman* and *Counsel for Amicus*

121.   Norohna, Maya, *Amicus*

*August Dekker, et al. v. Secretary, Florida Agency for Health Care Administration*
No. 23-12155

122.   North Central Florida Council of Child and Adolescent Psychiatry, *Amicus*

123.   Olezeski, Christy, *Amicus*

124.   Olson-Kennedy, Johanna, *Witness*

125.   Paxton, Ken, *Counsel for Amicus*

126.   Pediatric Endocrine Society, *Amicus*

127.   Perko, Gary, *Counsel for Defendants*

128.   Polston, Ricky L., *Counsel for Amicus*

129.   Pratt, Christine, *Amicus*

130.   Pratt, Joshua E., *Counsel for Defendants*

131.   Ramer, John, *Counsel for Amicus*

132.   Reinhardt, Elizabeth, *Counsel for Amicus*

133.   Reyes, Sean, *Counsel for Amicus*

134.   Richards, Jay W., *Amicus*

135.   Rivaux, Shani, *Counsel for Plaintiffs*

136.   Rokita, Theodore E., *Counsel for Amicus*

137.   Rothstein, Brit, *Plaintiff*

138.   Samuels, Valerie, *Counsel for Amicus*

139.   Schechter, Loren, *Witness*

140.   Scott, Sophie, *Witness*

141.   Severino, Roger, *Amicus*

*August Dekker, et al. v. Secretary, Florida Agency for Health Care Administration*
No. 23-12155

142.  Shaw, Gary, *Counsel for Plaintiffs*

143.  Sheeran, Andrew, *General Counsel for Defendant AHCA*

144.  Shumer, Daniel, *Witness*

145.  Skrmetti, Jonathan, *Counsel for Amicus*

146.  Societies for Pediatric Urology, *Amicus*

147.  Society for Adolescent Health and Medicine, *Amicus*

148.  Society for Pediatric Research, *Amicus*

149.  Society of Pediatric Nurses, *Amicus*

150.  State of Alabama, *Amicus*

151.  State of Arkansas, *Amicus*

152.  State of California, *Amicus*

153.  State of Delaware, *Amicus*

154.  State of Georgia, *Amicus*

155.  State of Idaho, *Amicus*

156.  State of Illinois, *Amicus*

157.  State of Indiana, *Amicus*

158.  State of Iowa, *Amicus*

159.  State of Kansas, *Amicus*

160.  State of Louisiana, *Amicus*

161.  State of Maryland, *Amicus*

162.  State of Mississippi, *Amicus*

*August Dekker, et al. v. Secretary, Florida Agency for Health Care Administration*
No. 23-12155

163.  State of Missouri, *Amicus*

164.  State of Montana, *Amicus*

165.  State of Nebraska, *Amicus*

166.  State of New York, *Amicus*

167.  State of North Dakota, *Amicus*

168.  State of Oregon, *Amicus*

169.  State of Rhode Island, *Amicus*

170.  State of South Carolina, *Amicus*

171.  State of Tennessee, *Amicus*

172.  State of Texas, *Amicus*

173.  State of Utah, *Amicus*

174.  State of West Virginia, *Amicus*

175.  Szilagyi, Nathalie, *Amicus*

176.  Thompson, David, *Counsel for Amicus*

177.  Veroff, Julie, *Counsel for Amicus*

178.  Veta, D. Jean, *Counsel for Amicus*

179.  Van Meter, Quentin, *Witness*

180.  Van Mol, Andre, *Witness*

181.  Weida, Jason, *Defendant*

182.  Wilson, Alan, *Counsel for Amicus*

183.  World Professional Association for Transgender Health, *Amicus*

*August Dekker, et al. v. Secretary, Florida Agency for Health Care Administration*
No. 23-12155

184.   Zanga, Joseph, *Witness*

Per Circuit Rule 26.1-2, Plaintiffs-Appellees certify that the CIP contained

herein is complete.

Dated: November 27, 2023

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan

*Counsel for Plaintiffs-Appellees*

C-10

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Plaintiffs concur with the State's request for oral argument. Oral argument is warranted because this case raises important questions about the limits on the State's ability to deny Medicaid coverage for necessary medical care to transgender people with gender dysphoria under federal law, namely, the Fourteenth Amendment, Section 1557 of the Patient Protection and Affordable Care Act, and the Medicaid Act.

## **TABLE OF CONTENTS**

Certificate of Interested Persons and Corporate Disclosure Statement ................C-1

Statement Regarding Oral Argument .................................................................... i

Table of Contents ................................................................................................. ii

Table of Authorities ............................................................................................ iv

Introduction .........................................................................................................1

Statement of the Case .........................................................................................2

        A.     Treatment for Gender Dysphoria .................................................3

        B.     Florida Medicaid and GAPMS ....................................................7

        C.     Florida's prior coverage of gender-affirming medical care ..........................................................................................8

        D.     The 2022 GAPMS Process ..........................................................8

        E.     The Exclusions ..........................................................................10

        F.     The Exclusions are part of a pattern of discrimination against transgender people. ....................................................12

        G.     The District Court's Decision ....................................................14

Counterstatement of Issues ..............................................................................16

Summary of the Argument................................................................................16

Argument...........................................................................................................17

    I.     The Exclusions Violate the Equal Protection Clause.........................17

        A.     The Exclusions discriminate based on sex and are therefore subject to intermediate scrutiny................................18

            1.     The Exclusions prohibit coverage based on a person's sex. .................................................................. 18

            2.     The Exclusions prohibit coverage based on transgender status. ........................................................ 23

            3.     The Exclusions prohibit coverage based on sex stereotypes. ......................................................... 27

        B.     Because the Exclusions discriminate based on transgender status, they are independently subject to heightened scrutiny. ...............................................................29

C.    The Exclusions are subject to heightened scrutiny because they engage in purposeful discrimination. .................32

D.    Neither *Geduldig*, *Dobbs*, nor *Eknes-Tucker* forecloses the application of heightened scrutiny to the Exclusions. ........38

E.    No rational bases, let alone exceedingly persuasive justifications, exist for the Exclusions. .....................................42

    1.    Defendants' assertion that gender-affirming medical care is experimental has no basis. ................... 43

    2.    The Exclusions are not justified by potential risks and side effects of the proscribed treatment. ................ 48

    3.    Appeals to the general welfare do not justify the Exclusions. ................................................................... 48

F.    The Exclusions fail any level of review ....................................49

II.    The Exclusions Violate the Affordable Care Act. .............................51

III.    The Exclusions Violate the Medicaid Act. ........................................52

A.    The Exclusions Violate the Medicaid Act's EPSDT Requirements. ..................................................................53

B.    The Exclusions Violate the Medicaid Act's Comparability Requirement. ...................................................56

Conclusion ........................................................................................................59

Certificate of Compliance .............................................................................61

Certificate of Service ......................................................................................62

# TABLE OF AUTHORITIES[1]

**Page(s)**

CASES

*A.C. v. Metro. Sch. Dist. of Martinsville*,
  75 F.4th 760 (7th Cir. 2023) .................................................... 19, 23, 26

*\*Adams v. Sch. Bd. of St. Johns Cnty.*,
  57 F.4th 791 (11th Cir. 2022) .................................................. 18, 20, 33

*Anderson v. City of Bessemer City*,
  470 U.S. 564 (1985) .............................................................................55

*Anderson v. Holder*,
  673 F.3d 1089 (9th Cir. 2012) .............................................................37

*Bd. of Trs. of Univ. of Alabama v. Garrett*,
  531 U.S. 356 (2001) ...................................................................... 50, 51

*\*Bostock v. Clayton Cnty.*,
  140 S.Ct. 1731 (2020) ...................................................... 20, 21, 23, 26

*Bowen v. Gilliard*,
  483 U.S. 587 (1987) ...................................................................... 29, 31

*Boyden v. Conlin*,
  341 F.Supp.3d 979 (W.D. Wis. 2018)..................................................28

*Brandt v. Rutledge*,
  47 F.4th 661 (8th Cir. 2022)......................................................... 19, 30

*Bray v. Alexandria Women's Health Clinic*,
  506 U.S. 263 (1993) ...................................................................... 40, 41

*C.P. v. Blue Cross Blue Shield of Illinois*,
  2022 WL 17788148 (W.D. Wash. Dec. 19, 2022)...............................24

*Castaneda v. Partida*,
  430 U.S. 482 (1977) .............................................................................40

---

[1]    Authorities upon which Plaintiffs-Appellees primarily rely are marked with asterisks.

*Christian Legal Soc'y Chapter of the Univ. of California, Hastings Coll.*
  *of the L. v. Martinez,*
  561 U.S. 661 (2010) ......................................................................40

*City of Cleburne, Texas v. Cleburne Living Ctr.,*
  473 U.S. 432 (1985) ....................................................... 29, 49, 50

*Cota v. Maxwell-Jolly,*
  688 F.Supp.2d 980 (N.D. Cal. 2010)................................... 56-57, 59

*Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.,*
  304 F.3d 1167 (11th Cir. 2002) .....................................................15

*Daubert v. Merrell Dow Pharms., Inc.,*
  43 F.3d 1311 (9th Cir. 1995) ........................................................45

*Davis v. Shah,*
  821 F.3d 231 (2d Cir. 2016) .................................................. 56, 57

*Deen v. Egleston,*
  597 F.3d 1223 (11th Cir. 2010) ....................................................49

*Dobbs v. Jackson Women's Health Org.,*
  142 S.Ct. 2228 (2022) .................................................................38

*Dobson v. Sec'y of Health & Hum. Servs.,*
  2022 WL 424813 (11th Cir. 2022)................................................58

*Dolloff v. United States,*
  121 F.2d 157 (8th Cir. 1941) .......................................................37

*Edmonds v. Levine,*
  417 F.Supp.2d 1323 (S.D. Fla. 2006)...........................................58

*Eisenstadt v. Baird,*
  405 U.S. 438 (1972) ....................................................................50

*Ekloff v. Rodgers,*
  443 F.Supp.2d 1173 (D. Ariz. 2006).............................................54

*Eknes-Tucker v. Governor of Alabama,*
  80 F.4th 1205 (11th Cir. 2023)............................................. *passim*

v

*Equal Emp. Opportunity Comm'n v.*
  *R.G. &. G.R. Harris Funeral Homes, Inc.*,
  884 F.3d 560 (6th Cir. 2018), *aff'd sub nom. Bostock*, 140 S.Ct. 1731 ..............28

*Evancho v. Pine-Richland Sch. Dist.*,
  237 F.Supp.3d 267 (W.D. Pa. 2017) ...................................................................30

*F.V. v. Barron*,
  286 F.Supp.3d 1131 (D. Idaho 2018)...................................................................32

*Fabian v. Hosp. of Cent. Connecticut*,
  172 F.Supp.3d 509 (D. Conn. 2016) ...................................................................28

*Fain v. Crouch*,
  618 F.Supp.3d 313 (S.D.W. Va. 2022) ........................................................ 24, 57

*Flack v. Wisconsin Dep't of Health Servs.*,
  328 F.Supp.3d 931 (W.D. Wis. 2018)..................................................................24

*Flack v. Wisconsin Dep't of Health Servs.*,
  395 F.Supp.3d 1001 (W.D. Wis. 2019)................................................................57

*Frew ex rel. Frew v. Hawkins*,
  540 U.S. 431 (2004) .............................................................................................52

*Geduldig v. Aiello*,
  417 U.S. 484 (1974) ...................................................................................... 38, 41

*Gen. Elec. Co. v. Gilbert*,
  429 U.S. 125 (1976), *superseded by statute*, 42 U.S.C. § 2000e(k) ...................25

*Glenn v. Brumby*,
  663 F.3d 1312 (11th Cir. 2011).............................................................. 24, 27, 40

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) ....................................................................... *passim*

*Hecox v. Little*,
  79 F.4th 1009 (9th Cir. 2023) ....................................................................... 23, 41

*J.E.B. v. Alabama*,
  511 U.S. 127 (1994) ...................................................................................... 22, 26

*K.C. v. Individual Members of Med. Licensing Bd. of Ind.*,
    2023 WL 4054086 (S.D. Ind. June 16, 2023), *appeal filed*,
    No. 23-2366 (7th Cir. July 12, 2023) ...................................................................19

*\*K.G. ex rel. Garrido v. Dudek*,
    864 F.Supp.2d 1314 (S.D. Fla. 2012), *aff'd in part, rev'd in part sub*
    *nom. Garrido v. Dudek*, 731 F.3d 1152 (11th Cir. 2013)............................. 43, 44

*Kadel v. Folwell*,
    2022 WL 11166311 (M.D.N.C. Oct. 19, 2022) ...................................................24

*Kadel v. Folwell*,
    446 F.Supp.3d 1 (M.D.N.C. 2020) .......................................................................29

*Kadel v. Folwell*,
    620 F.Supp.3d 339 (M.D.N.C. 2022) ...................................................................20

*Karnoski v. Trump*,
    926 F.3d 1180 (9th Cir. 2019) ..............................................................................30

*Katie A., ex rel. Ludin v. L.A. County*,
    481 F.3d 1150 (9th Cir. 2007) ..............................................................................54

*L.W. v. Skrmetti*,
    83 F.4th 460 (6th Cir. 2023) .................................................................................39

*Lange v. Houston Cnty.*,
    608 F.Supp.3d 1340 (M.D. Ga. 2022)............................................................ 34, 38

*Latta v. Otter*,
    771 F.3d 456 (9th Cir. 2014) ................................................................................31

*Lawrence v. Texas*,
    539 U.S. 558 (2003) .............................................................................................40

*\*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*,
    66 F.4th 905 (11th Cir. 2023)......................................................................... 34, 38

*M.H. v. Berry*,
    2021 WL 1192938 (N.D. Ga. March 29, 2021) ...................................................53

*Mallory v. Norfolk S. Ry. Co.*,
    600 U.S. 122 (2023) .............................................................................................39

*Mathews v. Lucas*,
  427 U.S. 495 (1976) ...........................................................................49

*McLaughlin v. Florida*,
  379 U.S. 184 (1964) ...........................................................................22

*Mills v. Habluetzel*,
  456 U.S. 91 (1982) .............................................................................31

*Mississippi Univ. for Women v. Hogan*,
  458 U.S. 718 (1982) ...........................................................................23

*Moore ex rel. Moore v. Reese*,
  637 F.3d 1220 (11th Cir. 2011) ..........................................................54

*Nyquist v. Mauclet*,
  432 U.S. 1 (1977) ...............................................................................31

*Peltier v. Charter Day Sch., Inc.*,
  37 F.4th 104 (4th Cir. 2022), *cert. denied*, 143 S.Ct. 2657 (2023) .....................22

*Pers. Adm'r of Massachusetts v. Feeney*,
  442 U.S. 256 (1979) ..................................................................... 33, 39

*Powers v. Ohio*,
  499 U.S. 400 (1991) ...........................................................................22

*Ray v. McCloud*,
  507 F.Supp.3d 925 (S.D. Ohio 2020) ..................................................30

*Reed v. Reed*,
  404 U.S. 71 (1971) .............................................................................19

*Rinaldi v. Yeager*,
  384 U.S. 305 (1966) ...........................................................................49

*Romer v. Evans*,
  517 U.S. 620 (1996) ..................................................................... 50, 51

*Rush v. Parham*,
  625 F.2d 1150 (5th Cir. 1980) .................................................. 43, 46, 53

*S. Bay United Pentecostal Church v. Newsom*,
  141 S.Ct. 716 (2021) ..........................................................................49

viii

*S.D. ex rel. Dickson v. Hood*,
    391 F.3d 581 (5th Cir. 2004) ......................................................... 54, 55

*Schmitt v. Kaiser Found. Health Plan of Washington*,
    965 F.3d 945 (9th Cir. 2020) .................................................................51

*Sessions v. Morales-Santana*,
    582 U.S. 47 (2017) ...............................................................................43

*Smith v. Benson*,
    703 F.Supp.2d 1262 (S.D. Fla. 2010).................................................54

*Students for Fair Admissions, Inc. v.*
    *President & Fellows of Harvard Coll.*,
    600 U.S. 181 (2023) ....................................................................... 26, 52

*Thompson v. Hebdon*,
    7 F.4th 811 (9th Cir. 2021).................................................................25

*Toomey v. Arizona*,
    2019 WL 7172144 (D. Ariz. Dec. 23, 2019).......................................24

*Tuan Anh Nguyen v. I.N.S.*,
    533 U.S. 53 (2001) ...............................................................................23

*United States v. Virginia*,
    518 U.S. 515 (1996) ....................................................................... 18, 22

*Village of Arlington Heights v. Metropolitan Housing Development*
    *Corp.*,
    429 U.S. 252 (1977) .............................................................................34

*Warren v. DeSantis*,
    653 F.Supp.3d 1118 (N.D. Fla. 2023) .................................................13

*Washington v. Seattle Sch. Dist. No. 1*,
    458 U.S. 457 (1982) .............................................................................20

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
    858 F.3d 1034 (7th Cir. 2017), *partially abrogated on other grounds as*
    *recognized by A.C. v. Metro. Sch. Dist. of Martinsville*,
    75 F.4th 760 (7th Cir. 2023)................................................. 19, 27, 30

*White v. Beal*,
    555 F.2d 1146 (3d Cir. 1977) ..............................................................56

*Williams v. Kincaid*,
   45 F.4th 759 (4th Cir. 2022)................................................................40

*Windsor v. United States*,
   699 F.3d 169 (2d Cir. 2012) ..............................................................31

*Wolf v. Walker*,
   986 F.Supp.2d 982 (W.D. Wis. 2014), *aff'd sub nom*,
   *Baskin v. Bogan*, 766 F.3d 648 (7th Cir. 2014)..................................31

## STATUTES AND OTHER AUTHORITIES

U.S. Const., amend XIV ............................................................... *passim*

42 U.S.C. § 1396a(a)(10)(A) ............................................... 52-53, 54

42 U.S.C. § 1396a(a)(10)(B)................................................... 53, 56

42 U.S.C. § 1396a(a)(43)(C)...................................................54

42 U.S.C. § 1396d(a) ...............................................................54

42 U.S.C. § 1396d(a)(4)(B) ................................................ 52-53, 54

42 U.S.C. § 1396d(a)(12) .........................................................54

42 U.S.C. § 1396d(r)(5) ....................................................52-53, 54, 55

42 U.S.C. § 1396r-8 ...................................................................55

42 U.S.C. § 1396r-8(d)(1)(B) .................................................57

42 U.S.C. § 1396r-8(g)(1)(B)(i)...............................................58

42 U.S.C. § 1396r-8(k)(2) .........................................................57

42 U.S.C. § 1396r-8(k)(6) .........................................................58

42 U.S.C. § 18116(a) ................................................................51

42 U.S.C. § 2000e(k) ...............................................................25

42 C.F.R. § 440.120 ................................................................54

42 C.F.R. § 440.230(c).......................................................... 53, 56

42 C.F.R. § 440.240 ................................................................56

Fla. Stat. § 286.311(2)................................................................19

Fla. Stat. § 456.001(9)(a) ..................................................... 19, 27

Fla. Stat. § 456.001(9)(b) .........................................................21

Fla. Stat. § 456.52(1) ................................................................13

Fla. Stat. § 456.52(5)(b) ...........................................................13

Fla. Stat. § 456.52(5)(c) ...........................................................13

FAC 59G-1.010 .........................................................................7

FAC 59G-1.035.......................................................................7, 9

FAC 59G-1.035(1)(a)..................................................................7

FAC 59G-1.035(4) ............................................................... 43, 44

FAC 59G-1.035(6) .....................................................................7

FAC 59G-1.050(7) ........................................................... *passim*

FAC 64B15-14.014 ...................................................................13

FAC 64B8-9.019 .......................................................................13

Fla. Exec. Order No. 23-160 (Aug. 9, 2023) ............................13

Fla. H.B. 1069, 2023 Leg., 125th Reg. Sess. (Fla. 2023) ..........13

Fla. H.B. 1521, 2023 Leg., 125th Reg. Sess. (Fla. 2023) ..........13

Fla. H.B. 1557, 2022 Leg., 124th Reg. Sess. (Fla. 2022) ..........13

Fla. S.B. 254, 2023 Leg., 125th Reg. Sess. (Fla. 2023)..................... *passim*

Fla. S.B. 1028, 2021 Leg., 123rd Reg. Sess. (Fla. 2021) ..........13

Fla. S.B. 1438, 2023 Leg., 125th Reg. Sess. (Fla. 2023).........13

ACLU, *Mapping Attacks on LGBTQ Rights in U.S. State Legislatures*
(Nov. 15, 2023), https://www.aclu.org/legislative-attacks-on-lgbtq-
rights ......................................................................................12

Bill Analysis and Fiscal Impact Statement (Pre-Hearing), Committee on
Health Policy (Mar. 10, 2023), https://tinyurl.com/3p98jyy4............................12

Bill Analysis and Fiscal Impact Statement, Committee on Health Policy
    (Mar. 10, 2023), https://tinyurl.com/2s3cbh4f .....................................................12

Bill Analysis and Fiscal Impact Statement, Committee on Health Policy
    (Mar. 14, 2023), https://tinyurl.com/3jbvdatt.........................................................12

Bill Analysis and Fiscal Impact Statement, Committee on Fiscal Policy
    (Mar. 22, 2023), https://tinyurl.com/2hpvb3hy......................................................12

Hearing on H.B. 1421, 2023 Leg., 125th Sess. (Mar. 22, 2023),
    https://tinyurl.com/464nmuvn ................................................................................37

Hearing on S.B. 254, 2023 Leg., 125th Reg. Sess. (Apr. 19, 2023),
    https://tinyurl.com/2usfjna4....................................................................................37

House Health & Human Servs. Comm. Meeting, 2023 Leg., 125th Sess.
    (Feb. 21, 2023), https://tinyurl.com/ms7w62dz,
    https://tinyurl.com/3zrkd8c4 ..................................................................................12

Kenneth Culp Davis, *An Approach to Problems of Evidence in the
    Administrative Process*, 55 HARV. L. REV. 364 (1942)........................................37

Movement Advancement Project, *Under Fire: Banning Medical Care and
    Legal Recognition for Transgender People* (Sept. 2023),
    https://www.mapresearch.org/file/MAP-2023-Under-Fire-Report-5.pdf...........32

Order Granting Pls.' Mot. Prelim. Inj., *van Garderen v. Montana*,
    No. DV-23-541 (Missoula Cnty. Dist. Ct., Mont. Sept. 27, 2023),
    https://www.documentcloud.org/documents/23993157-montana-order-
    granting-plaintiffs-motion-for-preliminary-injunction.......................................33

**INTRODUCTION**

Decades of clinical experience and rigorous study have demonstrated medical treatment for a transgender person's gender dysphoria is safe and effective. This is true for adults and adolescents. Yet, based on a flawed, biased, and predetermined process, Florida categorically prohibited Medicaid coverage for this evidence-based and widely accepted medical care, thereby endangering the health and wellbeing of transgender Floridians. Florida did so notwithstanding that it previously covered this medical care that is supported by "[t]he overwhelming weight of medical authority." Doc.246, at 18-19.

Seeking to protect their rights, Plaintiffs challenged the State's adoption of the Exclusions pursuant to the Fourteenth Amendment, Section 1557 of the Affordable Care Act, and the Medicaid Act.[2]

After a trial involving testimony from multiple medical experts and fact witnesses, the district court correctly concluded that prohibiting Medicaid coverage for the medical treatment of gender dysphoria has no reasonable basis, as this care is safe, effective, and not experimental. The alternative—providing no medical treatment—is not supported by any evidence and can result in grave consequences,

---

[2]    Initially Plaintiffs challenged Rule 59G-1.050(7) (the "Rule"). Doc.1. After the enactment of Senate Bill 254 ("SB254"), Plaintiffs amended their suit to also challenge Section 3 of SB254. Doc.233. Together, these are the "Exclusions."

however.  The district court thus found in favor of Plaintiffs on each of their claims pertaining to coverage of puberty-delaying medications or hormone treatments.[3]

The district court's decision is correct as a matter of law and fact.  This Court should affirm.

## STATEMENT OF THE CASE

Plaintiffs are two transgender adults—August Dekker and Brit Rothstein—and two transgender adolescents—Susan Doe and K.F.  Tr. 603:6-9, 622:7-10, 655:1-2, 683:16-17.[4]  Each of them has been diagnosed with gender dysphoria.  Tr. 93:20-95:3.  At all relevant times, Plaintiffs were enrolled in Florida's Medicaid program.  Tr. 602:14-18, 622:1-2, 651:1-12, 681:16-17.  Until the adoption of the Exclusions, Florida Medicaid covered the medications needed to treat their gender dysphoria.  Tr. 611:10-13, 614:25-615:4, 622:3-6, 668:9-11, 703:18-20.

Gender-affirming medical care has had profound benefits for each Plaintiff.  Tr. 611:3-6, 612:24-613:5, 636:12-19, 642:18-22, 644:13-15, 663:23-664:12, 666:13-19, 673:10-674:17, 696:22-697:9.

---

[3]     The court found Plaintiffs did not have standing regarding surgery.  Doc.246, at 13-14.  Plaintiffs did not appeal that ruling.

[4]     In this brief, "Doc." citations refer to district court docket entries.  "Tr." citations refer to the trial transcript.  "PX" and "DX" citations refer to Plaintiffs' and Defendants' exhibits, respectively.

The Exclusions harm Plaintiffs by denying them access to medical treatment they need.  Tr. 611:16-19, 615:8-16, 643:20-646:6, 674:3-675:1, 705:19-21.

### A.    Treatment for Gender Dysphoria

Gender identity is a person's core internal sense of being male or female.  Tr. 23:11-12, 783:22-784:1.  It has a strong biological basis and cannot be changed.  Tr. 27:15-28:2, 30:1-5.  As the district court concluded, "Gender identity is real." Doc.246, at 4.

Most people's gender identity aligns with their sex assigned at birth ("assigned sex"), typically designated based on external genitalia. Tr. 23:13-18.  For transgender people—less than one percent of the population—it does not.  Tr. 23:22-23, 472:5-14, 537:18–538:7, 950:7-18.

Being transgender is not itself a disorder or condition to be cured.  Tr. 26:5-7, 114:10-14.  Many transgender people suffer from gender dysphoria, a serious medical condition characterized by clinically significant distress resulting from the incongruence between a person's gender identity and assigned sex.  Tr. 23:8-9, 186:12-17, 782:14-17.  Without treatment, gender dysphoria can cause debilitating anxiety, severe depression, self-harm, and even suicidality.  Tr. 38:10-39:1, 571:23-572:10, 808:15-809:14.

Fortunately, gender dysphoria is treatable.  Tr. 801:4-9, 801:21-25, 802:7-13. For decades, medical organizations have studied gender dysphoria and created

evidence-based standards for its treatment. Tr. 31:12-17, 66:24-67:2, 359:4-11, 363:5-7, 539:7-10. Since 1979, the World Professional Association for Transgender Health ("WPATH") has continuously published clinical practice guidelines for the treatment of gender dysphoria, now in its eighth version ("WPATH Standards of Care"). Tr. 31:24-32:5; DX.16. The Endocrine Society has also published practice guidelines, first in 2009 and then in 2017 ("ES Guidelines"). Tr. 864:17-21; DX.24. The WPATH Standards of Care and ES Guidelines (together the "Protocols") are consistent (Tr. 40:16-21, 198:14-19, 363:12-16) and widely accepted by the nation's major medical and mental health organizations as reflecting the consensus on the appropriate treatment for gender dysphoria. Tr. 34:5-17; PX.36-43 and PX.45-49.

Treatment for gender dysphoria seeks to eliminate distress by aligning an individual's body and presentation with their internal sense of self. Tr. 37:23-38:3, 292:9-13. Under the Protocols, the appropriate treatment for gender dysphoria varies based on an individualized assessment of each patient's needs. Tr. 42:8-12, 217:25-218:2; DX.16, at S32, S45. The Protocols differ for children, adolescents, and adults. Tr. 42:16–44:10; DX.16; DX.24.

Before puberty, treatment does not include any medical or surgical intervention. Tr. 36:9-10, 41:6-10, 783:9-10.

For medical interventions, the Protocols require detailed assessments, particularly for adolescents. Tr. 29:16-25, 782:8-21. Medical treatment is

appropriate only when the adolescent or adult has marked and sustained gender dysphoria, no health issues that would interfere with treatment, and the capacity to provide informed consent.  Tr. 42:13-44:18; DX.16, at S32, S48.  The Protocols emphasize the importance of informed consent, including counseling about the risks and benefits of treatment.  Tr. 52:6-53:21, 377:4-378:15.

For some adolescents, puberty-delaying medications (also known as GnRH agonists or puberty blockers) may be indicated following the onset of puberty.  Tr. 36:11-13.  These medications work by pausing endogenous puberty, affording the adolescent time to better understand their gender identity while delaying the development of secondary sex characteristics, which can cause extreme distress.  Tr. 37:6-20, 534:13-23.  These medications have been used for decades to treat other conditions, like precocious puberty.  Tr. 200:22-201:18, 733:15-16.  This treatment is reversible; if discontinued, puberty resumes.  Tr. 200:19-21.

Puberty-delaying medications have no long-term implications for fertility, sexual function, brain development, emotional regulation, or cognition.  Tr. 206:20-207:6, 210:9-17, 726:2-4, 729:19-24, 730:19-23.  The medical and scientific literature has established that puberty-delaying medications are safe, effective, and not experimental to treat gender dysphoria.  Tr. 201:24-204:14, 572:12-19, 737:6-9, 739:20-23.

For some older adolescents and adults with gender dysphoria, hormone therapy (like testosterone for transgender men or estrogen for transgender women) may be medically necessary. Tr. 36:14-20, 37:21-38:3, 216:9-12. Hormone therapy is safe, effective, and not experimental to treat gender dysphoria. Tr. 218:10-21, 572:20-573:1, 737:10-13.

Hormone therapy has been administered and studied since the 1920s. Tr. 529:21-530:3. Puberty-delaying medications have been used to treat gender dysphoria in adolescents since the 1990s. Tr. 530:4-17. Thus, decades of clinical experience support these treatments for gender dysphoria. Tr. 58:9-21, 202:4-9, 228:7-229:10, 547:11-548:3, 553:17-554:13. Similarly, decades of scientific studies and evidence confirm that gender-affirming care is safe and effective. Tr. 72:23-24, 218:10-21, 359:23-360:1, 541:12-16, 543:23-546:3, 547:4-9, 548:12-550:7, 552:4-553:16, 564:4-8, 573:19-574:1.

As with most medical care, there are limitations to the evidence base. Tr. 67:3-5, 735:7-16. There are no randomized controlled trials and some of the evidence supporting this care is considered "low-quality" under the GRADE system. Tr. 146:3-6, 350:4-7. However, a determination that a particular study is "low quality" does not mean that a treatment is unsafe or ineffective. Tr. 346:21–347:2, 359:12-18. It is commonplace for medical treatments to be provided even when supported only by research producing evidence classified as "low" or "very low" on this scale. Tr.

6

349:12-15.    Many practice guidelines, especially in pediatric care, make recommendations based on "low" quality of evidence.  Tr. 349:12-350:20, 365:5-11.  In fact, only about 13.5% of accepted medical treatments across all disciplines are supported by "high" quality evidence on the GRADE scale.  Tr. 69:4-70:3.

Conversely, there is no established safe and effective alternative to medical treatment for gender dysphoria for those who need it.  Tr. 231:3-25, 569:14-20, 803:16-22.  While behavioral health interventions are one component of treatment for gender dysphoria, they are insufficient on their own. Tr. 51:8-15, 234:21-25.  As Defendants' expert (Dr. Levine) acknowledged, there are no studies that support *withholding* gender-affirming medical care.  Tr. 1039:9-17.

### B.    Florida Medicaid and GAPMS

Florida regulations require the Agency for Health Care Administration ("AHCA") to provide Medicaid coverage for health services that are medically necessary, i.e., are consistent with "generally accepted professional medical standards" ("GAPMS") and are neither experimental nor investigational.    Fla. Admin. Code R. ("FAC") 59G-1.035(6), 59G-1.010, 59G-1.035.

GAPMS are defined as "standards based on reliable scientific evidence published in peer-reviewed scientific literature generally recognized by the relevant medical community or practitioner specialty associations' recommendations."  FAC 59G-1.035(1)(a).  AHCA uses the GAPMS process to determine whether to cover a

7

new service.  Prior to this case, AHCA had *never* used the GAPMS process to exclude coverage of a previously covered service.  Tr. 435:19-22; Doc.235-1, at 93:13-21; PX.302.  Each GAPMS review covers a single treatment.  Tr. 436:10-18.

### C.    Florida's prior coverage of gender-affirming medical care

Until the Exclusions, Florida Medicaid covered gender-affirming medical care, including puberty-delaying medications and hormone therapy, to adolescents and adults for whom it was necessary to treat gender dysphoria.  Doc.235-1, at 66:25-68:17, 74:18-75:9, 84:2-18; Doc.235-2, at 243:7-15; PX.257; PX.317; Tr. 433:14-434:10.  Moreover, AHCA covers these same medical treatments to treat conditions other than gender dysphoria.  PX.1, at 4-5.

### D.    The 2022 GAPMS Process

After the U.S. Department of Health and Human Services issued guidance supporting gender-affirming care in April 2022 (DX.1, DX.2), the Florida Governor's office instructed AHCA and the Florida Department of Health ("FDOH") to re-review their policies on gender-affirming care.  Tr. 1259:24-1260:16; *see also* Tr. 421:7-12, 1378:15-17.  In response, FDOH issued guidance on April 20, 2022, recommending against prescribing puberty-delaying medication and hormones to minors, as well as social transition.  DX.5.  That same day, AHCA's then-Secretary instructed the Deputy Secretary to initiate a GAPMS process to re-

8

review treatments for gender dysphoria even though AHCA already covered these medical services to treat gender dysphoria.  PX.19; Tr. 1182:7-10.

AHCA tasked agency employee Matthew Brackett with conducting the GAPMS re-review.  Tr. 1195:11-13.  Brackett "suspected" the request came from the Governor's office and "had an idea" of "what result the administration would prefer."  Tr. 1256:14-16.[5]

Brackett did not have any background in science, medicine, or clinical research, nor was he responsible for conducting GAPMS reviews.  Tr. 1219:2–220:25, 1223:1-4.  In choosing Brackett, AHCA leadership bypassed the employee responsible for GAPMS reviews to obtain the desired result.  Tr. 413:1-10, 1167:8-10, 1167:19-20.

While Brackett knew that FAC 59G-1.035 "require[s] an exhaustive search for what peer-reviewed literature is available," Tr. 1192:12-17, his review was not exhaustive.  He admitted he failed to consider at least eight well-known studies supportive of gender-affirming medical care.  Tr. 1225:3–1230:15.

In drafting his report, Brackett relied on two consultants: Andre Van Mol and Miriam Grossman.  Tr. 1175:5-7, 1202:13–1203:18, 1204:8-18.  This was the first time that AHCA retained consultants to advise on a GAPMS review.  Tr. 428:25–

---

[5]     The district court did not credit Brackett's testimony that "he did not know the preferred outcome."  Doc.246, at 9 n.21.  Defendants do not challenge this.

9

429:9.  And Brackett and AHCA were aware that both Van Mol and Grossman are well-known opponents of gender-affirming medical care.  Tr. 1240:24-1241:2, 1242:17-20.

Brackett's GAPMS report concluded that gender-affirming medical treatments were experimental and investigational.  DX.6.  The report was submitted to Brackett's superiors on June 1, 2022.  Tr. 1181:4-13, 1202:20-24.  The very next day, the lengthy report had purportedly been reviewed and approved by four different senior officials and was published.  PX.297A.

Additionally, AHCA retained five other "consultants"—doctors Cantor, Donovan, Van Meter, Brignardello-Petersen, and Lappert—to draft separate reports to be attached to the GAPMS report.  DX.6; Defs.' Br. 14.  These consultants have a history of opposing gender-affirming care, which their reports reflected.  DX.6; Doc.199 at 98-102.

E.    The Exclusions

The day after the report was published, AHCA proposed to codify the GAPMS decision in Rule 59G-1.050(7) to bar Medicaid coverage for puberty-delaying medications, hormone treatments, and surgery when used to treat gender dysphoria.

On July 8, 2022, AHCA held a public hearing on the Proposed Rule and took the unprecedented step of having Van Mol, Van Meter, and Grossman serve as panelists to respond to comments from the public. Tr. 1213:9-16; PX.305.

Hundreds of oral and written comments were submitted in opposition to the Proposed Rule, including comments from the Endocrine Society, the American Academy of Pediatrics, and a team of legal and medical experts from various academic institutions. *See*, *e.g.*, PX.323-325. The comments made clear that the Proposed Rule would cause unnecessary harm and suffering; the GAPMS Report was flawed and contrary to established standards of care; and the Proposed Rule was unlawful.

Notwithstanding this opposition, AHCA finalized the Rule, effective August 21, 2022.

On May 17, 2023, during the trial in this case, Florida's Governor signed SB254. Although it applies to minors and adults, the Governor's Office described the bill as "sweeping legislation to protect the innocence of Florida's children." PX.365. Among other things, SB254 prohibits the use of state funds (including Medicaid) to pay for medical treatment for gender dysphoria. Defs.' Br. 22.

Throughout the hearings on SB254, legislators relied heavily on the GAPMS Report.[6]  When the House heard testimony, only doctors opposed to medical care were permitted to testify.[7]  The legislature refused to hear testimony from any transgender people, parents of transgender adolescents, or providers of gender-affirming care.[8]

### F.    The Exclusions are part of a pattern of discrimination against transgender people.

Transgender people have faced a long history of discrimination in this country.  In the past several years alone, "hundreds of anti-transgender bills in States were proposed across America, most of them targeting transgender kids."  Doc.176-36.[9]

Florida is no exception.  Between April 20, 2022 and May 17, 2023, in addition to the Exclusions, Florida banned medical providers from prescribing

---

[6]    *See* Bill Analysis and Fiscal Impact Statement, Committee on Fiscal Policy, at 17 (Mar. 22, 2023), https://tinyurl.com/2hpvb3hy; Bill Analysis and Fiscal Impact Statement, Committee on Health Policy, at 17 (Mar. 14, 2023), https://tinyurl.com/3jbvdatt; Bill Analysis and Fiscal Impact Statement, Committee on Health Policy, at 17 (Mar. 10, 2023), https://tinyurl.com/2s3cbh4f; Bill Analysis and Fiscal Impact Statement (Pre-Hearing), Committee on Health Policy, at 20 (Mar. 10, 2023), https://tinyurl.com/3p98jyy4.

[7]    *See* House Health & Human Servs. Comm. Meeting, 2023 Leg., 125th Sess. (Feb. 21, 2023), https://tinyurl.com/ms7w62dz, https://tinyurl.com/3zrkd8c4.

[8]    *Id.*

[9]    *See also* ACLU, *Mapping Attacks on LGBTQ Rights in U.S. State Legislatures*, https://www.aclu.org/legislative-attacks-on-lgbtq-rights (Nov. 15, 2023).

established medical care for transgender minors by rule (FAC 64B8-9.019 and 64B15-14.014) and statute (Fla. Stat. § 456.52(1)); made the provision of these services to minors a felony (Fla. Stat. § 456.52(5)(b)); and took the unprecedented step of restricting transgender adults from accessing established medical care, whose providers now face criminal penalties (Fla. Stat. § 456.52(5)(c)) for providing this care.

In addition to restricting access to health care, Florida has enacted multiple laws singling out transgender people for adverse treatment, including: SB1028, banning transgender girls and women from playing on female sports teams; HB1557 and HB1069, together banning instruction about LGBTQ+ people or issues from Kindergarten to eighth grade, prohibiting transgender teachers and staff from using pronouns consistent with their gender identity, and singling out transgender persons in school by authorizing others to refer to them without regard for their gender identity; HB1521, excluding transgender people from public restrooms; and SB1438, criminalizing drag shows.

Florida's Governor also removed two state attorneys from office for, in part, saying that "transgender people are 'some of the most vulnerable Americans' and that attacks on them 'will deeply harm public safety.'" *Warren v. DeSantis*, 653 F.Supp.3d 1118, 1138 (N.D. Fla. 2023); *see also* Fla. Exec. Order No. 23-160 (Aug. 9, 2023), https://www.flgov.com/wp-content/uploads/2023/08/EO-23-160.pdf.

These measures constitute a clear expression of governmental hostility toward transgender Floridians and establish an official policy of disapproval, with the goal of preventing transgender Floridians from participating openly or equally in civil society. No other state has enacted as many anti-transgender measures as Florida.

## G.    The District Court's Decision

Following a seven-day day bench trial, the district court issued its decision on June 21, 2023. Doc.246.

The court assessed the credibility of the parties' designated experts. Regarding Plaintiffs' experts, the court found that "[t]he record includes testimony of well-qualified doctors who have treated thousands of transgender patients with GnRH agonists and cross-sex hormones over their careers and have achieved excellent results," and specifically credited the testimony of Drs. Karasic, Shumer, Janssen, Olson-Kennedy, and Antommaria. Doc.246, at 21. This included "their testimony that denial of this treatment will cause needless suffering for a substantial number of patients and will increase anxiety, depression, and the risk of suicide." Doc.246, at 21. By contrast, Defendants' experts lacked any significant experience with gender dysphoria or providing gender-affirming care. Docs.119, 127, 133, 136, 139, 145. The court did not credit Dr. Hruz's testimony and credited the "other defense experts only to the extent consistent with this opinion." Doc.246, at 5 n.8.

14

As to the merits, the district court made a series of factual findings based on the extensive case record.  Doc.246, at 3-11, 16-26, 38-51.[10]  The court found that the "well-established standards of care for treatment of gender dysphoria" are set forth in the WPATH Standards of Care and ES Guidelines and "credit[ed] the abundant testimony in this record that these standards are widely followed by well-trained clinicians."  Doc.246, at 16.  It also found that "[t]he overwhelming weight of medical authority supports treatment of transgender patients with GnRH agonists and cross-sex hormones in appropriate circumstances."  Doc.246, at 18.  The court concluded that "[t]here is no rational basis for a state to categorically ban these treatments or to exclude them from the state's Medicaid coverage" and rejected each of the State's possible justifications for the Exclusions.   Doc.246, at 21, 38-51.

Following its extensive analysis, the Court held that the Exclusions "violate the federal Medicaid statute, the Equal Protection Clause, and the Affordable Care Act's prohibition of sex discrimination."  Doc.246, at 53.  Thus, the court declared the Exclusions to be "invalid to the extent they categorically ban Medicaid payment for puberty blockers and cross-sex hormones for the treatment of gender dysphoria" and enjoined Defendants from applying the Exclusions to Plaintiffs.  *Id.*

---

[10]    Because the district court's findings are not clearly erroneous, nor do Defendants argue that they are, they warrant deference from this Court.  *See Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1171 (11th Cir. 2002).

## COUNTERSTATEMENT OF ISSUES

1.     Whether the Exclusions violate the Equal Protection Clause of the Fourteenth Amendment.

2.     Whether the Exclusions violate Section 1557 of the Affordable Care Act ("Section 1557").

3.     Whether the Exclusions violate the Medicaid Act's Early and Periodic Screening, Diagnostic and Treatment (EPSDT) and comparability requirements.

## SUMMARY OF THE ARGUMENT

Defendants do not challenge a single factual finding in the district court's detailed and well-reasoned 54-page decision, which carefully analyzed all the evidence and faithfully applied the law.  Instead, Defendants engage in legal gymnastics to avoid scrutiny for their discriminatory actions and ask for absolute deference to the State.  But Floridians deserve better, and our Constitution and laws demand more.

*First*, the district court correctly held that the Exclusions violate the Fourteenth Amendment's Equal Protection Clause.  They discriminate based on sex and transgender status, bases that each demand heightened scrutiny.  And the Exclusions *purposely* discriminate against transgender Medicaid beneficiaries, which independently warrants heightened scrutiny.  Defendants' arguments to the contrary are unavailing.  Not only are their cited precedents inapposite, but their call

16

for total deference would hollow out our Constitution's promise of equality under the law.  Defendants' Exclusions cannot withstand any level of scrutiny.

*Second*, the district court rightly held the Exclusions violate Section 1557, which prohibits discrimination based on sex in health programs or activities. Defendants do not challenge that the requisite elements are met.  Rather, they argue that "sex" means "biological sex," and therefore the Exclusions pass muster.  Even under that framing, however, the Exclusions violate Section 1557.

*Third*, the district court correctly held that the Exclusions violate the Medicaid Act's EPSDT and comparability requirements.

The Court should affirm the district court's decision.

## ARGUMENT

### I.    The Exclusions Violate the Equal Protection Clause.

The Exclusions single out transgender Medicaid beneficiaries for unequal treatment in violation of the Constitution's equal protection guarantee.  They facially discriminate based on sex and transgender status, and purposely discriminate against transgender people, impermissibly seeking to impose gender conformity.  The district court thus properly subjected the Exclusions to heightened scrutiny and held that they violated the Fourteenth Amendment.

17

In fact, the Exclusions cannot survive any level of scrutiny.   As the district court held, "[t]here is no rational basis for a state to categorically ban these treatments or to exclude them from the state's Medicaid coverage."  Doc.246, at 21.

### A.    The Exclusions discriminate based on sex and are therefore subject to intermediate scrutiny.

 "[W]hen it comes to sex-based classifications, a policy will pass constitutional muster only if it satisfies intermediate scrutiny." *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 801 (11th Cir. 2022) (en banc).  To survive such scrutiny the State must offer an "exceedingly persuasive justification." *United States v. Virginia*, 518 U.S. 515, 531-33 (1996).  It must show that its decision to regulate by sex-discriminatory means is substantially related to the achievement of important governmental objectives. *Id.*

The district court properly determined the Exclusions discriminate based on sex.  They do so in three ways, they: (1) facially classify based on sex; (2) facially classify based on a person's failure to identify with their assigned sex, i.e., their transgender status; and (3) impermissibly seek to impose sex stereotypes.

### 1.    *The Exclusions prohibit coverage based on a person's sex.*

The Exclusions "necessarily rest[] on a sex classification." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020).  The Rule prohibits coverage for treatments for gender dysphoria if they seek to "*alter* primary or secondary *sexual* characteristics," including puberty blockers, hormones and

18

hormone antagonists, and "*sex reassignment* surgeries."    FAC 59G-1.050(7) (emphasis added).  Meanwhile, Section 3 of SB254 prohibits the use of "state funds … for *sex-reassignment* prescriptions or procedures," which includes "puberty blockers," "hormones or hormone antagonists," or any "medical procedure" "to affirm a person's *perception of his or her sex* if that perception is *inconsistent with the person's sex*."  Fla. Stat. §§ 286.311(2), 456.001(9)(a) (emphasis added).  These provisions "cannot be stated without referencing sex" and are therefore "inherently based upon a sex-classification."  *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1051 (7th Cir. 2017), *partially abrogated on other grounds as recognized by A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 768-69 (7th Cir. 2023).

By their plain terms, the Exclusions condition necessary medical care on a person's assigned sex.  This is discrimination based on sex.  *See Brandt v. Rutledge*, 47 F.4th 661, 669 (8th Cir. 2022); *see also K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 2023 WL 4054086, at *8 (S.D. Ind. June 16, 2023), *appeal filed*, No. 23-2366 (7th Cir. July 12, 2023).  When a law facially "provides that different treatment be accorded to [persons] on the basis of their sex," the law necessarily "establishes a classification subject to scrutiny under the Equal Protection Clause."  *Reed v. Reed*, 404 U.S. 71, 75 (1971).

The district court rightly noted that "[i]f one must know the sex of a person to know whether or how a provision applies to the person, the provision draws a line based on sex."  Doc.246, at 30 (citing *Bostock v. Clayton Cnty.*, 140 S.Ct. 1731, 1737 (2020); *Adams*, 57 F.4th at 801).  That is because "[a] facial inquiry is what it sounds like: a review of the language of the policy to see whether it is facially neutral or deals in explicitly … gendered terms."  *Kadel v. Folwell*, 620 F.Supp.3d 339, 375 (M.D.N.C. 2022) (cleaned up) (citing *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 485 (1982)).

Defendants rely on this Court's recent decision in *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205 (11th Cir. 2023).  But that decision does not foreclose Plaintiffs' arguments.  True, the Court in *Eknes-Tucker* did "not find the direct sex-classification argument to be persuasive" because "it is difficult to imagine how a state might regulate the use of puberty blockers and cross-sex hormones for the relevant purposes in specific terms *without* referencing sex in some way."  *Id.* at 1228.  But even setting aside that no mandate has been issued and a petition for rehearing *en banc* remains pending in that case, its reasoning does not apply to Plaintiffs' arguments, which are not based on the mere incidental use of "gendered terms."

That the Exclusions utilize "gendered terms" is not just a matter of semantics; *it is central to how the Exclusions operate*.  They do not categorically prohibit

coverage for certain medical procedures writ large; instead, whether coverage for a specific treatment is prohibited depends exclusively on whether the treatment is deemed consistent or inconsistent with the person's assigned sex. As the district court explained, "consider an adolescent … that a physician wishes to treat with testosterone. To know the answer [to whether the care will be covered], one must know the adolescent's sex. If the adolescent is a natal male, the treatment is covered. If the adolescent is a natal female, the treatment is not covered." Doc.246, at 30-31. In other words, the Exclusions "penalize" a person designated male at birth for the same "action[]" of seeking feminizing medical treatment that they "tolerate" in persons designated female at birth. *Bostock*, 140 S.Ct. at 1741.[11] Stated differently, the Exclusions' gendered terms do not simply describe the nature of the care that is excluded from coverage, but *who* can have the care they need covered. As the Supreme Court explained, if the legislature cannot "writ[e] out instructions" for determining whether treatment is covered "without using the words man, woman, or sex (or some synonym)," the law classifies based on sex. *Bostock*, 140 S.Ct. at 1746.[12] The Exclusions expressly reference a Medicaid beneficiary's sex and gender

---

[11]    By contrast, the Exclusions contain an explicit exception allowing for irreversible, sterilizing surgery on intersex infants with differences of sex development if the surgery seeks to conform the infant's body with their assigned sex. Fla. Stat. § 456.001(9)(b).

[12]    As discussed in greater depth *infra* at Section I.A.2, this analysis applies regardless that *Bostock* was a Title VII case rather than an Equal Protection case.

conformity and use them to determine whether treatment will be covered. This triggers the Equal Protection inquiry. *See Virginia*, 518 U.S. at 555.

Defendants further argue "[t]here's no sex-based discrimination" because "the challenged laws apply equally to both sexes." Defs.' Br. 29. This misses the mark. There is no exception to heightened scrutiny for sex-based classifications that apply equally to men as a group and women as a group. "Judicial inquiry under the Equal Protection Clause … does not end with a showing of equal application." *McLaughlin v. Florida*, 379 U.S. 184, 191 (1964). Explicit facial classifications do not become neutral "on the assumption that all persons suffer them in equal degree." *Powers v. Ohio*, 499 U.S. 400, 410 (1991). We do not compare the relative burdens the law places on people of differing sexes. *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 125 n.13 (4th Cir. 2022), *cert. denied*, 143 S.Ct. 2657 (2023). Indeed, the Supreme Court squarely rejected this argument in *J.E.B. v. Alabama*, 511 U.S. 127, 141-42 (1994). The right to equal protection is individually held, and the Exclusions impose an impermissible sex-based classification upon each person seeking coverage for their care, requiring heightened scrutiny.

Finally, that the Exclusions deal with medical procedures and a medical diagnosis does not mean they do not discriminate based on sex. To argue otherwise puts the cart before the horse, as such argument goes to whether the Exclusions' sex-based classifications can be sufficiently justified, not whether they discriminate

based on sex. The very purpose of heightened scrutiny is "to assure that the validity of [a sex] classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions." *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 725-26 (1982). The nature of the medical care and underlying diagnosis may be reasons why a particular classification survives heightened scrutiny, *see Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 73 (2001), but they cannot be a basis for refusing to apply heightened scrutiny in the first place. *See Hogan*, 458 U.S. at 724 n.9 ("While the validity and importance of the objective may affect the outcome of the analysis, the analysis itself does not change.").

In sum, because a beneficiary's sex plays "an unmistakable and impermissible role in the" decision to deny Medicaid coverage, the Exclusions facially discriminate based on sex. *Bostock*, 140 S.Ct. at 1741–42.

### 2. The Exclusions prohibit coverage based on transgender status.

The Exclusions also discriminate based on transgender status or, in other words, the incongruence between a person's gender identity and assigned sex. And "discrimination based on … transgender status necessarily entails discrimination based on sex." *Bostock*, 140 S.Ct. at 1747; *see also Hecox v. Little*, 79 F.4th 1009, 1026 (9th Cir. 2023) ("discrimination on the basis of transgender status is a form of sex-based discrimination" under Equal Protection); *A.C.*, 75 F.4th at 769; *Grimm*,

23

972 F.3d at 608; *Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) (discrimination against a transgender person is sex discrimination under the Equal Protection Clause). Defendants fail to even mention *Bostock*, notwithstanding that litigants are not free to ignore the Supreme Court's reasoning.

Here, the Exclusions explicitly bar "*sex reassignment*" prescriptions or procedures.[13] By targeting "sex reassignment," the Exclusions necessarily classify based on transgender status: only transgender people undergo "sex reassignment" as treatment for gender dysphoria. And "a person cannot suffer from gender dysphoria without identifying as transgender." *Fain v. Crouch*, 618 F.Supp.3d 313, 325 (S.D.W. Va. 2022); *see also C.P. v. Blue Cross Blue Shield of Illinois*, 2022 WL 17788148, at *6 (W.D. Wash. Dec. 19, 2022); *Kadel v. Folwell*, 2022 WL 11166311, at *4 (M.D.N.C. Oct. 19, 2022). The Exclusions therefore single out treatment that only transgender people need or seek. *See Fain*, 618 F.Supp.3d at 327; *Toomey v. Arizona*, 2019 WL 7172144, at *6 (D. Ariz. Dec. 23, 2019); *Flack v. Wisconsin Dep't of Health Servs.*, 328 F.Supp.3d 931, 950 (W.D. Wis. 2018); *see also Eknes-Tucker*, 80 F.4th at 1229. By doing so, the Exclusions discriminate based on transgender status, and therefore discriminate based on sex.

---

[13]    This includes any prescriptions or procedures "to affirm a person's *perception of his or her sex* if that perception is *inconsistent with the person's sex*," as SB254 states, or to "*alter* primary or secondary *sexual* characteristics," as the Rule states.

To be sure, in *Eknes-Tucker*, this Court observed that "[b]ecause *Bostock* … concerned a different law (with materially different language) and a different factual context, it [bore] minimal relevance to [that] case." 80 F.4th at 1229. But the question here is not whether to import Title VII's liability standard to the Equal Protection Clause; instead, it is whether the Exclusions' discrimination against transgender people constitutes sex discrimination. The answer is yes.

That *Bostock* addressed Title VII rather than Equal Protection is irrelevant, as we look to its reasoning, not its holding. Indeed, *Bostock* did not say its reasoning applies only to Title VII or suggest that its assessment of sex classifications could not apply in other contexts. Lower courts are "bound by more than just the express holding of a case"—their decisions "must comport with the 'reasoning or theory,' not just the holding, of Supreme Court decisions." *Thompson v. Hebdon*, 7 F.4th 811, 827 (9th Cir. 2021). And what constitutes sex discrimination for purposes of Title VII is the same for purposes of the Fourteenth Amendment. *See Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 145 (1976), *superseded by statute*, 42 U.S.C. § 2000e(k).[14]

---

[14]    While *Gilbert* was superseded by statute, its broader point about what constitutes sex discrimination not differing remains.

While differences exist between Title VII and the Equal Protection Clause, those distinctions concern whether sex discrimination is *permissible*[15]—not whether a sex classification exists in the first place.  When attention is properly trained on the *classification* identified in *Bostock* rather than the ultimate question of liability, it is apparent the Supreme Court's reasoning applies in full force here.

That *Bostock* did not decide this case does not mean that its reasoning does not apply.  To find otherwise "is reading quite a bit into a statement that says, in essence, 'we aren't reaching this point.'"  *A.C.*, 75 F.4th at 769.  "It is best to take the Court at its word," however.  *Id.*

And any reliance on the "different language" between Title VII and the Fourteenth Amendment overlooks that both unambiguously focus on discrimination against individual persons, not groups.  *Compare Bostock*, 140 S.Ct. at 1740-41, *with J.E.B.*, 511 U.S. at 152 (Kennedy J., concurring).

Even if *Bostock*'s reasoning could be limited to Title VII (it cannot), Defendants cannot explain how consideration of a person's sex can be avoided when considering their transgender status.

---

[15]    Sex discrimination under Title VII is categorically prohibited, but a sex classification may still be permissible under the Equal Protection Clause if it satisfies heightened scrutiny.  *Cf. Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 308-309 (2023) (Gorsuch, J., concurring) (drawing distinction between Title VI and Title VII's categorical prohibitions on race and sex discrimination and the Equal Protection Clause's application of strict and intermediate scrutiny).

Because the Exclusions discriminate based on transgender status, they discriminate based on sex.

### 3. *The Exclusions prohibit coverage based on sex stereotypes.*

The Exclusions also rest on stereotypical notions about what it means to be male or female. Blackletter law holds that discrimination based on "sex" encompasses discrimination based on the failure to conform to sex stereotypes—not merely "biological sex." Indeed, "governmental acts based upon gender stereotypes—which presume that men and women's appearance and behavior will be determined by their sex—must be subjected to heightened scrutiny because they embody the very stereotype the law condemns." *Glenn*, 663 F.3d at 1320 (quotation omitted).[16] And "[b]y definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth." *Whitaker*, 858 F.3d at 1048; *accord Glenn*, 663 F.3d at 1316 ("A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes."). Here, the Exclusions explicitly enforce sex stereotypes and gender conformity by targeting health care for exclusion if a treatment's purpose is to "to affirm a person's perception of his or her sex if that perception is inconsistent with the person's sex," Fla. Stat. § 456.001(9)(a), or "alter primary or secondary sexual characteristics," FAC 59G-1.050(7).

---

[16]    *Glenn*'s reasoning cannot be limited to employment context.

By making coverage contingent on a person's sex, the Exclusions are an impermissible "form of sex stereotyping where an individual is required effectively to maintain [their] natal sex characteristics." *Boyden v. Conlin*, 341 F.Supp.3d 979, 997 (W.D. Wis. 2018).

Such discrimination "is not only discrimination because of maleness and discrimination because of femaleness," it also includes "discrimination because of the properties or characteristics by which individuals may be classified as male or female." *Fabian v. Hosp. of Cent. Connecticut*, 172 F.Supp.3d 509, 526 (D. Conn. 2016); *see also Equal Emp. Opportunity Comm'n v. R.G. &. G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 576 (6th Cir. 2018), *aff'd sub nom. Bostock*, 140 S.Ct. 1731. Here, the Exclusions impose the notion that one's sex and sex characteristics are confined by and must be maintained in accordance with one's sex characteristics at birth. But a cisgender woman is no less a woman because she needs a mastectomy, hysterectomy, or estrogen, nor is a cisgender man any less a man because he needs an orchiectomy or testosterone. Similarly, transgender people should not have their medical care limited because the care is not "consistent" with their assigned sex.

The Exclusions "tether[] Plaintiffs to sex stereotypes which, as a matter of medical necessity, they seek to reject." *Kadel v. Folwell*, 446 F.Supp.3d 1, 14 (M.D.N.C. 2020).[17]

### B.    Because the Exclusions discriminate based on transgender status, they are independently subject to heightened scrutiny.

The district court was correct to hold that classifications based on transgender status are subject to heightened scrutiny.  Doc.246, at 32-34.

Heightened scrutiny is required where the government targets a class that (1) has been historically "subjected to discrimination," *Bowen v. Gilliard*, 483 U.S. 587, 602 (1987); (2) has a defining characteristic bearing "no relation to ability to perform or contribute to society," *City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985); (3) has "obvious, immutable, or distinguishing characteristics that define them as a discrete group," *Gilliard*, 483 U.S. at 602; and (4) is "a minority or politically powerless," *id*.  All the indicia are present here.

---

[17]    While the Court in *Eknes-Tucker* stated the law at issue "targets certain medical interventions for minors meant to treat the condition of gender dysphoria; it does not further any particular gender stereotype," 80 F.4th at 1229, this statement gets it backwards.  By targeting medical procedures (available to all others for other purposes) when used to treat gender dysphoria, the Exclusions exclude coverage based on notions about how sexual characteristics ought to align for a transgender person, given that gender dysphoria is defined by the incongruence between a person's gender identity and assigned sex.  Whether these limits are justified is a distinct question.

Relying on *Adams*'s footnote 5, Defendants argue the court erred in this respect. But *Adams*'s statement expressing "grave doubts," also cited in *Eknes-Tucker*, 80 F.4th at 1230, was *dictum*. Neither *Adams* nor *Eknes-Tucker* assessed the indicia of suspectness inherent in transgender status classifications. And "the lack of binding precedent does not require this Court to only apply rational basis review, nor does it prevent this Court from relying on well-reasoned opinions of non-binding courts to inform its opinion here." *Ray v. McCloud*, 507 F.Supp.3d 925, 938 (S.D. Ohio 2020).

The Court should follow the Fourth and Ninth Circuits (as well as most district courts) in concluding transgender persons constitute a quasi-suspect class. *See*, *e.g.*, *Grimm*, 972 F.3d at 608; *Karnoski v. Trump*, 926 F.3d 1180, 1200-01 (9th Cir. 2019); *Evancho v. Pine-Richland Sch. Dist.*, 237 F.Supp.3d 267, 288 (W.D. Pa. 2017); *cf. Brandt*, 47 F.4th at 670 n.4.

Defendants do not dispute the first two factors: (1) that "transgender individuals … continue to suffer widespread private opprobrium and governmental discrimination, notably in the rule and statute now under review," and (2) that "[t]ransgender status is rarely an appropriate basis on which to parcel out government benefits or burdens." Doc.246, at 33. "There is no denying that transgender individuals face discrimination, harassment, and violence because of their gender identity," *Whitaker*, 858 F.3d at 1051, and that this discrimination is

30

unrelated to transgender people's value to society, *Grimm*, 972 F.3d at 612.  The

record supports this.  *See*, *e.g.*, Doc.176-29; Doc.176-36; Doc.176-37; Doc.178-11;

Tr. 473:10-23, 550:16-24, 554:15-20, 561:22-24; *see also*, *supra*, Part F.

Because these first two factors alone may be dispositive, *see Windsor v.

United States*, 699 F.3d 169, 181 (2d Cir. 2012), heightened scrutiny is warranted,

and the district court's decision should be affirmed.

Nonetheless, as to the third factor, Defendants argue that transgender status is

not immutable.  Defs.' Br. 33.  But though gender identity is innate, has a biological

underpinning, and cannot be voluntarily changed, *Grimm*, 972 F.3d at 612-13;

Tr.27:15-17, 30:1-5, "the test is broader" than immutability.  *Windsor*, 699 F.3d at

183.[18]  It includes whether individuals exhibit "distinguishing characteristics that

define them as a discrete group."  *Gilliard*, 483 U.S. at 602.  Indeed, illegitimacy

and alienage are quasi-suspect or suspect classifications notwithstanding they are

not immutable.  *See Mills v. Habluetzel*, 456 U.S. 91, 98-99 (1982); *Nyquist v.

Mauclet*, 432 U.S. 1, 9 n.11 (1977).  Similarly, here, transgender people are an easily

distinguishable and discrete group.

---

[18]    "Rather than asking whether a person *could* change a particular characteristic, the better question is whether the characteristic is something that the person *should* be required to change [in order to avoid government discrimination] because it is central to a person's identity." *Wolf v. Walker*, 986 F.Supp.2d 982, 1013 (W.D. Wis. 2014), *aff'd sub nom*, *Baskin v. Bogan*, 766 F.3d 648 (7th Cir. 2014); *see also Latta v. Otter*, 771 F.3d 456, 464 n.4 (9th Cir. 2014).

As to the fourth factor, "transgender people are unarguably a politically vulnerable minority." *F.V. v. Barron*, 286 F.Supp.3d 1131, 1145 (D. Idaho 2018). Defendants argue otherwise because the current presidential administration is supportive of transgender rights. Defs.' Br. 33. But as documented throughout this brief and the record, transgender people lack the political power to prevent the onslaught of legislation targeting them for discrimination nationally and in Florida. *See Grimm*, 972 F.3d at 612; *see also*, *supra*, Part F, and *infra*, Section I.C. These attacks are "part of a much larger, coordinated effort to erase transgender people entirely."[19] Contending that transgender people are not a politically powerless group is untenable.

The district court was thus correct to hold classifications based on transgender status, like the Exclusions, are quasi-suspect and warrant heightened scrutiny.

## C. The Exclusions are subject to heightened scrutiny because they engage in purposeful discrimination.

Third, the district court correctly found that the Exclusions warrant heightened scrutiny because they engage in purposeful discrimination. The Exclusions were adopted "because of," not "in spite of," their adverse effects on transgender people's

---

[19]    Movement Advancement Project, *Under Fire: Banning Medical Care and Legal Recognition for Transgender People* (Sept. 2023), https://www.mapresearch.org/file/MAP-2023-Under-Fire-Report-5.pdf.

ability to live in accordance with their gender identity. *See Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979).

The district court found that "[t]he rule and statute at issue were motivated in substantial part by the plainly illegitimate purposes of disapproving transgender status and discouraging individuals from pursuing their honest gender identities," as well as "[d]issuading a person from conforming to the person's gender identity rather than to the person's natal sex." Doc.246, at 37-38. These are "not [] legitimate state interest[s]." *Id.* at 37. Rather, it "was purposeful discrimination against transgender[] [persons]." *Id.* at 38. The district court is not alone. Other courts have found the same regarding similar laws. *See* Order Granting Pls.' Mot. Prelim. Inj., *van Garderen v. Montana*, No. DV-23-541 (Missoula Cnty. Dist. Ct., Mont. Sept. 27, 2023), at 33-34.[20]

Given their explicit terms, disapproving of transgender people and enforcing state-mandated gender conformity was plainly not an incidental effect of the Exclusions; it was their purpose, thus triggering heightened scrutiny under *Feeney*. Indeed, "a disparate impact on a group offends the Constitution when an otherwise neutral policy is motivated by purposeful discrimination." *Adams*, 57 F.4th at 810.

---

[20]    Available    at:    https://www.documentcloud.org/documents/23993157-montana-order-granting-plaintiffs-motion-for-preliminary-injunction.

Moreover, the Exclusions were not adopted in a vacuum, but within a broader context of legislation and other measures in Florida and nationally targeting transgender people for discrimination. *See*, *supra*, Part F and Section I.B. This, coupled with the Exclusions' history and context, is independently sufficient to warrant heightened scrutiny.

In determining whether a "law has both a discriminatory intent and effect," this Court has relied on *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), and later caselaw requiring the consideration of several factors about the law and its adoption. *See League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 922 (11th Cir. 2023). These factors support the application of heightened scrutiny:

*The impact of the challenged law:* Undeniably, "the Exclusion[s] impact[] only transgender individuals—that provides some circumstantial evidence of intentional discrimination." *Lange v. Houston Cnty.*, 608 F.Supp.3d 1340, 1355 (M.D. Ga. 2022); *see also Eknes-Tucker*, 80 F.4th at 1229; Doc.246, at 35, 36.

*The historical background:* Florida Medicaid covered medical treatment for gender dysphoria until 2022, when Florida enacted or adopted a blizzard of anti-LGBTQ laws. Indeed, the district court found that, until the Exclusions were implemented, "AHCA approved Medicaid payment for puberty blockers … and

cross-sex hormones." Doc.246, at 9; *see also*, *supra*, Part C; Tr. 435:7-16. Again, Defendants do not dispute any of these factual findings.

*The specific sequence of events leading up to passage:* The Exclusions originated as part of a political response to an HHS fact sheet. *See*, *supra*, Part D. The Rule was adopted at the behest of the Governor's office, using a political, anomalous, and predetermined process. *Id.*; Doc.246, at 9. The outcome was known from the start, always leading to the care being "effectively banned." PX.295; PX.296. Moreover, the rapid succession of events leading to the Exclusions' adoption evinces that they were driven by opposition to medical care unique to transgender people, with the predetermined objective of restricting care for a targeted group, rather than a neutral or good faith inquiry.

*Procedural and substantive departures:* A litany of procedural and substantive departures led to the Exclusions' adoption. As the district court found, "[t]he new GAPMS process was, from the outset, a biased effort to justify a predetermined outcome, not a fair analysis of the evidence." Doc.246, at 9. These departures included: (1) direction from the Florida Governor's office to reconsider coverage of this care, Tr. 1259:24-1260:16; *see also* Tr. 421:7-12, 1378:15-17; (2) close coordination with other agencies, including the Governor's Office and FDOH, *see*, *supra*, Part D; (3) the unprecedented use of the GAPMS process for a treatment already covered, Doc.235-1, at 93:13-21; (4) the retaining of consultants to support

35

a GAPMS determination, Doc.235-2, 13:10-12, 15:17-16:3; (5) the use of only consultants known in advance for their staunch opposition to gender-affirming care, Doc.230-4, 112:5-23; PX.324; and (6) the dismissal of professional organizations and experts that AHCA had frequently cited in prior GAPMS determinations, Doc.235-1, 117:21-120:7; PX.18; *see also* Tr. 1231:10-20; PX.240; PX.333.

Moreover, the legislative process through which SB254 was adopted primarily relied on the GAPMS Report and witnesses who opposed gender-affirming medical care and already served as the State's witnesses in this case. Furthermore, as noted in Part E, *supra*, the legislature refused to hear from any person negatively impacted by SB254 or who was supportive of the care at issue.

*The contemporary statements and actions of key officials and legislators:* The district court cited some of the many examples in the trial and public records evidencing the targeted opposition to transgender people by key stakeholders. Doc.246, at 33 n.62 (pointing to Representative Webster Barnaby's comments referring to transgender Floridians as "mutants" and "demons and imps"). For example, in their trial brief, Plaintiffs pointed to Governor DeSantis's tweet saying that "Gender-affirming care is a euphemism for disfiguring kids" and a video where he falsely says that gender-affirming medical care involves "chopping off [kids'] private parts" and is a "woke ideology" that "is a really destructive mind virus." Doc.199, at 17 n.11.

Another cited a fabricated story that a parent had put a six-month-old child on hormone therapy who was "changed into a man."[21]  One  referred to medical care for transgender adolescents as an "abomination" and "child abuse"[22] while another described medical care for transgender people as "gruesome" and "diabolical," and claimed that it leaves those that undergo it "disfigured" and "crippled."[23]

These statements and many more are in the public record and this Court can take judicial notice of them.  *See Anderson v. Holder*, 673 F.3d 1089, 1094 (9th Cir. 2012) ("Legislative history is properly a subject of judicial notice."); *Dolloff v. United States,* 121 F.2d 157, 159 (8th Cir. 1941).  Furthermore, these are legislative facts, which appellate courts often find on their own.  *See* Kenneth Culp Davis, *An Approach to Problems of Evidence in the Administrative Process*, 55 Harv. L. Rev. 364, 403-07 (1942) (describing Supreme Court and other cases in which appellate courts found legislative facts).

*The foreseeability of the disparate impact and knowledge of that impact:*  The Exclusions' impact on transgender Medicaid beneficiaries was not only foreseeable

---

[21]    Hearing on H.B. 1421, 2023 Leg., 125th Sess., at 1:53:53 to 1:54:09 (Mar. 22, 2023), https://tinyurl.com/464nmuvn (statement of Rep. Melony M. Bell at 1:53:53 to 1:54:09).

[22]    *Id.* (statement of Rep. Randy Fine at 32:57- 35:51; 2:03:54-2:03:58).

[23]    Hearing on S.B. 254, 2023 Leg., 125th Reg. Sess., at 2:23:05-2:24:04 (Apr. 19, 2023) https://tinyurl.com/2usfjna4 (statement of Rep. Dean Black at 2:23:05-2:24:04).

but intended.  Coverage for the treatments is banned only when transgender people need them.  The record below thus established not only a "foreseeab[le] … disparate impact," *League of Women Voters*, 66 F.4th at 922, but a disparate impact within the actual "knowledge" of policymakers.  *Id.*  This impact was communicated to Defendants.  *See*, *e.g.*, PX.323-25; *see also*, *supra*, Part F.

*The availability of less discriminatory alternatives*: "There is no evidence [Defendants] considered less discriminatory alternatives."  *Lange*, 608 F.Supp.3d at 1356.  For example, if Florida sought to ensure that individuals receive competent and appropriate care for treatment of gender dysphoria, it could have required compliance with the Protocols, which include standards for prescribing medication, ensuring that patients understand the risks and benefits of treatment, and obtaining informed consent.  Instead, Florida banned public funding for all gender-affirming medical care.

These facts, none of which Defendants dispute, could not be clearer.  The district court correctly found that the Exclusions manifested purposeful discrimination against transgender people.

**D.    Neither *Geduldig*, *Dobbs*, nor *Eknes-Tucker* forecloses the application of heightened scrutiny to the Exclusions.**

Relying on *Geduldig v. Aiello*, 417 U.S. 484, 496 n.20 (1974), *Dobbs v. Jackson Women's Health Org.*, 142 S.Ct. 2228, 2235 (2022), and *Eknes-Tucker*, Defendants say it does not matter that the Exclusions prohibit treatment only

38

transgender people need or seek, because, they claim, the Exclusions discriminate based on diagnosis. But neither *Geduldig* nor *Dobbs* assist Defendants.[24] As the district court found, the statement in these cases "about procedures only one sex can undergo is simply inapplicable." Doc.246, at 36.

Equal protection jurisprudence has long drawn a fundamental distinction between sex-neutral classifications (which trigger heightened scrutiny only when passed, at least in part, for a discriminatory purpose) and facial sex classifications (which always trigger heightened scrutiny). *See Feeney*, 442 U.S. at 273-74. Here, the Exclusions *facially* classify based on sex, requiring that in each instance a person's sex be known and used to determine whether treatment is covered. *See*, *supra*, Section I.A.1; *see also L.W. v. Skrmetti*, 83 F.4th 460, 502 (6th Cir. 2023) (White, J., dissenting). Nor did *Dobbs* overrule *Virginia*'s command that all sex classifications warrant heightened scrutiny. Indeed, lower courts are bound to follow Supreme Court precedent "even if the lower court thinks the precedent is in tension with some other line of decisions." *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (quotation omitted). By conflating the disparate impact at issue in

---

[24]     *Dobbs* did not create new equal-protection law; it simply reiterated *Geduldig*'s holding that facially neutral regulations of medical procedures do not always receive heightened scrutiny simply because they disparately impact members of one sex.

*Geduldig/Dobbs* with the facial classification at issue in this case, Defendants ignore that fundamental distinction.

The centrality of gender transition to transgender identity further distinguishes this case from *Geduldig*. Unlike the pregnancy exclusion in *Geduldig*, the Exclusions are based on a characteristic that defines membership in the excluded group. Pregnancy is not the defining characteristic of womanhood. Living in accord with one's gender identity rather than assigned sex, which the excluded care enables, is the defining characteristic of a transgender person. *See*, *e.g.*, *Glenn*, 663 F.3d at 1316.

The Supreme Court has "declined to distinguish between status and conduct" in analogous contexts. *Christian Legal Soc'y Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 689 (2010); *see also Lawrence v. Texas,* 539 U.S. 558, 583 (2003) (O'Connor, J., concurring) (Where "the conduct targeted by th[e] law … is closely correlated" with the status of being gay, the law "is targeted at more than conduct," "[i]t is instead directed toward gay persons as a class."); *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993); *cf. Castaneda v. Partida*, 430 U.S. 482, 495 (1977). Thus, laws singling out "sex reassignment" for differential treatment should be understood as treating transgender people differently "as a class." *Williams v. Kincaid*, 45 F.4th 759, 772 (4th Cir. 2022).

Finally, *Geduldig* itself recognized that where, as here, distinctions are "mere pretexts designed to effect an invidious discrimination against the members of one [protected class] or the other," such distinctions are unconstitutional. *Geduldig*, 417 U.S. at 496 n.20; *see also Hecox*, 79 F.4th at 1025. The intent to treat transgender persons differently pervades the Exclusions' history and showcases their discriminatory purpose. *See*, *supra*, Section II.C. Moreover, "[s]ome activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed." *Bray*, 506 U.S. at 270. The Exclusions are plain: coverage is prohibited only for the purpose of "sex reassignment." That is enough to show pretext.

Such a finding of pretext, which the district court made, also distinguishes this case from *Eknes-Tucker*. In *Eknes-Tucker*, the court stated that "the regulation of a course of treatment that only gender nonconforming individuals can undergo would not trigger heightened scrutiny unless the regulation were a pretext for invidious discrimination against such individuals," which "the district court did not find" in that case. 80 F.4th at 1229–30. Here, however, the district court made such a finding.

Additionally, the law at issue in *Eknes-Tucker* pertained solely to children, and the court expressly explained that "notably that interest itself distinguishes

41

minors from adults." *Id.* at 1230. Here, by contrast, the Exclusions prohibit coverage for adults and minors alike. This fact further bolsters the finding of pretext as the Exclusions do not discriminate based on age and cannot be explained by an interest in the wellbeing of minors.[25]

### E.    No rational bases, let alone exceedingly persuasive justifications, exist for the Exclusions.

The district court carefully analyzed the possible justifications for the Exclusions and found each lacking and to be "largely pretextual." Doc.246, at 38. This included assertions that the evidence in support of this care is of "low quality"; the risks attendant to treatment; allegations of bias in medical organizations; international views; concerns about malpractice; allegations that starting treatment leads to continuation of treatment; and that the use of puberty-delaying medications and hormones as treatment for gender dysphoria is "off-label." *Id.* at 38-51. The court rightly dismissed each of these contentions, concluding that "the denial of Medicaid coverage for transgender patients for the same drugs covered for others survives neither intermediate nor rational-basis scrutiny." *Id.* at 51.

---

[25]    Both AHCA and the legislature focused on gender-affirming medical care solely as to minors. There is no evidence whatsoever introduced by the State in the lead up to the Rule, to SB254, or at trial pertaining to this care as to adults, for whom the Exclusions apply. While the Equal Protection Clause may not always require perfectly drawn lines, the unprecedented gross overinclusivity of the Exclusions in this regard further shows the justifications for the Exclusions are pretextual.

On appeal, Defendants do not argue that the district court's analysis on any of these purported rationales was wrong, rather they cursorily argue that the State has an interest in (1) "protecting its citizens from risky and poorly supported medical procedures for the treatment of a difficult-to-diagnose condition," (2) "in protecting the integrity and ethics of the medical profession," and (3) in "preserving and promoting the welfare of its residents, particularly children." Defs.' Br. 35. Defendants do not explain how the Exclusions are rationally related to these interests; let alone how they meet "the close means-end fit required to survive heightened scrutiny." *Sessions v. Morales-Santana*, 582 U.S. 47, 68 (2017).

1. *Defendants' assertion that gender-affirming medical care is experimental has no basis.*

Defendants' argument that gender-affirming medical care is experimental is baseless. Plaintiffs' experts, whom the court credited, testified extensively regarding the safety, efficacy, and well-established nature of this care. *See*, *supra*, Part A. Defendants' say so is not enough.[26]

---

[26]    While not applicable to the equal protection context, the State tries to equate reasonableness under *Rush v. Parham*, 625 F.2d 1150 (5th Cir. 1980), with rational basis analysis. These analyses are distinct, however. In any event, the district court found the State's determination was patently unreasonable. And AHCA's skewed and incomplete consideration of the six factors set forth in FAC 59G-1.035(4) underscores that its determination was not reasonable. *See K.G. ex rel. Garrido v. Dudek*, 864 F.Supp.2d 1314, 1322 (S.D. Fla. 2012), *aff'd in part, rev'd in part sub nom. Garrido v. Dudek*, 731 F.3d 1152 (11th Cir. 2013).

While not binding in this context, Florida's Medicaid regulations are instructive in this regard. They articulate six criteria to determine whether a service is consistent with generally accepted professional medical standards, as opposed to experimental or investigational. FAC 59G-1.035(4); *see also K.G.*, 864 F.Supp.2d at 1321. The criteria are: (a) evidence-based clinical practice guidelines; (b) published reports and articles in the authoritative medical and scientific literature related to the health service (published in peer-reviewed scientific literature generally recognized by the relevant medical community or practitioner specialty associations); (c) effectiveness of the health service in improving the individual's prognosis or health outcomes; (d) utilization trends; (e) coverage policies by other creditable insurance payor sources; (f) recommendations or assessments by clinical or technical experts on the subject or field. FAC 59G-1.035(4). Each of these factors favors Plaintiffs.

a.      Here, WPATH and the Endocrine Society have published the Protocols, which the district court found "are widely followed by well-trained clinicians," "are used by insurers," and "have been endorsed by the United States Department of Health and Human Services." Doc.246, at 16-17. Defendants do not dispute any of this.

Defendants argue that WPATH and the Endocrine Society are "advocacy organizations." Defs.' Br. 5. But these aspersions lack merit. First, it is *de rigeur*

for professional medical associations to advocate on behalf of healthcare providers and patients. Tr. 76:20-77:9, 96:6-17. That does not undermine—let alone, invalidate—their published clinical practice guidelines. Second, the fact that WPATH members drafted the Standards of Care merely reflects that clinicians and researchers with the requisite expertise in transgender medicine drafted them. Tr. 125:5-8, 125:19-21. Third, the guidelines are based on rigorous reviews of the peer-reviewed scientific literature and extensive clinical experience. Tr. 32:25-33:13, 186:2-9; DX.16, at App. A; DX.24, at 3872-73. Indeed, they were published in peer-reviewed, medical journals, providing "a significant indication that it is taken seriously by other scientists, i.e., that it meets at least the minimal criteria of good science." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995).

b.    A plethora of cross-sectional and longitudinal observational studies support the provision of gender-affirming medical care. *See*, *supra*, Part A. These studies also accord with Plaintiffs' experts' abundant clinical experience. *Id*. Conversely, as the district court found, "evidence suggesting these treatments are ineffective is nonexistent." Doc.246, at 39.

Defendants attempt to discount the abundant supportive literature as "low quality." But as the district court found, that claim is highly misleading. *See*, *supra*, Part A; Doc.246, at 38-41. "[I]t is commonplace for medical treatments to be provided even when supported only by research producing evidence classified as

'low' or 'very low on [the GRADE] scale."  Doc.246, at 39-40.  And "[t]he record includes unrebutted testimony that only about 13.5% of accepted medical treatments across all disciplines are supported by 'high' quality evidence on the GRADE scale." *Id.* at 40.

c.    The peer-reviewed literature shows that puberty-delaying medications, hormone therapy, and surgery are: 1) safe and effective for the treatment of gender dysphoria; and 2) when used for that purpose, correlated with additional positive health outcomes, including improved quality of life, mental health, and psychosocial functioning.  *See*, *supra*, Part A.

d.    A notable increase in the utilization of gender-affirming medical care has occurred over the last three decades, as reflected by AHCA's own data.  Tr. 487:24-489:7; PX.317.  This shows that the services are commonly used and not experimental.  *See Rush*, 625 F.2d at 1156 n.11 (contrasting service that is "generally accepted by the professional medical community as an effective and proven treatment for the condition for which it is being used" with a one that "is rarely used, novel, or relatively unknown").

e.    The Exclusions are outliers among health insurance plans.  Most health plans, in Florida and elsewhere, do not have categorical transgender-specific exclusions.  Tr. 480:19-481:16.  Indeed, most states and territories operating a Medicaid program *do not* exclude coverage of gender-affirming medical care.  Tr.

484:8-485:9.   And Florida Medicaid itself covered this care until the Rule was adopted.  *See*, *supra*, Part C.

While other nations' coverage policies have never factored into the GAPMS process, Defendants argue that their determination regarding gender-affirming medical care reflects a "growing global consensus" on the issue.  Defs. Br. 29.  But as the district court found, "[t]he assertion is false. And no matter how many times the defendants say it, it will still be false."  Doc.246, at 45.  "No country in Europe— or so far as shown by this record, anywhere in the world—entirely bans these treatments or refuses to pay for them."  *Id.* at 45-46; Tr. 78:5-17.  Moreover, the small handful of policies Defendants point to pertain solely to minors, Tr. 81:9-17, whereas the Exclusions apply to adolescents and adults alike.  The Exclusions are thus extreme outliers nationally and internationally.

f.    Finally, recognized clinical and technical experts in the field of transgender medicine agree that puberty-delaying medications and hormone therapy are safe and effective treatments for gender dysphoria.  "The record includes testimony of well-qualified doctors who have treated thousands of transgender patients with GnRH agonists and cross-sex hormones over their careers and have achieved excellent results."  Doc.246, at 21.  And the district court credited the testimony of Plaintiffs' experts "that denial of this treatment will cause needless suffering for a substantial number of patients and will increase anxiety, depression,

and the risk of suicide." *Id*. "Even the defendants' expert Dr. Levine testified that treatment with GnRH agonists and cross-sex hormones is sometimes appropriate." Doc.246, at 20.

By contrast, the district court did not credit Defendants' experts and AHCA consultants. Doc.246, at 5 n.8 (noting the court did not credit Dr. Hruz's testimony and "credit[ed] other defense experts only to the extent consistent with this opinion").

> 2.    *The Exclusions are not justified by potential risks and side effects of the proscribed treatment.*

That the treatment for which coverage is banned carries potential side effects and risks cannot justify the Exclusions. As the district court rightly found, "[t]hat there are risks does not end the inquiry." Doc.246, at 42. The overwhelming weight of the evidence shows that the potential risk of harm from pubertal suppression and hormone therapy is rare when provided under medical supervision. Further, the fact that the treatment carries risk does not distinguish it from other medical treatments. "Florida's Medicaid program routinely covers treatments with greater risks than those involved here." Doc.246, at 43.

> 3.    *Appeals to the general welfare do not justify the Exclusions.*

Defendants argue that the Exclusions "are health and welfare laws" and that the court erred in not deferring to the State. Defs.' Br. 26. But "courts nearly always face an individual's claim of constitutional right pitted against the government's

claim of special expertise in a matter of high importance involving public health or safety." *S. Bay United Pentecostal Church v. Newsom*, 141 S.Ct. 716, 718 (2021) (Gorsuch, J., separate op.). Just because the Exclusions are "health and welfare laws" does not mean that they are not subject to scrutiny, under any level of review. "It has never been enough for the State to insist on deference or demand that individual rights give way to collective interests." *Id.* Sure, courts "are not scientists," but neither are Defendants, and courts need not "abandon the field when government officials … seek to infringe a constitutionally protected liberty." *Id.* The whole point of judicial scrutiny is to test the government's assertions.

> ### F.    The Exclusions fail any level of review.

Although the Exclusions are properly subject to heightened scrutiny, they fail any level of review. Even standard rational basis review is "not a toothless one," *Mathews v. Lucas*, 427 U.S. 495, 510 (1976), and "there are limits to the latitude afforded states." *Deen v. Egleston*, 597 F.3d 1223, 1230 (11th Cir. 2010). "The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Cleburne*, 473 U.S. at 446–47.

Indeed, rational basis review "imposes a requirement of some rationality in the nature of the class singled out." *Rinaldi v. Yeager*, 384 U.S. 305, 308–09 (1966). Courts must "insist on knowing the relation between the classification adopted and

the object to be attained," which "ensure[s] that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." *Romer v. Evans*, 517 U.S. 620, 632, 633 (1996).

Here, the Exclusions are "so far removed from [the asserted] justifications that … it [is] impossible to credit them." *Id.* at 635. Rather than protect anyone, the Exclusions harm transgender persons, adult and young alike. Tr. 615:8-16, 641:14-25, 674:19-25, 705:19-21. There is no rational basis to conclude that allowing persons with gender dysphoria to receive medications that they, their parents (if minors), and their doctors agree is medically necessary "would threaten legitimate interests of [Florida] in a way that" allowing other people to receive the same medications "would not." *Cleburne*, 473 U.S. at 448; *see also Eisenstadt v. Baird*, 405 U.S. 438, 452 (1972). Thus, even under rational basis review, the justifications for the Exclusions "ma[k]e no sense in light of how the [statute] treat[s] other [procedures] similarly situated in relevant respects." *Bd. of Trs. of Univ. of Alabama v. Garrett*, 531 U.S. 356, 366 n.4 (2001).

Furthermore, like the law struck in *Romer*, the Exclusions "ha[ve] the peculiar property of imposing a broad and undifferentiated disability on a single named group"—in this case, all transgender people, adults, and minors alike. 517 U.S. at 632. Their "sheer breadth"—prohibiting *all* gender-affirming medical treatment for *all* transgender Medicaid beneficiaries—"is so discontinuous with the reasons

offered" that they are "inexplicable" and "lack[] a rational relationship to legitimate state interests." *Id.*

Finally, an improper motive for legislation can arise "not from malice or hostile animus alone" but also "from insensitivity caused by simple want of careful, rational reflection or from some instinctive mechanism to guard against people who appear to be different in some respects from ourselves." *Garrett*, 531 U.S. at 374 (Kennedy, J., concurring). That is, at minimum, the case here and why the Exclusions fail any level of review.

## II. The Exclusions Violate the Affordable Care Act.

Section 1557 requires, in relevant part, that "[a]n individual shall not, on the ground prohibited under … title IX … be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). It is "an affirmative obligation not to discriminate in the provision of health care." *Schmitt v. Kaiser Found. Health Plan of Washington*, 965 F.3d 945, 955 (9th Cir. 2020).

Defendants' sole argument regarding this claim is that "the challenged laws turn on a medical diagnosis—gender dysphoria—that both biological males and biological females suffer." Defs.' Br. 36. Defendants make a passing reference to *Adams*, noting that for Title IX, "sex" means "biological sex." *Id.* But that is beside

51

the point. No matter how one defines "sex," a beneficiary's sex plays "an unmistakable and impermissible role in the" decision to deny Medicaid coverage. Thus, for the reasons noted in Section I.A, the Exclusions discriminate based on sex and therefore violate Section 1557.

Notably, no justification can save the Exclusions once it is determined they discriminate based on sex, which they do. As Justice Gorsuch recently explained, "judges have never been entitled to disregard the plain terms of a valid congressional enactment." *SFFA*, 600 U.S. at 309 (Gorsuch, J., concurring). Under Section 1557, "it is *always* unlawful to discriminate among persons even in part" based on sex. *Id.* (emphasis in original).

## III. The Exclusions Violate the Medicaid Act.

Whether Medicaid covers gender-affirming medical care is not a decision left to the State's sole discretion. "[O]nce a State elects to join the program, it must administer a state plan that meets federal requirements."[27] *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 433 (2004). Federal EPSDT requirements mandate that states cover medically necessary services for beneficiaries under age 21. *See* 42

---

[27] In addition, AHCA makes the farfetched suggestion that it was somehow improper for the district court to decide whether the Medicaid Act requires coverage of the excluded services. Defs.' Br. 1. As shown herein, courts routinely decide whether a state coverage policy violates the Medicaid Act provisions at issue here.

U.S.C. §§ 1396a(a)(10)(A), 1396d(a)(4)(B), 1396d(r)(5).  The federal comparability provision prohibits States from covering a service when medically necessary to treat one condition but declining to cover the service when medically necessary to treat another condition.  *See* 42 U.S.C. § 1396a(a)(10)(B); 42 C.F.R. § 440.230(c).  And while a state may exclude coverage of a service it has determined is never medically necessary because it is experimental or investigational, it can only do so if the determination was reasonable.  *Rush*, 625 F.2d at 1157.

As described in Section I.E.1, *supra*, Defendants' determination that the use of puberty-delaying medications and hormone therapy to treat gender dysphoria is experimental was far from reasonable.  Doc.246, at 10, 15, 21.  Accordingly, Florida cannot escape its obligations under the EPSDT and comparability requirements to cover the services when medically necessary for transgender beneficiaries with gender dysphoria.

## A.    The Exclusions Violate the Medicaid Act's EPSDT Requirements.

The district court correctly concluded that the Exclusions violate the EPSDT requirements of the Medicaid Act.  Doc.246, at 51-52.  The fundamental purpose of these requirements is to ensure that Medicaid recipients under age 21 receive the "health care they need when they need it."  *M.H. v. Berry*, 2021 WL 1192938, *6 (N.D. Ga. March 29, 2021); *see also* PX.62.  The EPSDT provisions require each state Medicaid program to cover any service that is allowable under Medicaid's

scope of benefits listed in §1396d(a) if "necessary … to correct or ameliorate" an individual's illness or condition regardless of whether the state covers the service for adults.  42 U.S.C. §§ 1396d(r)(5), 1396a(a)(10)(A), 1396d(a)(4)(B); *see*, *e.g.*, *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1233-34 (11th Cir. 2011); *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 589-593 (5th Cir. 2004).  "The EPSDT obligation is thus extremely broad."  *Katie A., ex rel. Ludin v. L.A. County*, 481 F.3d 1150, 1154 (9th Cir. 2007); *see also Smith v. Benson*, 703 F.Supp.2d 1262, 1269-70 (S.D. Fla. 2010) ("CMS … has made the broad mandate of the EPSDT program abundantly clear.").  And "there is a very strong inference to be inclusive rather than exclusive" when determining the meaning of "correct or ameliorate."  *Ekloff v. Rodgers*, 443 F.Supp.2d 1173, 1180 (D. Ariz. 2006).  Further, states must take the proactive step of arranging for the services determined to be medically necessary for a particular beneficiary.  42 U.S.C. § 1396a(a)(43)(C); *Katie A.*, 481 F.3d at 1158-59.

The EPSDT provisions require AHCA to cover puberty-delaying medications and hormone therapy for transgender beneficiaries under 21. The services are benefits listed in § 1396d(a).  *See* 42 U.S.C. § 1396d(a)(12) (prescribed drugs).[28]

---

[28]    While the Medicaid Act allows states to place certain limits on coverage of prescribed drugs for adults, *see*, *infra*, Section III.B., EPSDT requires coverage of all "prescribed drugs" for beneficiaries under age 21 when medically necessary. *See* 42 C.F.R. § 440.120 (defining prescribed drugs); PX.63 (noting that "any prescribed

And, for many transgender young people, the services are "necessary … to correct or ameliorate" their gender dysphoria. *Id*. § 1396d(r)(5). As the district court found, "the overwhelming weight of medical authority supports treatment of transgender patients with GnRH agonists and cross-sex hormones in appropriate circumstances." Doc.246, at 18; *see also*, *supra*, Section I.E.1.

Prior to implementing the Exclusions, AHCA itself concluded these services are medically necessary, covering them for a significant number of transgender Medicaid beneficiaries under age 21. PX.317. Indeed, AHCA covered puberty-delaying medications for K.F. and Susan Doe and hormones for Mr. Rothstein. Doc.246, at 9; Tr. 611:7-15; 636:7-11, 703:18-20. Despite the change in agency policy, the treatment was and continues to be medically necessary for K.F., Susan Doe, and Mr. Rothstein, as the district court determined. Doc.246, at 23-26; *see also id*. at 37. These factual findings were not clearly erroneous, *see Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985), and Defendants do not argue otherwise.

Given that puberty-delaying medications and hormone therapy are medically necessary for many transgender young people, including K.F., Susan Doe, and Mr. Rothstein, Defendants cannot categorically exclude coverage of these services. *See S.D.*, 391 F.3d at 592 ("[T]he plain words of the [Medicaid Act] and the legislative

---

drug covered under Medicaid EPSDT requirements is eligible for federal financial participation (FFP) regardless of the applicability of [42 U.S.C. § 1396r-8]").

history make evident that Congress intended that the health care, services, treatment and other measures that must be provided under the EPSDT program be determined by reference to federal law, not state preferences.").

### B.    The Exclusions Violate the Medicaid Act's Comparability Requirement.

Likewise, the district court correctly concluded that the Exclusions violate the comparability requirement of the Medicaid Act.  Doc.246, at 52.  The Medicaid Act requires AHCA to ensure that the "medical assistance made available to any [categorically needy] individual … shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual."  42 U.S.C. § 1396a(a)(10)(B); 42 C.F.R. § 440.240.  Federal regulations make clear that states "may not arbitrarily deny or reduce the amount, duration, or scope of a required service … to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition."  42 C.F.R. § 440.230(c).

Courts have repeatedly held the comparability requirement "prohibits discrimination among individuals with the same medical needs stemming from different medical conditions."  *Davis v. Shah*, 821 F.3d 231, 258 (2d Cir. 2016) (finding state policy covering prescription orthopedic footwear and compression stockings for beneficiaries with certain listed conditions, but not for those with equal need for the services due to other conditions, violated comparability requirement); *see also White v. Beal*, 555 F.2d 1146, 1148 (3d Cir. 1977); *Cota v. Maxwell-Jolly*,

688 F.Supp.2d 980, 993 (N.D. Cal. 2010). Plaintiffs need not show that their medical needs are *identical* to those of the beneficiaries who are receiving coverage – rather, a showing that their medical needs are *equivalent* is sufficient. *See Davis*, 821 F.3d at 258.

Plaintiffs made that factual showing.[29] For example, AHCA unquestionably covers hormone therapy to treat various health conditions other than gender dysphoria. PX.1, at ¶8; PX.4, at Definitions ¶13. The district court rightly found, based on the substantial trial record, that these medications are equally appropriate and effective treatment for gender dysphoria. Doc.246, at 20.

The prescription drug provision of the Medicaid Act supports this conclusion. The statute requires states to cover all FDA-approved drugs when they are prescribed for a "medically accepted indication," subject to certain limited unrelated exceptions.[30] 42 U.S.C. §§ 1396r-8(k)(2), 1396r-8(d)(1)(B); *see* PX.63, at 2

---

[29]  While coverage of gender-affirming surgery is not at issue here, AHCA argues that covering a mastectomy to treat cancer but declining to cover a mastectomy to treat gender dysphoria shows it does not violate comparability. Defs.' Br. 52. Multiple federal courts have disagreed, holding that such a policy impermissibly discriminates based on diagnosis. *See, e.g., Flack v. Wisconsin Dep't of Health Servs.*, 395 F.Supp.3d 1001, 1019 (W.D. Wis. 2019); *Fain*, 618 F.Supp.3d 313. Defendants' claim is based on the false premise that surgery is not effective treatment for gender dysphoria (because "healthy breast tissue" is removed). *See* Tr. 307:7-309:7, 554:25-558:4.

[30]  Conversely, nothing in the Medicaid Act prohibits states from covering FDA-approved drugs when they are prescribed for a use that is not FDA-approved or supported by citation in a compendium.

("covered outpatient drugs that are prescribed for a medically accepted indication must be covered" by Medicaid)). A "medically accepted indication" is a use that is FDA-approved or "supported by one or more citations included or approved for inclusion in any of the compendia" listed in the Medicaid Act. 42 U.S.C. § 1396r-8(k)(6); *see also id*. § 1396r-8(g)(1)(B)(i) (listing three compendia, one of which is DRUGDEX). For purposes of determining medical need for a prescription drug under the Medicaid Act, a use that is FDA-approved stands on equal footing with a use that is supported by citation in a compendium. *See Edmonds v. Levine*, 417 F.Supp.2d 1323, 1337 (S.D. Fla. 2006) (holding AHCA cannot "substitute its own judgment for that of Congress" and deny coverage for uses of a prescription drug that are supported by citation in a compendium).

Here, citations in DRUGDEX support the use of forms of testosterone and estrogen to treat gender dysphoria. PX.25, at 18-21, 23-26, 29-36; PX.26, at 23-25, 27-28, 34-35. *See Dobson v. Sec'y of Health & Hum. Servs.*, 2022 WL 424813 at *7 (11th Cir. 2022) (interpreting the phrase "supported by one or more citations" in § 1396r-8(k)(6) to mean a citation "tend[s] to show or help[s] prove the efficacy and safety of the prescribed off-label use"). Nevertheless, AHCA refuses to cover these medications to treat that diagnosis. Further, AHCA covers testosterone cypionate, testosterone enanthate, and estrogen for absolutely any use—whether the use is FDA-approved, supported by citation in a compendium, or not—other than to treat

58

gender dysphoria.  Doc.241-1 (linking to AHCA's Preferred Drug List)[31]; PX.28 (indicating that for drugs that do not require prior authorization, AHCA "does not verify the diagnosis" prior to providing coverage).  Thus, AHCA is excluding coverage for only one "medically accepted indication" (gender dysphoria) and providing coverage for every other indication, even those not medically accepted.

By failing to provide "comparable services for individuals with comparable needs," Defendants plainly violate the Medicaid Act.  *Cota*, 688 F.Supp.2d at 993; *see also* Doc.246, at 52.

## <u>CONCLUSION</u>

For the foregoing reasons, the district court's judgment should be affirmed.

Dated this 27th day of November 2023.

---

[31]    The district court admitted AHCA's Preferred Drug List as an exhibit but given that it is available online did not assign it an exhibit number.  Doc.241-1.

Respectfully submitted,

Simone Chriss
Chelsea Dunn
SOUTHERN LEGAL COUNSEL, INC.
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
simone.chriss@southernlegal.org
chelsea.dunn@southernlegal.org

Katy DeBriere
FLORIDA HEALTH JUSTICE PROJECT
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

Abigail Coursolle
NATIONAL HEALTH LAW PROGRAM
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

Catherine McKee
NATIONAL HEALTH LAW PROGRAM
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27514
(919) 968-6308
mckee@healthlaw.org

 /s/ Omar Gonzalez-Pagan
Omar Gonzalez-Pagan
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

Karen L. Loewy
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1776 K Street, NW, 8th Floor
Washington, DC 20006
(202) 804-6245
kloewy@lambdalegal.org

Jennifer Altman
Shani Rivaux
PILLSBURY WINTHROP
SHAW PITTMAN, LLP
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsburylaw.com
shani.rivaux@pillsburylaw.com

William C. Miller
Gary J. Shaw
PILLSBURY WINTHROP
SHAW PITTMAN, LLP
1200 17th Street, NW
Washington, DC 20036
(202) 663-8000
william.c.miller@pillsburylaw.com
gary.shaw@pillsburylaw.com

*Counsel for Plaintiffs-Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 12,998 words.

This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5)-(6) because it was prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman font size 14.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 27, 2023, I filed a true and correct copy of the foregoing with the Clerk of the United States Court of Appeals for the Eleventh Circuit by using the appellate case filing CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan