No. 23-12155

# In the United States Court of Appeals for the Eleventh Circuit

AUGUST DEKKER, BRIT ROTHSTEIN, SUSAN DOE, by and through her parents and next friends, JANE DOE and JOHN DOE, and K.F., by and through his parent and next friend, JADE LADUE,

*Plaintiffs-Appellees*,

v.

SECRETARY, FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION, *et al.*,

*Defendants-Appellants*.

On Appeal from the U.S. District Court for the Northern District of Florida, No. 4:22-cv-00325, Honorable Robert L. Hinkle, District Judge

## APPELLEES' APPENDIX
## VOLUME 1 OF 10 (Tabs 119 – 145)

| | | |
|---|---|---|
| Jennifer Altman | Simone Chriss | Omar Gonzalez-Pagan |
| Shani Rivaux | Chelsea Dunn | LAMBDA LEGAL DEFENSE |
| PILLSBURY WINTHROP | SOUTHERN LEGAL | AND EDUCATION FUND, INC. |
| SHAW PITTMAN, LLP | COUNSEL, INC. | 120 Wall Street, 19th Floor |
| 600 Brickell Avenue, | 1229 NW 12th Avenue | New York, NY 10005 |
| Suite 3100 | Gainesville, FL 32601 | (212) 809-8585 |
| Miami, FL 33131 | (352) 271-8890 | |
| (786) 913-4900 | | Katy DeBriere |
| | Abigail Coursolle | FLORIDA HEALTH JUSTICE |
| Catherine McKee | NATIONAL HEALTH LAW | PROJECT |
| NATIONAL HEALTH LAW | PROGRAM | 3900 Richmond Street |
| PROGRAM | 3701 Wilshire Boulevard | Jacksonville, FL 32205 |
| 1512 E. Franklin Street, | Suite 315 | (352) 278-6059 |
| Suite 110 | Los Angeles, CA 90010 | |
| Chapel Hill, NC 27514 | (310) 736-1652 | |
| (919) 968-6308 | | |

*Counsel for Plaintiffs-Appellees*
(Additional counsel listed on inside cover.)

William C. Miller
Gary J. Shaw
PILLSBURY WINTHROP
SHAW PITTMAN, LLP
1200 17th Street, NW
Washington, DC 20036
(202) 663-8000

Karen L. Loewy
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
1776 K Street, NW, 8th Floor
Washington, DC 20006
(202) 804-6245

*Counsel for Plaintiffs-Appellees*

# TABLE OF CONTENTS

**Tab/Docket No.**

**VOLUME 1 OF 10**

Plaintiffs' Motion to Exclude Testimony of Sophie Scott, Ph.D. and
Supporting Memorandum of Law
      filed April 7, 2023 ........................................................................119

Plaintiffs' Motion to Partially Exclude Expert
Testimony of Dr. Patrick W. Lappert and Incorporated Memorandum of Law
      filed April 7, 2023 ........................................................................127

Plaintiffs' Motion to Exclude Expert Testimony of Michael Laidlaw
      filed April 7, 2023 ........................................................................133

Plaintiffs' Motion to Exclude Expert Testimony of Dr. Paul Hruz
and Supporting Memorandum of Law
      filed April 7, 2023 ........................................................................136

Plaintiffs' Motion to Exclude Expert Testimony of Dr. Kristopher Kaliebe
      filed April 7, 2023 ........................................................................138

Plaintiffs' Memorandum of Law in Support of Motion to Exclude
Expert Testimony of Dr. Kristopher Kaliebe
      filed April 7, 2023 ........................................................................139

Plaintiffs' Motion in *Limine* to Exclude Expert Testimony of
Stephen B. Levine, M.D.
      filed April 7, 2023 ........................................................................141

Plaintiffs' Memorandum of Law in Support of Motion to Exclude
Expert Testimony of Stephen Levine, M.D.
      filed April 7, 2023 ........................................................................145

i

**VOLUME 2 OF 10**

Plaintiffs' Trial Exhibits
    filed April 27, 2023:

        Exhibit 1, Defendants' Response to Plaintiffs' First Set of
        Requests for Admission
            dated January 12, 2023 .................................................................. 175-1

        Exhibit 4, Plaintiffs' First Set of Requests for Admission to
        Defendants Florida Agency for Healthcare Administration and
        Secretary Simone Marstiller
            dated December 12, 2022 .............................................................. 175-4

        Exhibit 18, Florida Medicaid – Generally Accepted Professional Medical
        Standards Determination on The Treatment of Gender Dysphoria
            dated June 2022 .......................................................................... 175-18

        Exhibit 19, Letter from Simone Marstiller to Tom Wallace
            dated April 20, 2022 .................................................................... 175-19

        Exhibit 25, Testosterone DrugDex Evaluation
            dated December 5, 2022 ................................................................ 175-25

**VOLUME 3 OF 10**

        Exhibit 25, Testosterone DrugDex Evaluation (continued)
            dated December 5, 2022 ................................................................ 175-25

        Exhibit 26, Extradiol DrugDex Evaluation
            dated November 21, 2022 ............................................................ 175-26

**VOLUME 4 OF 10**

        Exhibit 26, Extradiol DrugDex Evaluation (continued)
            dated November 21, 2022 ............................................................ 175-26

        Exhibit 28, Agency Responses to Plaintiffs' Questions
            dated March 1, 2023 .................................................................... 175-28

        Exhibit 36, AACAP Statement Responding to Efforts to Ban
        Evidence-Based Care for Transgender and Gender Diverse Youth
            dated November 8, 2019 .............................................................. 175-36

Exhibit 37, AAFP Care for the Transgender and Gender
Nonbinary Patient .................................................................................. 175-37

Exhibit 38, American Academy of Pediatrics – Ensuring
Comprehensive Care and Support for Transgender and
Gender-Diverse Children and Adolescents
        dated October 2018 .................................................................... 175-38

Exhibit 39, ACOG Committee Opinion on Health Care for
Transgender Individuals
        dated March 2021 ...................................................................... 175-39

Exhibit 40, ACP Attacks on Gender-Affirming and Transgender
Health Care
        dated May 3, 2022 ..................................................................... 175-40

Exhibit 41, Annals of Internal Medicine – Lesbian, Gay, Bisexual, and
Transgender Health Disparities: Executive Summary of a Policy Position
Paper from the American College of Physicians
        dated July 21, 2015 ...................................................................... 176-1

Exhibit 42, AMA Letter to Nat'l Gov. Assoc.
        dated April 26, 2021 .................................................................... 176-2

Exhibit 43, AMA/GLMA Issue Brief on Health Insurance Coverage
for Gender-Affirming Care of Transgender Patients ............................... 176-3

Exhibit 45, American Psychological Association,
Guidelines for Psychological Practice with Transgender and Gender
Nonconforming People
        dated December 2015 .................................................................. 176-5

Exhibit 46, American Psychological Association, Resolution on Gender
Identity Change Efforts
        dated February 2021 .................................................................... 176-6

Exhibit 47, APA – Position Statement on Treatment of Transgender
(Trans) and Gender Diverse Youth
        dated July 2020 ........................................................................... 176-7

Exhibit 48, APA – Position Statement on Access to Care for Transgender and Gender Diverse Individuals
    dated July 2018............................................................................ 176-8

Exhibit 49, Pediatric Endocrine Society – Transgender Health
    dated December 2020.................................................................. 176-9

**VOLUME 5 OF 10**

Exhibit 62, Ctrs. for Medicare & Medicaid Servs., EPSDT – A Guide for States: Coverage in the Medicaid Benefit for Children and Adolescents
    dated June 2014 ......................................................................... 176-22

Exhibit 63, Ctrs. for Medicare & Medicaid Servs., CMCS Informational Bulletin Re: Beneficiary Protection and Medicaid Drug Coverage etc.
    dated July 21, 2022................................................................... 176-23

Exhibit 69, U.S. Commission on Civil Rights, The U.S. Commission on Civil Rights Statement Condemning Recent State Laws and Pending Proposals Targeting the Lesbian, Gay, Bisexual, and Transgender Community
    dated April 18, 2016 .................................................................. 176-29

Exhibit 71, U.S. Department of Health and Human Services, Departmental Appeals Bd., Appellate Div., Decision No. 2576
    dated May 30, 2014 ................................................................... 176-31

Exhibit 74, Substance Abuse and Mental Health Services Administration, Moving Beyond Change Efforts (2023)...................... 176-34

Exhibit 76, U.S. Presidential Proclamation, Transgender Day of Visibility, 2022
    dated March 30, 2022................................................................ 176-36

Exhibit 77, U.S. Presidential Proclamation, Transgender Day of Visibility, 2023
    dated March 30, 2023................................................................ 176-37

Exhibit 78, Executive Order, Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation
    dated January 20, 2021.............................................................. 176-38

iv

**VOLUME 6 OF 10**

Exhibit 131, U.S. Commission on Civil Rights, Working for Inclusion:
Time for Congress to Enact Federal Legislation to Address Workplace
Discrimination against Lesbian, Gay, Bisexual, and
Transgender Americans
        dated November 29, 2017 ........................................................... 178-11

Exhibit 240, GAPMS – GnRH for Treatment of Gender Dysphoria
        dated September 14, 2018 ........................................................... 181-4

Exhibit 257, Special Services Criteria Pubertal Suppression with
Gonadotropin-Releasing Hormone Analog Agent for
Gender Dysphoria
        dated September 20, 2016 (updated November 17, 2017).......... 181-24

Exhibit 295, Gender Dysphoria/Transgender Health Care
Non-Legislative Pathway
        dated June 2022 ........................................................................... 182-35

Exhibit 296, Gender Dysphoria/Transgender Health Care
Policy Pathway
        dated June 2022 ........................................................................... 182-36

Exhibit 297A, Medicaid Policy Routing and Tracking Form
for June 2022 GAPMS
        dated June 1, 2022 ....................................................................... 182-38

Exhibit 302, Email from Christopher Cogle to Jeff English
Re:  GAPMS process
        dated June 27, 2022 ..................................................................... 183-4

Exhibit 305, AHCA, Brief of the Hearing on General Medicaid
Policy Rule
        dated July 8, 2022........................................................................ 183-7

Exhibit 317, AHCA Draft Response to Media Regarding Gender
Affirming Care
        dated September 1, 2022 ............................................................. 183-20

**VOLUME 7 OF 10**

Exhibit 323, Comment of Endocrine Society (Email from
Fl-Rules@dos.state.fl.us to Cole Giering)
        dated July 7, 2022......................................................................... 183-26

Exhibit 324, Comment of Yale Univ. et al. Scholars
(Letter from Anne Alstott to Simone Marstiller
Re:  Rule No. 59G-1.050: General Medicaid Policy)
        dated July 8, 2022......................................................................... 183-27

Exhibit 325, Comment of American Academy of Pediatrics
(Email from Fl-Rules@doc.state.fl.us to Cole Giering
Re:  One-time User Comment from FLRules.com)
        dated July 7, 2022......................................................................... 183-28

Exhibit 333, GAPMS Determination Report with Recommendation Memo
from Bureau of Medicaid Policy to Justin Senior, Deputy Secretary of
Medicaid Re:  Breast Pump Coverage
        dated May 18, 2015 .................................................................... 183-37

Exhibit 356, U.S. Department of Justice, Dear State Attorneys General
Letter Re:  Transgender Youth
        dated March 31, 2022.................................................................. 184-21

Defendants' Trial Exhibits
        dated April 28, 2023:

Exhibit 5, Florida Department of Health Fact Sheet on Treatments for
Gender Dysphoria
        dated April 20, 2022 ..................................................................... 193-5

Exhibit 6, Florida Medicaid Generally Accepted Professional Medical
Standards Determination on the Treatment of Gender Dysphoria
(with attachments)
        dated June 2022 ........................................................................... 193-6

**VOLUME 8 OF 10**

Exhibit 6, Florida Medicaid Generally Accepted Professional Medical
Standards Determination on the Treatment of Gender Dysphoria
(with attachments) (continued)
    dated June 2022 ........................................................................ 193-6

Plaintiffs' Trial Brief,
    filed April 28, 2023 ...................................................................... 199

Transcript Excerpts of August Dekker Deposition
    dated January 26, 2023 ............................................................... 199-1

**VOLUME 9 OF 10**

Transcript Excerpts of Jeffrey English Deposition
    dated January 23, 2023 ............................................................... 199-2

Transcript Excerpts of G. Kevin Donovan, M.D., M.A. Deposition
    dated March 22, 2023 ................................................................. 199-3

Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for
Summary Judgment
    filed April 28, 2023 ...................................................................... 200

Declaration of Omar Gonzalez-Pagan
    dated April 28, 2023 ................................................................... 200-1

Exhibit A – Message from WPATH President
    dated April 21, 2023 ................................................................... 200-2

Exhibit B – New Zealand Guidelines regarding Treatment of
Gender Dysphoria
    dated December 14, 2018 ............................................................ 200-3

Exhibit C – Primary Care GAHT Guidelines ........................................ 200-4

Exhibit D – Excerpts of Deposition of Jason Weida
    dated April 24, 2023 ................................................................... 200-5

Exhibit E – EQFL Travel Advisory
    dated April 11, 2023 ................................................................... 200-6

Plaintiffs' Motion Requesting Judicial Notice and Incorporated Memorandum of Law as to Governmental Actions, Policies, and Reports
filed May 3, 2023 .......................................................................210

Transcript of Deposition Designations of Ann Dalton – January 24, 2023
filed May 17, 2023 ................................................................. 230-4

## VOLUME 10 OF 10

Transcript of Deposition Designations of Ann Dalton – January 24, 2023 (continued)
filed May 17, 2023 ......................................................... 230-4

Plaintiffs' Trial Exhibit
filed May 22, 2023:

    Exhibit 365, Ron DeSantis Press Release, Let Kids be Kids Bill
dated May 17, 2023 ..................................................... 236-1

Civil Minutes – Trial
filed May 22, 2023 ......................................................................241

    Exhibit List
filed May 22, 2023 ..................................................... 241-1

Certificate of Service ............................................................................. A

# TAB 119

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, et al.,

       Plaintiffs,

v.                           Case No. 4:22-cv-00325-RH-MAF

JASON WEIDA, et al.,

       Defendants.

_____/

## PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY OF SOPHIE SCOTT, PH.D., AND SUPPORTING MEMORANDUM OF LAW

Pursuant to Federal Rules of Civil Procedure 26 and 37, and Federal Rules of Evidence 104, 403 and 702, Plaintiffs respectfully move this Court to exclude the expert report, opinions, and testimony of Defendants' proposed expert Professor Sophie Scott *in its entirety*. Professor Scott is not a qualified expert on gender dysphoria or its treatment, and her opinions and testimony are neither relevant nor reliable under Federal Rule of Evidence 702 and the standards set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny. Her opinions and testimony are likewise inadmissible because any probative value they may have (and they have none) is substantially outweighed by the danger of unfair prejudice, confusion of the issues, waste of time, undue delay, and needless presentation of cumulative evidence. *See* Fed. R. Evid. 403.

**WHEREFORE**, Plaintiffs respectfully request an order excluding Professor Scott's report, expert opinions and testimony in their entirety.

Case 4:23-cv-00325-RH-MAF Document 119 Filed 04/07/23 Page 2 of 23

## MEMORANDUM OF LAW

Professor Scott is not qualified to offer the opinions stated in her report. She opines that puberty delaying medication administered to teenagers "*may have*" unknown, negative effects on brain development. Report, ¶ 15 (**Exhibit A**). She also believes without any scientific support that it is "very possible" that teenagers cannot "fully grasp the implications of puberty blocking treatment." *Id*. ¶ 16. But Professor Scott is not qualified to give these opinions because she has never treated patients with gender dysphoria (at any age) given that she is not a medical provider of any kind, nor has she administered or studied the effects of puberty delaying treatment in any clinical or academic setting. She has never written on these subjects either— except on Twitter.

Aside from her lack of qualifications, Professor Scott's opinions are inadmissible because they are entirely speculative and lack any reliable or testable foundation or methodology. There is no existing data to support her ultimate conclusions, which means her opinions are based on impermissible "leaps of faith." The data that does exist directly contradicts her conclusions, but, strikingly, she never mentions this data in her report. Her opinions moreover are based solely on her unqualified review of other studies, and they are far outside the scientific mainstream. The Court should therefore exercise its gatekeeping function under Rule 702 and exclude Professor Scott's testimony. *See Rink v Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005).

Case 4:23-cv-00325-RH-MAF    Document 119    Filed 04/07/23    Page 3 of 23

### A.    Legal Standard

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Pursuant to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and Rule 702, district courts must perform a "gatekeeping" role "to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability[.]" *Rink*, 400 F.3d at 1291; *Kilpatrick v. Berg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010) ("The trial court must make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.").

To do so, the Court must engage in a rigorous inquiry to determine whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*E.g.*, *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc), *cert. denied*, 544 U.S. 1063 (2005). The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence. *Rink*, 400 F.3d at 1292.

### B.    Professor Scott is Not Qualified To Offer An Expert Opinion on Any Issue in the Case.

A witness may be qualified as an expert by virtue of her "knowledge, skill,

Case 4:23-cv-00325-RH-MAF    Document 119    Filed 04/07/23    Page 4 of 23

experience, training, or education." Fed. R. Evid. 702. However, "[e]xpertise in one field does not qualify a witness to testify about others." *Lebron v. Secretary of Florida Dept. of Children and Families*, 772 F.3d 1352, 1368 (11th Cir. 2014) (holding that a psychiatrist was properly prevented from opining on rates of drug use because he had never conducted research on the subject, and instead relied on studies to form his opinion).

A scientist, however well credentialed, cannot be "the mouthpiece of a scientist in a different specialty." *Id*. at 1369 (quoting *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002)); *TB Food USA, LLC v. American Mariculture, Inc.*, 2021 WL 4962969, at *4 (M.D. Fla. October 26, 2021) ("[A]n expert must have at least some minimum training, education, experience, knowledge, or skill pertaining to the particular subject matter of his proposed testimony.") (cleaned up). "Merely reading literature in a scientific field does not qualify a witness—even an educated witness—as an expert." *Kadel v. Folwell*, 2022 WL 3226731, at *9, 13 (M.D.N.C. August 10, 2022) (excluding Dr. Lappert's expert opinion about puberty delaying medication because he is a surgeon, not an endocrinologist, and he never treated a patient with hormone therapies). If an expert witness does not intend to testify about matters growing directly out of "research [s]he had conducted independent of the litigation," the expert should be disqualified. *Lebron*, 772 F.3d at 1369 (quoting Fed. R. Evid. 702).

4

Case: 4:23-cv-00325-RH-MAF    Document 119    Filed 04/07/23    Page 5 of 23

Professor Scott is the Director of University College London's Institute of Cognitive Neuroscience. Report ¶ 6.[1] Her main area of research is "speech, laughter and sound." Tr. 48:25 – 49:4 ("Q. All of these publications are about speech, laughter and sound. Isn't that right? A. There are a few other things. But yeah, that's the majority. That is my main area of research.") (**Exhibit B**). She is proffered as an expert based on her "training and experience as a neuroscientist," her reading and assessment of "the relevant neuroscientific literature on brain development, and the potential effects of [puberty delaying medication] on the developing brain." Report, ¶ 4. However, she has no experience with the provision of puberty delaying medication, gender-affirming medical care or medical treatment of gender dysphoria. She has never published any papers or studies on gender dysphoria, gender-affirming care or puberty delaying medication. Nor has she published any reviews of such studies in her entire career. Tr. 49:5-12 ("Q. Are any of [your publications] about gender-affirming care? A. No. Q. Are any of these publications specific to gender dysphoria? A. No. Q. Any about puberty blockers? No.").

Professor Scott is not a medical doctor, a psychiatrist or a clinical psychologist; she has no medical training. Tr. 34:25 – 35:4; Tr. 35:13-14. She does

---

[1] According to Professor Scott, cognitive neuroscience is "a scientific field that examines the relationships between human behaviour to the human brain, and how these can be affected by age, disease and individual differences." Report, ¶ 6; Tr. 37:6-10 ("A neuroscientist is somebody who studies brains…[H]e's studying it in a purely basic science position. They're not treating people. They're not prescribing things.").

Case 4:23-cv-00325-RH-MAF Document 119 Filed 04/07/23 Page 6 of 23

not treat patients. Tr. 44:22-23. She has never studied gender dysphoria in a clinical

setting, nor has she ever administered puberty delaying medication or studied their

effects, let alone in humans. Tr. 31:18-24 (Q. So you've never conducted any clinical

studies yourself related to gender dysphoria? A. No. Q. What about the effects of

gender-affirming care? A. Nope."). Nor has anyone at Professor Scott's place of

employment, the Institute for Cognitive Neuroscience ever studied gender dysphoria

or the effects of gender-affirming medical care either, meaning Professor Scott has

not overseen any such study. Tr. 31:6-8 ("Q. Has anyone at the Institute ever

conducted any clinical studies related to gender dysphoria? A. No, not that I'm aware

of."; Tr. 31:25-32:2 (Q. Has the Institute ever studied the effects of puberty blockers?

A. No.").

Without *any* qualifications, training or experience related to gender dysphoria

or puberty delaying medication, Professor Scott is not qualified to give an expert

opinion on these subjects. *See Kadel*, 2022 WL 3226731, at *13.[2] Nor is she

---

[2] *See also, e.g.*, *Fernandez v United States*, 2020 WL 3105925, at *5 (N.D. Fla. June 4, 2020) (excluding an expert because the Plaintiff offered "no information indicating that he has any experience or specialized knowledge regarding medicine generally or any of the branches of medical science which might be relevant to causation); *Doctors Licensure Group, Inc. v. Continental Casualty Company*, 2011 WL 13182969, at *4 (N.D. Fla. September 26, 2011) (excluding a proffered expert on accounting because he was "not an accountant" and had "virtually no experience in accounting"); *Webb v. Carnival Corporation*, 321 F.R.D. 420, 429 (S.D. Fla. 2017) ("Because Mr. Jaques has no experience in toxicology, responsible alcohol vending policies, nor medicine, and has never served onboard the California Dream, he is unqualified to opine on the Decedent's level of intoxication[.]").

6

qualified to opine on studies related to gender dysphoria or puberty delaying medication conducted by others. *See Dura Automotive*, 285 F.3d at 614 ("[A] scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.").

This is so particularly here where Professor Scott's opinions and so-called review of literature did not "grow[] naturally and directly out of research [s]he had conducted independent of the litigation." *Lebron*, 772 F.3d at 1369 (cleaned up); *see also* Fed. R. Evid. 702, Advisory Comm. Notes (2000 Amendments). Here, Professor Scott reviewed the literature and developed her opinions in connection with litigation in the UK, namely, *Bell v. Tavistock*, and now seeks to transpose those opinions here without still having done any independent work in the area. Tr. 52:7-18 ("Q. Why did you think that you had an opinion to give in this case? A. *Because I provided an opinion before for the Keira Bell case.* And I discussed that a lot with Paul Conrathe at the time for all the reasons you said. I'm not a clinician. *I haven't worked in this area.* … And I did some reading into the literature, … ."); Tr. 53:6-9 ("Q. So you formed your opinion about puberty blockers in adolescents while you were working on the Bell case? A. Yeah.").

In *Kadel*, a case similar to this one about insurance coverage for gender-affirming medical care, the court excluded a proposed expert (Dr. Lappert) because "[h]e is not a psychiatrist, psychologist, or mental health professional, nor has he

7

ever diagnosed a patient with gender dysphoria,"[3] and "[h]e is not an endocrinologist, nor has he ever treated a patient with hormone therapies." *Kadel*, 2022 WL 3226731, at \*13. Here, Professor Scott, who unlike the excluded expert in *Kadel*, has no medical degree and has never provided medical or mental health care, is likewise "not qualified to render opinions about the diagnosis of gender dysphoria, its possible causes, … the efficacy of puberty blocking medication or hormone treatments, the appropriate standard of informed consent for mental health professionals or endocrinologists, or any opinion on the non-surgical treatments obtained by Plaintiffs." *Id.* Her opinions should be excluded *in toto*.

## C.    Professor Scott's Opinions are Unreliable.

An expert's reliability concerns whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Kilpatrick*, 613 F.3d at 1335. When evaluating whether an expert's methodology is reliable, the Court considers, among other things:

> (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.

---

[3] While Dr. Scott has an undergraduate degree where she minored in psychology, she is not certified as psychologist, and admits she's "not clinically qualified." Tr. 35:8-17. In her words, she is "a basic scientist." *Id.*

*Frazier*, 387 F.3d at 1262. The court must undertake an independent analysis of each step in the logic leading to the expert's conclusions, and if any step in the logic is deemed unreliable, the expert's entire opinion must be excluded. *Hendrix v Evenflo Co., Inc.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009) (citing *McClain v. Metabolife Int'l., Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005)). Likewise, if the expert's opinions are vague or based on "leaps of faith unsupported by good science," then those opinions should be excluded as well. *Id.* at 579; *McDowell v. Brown*, 392 F.3d 1283, 1299, 1301 (11th Cir. 2004) (characterizing the experts' opinions as "too vague" and "more of a guess than a scientific theory."); *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) ([T]he courtroom is not the place for scientific guesswork, even of the inspired sort.").

1. Professor Scott's Opinions Lack Reliability Because They Are Based on Flawed Reasoning or Methodology.

Professor Scott's Report does not provide any basis for her "concern" about puberty delaying medication or her speculations about a teenager's ability to grasp its implications. The reason for this is simple: Professor Scott does not know what the effects of puberty delaying medication are on the brain, and she does not know whether teenagers can fully grasp its implications. She does not know what these implications are herself, and accordingly, all her opinions are hypothetical and unmoored from facts or data.

9

Case 4:22-cv-00325-RH-MAF Document 119 Filed 04/07/23 Page 10 of 23

### a. *Puberty Delaying Medication*

Her report is full of statements about the alleged lack of studies pertinent to the effects of puberty delaying medication. Report, ¶ 7 ("My concern is that we do not yet have enough evidence about the best ways to identify the individuals for whom [puberty delaying medication] are appropriate."); Report, ¶ 15 ("All the papers I can find suggest that we need much more data on the long-term brain effects of [puberty delaying medication] when administered around puberty, [and] the effects this can have on behaviour[.]"). Without any evidence (and with no experience or training in the subject), Professor Scott can only guess the effects of these treatments. Report, ¶ 15 ("As puberty is associated with very marked changes in the structure of the brain…the use of puberty blockers *may* have serious consequences for the development of the human brain.") (emphasis added); Report, ¶ 16 ("We need more research to be able to determine the *potential* for puberty blockers to be effective in alleviating some aspects of gender dysphoria[.]") (emphasis added). Guessing is not permitted under Rule 702. *McDowell*, 392 F.3d at 1301 (noting that while an expert may "draw conclusions from existing data," drawing "conclusions where there was no existing data" amounted to a "mere guess" that "fails the tests for expert opinion"); *Magical Farms, Inc. v. Land O'Lakes, Inc*., 2007 WL 4727225, at *2 (N.D. Ohio March 8, 2007) ("Dr. Ames' report is replete with statements like, 'suggest the possibility,' 'may have,' and 'I would be concerned,' all of which fail to rise to the level of a reasonable degree of certainty required by courts.").

Case 4:22-cv-00325-RH-MAF    Document 119    Filed 04/07/23    Page 11 of 23

To substantiate her untrained guesswork, Professor Scott briefly discusses—in a single paragraph—just five articles related to puberty delaying medication. *See* Report, ¶ 15. Only one of the articles is an original study pertaining to humans, namely, children with precocious puberty (Mul et al., 2001). *See* Report, ¶ 15; Scott Bibliography. Two other articles are not studies themselves, but rather a single commentary piece (Hayes, 2017) and a review of literature (Wojniusz et al., 2016), both pertaining to the treatment of precocious puberty. *See* Report, ¶ 15; Scott Bibliography. Finally, the other two studies pertain to sheep not people. *See* Report, ¶ 15; Scott Bibliography.[4] None of the studies pertain the use of puberty delaying medications for gender dysphoria in adolescents.

Notwithstanding the above, Professor Scott's discussion is nothing more than a recitation of findings from the above papers. She does not say anything about the methodologies behind those studies, whether they have been peer reviewed, or whether or how they are applicable to the context of using puberty delaying medications as treatment of gender dysphoria in adolescents. In fact, she disclaims them away after discussing them, saying "we cannot say if the results are due to direct effects of [puberty delaying medication] on the brain, heart and behaviour, or if they are secondary to this[.]" Report, ¶ 15. Without any qualifications or training in

---

[4] *But see Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997) (offering animal studies showing one type of cancer in mice to establish causation of another type of cancer in humans is "simply too great an analytical gap between the data and the opinion offered").

Case 4:22-cv-00325-RH-MAF   Document 119   Filed 04/07/23   Page 12 of 23

these areas, her use of these articles to support her opinions about puberty delaying medication is completely unreliable and the type of hypothetical guesswork prohibited by Rule 702. *Lebron*, 772 F.3d at 1368 ("Expertise in one field does not qualify a witness to testify about others."); *Dura Automotive*, 285 F.3d at 614 ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.").

Most disturbingly, however, and demonstrative of her extremely flawed methodology, is the fact that she does not discuss any of the original studies that exist pertaining to the use of puberty delaying medications on transgender adolescents. There are at least three original, peer-reviewed studies that have looked specifically into the effects of puberty delaying medications on brain structure and function in transgender adolescents. *See* Corrected Edmiston Rebuttal Report, at ¶¶ 26, 29 (**Exhibit C**) (discussing Heesewijk et al., 2022; Soleman et al., 2016; Staphorsius et al., 2015). Indeed, none of these have found any significant effects of treatment on the brain. *Id.* Plaintiffs do not refer to these studies to argue the merits, but rather to starkly illustrate the flawed nature of Professor Scott's methodology. How can Professor Scott opine of the effects of puberty delaying medications on transgender adolescents' brains when she does not discuss any of the original, peer-reviewed studies looking at that question? The answer is she cannot.

Simply put, Professor Scott's concern over puberty delaying medication as a

12

Case 4:22-cv-00325-RH-MAF   Document 119   Filed 04/07/23   Page 13 of 23

treatment for gender dysphoria stems from her own lack of knowledge.[5] Not only does she not cite, let alone discuss, the most relevant studies in this area, but throughout her testimony, she repeatedly used the words "we don't know," when referring to the effects of puberty delaying medication. Tr. 24:11-14 ("[W]hat evidence we do have suggests that there are effects on the brain of delaying puberty. And we don't know what that might mean further down the line. We just don't know."); Tr. 68:20-21 ("Q. But you can't say here that these puberty blockers have any harmful effects on the brain? A. But we know that they change the brain and we don't know that that's not harmful."). Her concern is completely unreliable however because it ignores what we do know about puberty delaying medication. In other

---

[5] It could be argued that Professor Scott's opinions really stem not out of just concern or lack of knowledge, but rather from personal feelings and biases about transgender people. Professor Scott is an active Twitter user. She often uses this platform to comment on a wide variety of topics outside her field of expertise, including transgender issues and treatments for gender dysphoria. In one tweet about a children's book for transgender youth and their families—that she did not read—she called the book a "cheap shot" and "reductive" because it "says that girls who like bugs and wear super hero capes and who don't like pink dresses are in fact boys." [**Exhibit E**]; Tr. 163:6-10; Tr. 164:12-16 ("Q. The book is about addressing that issue with your family. You didn't read the book? A. Well, that was – I've just quoted off the bits I saw. This is – you've asked me why I said it and that's why I said it."). Her rash comments about a children's book she did not read suggest a bias against the trans community.

In another tweet, Professor Scott showed disdain for a scholarship application that allowed applicants to "self-identify" as female. She wrote "Of God" in response to a tweet about the scholarship application. [**Exhibit F**] While her explanation speaks for itself, in summary, she believes that the trans community should be sectioned off from the cis community in what she calls "positive discrimination." Tr. 166:11 – 167:10.

13

Case 4:22-cv-00325-RH-MAF    Document 119    Filed 04/07/23    Page 14 of 23

words, her opinion ignores the research we have done on these treatments, none of which shows any significant effects on the brain. *See* Corrected Edmiston Rebuttal Report, ¶¶ 26, 29-30. In sum, Professor Scott's overall discussion about these studies is completely unreliable and should be excluded *in toto*.

        *b. Decision-making*

     Her concerns about a teenager's ability to grasp the implications of treatment is equally unreliable because the steps in her "analysis" are disconnected. In paragraphs 8-13 of the Report, Professor Scott explains how the brain develops over childhood and adolescence. Then, at paragraph 14, she says this pattern of brain development "*suggests*" that teenagers are prone to risky decision-making more than adults. From there she somehow concludes it is "very possible" that teenagers are unable to "fully grasp the implications of puberty blocking treatment." Report, ¶ 16.

     There are several problems with this "analysis." First, her conclusion about teenagers being prone to risky behavior because of brain development is a guess, just like her concerns over puberty delaying medication. She cannot say with any certainty (or authority) that the pattern of brain development during adolescence leads to more risky behavior in teenagers. The same is true for her ultimate opinion about a teenager's ability to grasp the implications of these treatments. She does not cite a single study that supports this opinion. *McDowell*, 392 F.3d at 1301 (drawing "conclusions where there was no existing data" amounted to a "mere guess" that "fails the tests for expert opinion").

14

Case 4:22-cv-00325-RH-MAF   Document 119   Filed 04/07/23   Page 15 of 23

*Second*, there is a disconnect between the two steps in her analysis. Professor Scott never explains how a tendency toward risky behavior effects a teenager's ability to understand the implications of that behavior. In other words, she never explains how her conclusion about risky behavior leads to her concern over whether teenagers can grasp the implications of puberty delaying treatment. She There is thus a large "analytical gap" in her methodology that renders her ultimate conclusion unreliable. *See Joiner*, 522 U.S. at 146.

For her opinions to be reliable, Professor Scott must have "knowledge," which requires "more than subjective belief or unsupported assumptions." *Daubert*, 509 U.S. at 590. Professor Scott does not have the requisite knowledge for either of her opinions. To assume that her opinions are correct (despite a lack of evidence and experience) would be to rely on her *ipse dixit* based on conjecture to judge the reliability of her conclusion. *See Bowers v Norfolk Southern Corp.*, 537 F.Supp.2d 1343, 1355 (M.D. Ga. 2007) (" The Court cannot rely on [the expert's] *ipse dixit* to judge the reliability of his conclusion[.]").

2. Professor Scott's Opinions are Vague and Imprecise.

Despite her "concerns" over the "potential effects" of puberty delaying medication, *see* Report, ¶¶ 4, 7, Professor Scott does not believe these treatments should be denied to all teenagers with gender dysphoria. She begins her report by saying it is "entirely possible that the use of puberty blockers is appropriate in some exceptional cases of gender dysphoria in prepubescent and adolescent individuals."

Case 4:22-cv-00325-RH-MAF   Document 119   Filed 04/07/23   Page 16 of 23

Report, ¶ 7. She repeated that sentiment in her deposition. Tr. 13:10-13 ("I think it's entirely possible that there are people, young people who this is an entirely appropriate course of treatment potentially."). When asked about whether she approves of complete bans pertaining to gender-affirming care, like the Challenged Exclusion in this case, Professor Scott could not give a straight answer. On the one hand, she acknowledged that all-inclusive bans on coverage are a bad idea. Tr. 13:22-23 ("I don't think it's a good idea to ban treatment in a blanket way."; Tr. 14:21-23 ("I think it should be something that's worked out in terms of a scientific and medical approach."). On the other hand, she understood she was offering an opinion in support of one such blanket ban. Tr. 12:21 – 13:8. When asked whether she would vote for or against the Challenged Exclusion in this case, she said she would "abstain like a coward." Tr. 16:17.

Opinions like these are too vague and imprecise to be sufficiently reliable. Professor Scott cannot identify when, or under what circumstances, puberty delaying medication may be appropriate for teenagers. She thus cannot say when the unknown risks of these treatments outweigh their benefits. Where she draws the line is completely unknown, making her opinion vague and imprecise. *See Ward v Carnival Corporation*, 2018 WL 11383459, at *6 (S.D. Fla. July 31, 2018) (excluding expert testimony because it was "unclear precisely what [the expert] was claiming.").

Her opinion about a teenager's decision-making ability is equally imprecise. Professor Scott is not certain whether all teenagers are prone to risky behavior, which

16

is the sole basis for her opinion. Tr. 141:9-19 (Q. Is [riskiness] common for all adolescents?" A. Well, I mean adolescence is very variable like all humans."). Her opinion is also based on research related to decision-making in a "hot context," Report, ¶ 14, which ignores the body of research and peer-reviewed literature on the contextual nature of decision-making in adolescence. Corrected Edmiston Rebuttal Report at ¶ 18 (discussing eleven (11) peer-reviewed papers on the contextual nature of adolescent decision-making). She also omits all literature on decision-making in the medical context and particularly decision-making about treatment of gender dysphoria occurring over several years. These cavernous omissions render her opinion about decision-making in the "hot" context both imprecise and misleading by leaving out the proper context.

    3.  <u>Professor Scott's Opinions are Far Outside the Mainstream</u>

General acceptance in the relevant scientific community is an important element to the reliability inquiry. See *Allison v. McGahn Medical*, 184 F.3d 1300, 1313 (11th Cir. 1999). Not only is widespread acceptance an important factor in assessing the reliability of an expert's opinions, but the fact that a known theory "has been able to attract only minimal support within the community may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594. Here, Professor Scott's opinions about the propriety of puberty delaying treatment is far outside the mainstream of medical and scientific opinion. In fact, her views have been explicitly rejected by every relevant scientific and medical community. Professor Scott says she is "slightly

17

worried" about using puberty delaying medication to treat even precocious puberty, the indication for which it was originally developed and for which it is approved by the FDA. Tr. 78:7-8; *see id*. 78:14-18 (expressing concerns about using puberty delaying treatment for any purpose because it is not "necessarily . . . safe" and "the data is not 100 percent clear that it doesn't have an effect" on cognitive function); Tr. 156:19-21 ("[M]y primary concern is about puberty blockers and giving them in adolescents and the risk associated with that."). Professor Scott claims she "doesn't know" whether her "concerns with puberty blockers for precocious puberty [are] shared by the medical community." Tr. 78:19-22. In fact, they are not shared, and indeed, run counter to the opinions of mainstream scientists and clinicians. See Corrected Edmiston Report, ¶ 38; Shumer Rebuttal Report ¶¶ 7, 54, 64 (**Exhibit D**); Dekker P.I. Hrg. Tr., at 29:16- 36:18 [ECF 62] (noting that the majority of major medical associations support gender-affirming care for adolescents and adults); *see also, e.g.*, *Brandt v. Rutledge*, 551 F.Supp.3d 882, 890 (E.D. Ark. 2021) ("The consensus recommendation of medical organizations is that the only effective treatment for individuals at risk of or suffering from gender dysphoria is to provide gender-affirming care [include puberty delaying treatment].") (emphasis added), *aff'd*, 47 F.4th at 671. Because Professor Scott's opinions about puberty delaying treatment are "not generally accepted by the scientific community, and [are] unsupported by other studies" her testimony is unreliable. *Allison*, 184 F.3d at 1319.

18

###### D. Professor Scott's Opinions Will Not Assist the Trier of Fact.

Expert testimony is helpful to the trier of fact if it explains subjects that are beyond the understanding of the average lay person. *Frazier*, 387 F.3d at 1262. The testimony must offer more than what lawyers can argue in closing arguments. *Id.* Expert testimony is not helpful if it fails to "fit" with the facts of the case. *McDowell*, 392 F.3d at 1299. This happens when a large analytical leap must be made between the facts and the opinion. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (offering animal studies showing one type of cancer in mice to establish causation of another type of cancer in humans is considered "too great an analytical gap").

Professor Scott's expert testimony will not assist the trier of fact for several reasons. *First*, her opinion about the ability of teenagers to fully grasp their decision to undergo treatment does not "fit" the facts of the case. She references these decisions as if they were made by the adolescent patient alone, that is, without any advice or assistance from medical professionals or other adults. Report, ¶ 16 ("All the evidence we have suggests that the complex, emotionally charged decisions required to engage with this treatment are not yet acquired as a skill at this age, both in terms of brain maturation and in terms of behaviour."). But the reality is that all decisions about whether to administer gender-affirming care are made by a group of individuals including the patient's family and healthcare providers. And, for individuals under 18, these decisions are ultimately made by the patient's parent or legal guardian. Professor Scott acknowledged this point in her deposition. Tr. 146:5-

19

10 (Q. But we're not talking about teenagers deciding about gender-affirming care themselves in this case, right? A. No. I understand that this would be something where the consent is not with the teenager."). Accordingly, her opinion on teenager decision-making is irrelevant to the facts of the case. *See Kadel*, 2022 WL 3226731, at *14 (excluding Dr. Lappert's opinion on informed consent in the context of gender dysphoria because the patient's father gave consent).

*Second*, this same opinion is well within the understanding of the average lay person, and it is certainly something counsel can argue in closing. Professor Scott concedes this point in her report when she describes the following as a "lay understanding of what neuroscience is now confirming." She says: "teenage brains on the whole are structurally and functionally different from adult brains, and this affects both their engaging with risky behaviour, and their understanding of the implications of risky behaviour." Report, ¶ 8. She confirmed the same in her deposition. Tr. 143:7-11 ("Q. Do you need to be an expert in neuroscience to understand that teenagers on the whole engage in risky behavior? A. No. Like I said in my report, it's something that all cultures recognize."). Since there already exists a "lay understanding" of her opinion about teenage behavior that "all cultures recognize," her opinion will not assist the trier of fact in this case. It is well-established that untestable "common sense" does not satisfy Rule 702's requirements. *See Fedor v. Freightliner, Inc.*, 193 F.Supp.2d 820, 832 (E.D. Pa. 2002) ("Generalized common sense does not rise to the level of expert opinion solely

Case 4:22-cv-00325-RH-MAF    Document 119    Filed 04/07/23    Page 21 of 23

because it is offered by someone with an academic pedigree.").

*Third*, her opinion about the unknown effects of puberty delaying medication is also within the understanding of the average person. The Court does not need an expert to explain the things we do not know. These can easily be explained in closing argument. *See Frazier*, 387 F.3d at 1262 ("Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments.").

*Fourth*, as noted above, her opinion about puberty delaying medication is based in part on animal studies without any connection to the treatment of gender dysphoria in humans. Report, ¶ 15; Tr. 71:11-15. Professor Scott does not even attempt to link these animal studies to humans, and as a result, such studies do not offer any support for her conclusions about the human brain. Therefore, they do not assist the trier of fact. *Joiner*, 522 U.S. at 146; *Kilpatrick*, 613 F.3d at 1338.

## CONCLUSION

WHEREFORE, based on the foregoing, Plaintiffs respectfully request that the Court grant the instant Motion and exclude Professor Scott's expert report, opinions and testimony in their entirety under *Daubert* and the Federal Rules of Evidence.

*    *    *

Respectfully submitted this 7th day of April, 2023.

21

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**

By: */s/ Jennfer Altman*
**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsburylaw.com
shani.rivaux@pillsburylaw.com

**William C. Miller***
**Gary J. Shaw***
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com
gary.shaw@pillsburylaw.com

**Joe Little***
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**

**Abigail Coursolle***
3701 Wilshire Boulevard, Suite 315 Los
Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee***
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27514
(919) 968-6308
mckee@healthlaw.org

**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**

**Omar Gonzalez-Pagan***
120 Wall Street, 19th Floor New
York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles***
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**FLORIDA HEALTH JUSTICE PROJECT**

**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

* *Admitted pro hac vice.*

## CERTIFICATE OF WORD COUNT

According to Microsoft Word, the word-processing system used to prepare this Motion and Memorandum, there is a combined total of 5,455 words in the Motion and the Memorandum of Law.

/s/ Gary J. Shaw
Gary J. Shaw

## CERTIFICATE OF SATISFACTION OF
## ATTORNEY-CONFERENCE REQUIREMENT

Pursuant to Local Rule 7.1(B), counsel for the Plaintiffs conferred with counsel for the Defendants on April 5, 2023. Counsel for Defendants indicated that same day that Defendants oppose the relief sought.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by email on April 7, 2023, on all counsel of record:

Mohammad O. Jazil (FBN 72556)
Gary V. Perko (FBN 855898)
Michael Beato (FBN 1017715)
HOLTZMAN VOGEL BARANTORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St., Suite 500
Tallahassee, FL 32301

**COUNSEL FOR DEFENDANTS**

/s/ Gary J. Shaw
**ATTORNEY FOR PLAINTIFFS**

23

# TAB 127

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, *et al.*,

                        *Plaintiffs*,

        v.

JASON WEIDA, *et al.*,

                        *Defendants*.

Case No. 4:22-cv-00325-RH-MAF

## PLAINTIFFS' MOTION TO PARTIALLY EXCLUDE EXPERT TESTIMONY OF DR. PATRICK W. LAPPERT AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Federal Rules of Civil Procedure 26 and 37, and Federal Rules of Evidence 104, 403, and Rule 702, Plaintiffs move to partially exclude certain testimony of Defendants' expert Dr. Patrick W. Lappert, M.D., on the grounds that he fails to meet the qualification, reliability, and helpfulness requirements imposed by Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). Specifically, Dr. Lappert's testimony should be limited to his area of expertise: the field of plastic surgery. To the extent that any of Dr. Lappert's purported opinions beyond plastic surgery hold any probative value (they do not), it is far outweighed by unfair prejudice and confusion of the issues and therefore the testimony should

be excluded pursuant to Fed. R. Evid 403.  In support of this motion, Plaintiffs state as follows:

## FACTUAL BACKGROUND

On February 17, 2023, Defendants served their expert witness disclosures for Dr. Lappert and thereafter provided his rebuttal opinions.[1]    His rebuttal opinions were primarily directed to the reports of Dr. Loren S. Schechter, M.D., and Dr. Johanna Olson-Kennedy, M.D., M.S.  Lappert Rebuttal ¶ 1.

In his reports, Dr. Lappert opines on numerous subjects that fall well outside the scope of his experience in plastic surgery, including the nature, causes, and diagnosis of gender dysphoria, non-surgical treatments for gender dysphoria, the quality of the evidence supporting medical treatments for gender dysphoria, and the development of clinical practice guidelines by professional medical associations of which he is not even a member.  *See generally*, Lappert Rep.; Lappert Rebuttal.

However, as a retired plastic surgeon, Dr. Lappert is not qualified to offer expert testimony on these matters.  Indeed, in a prior case in the Middle District of North Carolina involving a challenge to a categorical exclusion of gender-affirming health services from coverage through a state-sponsored health plan, the District Court precluded the vast majority of Dr. Lappert's proffered opinions based on his

---

[1] *See* Declaration of William Miller ("Miller Dec.") ¶¶ 4-5; Ex. A, Expert Declaration of Patrick W. Lappert, M.D. ("Lappert Rep."); Ex. B, Rebuttal Expert Report of Patrick W. Lappert, M.D. ("Lappert Rebuttal").

Case 4:23-cv-00325-RH-MAF Document 127 Filed 04/07/23 Page 3 of 27

lack qualifications and the unreliability of his testimony, limiting his testimony solely to those opinions related to the field of plastic surgery. *Kadel v. Folwell*, Case No. 1:19CV272, 2022 WL 3226731, *13-14 (M.D.N.C. Aug. 10, 2022).[2] Notably, the Court also found that the available evidence "call[ed] Lappert's bias and reliability ***into serious question***." *Id*. at *12 (emphasis added).

Similarly, in *Brandt v. Rutledge*, the court curtailed Dr. Lappert's testimony even further, limiting Dr. Lappert to offering opinions solely "to his practice," "to what he has personally done in his practice," and "his actual interaction with patients and what the outcomes were." Miller Dec. ¶ 6; Ex. C, Excerpts of *Brandt v. Rutledge* Trial Transcript ("*Brandt* Tr."), at 1058:25, 1059:11-15. Indeed, the court sustained objections that sought to elicit Dr. Lappert's testimony about what the clinical practice guidelines pertaining to gender-affirming medical treatment entail and any specific risks for transgender individuals because Dr. Lappert "is not an expert in gender-affirming care" and such testimony "is outside the scope of the doctor's practice." *Brandt* Tr. 1058:4-10, 1067:10-14.

This Court should do the same. Dr. Lappert lacks the necessary qualifications to so testify regarding any subject matter beyond the field of plastic surgery,

---

[2] Specifically, the court in *Kadel* held that Dr. Lappert was "limited to testifying to (1) the risks associated with the surgeries at issue in this case; (2) his anecdotal experience treating patients seeking to "de-transition"; and (3) the WPATH recommended role of the surgeon in treating gender dysphoria as compared to the role of the surgeon in other surgical contexts." 2022 WL 3226731, at *15.

including as to the nature, causes, or diagnosis of gender dysphoria, non-surgical treatments for gender dysphoria, the quality of evidence supporting medical treatments for gender dysphoria, and the development of clinical practice guidelines for the treatment of gender dysphoria, and any such testimony is otherwise unreliable, unhelpful, or its probative value is outweighed by potential prejudice.

## LEGAL STANDARD

Federal Rule of Evidence 702 places "a special gatekeeping obligation" on the trial court to ensure that an expert's testimony is "relevant to the task at hand" and "rests on a reliable foundation." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). As articulated by the Eleventh Circuit, "[t]he importance of Daubert's gatekeeping requirement cannot be overstated." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).

In determining admissibility under Rule 702, courts must engage in a "rigorous" inquiry to determine whether (1) the expert is qualified to testify regarding the matters they intend to address; (2) the methodology employed by the expert to reach their conclusions is sufficiently reliable, as determined by the inquiry mandated under *Daubert*; and (3) the testimony assists the trier of fact to understand the evidence or determine a fact at issue. *Id.*, at 1260; *see also City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998), *cert. denied*, 528 U.S. 812 (1999). These considerations of "qualification," "reliability," and "helpfulness"

4

are "distinct concepts that courts and litigants must take care not to conflate." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). Crucially, the party offering the expert testimony has the "burden of establishing qualification, reliability, and helpfulness." *Frazier*, 387 F.3d at 1260.

<u>**ARGUMENT**</u>

## I.    Dr. Lappert Is Not Qualified to Offer a Significant Portion of His Purported Opinions

"A witness may be qualified as an expert by virtue of his 'knowledge, skill, experience, training, or education." *Quiet Technology DC-8, Inc.*, 326 F.3d at 1342. But "expertise in one field does not qualify a witness to testify about others." *Lebron v. Sec'y of Fla. Dep't of Children & Families*, 772 F.3d 1352, 1368 (11th Cir. 2014) (holding that a psychiatrist was properly prevented from opining on rates of drug use in an economically vulnerable population because he had never conducted research on the subject and instead relied on studies to form his opinion). "A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty." *Id.* (quoting *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002)). Indeed, even "a supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999).

Case 4:23-cv-00325-RH-MAF  Document 127  Filed 04/07/23  Page 6 of 27

If a designated expert witness does not "propose to testify about matters growing naturally and directly out of research he had conducted independent of the litigation," the expert should be disqualified. *Lebron*, 772 F.3d at 1369 (quoting Fed. R. Evid. 702 (cleaned up)). Simply put, "an expert's qualifications must be within the same technical area as the subject matter of the expert's testimony; in other words, a person with expertise may only testify as to matters within that person's expertise." *Martinez v. Sakurai Graphic Sys. Corp.*, 2007 WL 2570362, at *2 (N.D. Ill. Aug. 30, 2007).

Indeed, the qualification inquiry is subject-specific because "[g]eneralized knowledge of a particular subject will not necessarily enable an expert to testify as to a specific subset of the general field of the expert's knowledge." *Id.*, at *2. "For example, no medical doctor is automatically an expert in every medical issue merely because he or she has graduated from medical school or has achieved certification in a medical specialty." *O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1390 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir. 1994). Here, Dr. Lappert's opinions topics relating to plastic surgery fail to meet the most basic standard for admissibility and must be excluded.

## A.  Dr. Lappert is Not Qualified to Offer Opinions on Topics Other Than Plastic Surgery

Dr. Lappert offers a clutter of opinions far afield from his experience as a plastic surgeon, including regarding the fields of endocrinology, psychology,

psychiatry, and treatment guidelines issued within those specialties. But Dr. Lappert lacks the necessary qualifications, or any other basis, to offer an expert opinion in these areas.[3] To be clear, Dr. Lappert has previously testified he "do[es] not claim to be an expert in the treatment of gender dysphoria." *Brandt* Tr. 1042:13-15.

Recognizing Dr. Lappert's lack of expertise on precisely the same subjects on which he purports to opine in this case, the court in *Kadel* precluded Dr. Lappert from providing expert testimony on matters outside the realm of plastic surgery and his anecdotal experiences as a surgeon. *See* 2022 WL 3226731 at *12-15. Similarly, at trial, the Court in *Brandt* limited his testimony solely "to his practice," "to what he has personally done in his practice," and "his actual interaction with patients and what the outcomes were." *Brandt* Tr. 1058:25, 1059:11-15. The Court should adopt the same approach here.

For example, Dr. Lappert proselytizes on the efficacy of hormone therapy as a treatment for gender dysphoria, and on the reliability of peer-reviewed medical

---

[3] Although Plaintiffs do not move to exclude Dr. Lappert's opinions, however fringe, within his own field, it must be noted that he has conceded that he has "never performed any kind of gender-affirming surgery in transgender patients." Miller Dec. ¶ 7; Ex. D, Excerpts of Sept. 30, 2021 Deposition Transcript ("Lappert Tr."), at 168; *id.* at 151 ("I have never treated a patient with gender dysphoria surgically."). He has also emphatically stated that he would never perform such surgeries, because in his personal view he does not "see them as beneficial" and thinks they are "incorrect treatments." *Id.* at 150. Indeed, Dr. Lappert believes that "in all instances" gender-affirming genital surgery is "an irreversible mutilation[.]" Lappert Rep. ¶ 42.

7

publications, and in particular clinical practice guidelines issued by the Endocrine Society (the nationally recognized professional society for endocrinologists), cited as support for the use of such treatments. *See* Lappert Rep. ¶¶ 33, 38-42. Dr. Lappert further purports to opine on the nature of, and differences between, gender and sex. *Id.* ¶¶ 31-32. But Dr. Lappert has previously conceded that he is "not an endocrinologist" and has "no specialized training or expertise in endocrinology." Lappert Tr., at 153, 204; *see also Brandt* Tr. 1040:22-25 ("Q And you're not an endocrinologist? A I am not. Q You're not an expert in endocrinology? A I am not.").

Dr. Lappert likewise admitted that he has "never prescribed cross-sex hormones for treatment of gender dysphoria," and that he has "no firsthand experience with advising [his] patients about potential risks and benefits" of such treatment. Lappert Tr., at 214. He has acknowledged that he does not "hold [himself] out as an expert in endocrinology," and indicated in a prior case that he did not plan to offer "any expert opinions in endocrinology . . . because that's outside [his] scope of expertise." Lappert Tr., at 204. Accordingly, as previously held in *Kadel*, all of Dr. Lappert's purported opinions relating to endocrinology should be excluded. *Kadel*, 2022 WL 3226731 at *13.

Dr. Lappert likewise is not qualified to opine regarding the development or efficacy of the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-V"), the diagnosis of gender dysphoria, or the treatment of gender dysphoria

8

by a mental health provider. *See, e.g.*, Lapper Rep. ¶¶ 46, 74-76, 93-94. The reasoning in *Kadel* applies equally here. Dr. Lappert "is not a psychiatrist, psychologist, or mental health professional, nor has he ever diagnosed a patient with gender dysphoria," but he nonetheless provides opinions in these areas. *Kadel*, 2022 WL 3226731 at *13. Dr. Lappert himself has acknowledged that he "do[es] not hold [himself] out as an expert in diagnosing mental health conditions[,]" and that he also does "not have special[ized] training or expertise in treating mental health conditions." Lappert Tr., at 75; *see also Brandt* Tr. 1041:6-8 ("Q You don't claim to be an expert in the diagnosis of gender dysphoria? A Expertise, no. … ."). He further admitted that he has never been involved in the development of the DSM-V, and does not know "what kind of scientific literature review was done" during that development or what went on during "different meetings or conferences" to "discuss that development[;]" thus, Dr. Lappert "do[es] ***not have expert firsthand knowledge*** of how the DSM-V was developed." Lappert Tr., at 190-93 (emphasis added).

In sum, Dr. Lappert's ability to read and regurgitate information pertaining to the treatment of gender dysphoria does not qualify him as an expert. Because Dr. Lappert's purported opinions about matters within the fields of psychology, psychiatry, and endocrinology are outside of his training and expertise, such opinions should be precluded, as they were in *Kadel* and *Brandt*. *See Kadel*, 2022 WL 3226731 at *12-15; *see also, e.g.*, *Lebron*, 772 F.3d at 1368-69.

9

## B.    Dr. Lappert is Not Qualified to Opine on the Quality of the Studies Supporting Gender-Affirming Care

Aware that his views on gender dysphoria and gender-affirming care are contradicted by the position of every major medical society and professional organization in the country, Dr. Lappert goes to great lengths to attempt to undermine the validity and basis of a select few of the multitude of medical studies that support the safety and efficacy of gender-affirming care by pointing out what he perceives as methodological flaws.  *See, e.g.*, Lappert Rep ¶¶ 38-41, 58-67, 85-87; Lappert Rebuttal ¶¶ 8, 11-12, 16-22.  He repeatedly contends that the existing studies do not constitute "quality evidence," and as a result, gender-affirming care is experimental or unsupported by reliable science. *See* Lappert Rep. ¶¶ 24-25, 57, 59, 106; Lappert Rebuttal ¶ 25.  But once again, such opinions are far afield from Dr. Lappert's professional experience.

As the court in *Kadel* noted, Dr. Lappert is "not a statistician or epidemiologist, and there is no evidence . . . that he has any experience, specialized training, or knowledge about crafting a research study, analyzing data, or conducting a clinical trial."  *Kadel*, 2022 WL 3226731 at *13.  Given his lack of personal experience with the study of gender-affirming care, the court in *Brandt* similarly limited his testimony to "to what he has personally done in his practice, not what the evidence shows." *Brandt* Tr. 1059:9-13.  Indeed, Dr. Lappert's prior publications (seven in total) include case reports and opinion essays, and he has not published in

10

a peer-reviewed journal in over *twenty-five years*. *See* Lappert Rep., at 69 (curriculum vitae). His curriculum vitae notes a brief academic career, but that role appears limited to overseeing clinical practitioners and did not involve conducting research or clinical trials of any kind. *See id.*, at 68; *see also Kadel*, 2022 WL 3226731 at *13.

In sum, as the court in *Kadel* noted, "[j]ust as an epidemiologist or statistician would not be qualified to perform surgery, a surgeon with little to no research experience is not qualified to opine of the veracity of statistical studies." *Kadel*, 2022 WL 3226731 at *13. Accordingly, Dr. Lappert's proffered opinions regarding the validity or veracity of studies pertaining to gender-affirming care or gender dysphoria should be excluded.

## II.    Dr. Lappert's Opinions on Topics Other than Plastic Surgery are Also Either Unreliable, Unhelpful, or Both

As a rule, an expert's testimony should only be admitted if it is sufficiently reliable. "To meet the reliability requirement, an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue." *In re 3M Combat Arms Earplug Products Liab. Litig.*, 3:19MD2885, 2022 WL 1262203, at *1 (N.D. Fla. Apr. 28, 2022). The reliability requirement in Rule 702 is "the centerpiece of any determination of admissibility." *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002). "At this stage, the court must undertake an independent analysis of each step in the logic leading to

11

the expert's conclusions; if the analysis is deemed unreliable at any step the expert's entire opinion must be excluded." *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009), *aff'd sub nom. Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183 (11th Cir. 2010).

To satisfy the helpfulness requirement, the proffered testimony must have a justified scientific relationship to the facts at issue. *Daubert*, 509 U.S. at 591. Thus, helpfulness, "goes primarily to relevance." *Daubert*, 509 U.S. at 580. Relevant expert testimony "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004). "The relationship must be an appropriate 'fit' with respect to the offered opinion and the facts of the case." *Id.* Where the court determines that proffered expert testimony does not "fit" the facts of the case, it is properly excluded. *See id.*, at 1301.

Here, Plaintiffs' case turns primarily on two issues, among others, (1) whether the Agency employed a process that was reasonable and (2) whether gender-affirming medical care is experimental or investigational. Many of Dr. Lappert's opinions are both unreliable and unhelpful to the issues before this Court, as detailed below.

12

Case 4:22-cv-00325-RH-MAF    Document 127    Filed 04/07/23    Page 13 of 27

## A.    Dr. Lappert's Opinions are Rejected by the Vast Majority of the Scientific and Medical Community and Lack Credible Support

General acceptance in the relevant scientific community is an important element to the reliability inquiry. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1313 (11th Cir. 1999).  Moreover, the fact that a known theory "has been able to attract only minimal support within the community may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594.  Here, Dr. Lappert's opinions about the effectiveness and propriety of gender-affirming care, which he is not qualified to present, are far outside the mainstream of medical and scientific opinion and have been explicitly rejected by every relevant scientific and medical community.  While undoubtedly Dr. Lappert "has strong beliefs," the fact that his opinions are "not generally accepted by the scientific community, and [are] unsupported by other studies" means that "his testimony is based more on personal opinion than on scientific knowledge," making it unreliable. *Allison*, 184 F.3d at 1319.

Dr. Lappert cites virtually no evidentiary support for his critiques of medical studies substantiating the need for gender-affirming care. *See generally*, Lappert Rep.; Lappert Rebuttal.  And to the contrary, the evidence shows that Dr. Lappert's opinions regarding the supposedly "experimental" nature of gender-affirming care are on the scientific fringe. *See, e.g.*, Lappert Rep. ¶¶ 23, 97-98; Lappert Rebuttal ¶¶ 21-22, 25 n. 3.  For example, in a recent case addressing a challenge to Arkansas' state-law ban on gender-affirming treatment for minors, Dr. Lappert offered

13

substantially similar opinions in support of the ban, contending that "[g]ender affirming' treatments are experimental[.]"  *See Brandt v. Rutledge*, 551 F.Supp.3d 882 (E.D. Ark. 2021); Lappert Tr., at 33-35; Miller Dec. ¶ 8; Ex. E, Declaration of Dr. Lappert in *Brandt v. Rutledge*.

Nevertheless, the *Brandt* court preliminarily enjoined the ban, recognizing that "the consensus recommendation of medical organizations is that the only effective treatment for . . . gender dysphoria is to provide gender-affirming care," citing briefs from organizations like the American Medical Association, American Academy of Pediatrics, and many more. *Brandt*, 551 F.Supp.3d at 890 n.3.  *Brandt* also found that "gender-affirming treatment is supported by medical evidence that has been subject to rigorous study," and that "every major expert medical association recognizes that gender-affirming care for transgender minors may be medically appropriate and necessary to improve the physical and mental health of transgender people."  *Id.*, at 891; *see also Fain v. Crouch*, Case No. 3:20-0740, 2022 WL 3051015, *10 ("[m]any of the major medical organizations have opposed the blanket denial of this medically necessary [gender-affirming] care.").

Dr. Lappert himself has previously acknowledged that "every major expert medical association disagrees with [him] because they've all taken [the] position that this treatment is in fact medically necessary."  Lappert Tr., at 40.  Dr. Lappert's own

Case 4:22-cv-00325-RH-MAF    Document 127    Filed 04/07/23    Page 15 of 27

former association, the American Society of Plastic Surgeons[4] ("ASPS") (whose categorizations of evidence for prognostic and therapeutic studies Dr. Lappert repeatedly relies upon in critiquing the studies and evidence in support of gender-affirming care) issued a statement in February 2021 stating that it "firmly believes that plastic surgery services can help gender dysphoria patients align their bodies with whom they know themselves to be," and promising to "continue its efforts to advocate across state legislatures for full access to medically necessary transition care." Miller Dec. ¶ 9; Ex. F, Feb. 25, 2021 ASPS Statement. So as Dr. Lappert has admitted, the ASPS also "does not agree with [his] opinions that gender affirming surgery is experimental." Lappert Tr., at 112-13. In short, the overwhelming consensus confirms that, far from being generally accepted, Dr. Lappert's opinions regarding gender-affirming care are unsupported and unreliable.

### B.   Dr. Lappert's Critiques of the WPATH Standards of Care, the Endocrine Society Guidelines, and Other Organizations' Positions Are Unreliable

Given that his views are unsupported by any reliable scientific evidence, and indeed run contrary to the position of every major medical society and professional organization, Dr. Lappert attempts to discredit the clinical guidelines and standards of care espoused by these respected organizations, including the World Professional

---

[4]  Dr. Lappert's report misidentifies his own former professional organization as the "American Society of Plastic Surgery." *E.g.*, Lappert Rep. ¶ 24.

15

Case 4:22-cv-00325-RH-MAF    Document 127    Filed 04/07/23    Page 16 of 27

Association for Transgender Health ("WPATH") and the Endocrine Society.  For example, Dr. Lappert asserts that "the WPATH standard of medical necessity is not supported in reliable scientific evidence" and he purports to "examine how such guidelines are developed."  Lappert Rep. ¶¶ 36, 51; *see also, e.g.,* Lappert Rebuttal ¶ 8 (contending that the "evidence cited in support of the WPATH Standard reveals a lack of evidence even to support a weak recommendation in a treatment guideline.").

But Dr. Lappert has previously conceded that he was "not involved with the development" of WPATH guidelines, he did not "know what kind of scientific literature [review] the WPATH conducted as part of drafting" the guidelines, or what other forms of "peer review," "outside experts," or "public comments" the WPATH may have relied on in developing their guidelines.  Lappert Tr., at 184-87.  To the point, Dr. Lappert admitted that he is "***not an expert***" in the development of either versions 7 or 8 of the WPATH standards of care.  *Id.*, at 188-89.  The court in *Kadel* agreed, precluding Dr. Lappert's views on the WPATH standards as "unscientific opinion and speculation."  *Kadel*, 2022 WL 3226731 at *14.  So did the court in *Brandt*, which sustained an objection to an attempt to elicit testimony from Dr. Lappert as to what the WPATH guidelines mean.  *Brandt* Tr. 1058:4-10.

Dr. Lappert similarly opines that the "scientific evidence used to support the Endocrine Society's special treatment guidelines for gender dysphoric/gender

16

incongruent persons appears to be of low to very low quality[.]"  Lappert Rep. ¶ 38.

Yet Dr. Lappert has admitted that he does not know when these guidelines "were

initially published" or "last revised;" he was "not involved with the[ir] development;"

he does not know "what kind of scientific literature review" went into that

development; thus, he agreed he is "not an expert in how the Endocrine Society

developed the original 2009 guidelines" or "the 2017 updates."  Lappert Tr., at 195-

200.

At bottom, Dr. Lappert has no expertise or understanding of the development

of the WPATH or Endocrine Society guidelines, and therefore his criticism of the

evidence in support of these standards is unreliable.  *See Kadel*, 2022 WL 3226731

at *14.  Consequently, he should not be permitted to mislead a factfinder with his

baseless *ipse dixit* critiques.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

> **C.    Dr. Lappert's Opinions Regarding Informed Consent, "Desistance," and Changes in Demographics are Unreliable, Unhelpful, and Irrelevant.**

Dr. Lappert dedicates a portion of his report to his opinions on whether

patients diagnosed with gender dysphoria can provide "meaningful consent" to

gender-affirming treatment, and he makes a number of claims regarding statistics

pertaining to the supposed "resolution" of the condition of "transgenderism" absent

gender-affirming care, and changes in the rates of diagnosis and makeup of the

population of individuals diagnosed with gender dysphoria.  *E.g.*, Lappert Rep. ¶¶

17

69-70, 73.  But these purported opinions are unreliable, unhelpful, and irrelevant to the issues before the Court.

**_First_**, Dr. Lappert has failed to support his opinions regarding "informed consent" with any credible evidence or data.  _See generally_, Lappert Rep. Accordingly, his conclusions regarding informed or meaningful consent are speculative and unreliable and should be excluded.  _See Jones v. Otis Elevator Co._, 861 F.2d 655, 662 (11th Cir. 1988) ("relevant testimony from a qualified expert is admissible only if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation."); _see also Hendrix_, 255 F.R.D. at 578; _Kadel_, 2022 WL 3226731, at *14 (concluding that Dr. Lappert's opinions regarding informed consent to gender-affirming care were "irrelevant" and "not admissible.").

**_Second_**, Dr. Lappert's opinions that gender dysphoria may resolve on its through his mischaracterizing description of "watchful waiting" (e.g., Lappert Rep. ¶¶ 93, 94, 98) are based on a severely flawed reading of the literature, which renders his opinions unreliable, and regardless, such opinions are also irrelevant. Specifically, Dr. Lappert cites a single article by Zucker et al. in support of this proposition.  But that study pertains to (1) _preadolescent/prepubertal_ youth not _adolescents after the onset of puberty_ and (2) who were diagnosed with _gender identity disorder_ under the DSM-III or the DSM-IV not _gender dysphoria_ under the

18

DSM-V. It is therefore inapplicable and irrelevant in this context, where the changes from the DSM-IV diagnosis of gender identity disorder to the DSM-V diagnosis of gender dysphoria in 2013 made "the diagnosis more restrictive and conservative" to reduce "false positives." *See* Miller Dec. ¶ 10; Ex. G, Memo Outlining Evidence for Change for Gender Identity Disorder, at 904-05.

Dr. Lappert's assertions are also flawed because they misrepresent Dr. Zucker's work. Indeed, Dr. Zucker authored the chapter in "Gender Dysphoria and Gender Incongruence" in the medical textbook *Lewis's Child and Adolescent Psychiatry, Fifth Edition*, published in 2018. *See* Miller Dec. ¶ 11, Ex. H, Excerpt of *Lewis's Child and Adolescent Psychiatry, Fifth Edition*. That chapter states that: (1) "it appears that the vast majority of transgender adolescents persist in their transgender identity," *id.* at 638; and (2) "Once children have reached puberty, transgender identity persists in the vast majority of cases, and medical intervention is often considered[.]" *Id.* at 640. Given that this case pertains to gender-affirming medical treatments which are not provided until after the *onset of puberty*, Dr. Lappert's opinions, premised on his flawed reading and understanding of the "desistance" literature, are irrelevant and unreliable.

***Third***, Dr. Lappert's opinions regarding a change of demographics are wholly unreliable and irrelevant. Lappert Rep. ¶ 73. He cites no scientific or peer-reviewed literature. To the contrary, he cites solely to a non-medical, non-scientific book by

Case 4:22-cv-00325-RH-MAF    Document 127    Filed 04/07/23    Page 20 of 27

an anti-transgender activist.[5]  But Rule 703 requires that "[t]he facts or data … upon which an expert bases an opinion or inference" must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," Fed. R. Evid. 703, and the book upon which Dr. Lappert relies is *not* the type of material reasonably relied upon by experts in any field of medicine.  Moreover, Dr. Lappert's opinion is irrelevant.  Gender dysphoria is a real and recognized condition that requires treatment – whether the demographics have changed has no bearing on that or the questions before the Court.

### D.    Dr. Lappert's Commentary on Gender-Affirming Care Provided in Other Countries is Unreliable and Unhelpful

Dr. Lappert also offers opinion regarding the treatment of gender dysphoria and the provision of gender-affirming care in certain European countries, including the United Kingdom, Sweden, Finland, France, and Italy, and cites developments in those countries as evidence in support of his opinions proffered in this case.  *See* Lappert Rep. ¶¶ 104-05; Lappert Rebuttal ¶ 24.  But, according to the curriculum vitae he supplied, Dr. Lappert is not licensed to practice in any of those countries.  *See* Lappert Rep., at 67-69.  His report and rebuttal report likewise offer no

---

[5] Abigail Shrier is not a doctor but an anti-transgender activist and opinion columnist.  She has described transgender rights as a "war on women" and has advocated against what she considers to be a "transgender craze."  GLAAD, GLAAD Accountability Project: Abigail Shrier, https://www.glaad.org/gap/abigail-shrier (accessed Apr. 6, 2023).

indication that Dr. Lappert has personal knowledge regarding the policies regarding gender-affirming care issued in those countries or how those policies were developed. *See generally*, Lappert Rep.; Lappert Rebuttal. Dr. Lappert also either wholly fails to cite any facts or data in support of his opinions regarding developments in these countries, or the data he cites is insufficient to support those opinions. *See* Lappert Rep. ¶¶ 104-05; Lappert Rebuttal ¶¶ 24-25. Consequently, the Court should exclude Dr. Lappert's testimony regarding such opinions. *See Jones*, 861 F.2d at 662.

## III. Dr. Lappert's Opinions are Based on His Personal Beliefs and Not Science

Reliability is a flexible inquiry, under which "courts must ensure that an expert's opinion is based on scientific, technical, or other specialized knowledge and not on belief or speculation." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 281 (4th Cir. 2021); *see also Jones*, 861 F.2d at 662 ("relevant testimony from a qualified expert is admissible only if the expert knows of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation."). Here, there is abundant evidence that Dr. Lappert's opinions are so tainted by his strong personal views against gender-affirming care as to render those opinions unreliable. Although Plaintiffs of course do not seek to impugn any moral or religious views that Dr. Lappert may hold, those views plainly inform the opinions he proffers in this case (and indeed appear to be the primary motivation for those opinions), and

Case 4:22-cv-00325-RH-MAF    Document 127    Filed 04/07/23    Page 22 of 27

therefore the Court must consider those views in assessing the reliability of Dr. Lappert's conclusions.

Dr. Lappert has previously testified that he has "strong personal opinions on whether doctors should be providing gender-affirming treatment to minors." Lappert Tr., at 78. That is an understatement. He has previously lobbied state legislatures in, at a minimum, Utah, Arkansas, Alabama, Texas to pass laws or regulations that would ban doctors from providing gender-affirming medical care to adolescents. *See id.*, at 57, 61-62; *id.* at 54-55 (agreeing he has "actively lobbied to get these kinds of bans passed"). In Alabama he spoke in favor of a ban on gender-affirming care for adolescents, and "publish[ed] an op-ed" that urged the legislature to protect what he called "gender-confused children." *Id.*, at 76, 63-64. He argued to the Utah legislature that "you can't change a person's sex," and that "all that is happening is that the patient is undergoing an intentional mutilation in order to create a counterfeit appearance of the other sex." *Id.*, at 57-60.

Dr. Lappert also affirmed in deposition testimony that he "absolutely" considers "gender reassignment surgery to be an intentional mutilation." *Id.*, at 60. He further testified that he would like to see doctors who perform these gender-affirming surgeries to be "criminally prosecute[d] – confirming that he thinks "that's a good idea." *Id.*, at 52. Dr. Lappert went so far as to confirm in his report in this

Case 4:22-cv-00325-RH-MAF    Document 127    Filed 04/07/23    Page 23 of 27

case that "in all instances" gender-affirming genital surgery is "an irreversible mutilation[.]" Lappert Rep. ¶ 42.

Dr. Lappert has also worked hand in hand with the Alliance Defending Freedom ("ADF"), an organization he agrees has "moral objections" to gender-affirming healthcare. Lappert Tr., at 81. Among other things, he attended an ADF conference that discussed the "poverty of [experts] who are willing to testify" about these anti-gender-affirming treatments. *Id.*, at 90-91. Attendees at that conference "were asked whether they would be willing as participate as expert witnesses[;]" not coincidentally, Dr. Lappert became an expert witness for the first time after attending that conference. *Id.*, at 91; *see also Brandt* Tr. 1080:5-1081:11. In this sense, Dr. Lappert is the definition of a manufactured "expert witness" who "developed his opinions expressly for purposes of testifying" in an area that he did not otherwise specialize in. *Lebron*, 772 F.3d at 1369.

Dr. Lappert's public interviews and presentations reinforce his vehement opposition to any form of gender-affirming care. These include, for example, his views that the religious conception of "the human person" "defines the 'end' of medical and surgical care." Lappert Tr., at 459. They also include his opinions that "changing a person's sex is a lie and also a moral violation for a physician," and that gender-affirming surgery is "diabolical in every sense of the word." *Id.*, at 464-65; *see also* Miller Dec. ¶ 12; Ex. I, Article titled *Plastic surgeon: Sex-change operation*

Case 4:22-cv-00325-RH-MAF    Document 127    Filed 04/07/23    Page 24 of 27

'utterly unacceptable' and a form of 'child abuse' ("LifeSite Article"), at 1, 7; Lappert Tr., at 465 (agreeing that he "hold[s] those views"). And finally, these also include his inflammatory views that parents who "discuss[] gender identity issues with children" are "sexualizing them" (Lappert Tr., at 462), and that these conversations are "grooming a generation" for abuse. *Id.* at 461; Miller Dec. ¶ 13; Ex. J, Presentation by Dr. Lappert titled "Transgender Surgery & Christian Anthropology," at 24; *see also* LifeSite Article, at 1, 2 (reporting that "regarding children, Lappert said, sexualizing them at a young age with these ideas is grooming them for later abuse.").

As the court in *Kadel* found, these positions call "Lappert's bias and credibility into serious question." *Kadel*, 2022 WL 3226731, at *12.

## IV.  Dr. Lappert's Opinions Lack Probative Value and are Therefore Neither Helpful to the Fact-Finder Nor Admissible Under Fed. R. Evid. 403

Finally, the Court should exclude the opinions and testimony of Dr. Lappert outside the field of plastic surgery because introduction of those opinions will result in unfair prejudice, confusion of the issues, or in misleading testimony. Fed. R. Evid. 403. As articulated above, Dr. Lappert's non-surgical opinions are irrelevant to the issues in this case, and are otherwise speculative, unhelpful, and unreliable. His testimony outside of his discipline would also result in prejudice, as it would sow confusion about the propriety of gender-confirming care based on speculation and irrelevant, misleading, and biased opinions. Accordingly, to the extent not

24

excluded for the reasons detailed above, Dr. Lappert's opinions outside of plastic surgery should be precluded under Rule 403.

## CONCLUSION

For the foregoing reasons, the Court should exclude any opinion proffered by Dr. Lappert outside the field of plastic surgery and limit his testimony to the provision of surgical care generally.

Dated: April 7, 2023

Respectfully Submitted,

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**

*/s/ William C. Miller*
**William C. Miller***
**Gary J. Shaw***
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com
gary.shaw@pillsburylaw.com

**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsbury.com
shani.rivaux@pillsbury.com

**Joe Little***
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**

**Omar Gonzalez-Pagan***
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles***
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**NATIONAL HEALTH LAW PROGRAM**

**Abigail Coursolle**\*
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee**\*
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27514
(919) 968-6308
mckee@healthlaw.org

**FLORIDA HEALTH JUSTICE PROJECT**

**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

\* *Admitted pro hac vice*
*Counsel for Plaintiffs*

26

**CERTIFICATE OF WORD COUNT**

As required by Local Rule 7.1(F), I certify that this Motion and Incorporated Memorandum of Law contains 5,753 words.

*/s/ William C. Miller*
Attorney for Plaintiffs

**CERTIFICATE OF SATISFACTION OF ATTORNEY-CONFERENCE REQUIREMENT**

Pursuant to Local Rule 7.1(B), counsel for Plaintiffs and counsel for Defendants conferred regarding the instant motion during a Zoom conference on April 6, 2023. Defendants indicated they do not consent to the relief requested herein.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of April, 2023, a true copy of the foregoing has been filed with the Court utilizing its CM/ECF system, which will transmit a notice of electronic filing to counsel of record for all parties in this matter registered with the Court for this purpose.

*/s/ William C. Miller*
Attorney for Plaintiffs

27

# TAB 133

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, *et al.*,

                *Plaintiffs*,

       v.

JASON WEIDA, *et al.*,

                *Defendants*.

Case No. 4:22-cv-00325-RH-MAF

**PLAINTIFFS' MOTION TO EXCLUDE
EXPERT TESTIMONY OF MICHAEL LAIDLAW**

Pursuant to Federal Rules of Civil Procedure 26 and 37, and Federal Rules of Evidence 104, 403, and 702, Plaintiffs respectfully move this court to exclude the expert testimony of Defendants' proposed expert, Dr. Michael Laidlaw. As explained more fully below, Dr. Laidlaw is not a qualified expert and his opinions and testimony are neither reliable nor helpful to the trier of fact pursuant to the standards set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny. His opinions and testimony are likewise inadmissible pursuant to Fed. R. Evid. 403. As grounds, Plaintiffs state:

1

1.      Defendants propose Dr. Laidlaw, an adult endocrinologist, as their expert and submitted a report with their Rule 26 Disclosures. (Exhibit 1, Laidlaw Expert Report.)

2.      According to Dr. Laidlaw's expert report, he was retained in this case to provide "expert opinion on the efficacy and safety of sex reassignment treatment." (Ex. 1, ¶ 5).

3.      Yet Dr. Laidlaw's expert reports also contain opinions about the causes, diagnosis, and treatment of gender dysphoria, including the use of puberty-delaying medication, hormone treatment, and surgery, the propriety of the physician-recommended treatment received by the Plaintiffs, as well as their physical and mental health. (Ex. 1, Exhibit 2, Laidlaw Rebuttal Report, Exhibit 3, Laidlaw Declaration in support of Defendants' Opposition to Preliminary Injunction).

4.      Dr. Laidlaw also submitted a declaration in support of Defendants' Response in Opposition to Plaintiffs' Motion for Preliminary Injunction. (Ex. 3).

5.      Defendants have not met their burden of establishing that Dr. Laidlaw is qualified to proffer an opinion on the assessment of gender dysphoria generally, or regarding his alleged concerns related to the assessment of Plaintiffs in particular, nor have they established that Dr. Laidlaw is qualified to testify about the appropriateness of surgery to treat gender dysphoria generally, or the

appropriateness of any surgeries received by Plaintiffs in the past or any surgical procedures they might undergo in the future. Dr. Laidlaw is not a mental health professional or a surgeon, has never provided treatment for gender dysphoria, he has never conducted any original research on the issue nor published any peer-reviewed literature on these matters, has never diagnosed a patient with gender dysphoria, and has only treated one patient with gender dysphoria nearly two decades ago.

6.    Defendants similarly have not met their burden of showing that Dr. Laidlaw's opinions are reliable. The opinions offered in his reports and testimony on the effectiveness of gender-affirming care, the harms it may pose, "desistence," informed consent, and WPATH fall outside of his qualifications, are based on speculation and ipse dixit, and lack any reliable scientific methodology.

7.    Nor have Defendants met their burden of showing that Dr. Laidlaw's opinions are relevant. Dr. Laidlaw offers opinions and testimony regarding the number of people diagnosed with gender dysphoria, human sexual development, the difference between gender identity and biological sex (including whether biological sex can be changed), social transition, and the policies of other counties. None of this testimony has a connection to the existing data or issues in this case and are therefore not helpful to the trier of fact.

3

Case 4:23-cv-00325-RH-MAF Document 133 Filed 04/07/23 Page 4 of 40

8.     The probative value of Dr. Laidlaw's testimony is substantially outweighed by the danger of unfair prejudice, confusion of the issues, waste of time, undue delay, and needless presentation of cumulative evidence.

**WHEREFORE**, Plaintiffs Request that the Court enter an Order excluding Dr. Laidlaw's opinions in this case, except as they relate to the risks associated with puberty suppressing medication and hormone therapy, including those contained in his expert declaration (Ex. 1), and rebuttal declaration (Ex. 2), and prohibit Defendants from relying on testimony for any purpose other than describing the risks associated with puberty suppressing medication and hormone therapy for any purpose during trial.

4

Case 4:23-cv-00325-RH-MAF Document 133 Filed 04/07/23 Page 5 of 40

## MEMORANDUM OF LAW

The vast majority of Dr. Laidlaw's opinions and testimony lack any indicia of admissibility required under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and the Federal Rules of Evidence. This testimony should be excluded because Dr. Laidlaw is not qualified to serve as an expert witness on matters beyond the scope of his expertise as an adult endocrinologist, and his opinions and testimony are not reliable, helpful to the trier of fact, or probative of the issues in this case.

## I.   LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. *Daubert* requires district courts, pursuant to Rule 702, to perform a critical "gatekeeping" function concerning the admissibility of expert scientific evidence, ensuring that the testimony or evidence is both relevant and reliable. *Daubert*, 509 U.S. at 597; *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The importance of Daubert's gatekeeping requirement cannot be overstated.").

In determining the admissibility of expert testimony under Rule 702, courts engage in a "rigorous" three-part inquiry and must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

5

*Frazier*, at 1260; *see also City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998), *cert. denied*, 528 U.S. 812 (1999). The Eleventh Circuit refers to these three considerations separately as "qualification," "reliability," and "helpfulness" and has emphasized that they are "distinct concepts that courts and litigants must take care not to conflate." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). The party offering the expert testimony has the "burden of establishing qualification, reliability, and helpfulness." *Frazier*, 387 F.3d at 1260.

To be sure, "[i]mplementing Rule 702, *Daubert* requires district courts to ensure that any and all scientific testimony or evidence admitted is both relevant and reliable." *Claire v. Fla. Dep't of Mgmt. Servs.*, 2021 WL 5982330, at *1 (N.D. Fla. Oct. 20, 2021). "[T]he trial judge must determine [this] ***at the outset***." *Daubert*, 509 U.S. at 592. (emphasis added). "Rule 702 applies whether the trier of fact is a judge or a jury." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 832 (3d Cir. 2020); *see also Kadel v. Folwell*, 2022 WL 3226731, at **5-17 (M.D.N.C. Aug. 10, 2022) (granting motions to exclude in the context of summary judgment).

6

Finally, because of the potentially misleading effect of expert evidence, *see Daubert*, 509 U.S. at 595, on occasion expert opinions that otherwise meet admissibility requirements may still be excluded under Fed. R. Evid. 403.

Here, Defendants have failed to demonstrate that the majority of Dr. Laidlaw's proffered testimony is relevant and meets the requirements of Rule 702 as interpreted by *Daubert*, or the requirements of Rule 403. It should be excluded.

## II. DR. LAIDLAW'S OPINIONS THAT GO BEYOND HIS QUALIFICATIONS AS AN ADULT ENDOCRINOLOGIST SHOULD BE EXCLUDED.

It is axiomatic that "[a] witness may be qualified as an expert by virtue of his 'knowledge, skill, experience, training, or education." *Quiet Technology DC-8, Inc.*, 326 F.3d at 1342; Fed. R. Evid. 702. However, credentials are not dispositive when determining qualification, particularly where an expert offers testimony in areas outside of their knowledge, skill, experience, training, or education. "Expertise in one field does not qualify a witness to testify about others." *Lebron v. Secretary of Florida Dept. of Children and Families*, 772 F.3d 1352, 1368 (11th Cir. 2014) (holding that a psychiatrist was properly prevented from opining on rates of drug use in an economically vulnerable population because he had never conducted research on the subject, and instead relied on studies to form his opinion). If a potential expert witness does not "propose to testify about matters

7

Case 4:23-cv-00325-RH-MAF  Document 133  Filed 04/07/23  Page 8 of 40

growing naturally and directly out of research he had conducted independent of the litigation," that testimony should be disqualified. *Lebron*, 772 F.3d at 1369 (quoting Fed. R. Evid. 702 (cleaned up)).

Dr. Laidlaw offers numerous opinions related to areas of medicine far afield from his experience and training as an endocrinologist. He is unqualified to offer these opinions, since "no medical doctor is automatically an expert in every medical issue merely because he or she has graduated from medical school or has achieved certification in a medical specialty." *O'Conner v. Commonwealth Edison Co.*, 807 F.Supp. 1376, 1390 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir. 1994). Here, Dr. Laidlaw, an adult endocrinologist,[1] is not qualified to render most of the opinions he proffers. Dr. Laidlaw: (1) has never conducted any original, peer-reviewed research about gender identity, transgender people, or gender dysphoria, Exhibit 4, PI Hearing Transcript, at 10:15- 11:13; Exhibit 5, Deposition of Dr. Laidlaw in *C.P. v. Blue Cross*, at 29:23-30:6; (2) has not published any scientific, peer-reviewed literature on gender dysphoria or transgender people, Ex. 5 at 42:10-42:22;[2] (3) has never diagnosed a patient with gender dysphoria, Ex. 4 at 11:19-

---

[1] Dr. Laidlaw testified that fewer than 5% of his patients are under 18. Ex. 4 at 8:14-16.

[2] Dr. Laidlaw's only publications relating to gender dysphoria in a peer-reviewed journal are letters to the editor not based on any original research or scientific

Case 4:23-cv-00325-RH-MAF Document 133 Filed 04/07/23 Page 9 of 40

11:21; Ex. 5 at 45:21-46:3; (4) has only treated one patient with gender dysphoria

(nearly two decades ago, prior to the existence of the DSM-5's gender dysphoria

diagnosis), Ex. 4 at 11:22-12:16; Ex. 5 at 43:11-43:17; (5) is not a psychiatrist, a

psychologist, nor mental health care provider of any kind, Ex. 4 at 7:20-8:2; Ex 5

at 184:8-11; and (6) is not a surgeon and has never provided gender-affirming

surgery, Ex. 4 at 8:9-10, 87:8-14; Ex. 5 at 184:12-13.

**One.** Dr. Laidlaw is not a mental health care provider, and is therefore

unqualified to opine on the "[a]ssessment of the patient with gender dysphoria."

(Ex. 1 ¶¶ 228-29; Ex 2 ¶¶ 15-16), or the appropriate treatment for people with

suicidal ideation (Ex. 1 ¶¶ 176-78; Ex. 2 ¶¶ 78-85). For the same reasons, he is

unqualified to testify as to the Plaintiffs' mental health. (Ex. 1 ¶¶ 141, 231-33, 238-

42, 249-50, 253-55, 267-70, 272, 274-75, 279-84, 291-93, 294-99, 305).

The district court's decision in *Kadel v. Folwell* is most illustrative here.

Like Dr. Laidlaw, Dr. Hruz, the endocrinologist at issue in *Kadel,* "offer[ed] a

wide range of conclusions that fall into five main categories: mental healthcare,

medical and surgical care, informed consent, criticism of medical associations, and

political criticisms." *Kadel,* 2022 WL 3226731, at *8. The *Kadel* court excluded

---

study, and which he cannot confirm are subjected to peer-review. Ex. 4 at 9:21-
11:18; Ex. 5 at 31:14-39:23.

9

Case 4:22-cv-00325-RH-MAF    Document 133    Filed 04/07/23    Page 10 of 40

most of his proffered testimony and limited the testimony "to a discussion of the risks associated with prescribing hormone treatments to adolescents and adults," the only possible area of expertise for Dr. Hruz, as well as his colleague, Dr. Laidlaw. *Id.*, at *10.

*Kadel* found that, given his lack of experience in those areas, Dr. Hruz was "not qualified to offer expert opinions on the diagnosis of gender dysphoria, the DSM, gender dysphoria's potential causes, the likelihood that a patient will 'desist,' or the efficacy of mental health treatments." *Id.*, at *9. The *Kadel* Court emphasized that Dr. Hruz was "not a psychiatrist, psychologist, or mental healthcare professional," and "ha[d] never diagnosed a patient with gender dysphoria, treated gender dysphoria, treated a transgender patient, conducted any original research about gender dysphoria diagnosis or its causes, or published any scientific, peer-reviewed literature on gender dysphoria." *Id.*

**Two.** Like Dr. Hruz, Dr. Laidlaw "is not a surgeon and has no experience with surgery for gender dysphoria and, therefore, is not qualified to testify to the risks associated with surgery or the standard of care used by surgeons for obtaining informed consent for surgery." *Kadel*, 2022 *WL 3226731*, at *9; *see* Ex. 4 at 8:9-

10

Case 4:22-cv-00325-RH-MAF    Document 133    Filed 04/07/23    Page 11 of 40

10, 87:8-87:9; Ex. 5 at 47:16- 47:17.[3] Dr. Laidlaw bases his opinions solely on his review of literature (Ex. 4 at 15:24-16:2). Simply reading about these issues does not qualify Dr. Laidlaw as an expert, however. *See* Ex. 4 at 18:20-18:25; Fed. R. Ev. 702. "Merely reading literature in a scientific field does not qualify a witness— even an educated witness—as an expert." *Kadel*, 2022 WL 3226731, at *9; *see also Lebron*, 772 F.3d at 1369; *Dura Auto. Sys. Of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.").

\*     \*     \*

In sum, Dr. Laidlaw is not qualified to serve as an expert on the diagnosis of or mental health or surgical treatment paradigms for gender dysphoria. He is "not qualified by background, training, or expertise to opine" about these issues. *Lebron*, 772 F.3d at 1369. At most, Dr. Laidlaw can testify as "to the risks associated with puberty blocking medication and hormone therapy," but much of

---

[3] Notwithstanding that he is not a surgeon of any kind and has no clinical or research experience with surgeries used to treat gender dysphoria, Dr. Laidlaw opines broadly about surgery (Ex. 1. ¶¶ 160-75; Ex. 2 ¶¶ 60-68, Ex. 3 at 23-25), as well as more specifically about two Plaintiffs' chest surgeries (Ex. 1 ¶¶ 257-59, 270, 295-300), and the potential for one Plaintiff to successfully undergo surgery in the future (Ex. 1 ¶ 290). Not only is Dr. Laidlaw unqualified to offer these opinions, but such testimony is wholly unreliable given Dr. Laidlaw's lack of expertise, skill, and experience with surgery.

his testimony on these subjects is not reliable, as described below. *See Kade*l, 2022
WL 3226731, at *10.

### III.    THE MAJORITY OF DR. LAIDLAW'S EXPERT OPINION IS WHOLLY UNRELIABLE.

An expert's testimony should only be admitted if it is sufficiently reliable. "To
meet the reliability requirement, an expert's opinion must be based on scientifically
valid principles, reasoning, and methodology that are properly applied to the facts at
issue." *In re 3M Combat Arms Earplug Products Liab. Litig.*, 3:19MD2885, 2022
WL 1262203, at *1 (N.D. Fla. Apr. 28, 2022). The requirement of reliability found
in Rule 702 is "the centerpiece of any determination of admissibility." *Rider v.
Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002). "At this stage,
the court must undertake an independent analysis of each step in the logic leading to
the expert's conclusions; if the analysis is deemed unreliable at any step
the expert's entire opinion must be excluded." *Hendrix v. Evenflo Co., Inc.*, 255
F.R.D. 568, 578 (N.D. Fla. 2009), *aff'd sub nom. Hendrix ex rel. G.P. v. Evenflo Co.,
Inc.*, 609 F.3d 1183 (11th Cir. 2010).

In making this determination the court can consider a variety of factors,
including whether the purported expert's theory has been subjected to peer review
and publication, and whether the theory has been generally accepted in the scientific
community.  *See Daubert*, 509 U.S. at 593-94; *Rink v. Cheminova, Inc.*, 400 F.3d

12

Case 4:22-cv-00325-RH-MAF    Document 133    Filed 04/07/23    Page 13 of 40

1286, 1291-92 (11th Cir. 2005).[4]  To be reliable, the expert's testimony must always be based on "good grounds," *Daubert,* 509 U.S. at 590, and must represent more than scientifically unsupported "leaps of faith." *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002). As such, courts must assess "whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Chapman v. Procter & Gamble Distributing, LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014). "In evaluating the reliability of an expert's method . . . a district court may properly consider whether the expert's methodology has been contrived to reach a particular result." *Rink*, 400 F.3d at 1293, n.7.

Here, Dr. Laidlaw offers several opinions that fail to meet any indicia of reliability. His proffered opinions are not consistent with generally accepted scientific consensus, but are based entirely on rank speculation, unfounded assumptions, and bias. These opinions should be excluded.

---

[4] Other factors which may be relevant include (1) the nature of the field of claimed expertise, (2) the source of the expert's knowledge, (3) the expert's level of care in using the knowledge, and (4) the expert's consideration of alternative hypotheses. *Hendrix*, 255 F.R.D. at 578-79.

13

Case 4:22-cv-00325-RH-MAF    Document 133    Filed 04/07/23    Page 14 of 40

### A. Dr. Laidlaw's opinions about the effectiveness of gender-affirming medical care are not generally accepted and are unreliable.

General acceptance in the relevant scientific community is an important element to the reliability inquiry. *See Allison*, 184 F.3d at 1313. Not only is widespread acceptance an important factor in assessing the reliability of an expert's opinions, but the fact that a known theory "has been able to attract only minimal support within the community may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594. Here, Dr. Laidlaw's opinions about the effectiveness and propriety of gender-affirming medical care are far outside the mainstream of medical and scientific opinion and have been explicitly rejected by every relevant scientific and medical community. Nor do his opinions stem from any accepted scientific methodology, rather, they are frequently contradicted by existing scientific literature.

Dr. Laidlaw falsely testifies that the "'professional consensus' [supporting gender-affirming medical care] exists only within the confines of" WPATH (Ex. 1 ¶ 185; *see also* Ex. 2 ¶ 28, Ex. 3 at 27, 29-30). Dr. Laidlaw offers no evidence to support this contention, and instead attempts to legitimize his opinions by nitpicking at and mischaracterizing a few of the studies that fall within the broad consensus of clinicians, scientists, and researchers in finding that the three services at issue in this case are effective in treating gender dysphoria. Specifically:

14

Case 4:22-cv-00325-RH-MAF    Document 133    Filed 04/07/23    Page 15 of 40

- Dr. Laidlaw cites Dhejne (2011) for the proposition that the study showed that gender-affirming care was not effective (Ex. 1 ¶ 202 & Ex. 3 at 31). This characterization flatly contradicts the study's own conclusion that "surgery and hormonal therapy alleviates gender dysphoria" (Exhibit 6, Dhejne et al. (2011), at e16885).

- Dr. Laidlaw emphasizes the fact that Branstrom & Pachankis (2020) issued corrections after Dr. Laidlaw and others wrote letters to the editor of the journal in which it was published (Ex. 1 ¶¶ 203-09 & Ex. 3 at 31-33). Dr. Laidlaw suggests that the article was completely retracted or repudiated, which is not true. Rather, a corrected version was published which changed the conclusion from "the longitudinal association between gender-affirming surgery and lower use of mental health treatment lends support to the decision to provide gender-affirming surgeries to transgender individuals who seek them" to "the longitudinal association between gender-affirming surgery and reduced likelihood of mental health treatment lends support to the decision to provide gender-affirming surgeries to transgender individuals who seek them." (Exhibit 7, Bränström & Pachankis (2020), at 734, 727).

15

- Dr. Laidlaw also maligns studies based on the 2015 US Transgender Survey because it was not a randomized control study but used convenience sampling (Ex. 1 ¶¶ 210-11; Ex. 2 at ¶ 71; Ex. 3 at 33). While there are inherent limitations to convenience sampling, it is an important methodology to capture information about large cohorts. Importantly, Dr. Laidlaw does not point to any studies that contradict the findings of the 2015 USTS. And in fact, many of its findings were recently confirmed by a Kaiser Family Foundation / Washington Post survey that used a random sampling methodology, conducted in 2022 (Exhibit 8, Parks et al. (2023), at 8).

- Dr. Laidlaw similarly denigrates various studies on mastectomy for minors (Ex. 1 ¶¶ 212-19 & Ex. 3 at 33-35). He makes various complaints about the methodology used by these studies, but again, does not show that these methodological flaws render the studies completely unreliable, and he fails to point to any studies that reach contrary conclusions. No study is perfect, but the collection of imperfect studies finding similar results creates scientific consensus. Dr. Laidlaw's opinions fall outside of that consensus.

- Dr. Laidlaw also spends considerable time discussing a 2016 Center for Medicare & Medicaid Services (CMS) review of gender-affirming surgery coverage in Medicare (Ex. 1 ¶¶ 220-21, Ex. 2 at 35-36). But again, Dr. Laidlaw overstates his case. The decision memo decided not to "make a national coverage determination on surgical remedies" for gender dysphoria, and instead allow local Medicare decision-makers to "make the determination of whether or not to cover gender reassignment surgery based on whether gender reassignment surgery is reasonable and necessary for the individual beneficiary after considering the individual's specific circumstances" (Exhibit 9, 2016 CMS Decision Memo, at 2). In other words, the CMS Memo ***mandated*** Medicare to cover gender-affirming surgery when clinically appropriate, but allowed local decision-makers discretion to establish medically necessity criteria for surgery, rather than establishing one uniform set of national criteria, *see id.* Dr. Laidlaw completely ignores the prior, 2014 decision, of an Administrative Appeals Board in the U.S. Department of Health & Human Services (which CMS falls within) to remove a ban on coverage of gender-affirming surgery in Medicare, finding "a consensus among researchers and mainstream medical organizations that [gender-

17

Case 4:22-cv-00325-RH-MAF   Document 133   Filed 04/07/23   Page 18 of 40

affirming] surgery is an effective, safe and medically necessary treatment

for" gender dysphoria (Exhibit 10, 2014 Department Appeals Board

Decision, at 20). That 2014 decision explicitly found that gender-

affirming surgery was safe, effective, and not experimental (*id.* at 11, 15,

21).

Indeed, Dr. Laidlaw acknowledges that his "opposition to gender-affirming

care for the treatment of gender dysphoria in youth and adults is contrary to the

vast majority of medical associations' recommendations" (Ex. 4 at 25:22-26:1).

This includes the following: American Medical Association, American

Psychological Association, American Psychiatric Association, Endocrine Society,

Pediatric Endocrine Society, American Academy of Pediatrics, American

Academy of Family Physicians, American College of Obstetricians and

Gynecologists, American College of Physicians, (Ex. 4 at 29:16- 36:18). *See e.g.,*

*Kadel v. N. Carolina State Health Plan for Tchrs. & State Emps*., 12 F.4th 422,

427–28 (4th Cir. 2021), *as amended* (Dec. 2, 2021) (noting the WPATH Standards

of Care "have been adopted by health organizations across the country" and that

gender-affirming treatments, including hormone therapy and surgical care, "are

safe, effective, and often medically necessary"), *cert. denied*, 142 S. Ct. 861

(2022); *Edmo v. Corizon, Inc*., 935 F.3d 757, 771 (9th Cir. 2019) (the provision of

18

gender-affirming medical care, consistent with the WPATH Standards of Care,
represents "the *broad medical consensus* in the area of transgender health care,"
which "requires providers to individually diagnose, assess, and treat individuals'
gender dysphoria.") (emphasis added); *see also Brandt v. Rutledge*, 551 F.Supp.3d
882, 890 (E.D. Ark. 2021) ("The *consensus* recommendation of medical
organizations is that the only effective treatment for individuals at risk of or
suffering from gender dysphoria is to provide gender-affirming care.") (emphasis
added), *aff'd*, 47 F.4th at 671; *Flack v. Wisconsin Dep't of Health Servs.*, 395
F.Supp.3d 1001, 1018 (W.D. Wis. 2019); Exhibit 16, Nat'l Academies of Science,
Engineering, and Medicine (2020), at 361 ("A major success of [WPATH's]
guidelines has been identifying evidence and *establishing expert consensus that
gender-affirming care is medically necessary* and, further, that withholding this
care is not a neutral option. A number of professional medical organizations have
joined WPATH in recognizing that gender-affirming care is medically necessary
for transgender people because it reduces distress and promotes well-being, while
withholding care increases distress and decreases well-being.") (emphasis added)
(citations omitted).

Dr. Laidlaw's opinions regarding the effectiveness of gender-affirming
medical care are wholly outside the mainstream, and he can cite to no authoritative

19

Case 4:22-cv-00325-RH-MAF   Document 133   Filed 04/07/23   Page 29 of 40

sources in support of his opinion. While undoubtedly Dr. Laidlaw "has strong beliefs," the fact that his opinions are "not generally accepted by the scientific community, and [are] unsupported by other studies" means that "his testimony is based more on personal opinion than on scientific knowledge," making it unreliable. *Allison*, 184 F.3d at 1319. These opinions should be excluded.

**B. Several of Dr. Laidlaw's opinions about the supposed harms caused by gender-affirming treatment to Plaintiffs deliberately misrepresent the facts and evidence, and are therefore unreliable**

Dr. Laidlaw offers several opinions about the potential for infertility and bone density loss resulting from the use of puberty-delaying medication in general, and as to the Plaintiffs in this litigation specifically (Ex. 1 ¶¶ 92-97, 100-09; Ex. 2 ¶¶ 35-43, 52-54). These opinions are entirely unreliable. In the first place, as discussed above, since he does not practice pediatric endocrinology, and has only ever treated one adult for gender dysphoria, Dr. Laidlaw's opinions with respect to the harms posed by puberty-delaying treatment for youth should be regarded with skepticism, (Ex. 4 at 8:14-16, 11:22-12:16 & Ex. 5 at 43:11-43:17 (fewer than 5% of Dr. Laidlaw's patients are under 18, and he has only treated one patient for gender dysphoria, more than a decade ago)).

In any event, Dr. Laidlaw's testimony that puberty-delaying medications "alter or block normal human development," deliberately misrepresents the facts and

Case 4:22-cv-00325-RH-MAF   Document 133   Filed 04/07/23   Page 21 of 40

data in order to obfuscate rather than elucidate (Ex. 1 ¶ 199). While usually the factual basis of an expert opinion goes to credibility, "it is possible for an experts' omission of articles to render his or her opinion inadmissible on reliability grounds." *Huggins v. Stryker Corp.*, 932 F.Supp.2d 972, 994 (D. Minn. 2013). Such is the case here where Dr. Laidlaw omits key information, or worse, misrepresents facts that if properly disclosed would contradict his opinions and undermine their foundation. It is appropriate to exclude expert testimony, like these opinions of Dr. Laidlaws, that is "confusing or misleading." *Hull v. Merck & Co.*, 758 F.2d 1474, 1478 (11th Cir. 1985).

**One.** Dr. Laidlaw misconstrues the effect of puberty-delaying treatments on fertility. He speculates at length about the potential impacts of these treatments on fertility in general, and on named Plaintiffs in particular (Ex. 1 ¶¶ 92-97, 246-47, 280, 287; Ex. 2 ¶¶ 35-43). In doing so, he ignores multiple studies that have made clear that these treatments do not have long-term implications on fertility (*e.g.,* Exhibit 11, Guaraldi et al. (2016) at R83; Exhibit 12, Marinerie et al. (2021), at 529). Dr. Laidlaw correctly points out that progression through puberty – at some point – is needed for biological reproduction (Ex. 1 ¶¶ 92-97; Ex. 2 ¶¶ 35-43). But Dr. Laidlaw then reaches far beyond this well-established fact to posit that gender-

affirming hormones could possibly damage immature gonads (Ex. 1 ¶¶ 92, 94, 97), providing no data or studies to support his speculation.[5]

**Two.** Dr. Laidlaw speculates about the impact of puberty-delaying treatment on bone density – again, both in general, and for the Plaintiffs specifically (Ex. 1 ¶¶ 100-09, 250, 266, 289; Ex. 2 ¶¶ 52-54). His analysis of the studies regarding the impacts of these medications on bone density completely ignores that youth given puberty-delaying medications will take those medications for a relatively short period of time, and then either resume puberty associated with their birth-assigned sex, or begin hormone treatment, either of which will ameliorate any impact on bone density caused by puberty suppressing medications. Not to mention, that exact same concerns with respect to bone density are present for youth who take these medications to treat precocious puberty, a use Dr. Laidlaw approves (Ex. 1 ¶¶ 100-09).

\*  \*  \*

The Court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Here, Dr.

---

[5] Dr. Laidlaw's testimony ignores that as long as a person retains their gonads, they have the potential for fertility. And he does not account for the fact that the same risks with respect to fertility are present when these medications are used to treat other conditions, which he approves (*See* Ex. 1 ¶¶ 74-75 (discussing the use of these medications to treat prostate cancer and precocious puberty)).

Case 4:22-cv-00325-RH-MAF   Document 133   Filed 04/07/23   Page 23 of 40

Laidlaw has misrepresented or omitted information that goes to the heart of his opinions and calls into question the reliability of his opinions. By omitting key information, or worse, misrepresenting facts that if properly disclosed would contradict his opinions and undermine their foundation, Dr. Laidlaw's testimony is not reliable but "misleading" and "quite speculative, and . . . [s]uch potentially confusing testimony is at odds with the purposes of expert testimony." *Hull*, 758 F.2d at 1478, 1477.

## C. Dr. Laidlaw's other opinions about the harms posed by gender-affirming medical care are based solely on ipse dixit and conjecture and are unreliable.

Dr. Laidlaw also raises, without any research or evidentiary support, the specter of several other harms that could be posed by puberty suppressing treatment. These include his musings about treatment's potential impact on future sexual function, for which he offers no evidence or citations to support other than anecdotal reports from a reality television show (Ex. 1 ¶¶ 98-99). They also include Dr. Laidlaw's conjecture about the "unknown, but likely negative consequences … with respect to brain development," for which he can offer no evidence or reasoning to support his speculation that any consequences would be "likely negative" (Ex. 1 ¶ 110).

23

These opinions are the epitome of ipse dixit that courts routinely exclude as unreliable. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[T]he unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express." *Frazier*, 387 F.3d at 1261; *see also McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1246 (11th Cir. 2005) ("[P]resumptions do not make for reliable opinions."). This is one of those circumstances in which "there is simply too great an analytical gap between the data and the opinion proffered." *Id.; see also McDowell v. Brown*, 392 F.3d 1283, 1300 (11th Cir. 2004) ("[A]n expert opinion is inadmissible when the only connection between the conclusion and the existing data is the expert's own assertions.")

**D. Dr. Laidlaw's opinions about desistence are completely unreliable.**

Again, Dr. Laidlaw does not diagnose or treat gender dysphoria, has not conducted any original research on gender dysphoria, gender identity, gender non-conformity in children/youth, or transgender people's experience. *See* Section II, *supra*. Yet, he opines extensively on gender dysphoria and desistence (Ex. 1 ¶¶ 28-

24

35; Ex. 2 ¶¶ 19-21; Ex. 3 at 5-7). To be sure, Dr. Laidlaw offers a theory that can

be (and has been) subjected to peer review and publication, based on generally

accepted techniques. *See Frazier*, 387 F.3d at 1262. But Dr. Laidlaw's gloss on the

peer reviewed literature that has been published based on generally accepted

techniques draws a conclusion exactly opposite to what that literature

demonstrates: contrary to the literature, he opines that the majority of youth

diagnosed with gender dysphoria will, by adulthood, "desist" (that is, their gender

identity will change to align with their birth-assigned sex). This testimony is

incorrect and not reliable.

A closer examination of Dr. Laidlaw's testimony reveals that he bases these

opinions on a single review of antiquated studies showing that a majority of

preadolescent children diagnosed with gender identity disorder—an outmoded

diagnosis distinct from gender dysphoria with different diagnostic criteria—

"desisted" from their gender nonconformity or cross-gender behavior (Ex. 1 ¶¶ 28-

35; Ex. 2 ¶¶ 19-21; Ex. 3 at 5-7).[6] Yet Dr. Laidlaw's opinions stretch far beyond

---

[6] Dr. Laidlaw also cites his own, non-peer reviewed "commentary" (i.e., opinion)
article on this topic, co-authored with two well-known critics of providing medical
care to people with gender dysphoria, one of whom has also been retained by
Defendants as an expert in this case. However, this commentary cites the same
Ristoria & Steensma review as the source for its statistics (Exhibit 17, Laidlaw et
al. (2019), at 76). The article is co-authored by Michelle Cretella, who has been

the "explicit[] findings, conclusions, and implications" of the Ristoria & Steensma
review he cites to improperly "extrapolate from this information a finding,
conclusion, or implication [that] authors themselves did not make." *In re Abilify
(Aripiprazole) Prod. Liab. Litig.*, 299 F. Supp. 3d 1291, 1351 (N.D. Fla. 2018).
The Ristoria & Steensma review examined outcomes from 10 studies on children
with gender dysphoria or gender identity disorder conducted from 1968 to 2012
(Exhibit 13, Ristoria & Steensma (2016), at Table 1). It acknowledges that:

> The lower persistence rates in the earlier studies, compared to the more
> recent studies after 2000, may be the result of the inclusion of less extreme
> cases in the earlier studies than in later studies.  For example, before . . .
> 1980 there was no formal diagnosis of GD for children. It could therefore be
> that the children included in the studies before 1980 would in retrospect not
> meet the full criteria for a diagnosis. Also, the recent studies consisted of
> clinically referred samples of children, which was not the case for the earlier
> studies.

*Id.* at 15-16. Despite the fact that the very paper on which he relies to claim that as
many as 98% of children who present with gender dysphoria later "desist" makes
clear that it supports no such conclusion, Dr. Laidlaw states that, "[b]ecause the

---

criticized by the Society for Adolescent Health and Medicine for "pushing political
and ideological agendas not based on science and facts" (Exhibit 18, Sct'y Adol.
Health & Med. (2017), at 4). The other co-author is Kevin Donovan, whom
Defendants have retained as an expert in this case, and who has described not only
"transgender conversion surgeries" but "homosexual marriage," "homosexual
behavior," contraception, cohabitation, and divorce, as "sinful" (Exhibit 19,
Donovan & Sotomayor (2020), at 135).

26

rate of desistance is so high, gender affirmative therapy will necessarily cause serious and irreversible harm to many children and adolescents who would naturally outgrow the condition if not affirmed" (Ex. 1 ¶ 33). This opinion is based on faulty propositions. *See, e.g., Kilpatrick v. Breg, Inc*., 613 F.3d 1329, 1338 (11th Cir. 2010) (study that explicitly limited its findings to rabbits could not be the basis of expert testimony regarding humans); *McClain v. Metabolife Int'l, Inc*., 401 F.3d 1233, 1247 (11th Cir. 2005) (expert could not reasonably rely on a study to prove causation where the study concluded that the supplement at issue "*may* pose health risks to *some* persons" and the authors had specifically written "a letter to the editor explaining that the study did not prove causation") (emphasis in original).

In fact, Dr. Laidlaw has previously admitted that the "desistance" studies on which he relies speak only to preadolescent youth who were diagnosed with gender identity disorder under the DSM-III or the DSM-IV, and do not pertain to "desistance" of youth diagnosed with gender dysphoria under the DSM-5 (Ex. 5 at 103:4-104:4). He has similarly admitted that he is unaware of any studies documenting "desistance" among adolescents (people over the age of 12) or adults (*id*. at 109:2-109:14. Dr. Laidlaw's attempts to rehabilitate his asserted desistence rates in his Rebuttal Report do not hold water. He notes that the three most recent

27

Case 4:22-cv-00325-RH-MAF   Document 133   Filed 04/07/23   Page 28 of 40

studies included in the Ristoria & Steensma review he relies on included children

aged 3 to 13, and that those studies showed desistance rates of 61-88% (Ex. 2

¶ 21). From that information he extrapolates that "this would include children in

the age range of 8-12 years old, many of whom were already adolescents going

through puberty based on their age and were therefore not pre-pubertal. Therefore

we can infer that a high proportion of adolescents do in fact desist" (*id.* (citation

omitted)). But of course, this is pure speculation and guesswork. Dr. Laidlaw fails

to acknowledge that it is just as likely that the desistence rates of older youth were

much lower than those of younger children. And the studies included in the

Ristoria & Steensma review, the most recent of which is over 10 years old (and

some of which rely on data from the 1950s, 1960s, and 1970s), do not comport

with more recent literature, which has uniformly found that youth who have a

diagnosis of gender dysphoria in adolescence overwhelmingly continue to identify

as transgender as they age (Exhibit 14, Olson et al. (2022), at 4; Exhibit 15, de

Vries et al. (2011), at 1).[7] In any event, the fact that younger, preadolescent

---

[7] Notably, Thomas D Steensma, who co-authored the study on which Dr. Laidlaw
improperly cites for the proposition that most youth with gender dysphoria "desist"
in their gender identity, also co-authored the de Vries study, which looked 70
youth in the Netherlands referred for treatment of gender dysphoria between 2000
and 2008, found that all of them decided to continue their medical transition after
1-2 years, confirming that "young adolescents who had been carefully diagnosed

Case 4:22-cv-00325-RH-MAF    Document 133    Filed 04/07/23    Page 29 of 40

children may have a concept of their gender identity that is still changing is of no

consequence to whether medical interventions are appropriate for adolescents and

adults, for whom research confirms gender dysphoria usually persists (Ex. 14; Ex.

15).[8] Dr. Laidlaw's opinions with respect to desistence do not use a "reliable and

sound" methodology, and the one study on which he purports to rely does not

support his "ultimate conclusion." *Kilpatrick*, 613 F.3d at 1337; *Rink*, 400 F.3d at

1293 (using unsound underlying data results in "flawed methodology"). This

testimony should be excluded.

### E. Dr. Laidlaw's opinions about informed consent are unreliable

Dr. Laidlaw does not offer any new information or evidence to support his

opinion that:

> [I]t is not possible for the parent or guardian to make a true informed consent
> decision for the child because of the poor quality of evidence of benefit, the
> known risks of harm, and the many unknown longterm risks of harm which
> could only truly be known after years and decades of gender affirmative
> therapy. A parent or guardian cannot consent to dubious treatments which result
> in irreversible changes to their child's body, infertility, sexual dysfunction, and
> in many cases eventual sterilization.

---

show persisting gender dysphoria into late adolescence or young adulthood." Ex.
15 at 2281.

[8] In addition, "a discussion of risks to prepubescent children is irrelevant to this
case and would likely serve only to confuse." *Kadel*, 2022 WL 3226731, at *9.

29

Case 4:22-cv-00325-RH-MAF    Document 133    Filed 04/07/23    Page 39 of 40

(Ex. 1 ¶ 181; *see also id.* ¶¶ 179-83, 307-08, 310; Ex. 3, at 26-27; Ex. 2 ¶¶ 86-90).

Instead, his opinions regarding informed consent are simply cumulative of the

same unreliable opinions he offers regarding the effectiveness and potential harm

caused by gender-affirming treatments. They completely misrepresent the concept

of informed consent, which can, and does allow people (including parents and

guardians making decisions about their children's medical care) to authorize

necessary care, even when it may result in irreversible changes to the body,

including impacts on fertility and sexual function, when they have been educated

about "the burdens, risks, and expected benefits of all options, including forgoing

treatment" such that they are able to "make an independent, voluntary decision"

about treatment (Exhibit 20, AMA Code of Medical Ethics, at § 2.1.1). Indeed, it is

common for parents to make these decisions, even when not all the risks of a

particular intervention are fully known. For example, many antidepressants have

both known and unknown impacts on fertility, yet they are commonly prescribed,

including to youth.[9] Dr. Laidlaw's opinions on informed consent lack any

---

[9] *See, e.g.,* Exhibit 21, Beeder & Samplaski (2020), at 45 ("At this point, it is difficult for clinicians to counsel patients on the effect that these medications might have on their fertility. We would recommend an informed discussion with patients attempting parenthood and taking these medications. Checking a baseline semen analysis and sperm DNA fragmentation might provide some level of guidance."); Exhibit 22, Casilla-Lennon et al. (2016), at 314.e1 ("Our data suggest that

Case 4:22-cv-00325-RH-MAF    Document 133    Filed 04/07/23    Page 31 of 40

"grounding in the methods and procedures of science," such that they are nothing

"more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at

590. They amount to nothing more than "unscientific speculation offered by a

genuine scientist," and should be excluded. *Allison,* 184 F.3d at 1317 (*quoting*

*Rosen v. Ciba–Geigy Corp*., 78 F.3d 316, 318 (7th Cir. 1996)).

### F. Dr. Laidlaw's opinions about WPATH are unreliable

Dr. Laidlaw's opinions about the WPATH Standards of Care for gender-

affirming medical care should similarly be disregarded as unreliable. In particular

he offers the completely unfounded, and therefore unreliable "professional opinion

WPATH SOC 8 represents a grave and immediate danger to minors, young adults,

and adults and should not be followed by any physician, mental health care

provider, or other medical professional" (Ex. 1 ¶ 198; *see also id.* ¶¶ 184-85, 192-

98, 309; Ex. 3 at 27, 29-30; Ex. 2 ¶¶ 28-30).[10] Dr. Laidlaw is not privy to the actual

---

antidepressants may reduce the probability of a woman with a history of
depression to conceive naturally. Future studies are needed to differentiate the
extent to which this association is due to the antidepressant itself versus the
underlying depression.").

[10] When pressed on the basis for his opinions regarding WPATH in another case,
Dr. Laidlaw did not cite any literature, study, or publication but rather stated that it
was based on his opinion that "one would expect them [WPATH] not to
exclusively follow one, say, politically based point of view," and that (again, in his
opinion) WPATH is not "open to a variety of points of view" Ex. 5 at 89:7-89:18.
When pressed further for his basis for this opinion, Dr. Laidlaw simply stated that

internal conversations of WPATH, has not participated in WPATH conferences, is

not a member of WPATH, and has not participated in any of its internal

discussions (Ex. 5 at 90:1-90:16). He therefore lacks knowledge "of facts which

enable him to express a reasonably accurate conclusion as opposed to conjecture or

speculation." *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988). In

short, Dr. Laidlaw does not have "any experience with . . . WPATH. . . upon which

to base his criticisms," nor does he cite to any meaningful data or evidence to

support them, making his speculation as WPATH's credibility completely

unreliable. *Kadel,* 2022 WL 3226731, at *10.

### G. Dr. Laidlaw's testimony is motivated by bias, rendering it unreliable

"In evaluating the reliability of an expert's method . . . a district court may

properly consider whether the expert's methodology has been contrived to reach a

particular result." *Rink*, 400 F.3d at 1293, n.7. Here, Dr. Laidlaw has already

confirmed the basis for all his opinions offered: He opposes affirmation of a

transgender person's identity in any circumstances (Ex. 4 at 87:15-87:21; *id.* at

39:22-40:19). In other words, the entire basis for all his opinions offered rests on

his non-scientific opposition to treatment for gender dysphoria, especially for

––––––––––––––––––––

his opinion is based on a conversation with one psychologist and the fact that
WPATH published the Standards of Care. *Id.*, at 92:2-92:12.

32

children. *But see Brandt,* 551 F. Supp. at 891 ("[G]ender-affirming care for transgender minors may be medically appropriate and necessary to improve the physical and mental health of transgender people."). While Plaintiffs are cognizant of the fact that bias in an expert witness's testimony is usually an issue of credibility as opposed to one of admissibility, when an expert's opinions are based on bias as opposed to scientific or medical knowledge, then the question of bias becomes one of reliability and admissibility. Indeed, reliability is a flexible inquiry wherein "courts must ensure that an expert's opinion is based on scientific, technical, or other specialized knowledge and not on belief or speculation." *Sardis v. Overhead Door Corp.,* 10 F.4th 268, 281 (4th Cir. 2021). Here, there is ample evidence that Dr. Laidlaw's testimony is so permeated and tainted by his unscientific views and personal bias as to render it unreliable. *Cf. Sanchez v. Esso Standard Oil de Puerto Rico, Inc.,* No. CIV 08-2151, 2010 WL 3809990, at *4 (D.P.R. Sept. 29, 2010).

## IV.  DR. LAIDLAW OFFERS SEVERAL UNHELPFUL AND IRRELEVANT OPINIONS.

"The gatekeeping inquiry must be tied to the facts of a particular case." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (quotations omitted). The proponent of the expert testimony bears the burden of proving that the

Case 4:22-cv-00325-RH-MAF   Document 133   Filed 04/07/23   Page 34 of 40

testimony is relevant and "logically advances a material aspect" of the case. *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009) (citations omitted). Here, Dr. Laidlaw offers several opinions that simply are not relevant to this inquiry as they will not "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Ev. 702(a); *Id.* 401, 402 & 403; *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.") (cleaned up).

The primary issues before this Court, among others, are: (1) whether medical treatment for gender dysphoria is experimental, such that it could be appropriately excluded from Medicaid coverage, *Rush v. Parham*, 625 F.2d 1150, 1156 (5th Cir. 1980); *K.G. ex rel. Garrido v. Dudek*, 864 F. Supp. 2d 1314, 1321 (S.D. Fla. 2012), *aff'd in part, rev'd in part sub nom. Garrido v. Dudek*, 731 F.3d 1152 (11th Cir. 2013); and (2) whether the process Florida underwent to exclude coverage of such care in its Medicaid program made "classifications that are 'arbitrary or irrational' and that reflect a 'bare desire to harm a politically unpopular group,'" *Glenn v. Brumby*, 663 F.3d 1312, 1315 (11th Cir. 2011) (*quoting City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446-47 (1985)). Because this case is about gender-affirming medical care, much of the testimony offered by Dr. Laidlaw has no bearing on the issues:

34

- He offers unsupported musings on the increased number of people diagnosed with gender dysphoria (Ex. 1 ¶¶ 29-31; *see* Ex. 3 at 5-6). His ideas in this regard are based only on his conjecture, and ignore several plausible alternative explanations for the increased number of people diagnosed with gender dysphoria. In any event, the number of people diagnosed with gender dysphoria (increasing or not) is simply not pertinent to the question of what treatment for the condition is medically appropriate, or whether refusing to cover treatment is discriminatory. Dr. Laidlaw does not and cannot dispute that gender dysphoria is a legitimate medical condition (Ex. 4 at 16:14-23).

- Similarly, Dr. Laidlaw takes pains to establish that gender dysphoria is a psychological condition and not an endocrine one (Ex. 1 ¶¶ 23-26; Ex. 2 ¶¶ 13-14; *see* Ex. 3 at 4-5). But again, it is not relevant to the issues in this case whether gender dysphoria is a psychological condition, an endocrine condition, or a health condition. Dr. Laidlaw does not and cannot dispute that gender dysphoria is a legitimate condition for which treatment is indicated (Ex. 4 at 16:14-23).

35

- He provides speculation about human sexual development (Ex. 1 ¶¶ 41-55; *see* Ex. 3 at 8-11). Again, human sexual development is entirely irrelevant to the legal questions presented in this case.

- He opines, without citing studies or data, as to the difference between gender identity and "biological sex," including as to whether "biological sex" can be changed (Ex. 1 ¶¶ 36-40, 53-55, 306; Ex. 2 ¶¶ 3-12; *see* Ex. 3 at 5-7). But this case is not about changing one's sex. It is about treatment for gender dysphoria. His unsupported speculation is irrelevant.

- His ideas about "social transition" are also irrelevant, since this case does not address social transition, but medical treatment for gender dysphoria (Ex. 1 ¶¶ 61-65; *see* Ex. 3 at 12-13).

- Dr. Laidlaw's opinions about the policies of other countries are similarly irrelevant, since what other countries cover in their state health care programs has no relation to Florida Medicaid's obligation to cover services under U.S. Law (Ex. 1 ¶¶ 29-31, 222-27; Ex. 2 ¶¶ 72-77; *see* Ex. 3 at 36-37).[11]

---

[11] Dr. Laidlaw does not have first-hand knowledge of these countries' policies, and misrepresents them, since none of the identified countries wholly exclude coverage for gender-affirming medical care. *See Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 671 (8th Cir. 2022) (discussing Finland's policy); Ex. 4 at 106:2-108:5.

36

Because each of these opinions offered lacks any "valid scientific connection to the disputed facts in the case," they should be excluded. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).

## V. THE OPINION OF DR. LAIDLAW LACKS PROBATIVE VALUE AND IS THEREFORE NEITHER HELPFUL TO THE FACT-FINDER NOR ADMISSIBLE UNDER FEDERAL RULE OF EVIDENCE 403.

Finally, the Court should exclude the majority of the opinion and testimony of Dr. Laidlaw because its introduction will result in unfair prejudice, confusion of the issues, or in duplicative or misleading testimony. Fed. R. Evid. 403. As articulated above, the majority of opinions offered by Dr. Laidlaw are irrelevant, speculative, and unreliable. In addition, Defendants have proffered two other endocrinologists to provide testimony in this case, and making Dr. Laidlaw's proposed testimony largely "cumulative or needlessly time consuming." *Hendrix*, 255 F.R.D. at 579. His testimony would also result in prejudice, as the testimony seeks to sow confusion about the propriety of gender-confirming care based on speculation, irrelevant, misleading, and biased opinions.

37

Case 4:23-cv-00325-RH-MAF    Document 133    Filed 04/07/23    Page 38 of 40

## CONCLUSION

For the foregoing reasons, the Court should exclude the reports, opinions, and testimony of Dr. Laidlaw, except as they relate to "to the risks associated with puberty blocking medication and hormone therapy." *Kadel*, 2022 WL 3226731, at *10.

Dated: April 7, 2023

Respectfully Submitted,

*/s/ Abigail Coursolle*

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**

**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsbury.com
shani.rivaux@pillsbury.com

**William C. Miller***
**Gary J. Shaw***
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com

**Joe Little***
500 Capitol Mall, Suite 1800
Sacramento, CA 95814

**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**

**Omar Gonzalez-Pagan***
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles***
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue

38

(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**

**Abigail Coursolle***
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee***
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27541
(919) 968-6308
mckee@healthlaw.org

Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**FLORIDA HEALTH JUSTICE PROJECT**

**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

* *Admitted pro hac vice*
*Counsel for Plaintiffs*

Case 4:23-cv-00325-RH-MAF   Document 133   Filed 04/07/23   Page 40 of 40

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of April, 2023, a true copy of the foregoing has been filed with the Court utilizing its CM/ECF system, which will transmit a notice of electronic filing to counsel of record for all parties in this matter registered with the Court for this purpose.

## CERTIFICATE OF SATISFACTION OF
## ATTORNEY-CONFERENCE REQUIREMENT

Pursuant to Local Rule 7.1(B), counsel for Plaintiffs and counsel for Defendants conferred regarding the instant motion during a Zoom conference on April 6, 2023. Defendants indicated they do not consent to the relief requested herein

## CERTIFICATE OF WORD COUNT

According to Microsoft Word, the word-processing system used to prepare this Motion and Memorandum, there is a combined total of 7,381 words in the Motion and the Memorandum of Law.

*/s/ Abigail K. Coursolle*
Attorney for Plaintiffs

40

# TAB 136

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

AUGUST DEKKER, *et al.,*

       *Plaintiffs*,

v.

JASON WEIDA, *et al.,*

       *Defendants*.

Case No. 4:22-cv-00325-RH-MAF

**PLAINTIFFS' MOTION TO EXCLUDE EXPERT TESTIMONY OF
DR. PAUL W. HRUZ AND SUPPORTING MEMORANDUM OF LAW**

# TABLE OF CONTENTS

Page

MEMORANDUM OF LAW ................................................................................. 2

LEGAL STANDARD ........................................................................................... 2

ARGUMENT ........................................................................................................ 3

I.    Dr. Hruz is not qualified to offer an expert opinion on the diagnosis and
      the mental health treatment of gender dysphoria. ..................................... 3

II.   Dr. Hruz's opinions and testimony are not relevant to this case. ............ 8

      A.    Dr. Hruz's opinions about "desistance" are irrelevant. ................... 9

      B.    Dr. Hruz's opinions about an "international response" in other
            countries is irrelevant. .................................................................. 10

      C.    Dr. Hruz's musings about the causes of gender dysphoria are
            irrelevant. ...................................................................................... 11

      D.    Dr. Hruz's Opinions about WPATH Standards of Care are irrelevant. ...... 12

      E.    Dr. Hruz's Hypothetical and Speculative opinions are irrelevant. ............. 13

III.  Dr. Hruz's opinions and testimony are unreliable. ................................ 14

      A.    Dr. Hruz's opinions are unreliable because they are based on
            untested hypotheses and speculation. ........................................... 16

      B.    Dr. Hruz's opinions are unreliable because they are misleading and
            therefore do not serve to enlighten the trier of fact. ..................... 16

      C.    Dr. Hruz's opinions are unreliable because they are not generally
            accepted in the scientific and medical community. ...................... 22

      D.    Dr. Hruz's opinions are unreliable because they have no support and
            are based on ipse dixit. ................................................................. 24

IV.   Dr. Hruz's opinions are so tainted by his personal bias as to render his
      opinions unreliable. ................................................................................ 25

V.    Dr. Hruz's opinions lack probative value and are therefore inadmissible
      under Federal Rule of Evidence 403. ..................................................... 29

CONCLUSION .................................................................................................. 30

Case 4:22-cv-00325-RH-MAF   Document 136   Filed 04/07/23   Page 3 of 34

Pursuant to Federal Rules of Civil Procedure 26 and 37, and Federal Rules of Evidence 104, 403, and Rule 702, Plaintiffs move to partially exclude certain testimony of Defendants' expert Dr. Paul Hruz, on the grounds that he fails to meet the qualification, reliability, and helpfulness requirements imposed by Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

Dr. Hruz is a pediatric endocrinologist. Many of the opinions he purports to offer in this case have previously been excluded. *See Kadel v. Folwell,* No. 1:19CV272, 2022 WL 3226731, at *9-10 (M.D.N.C. Aug. 10, 2022). He has no experience treating or diagnosing gender dysphoria; he has never provided gender-affirming care, has never done any original research on the issue, has never published any peer-reviewed literature on the matter, and holds opinions that are purely speculative and far afield from the mainstream of the medical and scientific communities. Indeed, as he does here, in *Kadel,* Dr. Hruz "offer[ed] a wide range of conclusions that fall into five main categories: mental healthcare, medical and surgical care, informed consent, criticism of medical associations, and political criticisms." *Kadel,* 2022 WL 3226731, at *8. Despite the broad ranging categories on which he was offered to testify, after reviewing his qualifications, the *Kadel* Court limited Dr. Hruz's testimony to "the risks associated with puberty blocking medication and hormone therapy." *Id.* at *9.

The Court here should similarly impose the same limitation on Dr. Hruz's

testimony. Accordingly, Dr. Hruz is not a qualified expert on gender dysphoria or its treatment, and his opinions and testimony are neither relevant nor reliable. Additionally, his opinions and testimony are likewise inadmissible because any probative value they may have (and they have none) is substantially outweighed by the danger of unfair prejudice, confusion of the issues, waste of time, undue delay, and needless presentation of cumulative evidence. *See* Fed. R. Evid. 403. In support of this motion, Plaintiffs state as follows:

## MEMORANDUM OF LAW

## LEGAL STANDARD

Federal Rule of Evidence 702 places gatekeeping obligation on a trial court, to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The importance of Daubert's gatekeeping requirement cannot be overstated."). In determining the admissibility of expert testimony under Rule 702, courts engage in a "rigorous" three-part inquiry and must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, at 1260; *see also City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d

2

Case 4:22-cv-00325-RH-MAF  Document 136  Filed 04/07/23  Page 5 of 34

548, 562 (11th Cir. 1998), *cert. denied*, 528 U.S. 812 (1999).

The Eleventh Circuit refers to these three considerations separately as "qualification," "reliability," and "helpfulness" and has emphasized that they are "distinct concepts that courts and litigants must take care not to conflate." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). The party offering the expert testimony has the "burden of establishing qualification, reliability, and helpfulness." *Frazier*, 387 F.3d at 1260. As detailed below, Dr. Hruz's proposed opinions fail to meet these requirements and should be excluded.

## **ARGUMENT**

I.     **Dr. Hruz is not qualified to offer an expert opinion on the diagnosis and the mental health treatment of gender dysphoria.**

A witness must be "qualified to testify competently regarding the matter he intends to address." *Frazier*, at 1260. "A witness may be qualified as an expert by virtue of his 'knowledge, skill, experience, training, or education." *Quiet Technology DC-8, Inc.*, 326 F.3d at 1342. However, credentials are not dispositive when determining qualification. Each of the three analytical prongs (including qualifications) is assessed in reference to the matter to which the expert seeks to testify—i.e., "to the task at hand." *Daubert*, 509 U.S. at 597. It is for that reason that "expertise in one field does not qualify a witness to testify about others." *Lebron v. Sec'y of Fla. Dep't of Children & Families*, 772 F.3d 1352, 1368 (11th Cir. 2014)

3

(holding that a psychiatrist was properly prevented from opining on rates of drug use in an economically vulnerable population because he had never conducted research on the subject, and instead relied on studies to form his opinion). Rather, an expert's qualifications must be within the same technical area as the subject matter of the expert's testimony; in other words, a person with expertise may only testify as to matters within that person's expertise." *Id.* at 1369. "A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty." *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002). If a proposed expert witness does not "propose to testify about matters growing naturally and directly out of research he had conducted independent of the litigation," such expert should be disqualified. *Lebron*, 772 F.3d at 1369 (quoting Fed. R. Evid. 702 (cleaned up)).

Therefore "[d]etermining whether a witness is qualified to testify as an expert requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." *Banuchi v. City of Homestead*, 606 F.Supp.3d 1262, 1272 (S.D. Fla. 2022) (cleaned up). Here, Dr. Hruz does not have the medical specialty required to discuss the diagnosis and treatment for gender dysphoria, particularly the diagnosis and assessment of gender dysphoria and non-endocrine treatments that are wholly outside his expertise as an endocrinologist.

The Court in *Kadel* succinctly determined based on Dr. Hruz's deposition

4

testimony that:

> Hruz is not qualified to offer expert opinions on the diagnosis of gender
> dysphoria, the DSM, gender dysphoria's potential; causes, the
> likelihood that a patient will "desist," or the efficacy of mental health
> treatments. He has never diagnosed a patient with gender dysphoria,
> treated gender dysphoria, treated a transgender patient, conducted any
> original research about gender dysphoria diagnosis or its causes, or
> published any scientific, peer reviewed literature on gender dysphoria.

*Kadel,* 2022 WL 3226731, at *9; Ex. A at ¶142 Hruz Expert Report[1] ("I have never

personally engaged in the delivery of gender affirming medical interventions to

children with gender dysphoria"); Ex. C at 88:18-89:8, 89:17-25 (Dr. Hruz

discussing his lack of qualifications and treatment for gender dysphoria); Ex. E at

24:11-24:14, 25:20-25:23. Indeed, Dr. Hruz has also not sat in on a meeting with

a patient discussing the treatment options for gender dysphoria. Ex. C at 40:6-

40:11. Nor has he conducted any original research about transgender people or

gender dysphoria. Ex. C at 35:5-36:1; Ex. E at 62:25-63:9; Ex. F at 25:24-28:13.

He has not published any scientific, peer-reviewed literature on gender dysphoria

or transgender people either. Ex. C at 42:14-49:19; Ex. E at 61:17-64:7, 295:19-

---

[1] Unless otherwise specified, all exhibits cited herein are attached to the
contemporaneously filed Declaration of Shani Rivaux.

295:23.[2] Dr. Hruz is neither a psychiatrist[3], a psychologist, nor a mental health care provider of any kind qualified to diagnose gender dysphoria or to opine on the reliability of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5"). Ex. C at 112:9-11, 55:23-56:15; Ex. E at 41:21-42:2, 42:11-42:18.

Like the Court in *Kadel,* this Court should exclude Dr. Hruz on these topics due to his lack of expertise. *See Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("The *Daubert* test must be applied with due regard for the specialization of modern science. A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science."). Instead, Dr. Hruz bases his opinions solely on his review of literature and conversations he has had with others. The fact that Dr. Hruz has read about gender dysphoria and

---

[2] Dr. Hruz's only publication relating to gender dysphoria in a peer-reviewed journal is a letter to the editor not based on any original research or scientific study, and for which it is unclear if letters to the editor are subjected to peer-review. Ex. C at 43:9-45:15. *See also* Ex. P (noting that letters to the editor are typically not peer reviewed). His other publications pertaining to gender dysphoria are all in non-scientific, non-medical, non-peer-reviewed journals affiliated with religious organizations.

[3] In his rebuttal report, Dr. Hruz claims that his opinions are supported by his "professional experience as a psychiatrist." Ex. B at ¶3. However, none of his qualifications or his prior testimony have demonstrated any credentials of a psychiatrist.

transgender people does not qualify him as an expert on these issues, however. That is precisely the sort of "generalized knowledge of a particular subject" that courts have rejected as a qualification under Rule 702. As with the disqualified expert in *Lebron* who "reached his opinion instead by relying on studies," this is insufficient to serve as an expert witness. *Lebron*, 772 F.3d at 1369.

Aside from his lack of expertise, Dr. Hruz is the definition of a manufactured "expert witness" as his involvement originates from and dates back to a conference by the Alliance Defending Freedom ("ADF")[4] organized specifically to cultivate professional "experts" who would testify against the gender-affirmation of transgender people. Ex. C at 241:10-246:20; Ex. E at 92:21-93:24; Ex. F at 147:11-21; *cf.* Ex. O at 84:3-85:12, 90:13-91:13 (Dr. Lappert testifying that he attended the same ADF conference as Dr. Hruz in 2017 where the "poverty of [experts] who are willing to testify" against gender-confirming policies was discussed and that attendees "were asked whether they would be

---

[4] ADF is well-known for pushing anti-LGBT policies across the country and internationally. *See*, *e.g.*, Nico Lang, *A Hate Group Is Reportedly Behind 2021's Dangerous Wave of Anti-Trans Bills*, them. (Feb. 19, 2021), https://bit.ly/3HEqCR9; Julie Compton, *Activists take aim at anti-LGBTQ 'hate group,' Alliance Defending Freedom*, NBC News (Nov. 14, 2018), https://nbcnews.to/3oEe9Es. The Southern Poverty Law Center has designated ADF a hate group. *See* S. Poverty Law Ctr., *Why is Alliance Defending Freedom a Hate Group?* (Apr. 10, 2020), https://bit.ly/3HE6LS1 (accessed Nov. 19, 2021).

willing to participate as expert witnesses"); Ex. Q at 169:18-171:4. Like the disqualified expert in *Lebron*, Dr. Hruz "developed his opinions expressly for purposes of testifying" in an area outside his specialty. *Lebron*, 772 F.3d at 1369.

In sum, Dr. Hruz is not qualified to serve as an expert on the diagnosis or the mental health treatment paradigms for gender dysphoria and his testimony should be limited to "the risks associated with puberty blocking medication and hormone therapy." *Kadel,* 2022 WL 3226731, at *9.

## II.    Dr. Hruz's opinions and testimony are not relevant to this case.

To satisfy the helpfulness requirement, the testimony must have a justified scientific relationship to the facts at issue. *Daubert*, 509 U.S. at 591. Thus, helpfulness, "goes primarily to relevance." *Id.* at 580. Relevant expert testimony "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004). "The relationship must be an appropriate 'fit' with respect to the offered opinion and the facts of the case." *Id.* The "court must satisfy itself that the proffered testimony is relevant to the issue at hand, for that is a precondition to admissibility." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 282 (4th Cir. 2021) (cleaned up). "The touchstone of this inquiry is the concept of relevance." *Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021). Thus, "expert testimony which does not relate to any issue in the case is not relevant and non-helpful." *Knight v. Boehringer Ingelheim*

8

*Pharms., Inc.*, 323 F.Supp.3d 837, 846 (S.D. W.Va. 2018). In order to be relevant, an opinion needs to "fit" with the facts at issue. *Simmons v. Augusta Aviation, Inc.*, 596 F. Supp. 3d 1363, 1374 (S.D. Ga. 2022) "To satisfy this requirement, the testimony must concern matters beyond the understanding of the average lay person and logically advance a material aspect of the proponent's case." *Id.* Testimony that "offers nothing more than what lawyers for the parties can argue in closing arguments" or that consists of "subjective portrayals of factual information" "generally will not help the trier of fact." *Giusto v. Int'l Paper Co.*, 2021 WL 3603374, at *4 (N.D. Ga. Aug. 13, 2021).

This case is about whether Defendants' exclusion of coverage for medically necessary gender-affirming health care treatments violates Plaintiffs' rights. Many of Dr. Hruz's opinions are not relevant to this inquiry as they do not have a "valid scientific connection to the pertinent inquiry" *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir.2009). His opinions do not "fit" because they are not sufficiently tied to the facts of the case so that they will aid a factfinder.

A. *Dr. Hruz's opinions about "desistance" are irrelevant.*

Take for example Dr. Hruz's opinions about purported "desistance" rates as a reason to question the provision of gender-confirming care. Another subject matter area in which the *Kadel* Court excluded Dr. Hruz's testimony. *Kadel*, 2022

9

Case 4:23-cv-00325-RH-MAF Document 136 Filed 04/07/23 Page 12 of 34

WL 3226731, at *9. Dr. Hruz spends considerable time on (and builds most of his testimony questioning the propriety of gender-affirming health care upon) antiquated studies showing that a majority of *prepubertal* children diagnosed with *gender identity disorder*—an outmoded diagnosis *distinct from gender dysphoria* with different diagnostic criteria—"desisted" from their gender nonconformity or cross-gender behavior. *See*, *e.g.*, Ex. A at ¶¶63-64; 141. But not only are such opinions based on faulty propositions, they simply do not fit the facts of this case.

Dr. Hruz's testimony that focuses on the risks associated with providing hormone therapy to prepubescent children—children who have not begun puberty—is not relevant. Ex. C at 125:23-126:5. By his own admission, "no medical and surgical interventions are initiated until after the onset of puberty" under any model of treatment. *Id.* But again, no hormonal or surgical care is recommended for or provided to *prepubertal* children, nor are any of the plaintiffs prepubertal children. Accordingly, Dr. Hruz's opinions regarding "desistance" are thus irrelevant to this case.

B. <u>Dr. Hruz's opinions about an "international response" in other countries is irrelevant.</u>

Dr. Hruz's opinions about a purported "international response" regarding the provision of gender-confirming care in Finland, Sweden, and the United Kingdom are both misleading and wholly irrelevant. Ex. A at ¶¶123-126; Ex. D at 91-96. In the first place, Dr. Hruz has offered no firsthand knowledge of other

10

Case 4:23-cv-00325-RH-MAF    Document 136    Filed 04/07/23    Page 13 of 34

countries' policies, so he is not qualified to testify about them. And his testimony is false, or at best, misleading, since, each of these countries *provides and covers* some gender-confirming hormonal and surgical treatment for gender dysphoria for adolescents and adults, whereas AHCA excludes treatment completely from Medicaid coverage. *See, e.g.*, Ex. C at 183:23-184:4, 185:3-10, 189:14-190:7; *see also Brandt by & through Brandt v. Rutledge*, 47 F.4th 661, 671 (8th Cir. 2022) ("Similarly, the WPATH Standards of Care and the Finnish council both recommend that cross-sex hormones be considered only where the adolescent is experiencing persistent gender dysphoria, other mental health conditions are well-managed, and the minor is able to meet the standards to consent to the treatment."). Moreover, how care is provided and covered in countries with nationalized health care systems is not relevant to whether gender-confirming care should be covered by Medicaid in Florida.[5]

C. *Dr. Hruz's musings about the causes of gender dysphoria are irrelevant.*

Dr. Hruz opines, without any evidence, that gender dysphoria *may be* caused by social contagion and social pressure. Ex. A at ¶¶ 31, 91, 116-118; Ex. D at 40-43, 99. But whether gender dysphoria is caused by social contagion is both wholly

---

[5] For example, in Sweden standards of care are developed through legislation and thus part of a political process, which contrasts with the process in the Florida. *See* Socialstyrelsen, *About the National Board of Health and Welfare*, https://www.socialstyrelsen.se/en/about-us/ (accessed Nov. 19, 2021) (noting that standards are based on legislation).

Case 4:23-cv-00325-RH-MAF    Document 136    Filed 04/07/23    Page 14 of 34

unsupported, as described below, and irrelevant to the case at hand. It is undisputed that gender dysphoria is a recognized medical condition that necessitates medical treatment. *See*, *e.g.*, Ex. C at 57:24-58:9 ("Q. Would you agree there are transgender people in this world? A. … That's undeniable that … there are individuals that have this experience of discordance between their gender identity and their sex."); *see also Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594-95 (4th Cir. 2020). Likewise his musings about as to the difference between gender identity and "biological sex," including as to whether "biological sex" can be changed, are immaterial since this case is about access to gender-affirming care, not changing sex. Ex. A at ¶¶ 14, 58, 66. Because each of these opinions offered lacks any "valid scientific connection to the disputed facts in the case," they should be excluded. *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).

    D. *Dr. Hruz's Opinions about WPATH Standards of Care are irrelevant.*

    Dr. Hruz opines that WPATH should be disregarded as an "advocacy group" and that its recommendations "represent ideological positions devoid of rigorous scientific evidence"[6] and that the Endocrine Society Guidelines should be rejected because some of the committee members are also WPATH members. Ex. A at ¶¶

---

[6] Without any support, Dr. Hruz also claims that the American Academy of Pediatrics is a "politically influenced, non-science association." Ex. A at ¶140.

88-97. However, Dr. Hruz has not demonstrated any personal knowledge regarding the internal conversations at WPATH, has not participated in WPATH conferences, is not a member of WPATH and therefore lacks knowledge "of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988). In short, Dr. Hruz does not have "any experience with . . . WPATH. . . upon which to base his criticisms[ and] is therefore not qualified to testify about the credibility of th[at] organization[]." *Kadel*, 2022 WL 3226731, at *10.

### E.  Dr. Hruz's Hypothetical and Speculative opinions are irrelevant.

Finally, and perhaps most crucially, essentially all of Dr. Hruz's opinions are irrelevant because they are not based on fact, let alone "fit" within the facts of case. Dr. Hruz's report in this case is substantially similar to the report he submitted in *Kadel*. *Compare* Ex. A and Ex. D.  Two years ago, when asked about his opinions in the report submitted in *Kadel*, he testified that they were hypotheses. More specifically, he testified that the entirety of his opinions is based on *hypotheses*, meaning they are based on speculation. Ex. C at 154:4-8 ("A. You know, all along here, … I've been stating, and I hope very clearly, that much of my opinion is based upon hypotheses and alternative hypotheses, because there is no definitive answer to this question."); *id.* at 57:1-3 ("A. Because I present many things in my report as hypotheses. And without making definitive statements.").

13

Case 4:23-cv-00325-RH-MAF    Document 136    Filed 04/07/23    Page 16 of 34

Indeed, Dr. Hruz purportedly has no view as to what modality of treatment should be provided to transgender people suffering gender dysphoria. *Id.* at 61:21-62:2. Such "speculation is unreliable evidence and is inadmissible." *Dunn*, 275 F.Supp.2d at 684; *see Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999). In other words, Dr. Hruz lacks knowledge "of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988). And opinions based on "subjective belief or unsupported speculation" should be rejected. *Daubert*, 509 U.S. at 589-590.

*    *    *

The opinions expressed by Dr. Hruz are insufficiently tied to the facts of this case so that they will aid a factfinder and should be excluded as irrelevant.

### III.   Dr. Hruz's opinions and testimony are unreliable.

An expert's testimony should only be admitted if it is sufficiently reliable. "To meet the reliability requirement, an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue." *In re 3M Combat Arms Earplug Products Liab. Litig.*, 3:19MD2885, 2022 WL 1262203, at *1 (N.D. Fla. Apr. 28, 2022). The requirement of reliability found in Rule 702 is "the centerpiece of any determination of admissibility." *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002). "At this stage,

14

the court must undertake an independent analysis of each step in the logic leading to the expert's conclusions; if the analysis is deemed unreliable at any step the expert's entire opinion must be excluded." *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009), *aff'd sub nom. Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183 (11th Cir. 2010). In making this determination the court can consider a variety of factors, including whether the purported expert's theory has been tested, whether it has been subjected to peer review and publication, and whether the theory has been generally accepted in the scientific community. *See Daubert*, 509 U.S. at 593-94; *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005).[7] To be reliable the expert's testimony must always be based on "good grounds." *Daubert,* 509 U.S. at 590. Moreover, *Daubert* requires that reliable expert testimony be more than scientifically unsupported "leaps of faith." *Rider v. Sandoz Pharm. Corp.*, 295 F.3d at 1202. Here, Dr. Hruz's opinions fail all indicia of reliability. Dr. Hruz's proffered opinions are based on nothing more than rank speculation, "untested" theories, uncorroborated anecdotes, and assumptions that are obsolete, flawed, unethical, and expressed opinions based upon "unsettled science." What is more, some of his opinions are patently false.

---

[7] Other factors which may be relevant include (1) the nature of the field of claimed expertise, (2) the source of the expert's knowledge, (3) the expert's level of care in using the knowledge, and (4) the expert's consideration of alternative hypotheses. Hendrix, 255 F.R.D. at 578-79.

15

A. *Dr. Hruz's opinions are unreliable because they are based on untested hypotheses and speculation.*

As noted above, **Dr. Hruz's opinions are hypotheses**; hypotheses that he himself has not tested or studied. *See, e.g.,* Ex. A at ¶¶31; 76; 90-91; 116-118; 130-131. And "[w]hile hypothesis is essential in the scientific community because it leads to advances in science, speculation in the courtroom cannot aid the fact finder in making a determination." *Dunn v. Sandoz Pharms. Corp.*, 275 F.Supp.2d 672, 684 (M.D.N.C. 2003). "[T]he courtroom is not the place for scientific guesswork, even of the inspired sort." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996). Indeed, "[w]here an expert's opinion testimony is founded on an unsupported premise, it gives rise to an inference that is based on speculation and has no evidentiary value." *Walker v. Blitz USA, Inc.*, 663 F. Supp. 2d 1344, 1364 (N.D. Ga. 2009). At bottom, such speculation is unreliable evidence and is inadmissible.

B. *Dr. Hruz's opinions are unreliable because they are misleading and therefore do not serve to enlighten the trier of fact.*

In addition, some of Dr. Hruz's opinions are misleading at best, or flat out false. For example:

**One.** Dr. Hruz opines that the literature around gender-affirming care is "in a state insufficient to enable sound conclusions about the efficacy of "affirming treatments." Ex. A at ¶¶93; 122; 142; Ex. D at 100 ("treatments – hormones and

surgery – for gender dysphoria and 'transitioning' have not been accepted by the relevant scientific communities (biology, genetics, neonatolgy [sic], medicine, psychology, etc.)."). Not true. It is the official, consensus, evidence-based position of the National Academies of Science, Engineering, and Medicine that, "[a] major success of these guidelines has been identifying evidence and establishing expert consensus that gender-affirming care is medically necessary and, further, that withholding this care is not a neutral option." Ex. H at 361;[8] Ex. C at 205:20-206:22. Indeed, "[a] number of professional medical organizations have joined WPATH in recognizing that gender affirming care is medically necessary for transgender people." Ex. H at 361. This includes, among others, the American Medical Association, American Psychiatric Association, American Psychological Association, American Academy of Family Physicians, American Academy of Pediatrics, American College of Obstetricians and Gynecologists, and the Endocrine Society. *Id.*; Ex. E at 58:21-61:9. It also includes Dr. Hruz's own employer, Washington University in St. Louis. Ex. C at 85:14-86:11.

***Two.*** In his report, Dr. Hruz presented a number of modalities of treatment for the care of patients with gender dysphoria, including: (1) "conversion" or "reparative therapy"; (2) "watchful waiting"; and (3) the "affirming" approach, as

---

[8] Ex. H, a report of the National Academies, is self-authenticating as a publication issued by a public authority, Fed. R. Evid. 902(5), and is appropriate for judicial notice, *United States v. Doe*, 962 F.3d 139, 147 n.6 (4th Cir. 2020).

if these did not endorse the provision of gender-affirming medical care for adolescents and adults. Ex. A at ¶¶54-65; Ex. D at 49-50. In doing so, Dr. Hruz opined that the approach advocated by Dr. Kenneth Zucker and the "watchful waiting" model use "modern psychotherapeutic approaches to address suicidal ideation in children with gender dysphoria." Ex. A at ¶¶63-64; *see also* Ex. D at 50-51 (Dr. Hruz explaining that treatment "involve[] no medical treatment and is currently the best scientifically supported intervention."). But Dr. Hruz misrepresents these approaches by failing to explain that Dr. Zucker's approach and the "watchful waiting" model, which recommends the provision of gender-affirming medical care if a patient's gender dysphoria persists into adolescence. Ex. G; Ex. C at 121:6-12, 125:11-17. For example, with regards to Dr. Zucker, his approach has been described as follows by the APA:

> For adolescent patients (including those who first came to the clinic as young children), Dr. Zucker follows the Standards of Care Guidelines of the World Professional Association for Transgender Health. The treatment options include helping patients make a satisfactory transition to the opposite sex, including the institution of hormonal treatment to facilitate transition. In some cases, treatment may include helping an interested adolescent obtain sex-reassignment surgery.

Ex. R; Ex. G at 61. Indeed, "All of the three models of care … share in common the administration of hormonal treatment in adolescence." *Id.* at 64.

**Three.** In that same vein Dr. Hruz falsely presented "reparative therapy" as if it was an accepted modality of treatment. Ex. A at ¶60. Nothing could be further

18

Case 4:23-cv-00325-RH-MAF Document 136 Filed 04/07/23 Page 21 of 34

from the truth, however. The provision of conversion/reparative therapy represents a fringe view completely contrary to the mainstream medical and scientific community in the United States. As Dr. Hruz has previously acknowledged in deposition, the American Psychiatric Association and the American Psychological Association oppose "reparative therapy" or gender identity change efforts as unethical and harmful. Ex. C at 164:1-170:8. The same position adopted by the National Academies. *Id.* at 176:9-177:24; Ex. H at 361-363. Indeed, per the American Psychological Association's Resolution on Gender Identity Change Efforts, "individuals who have experienced pressure or coercion to conform to their sex assigned at birth or therapy that was biased toward conformity to one's assigned sex at birth have reported harm resulting from these experiences such as emotional distress, loss of relationships, and low self-worth." Ex. S. What is more, Dr. Hruz cites to no authority—let alone any original, peer-reviewed study, in support of this so-called approach to treatment.[9]

**Four.** Dr. Hruz's misrepresents "desistance" rates as a reason to question the provision of gender-confirming care. This is a subject matter area in which the *Kadel* Court excluded Dr. Hruz's testimony. *Kadel v. Folwell,* 2022 WL 3226731at *9.

---

[9] Hruz cites to Dr. Ken Zucker's work as supportive of this therapeutic approach. However, as outlined above, Dr. Hruz grossly misrepresents Dr. Zucker's approach. What is more, the citation to Dr. Zucker is to an opinion article not any peer-reviewed original research.

19

Dr. Hruz spends considerable time on (and builds most of his testimony questioning the propriety of gender-affirming health care upon) antiquated studies showing that a majority of *prepubertal* children diagnosed with *gender identity disorder*—an outmoded diagnosis *distinct from gender dysphoria* with different diagnostic criteria—"desisted" from their gender nonconformity or cross-gender behavior. Ex. A at ¶¶ 63-64. But, his presentation of this literature is extremely misleading since, not only due to his reliance on outdated studies, but also because he ignores the more recent literature which has uniformly found that youth who have a diagnosis of gender dysphoria in adolescence overwhelmingly continue to identify as transgender as they age.[10]    Moreover, as Dr. Hruz has previously admitted that absolutely no gender-affirming medical or surgical care is provided to *prepubertal* children. Ex. C at 125:23-126:5. That is true for each of the treatment paradigms Dr. Hruz discusses (apart from "conversion" or "reparative therapy"), a fact Dr. Hruz did not disclose.

---

[10] *See, e.g.,* Kristina R. Olson, *Gender Identity 5 Years After Social Transition*, 150 Ped. e2021056082 (2022) (of 300 youth with gender dysphoria, at the end of the five years, 94% of participants still identified as transgender); Annelou L C de Vries et al., *Puberty Suppression in Adolescents with Gender Identity Disorder: A Prospective Follow-Up Study*, 8 J. Sex. Med. 2276 (2011). Notably, Thomas D Steensma, who co-authored the study on which Dr. Laidlaw improperly cites for the proposition that most youth with gender dysphoria "desist" in their gender identity, also co-authored the de Vries study, which looked 70 youth in the Netherlands referred for treatment of gender dysphoria between 2000 and 2008, found that all of them decided to continue their medical transition after 1-2 years, confirming that "young adolescents who had been carefully diagnosed show persisting gender dysphoria into late adolescence or young adulthood." *Id.* at 2281.

*Id.* at 119:22-140:12. His opinions are therefore not only misleading, but also irrelevant, since this case is about the coverage for medically necessary gender-affirming medical care, and none of the plaintiffs are prepubertal children.

> **Five.** Dr. Hruz provides no scientific bases for his conclusions that "A currently unknown percentage and number of patients reporting gender dysphoria suffer from mental illness(es) that complicate and may distort their judgments and perceptions of gender identity" or that "A currently unknown percentage and number of patients reporting gender dysphoria may be manipulated by a social contagion and social pressure processes, including peer group, social media, YouTube role modeling, and parental pressures." Ex. A at ¶¶ 130-131. But "Hruz is not a statistician and does not discuss in his report how he came to those conclusions, what data he relied upon, or what methodology he applied to that data." *Kadel*, 2022 WL 3226731, at *9. "This testimony will therefore be excluded as unreliable." *Id.*

*     *     *

The Court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Here, Dr. Hruz has misrepresented or omitted information that goes to the heart of his opinions and calls into question the reliability of his opinions. While usually the factual basis of an expert opinion goes to credibility, "it is possible for an experts'

21

Case 4:23-cv-00325-RH-MAF   Document 136   Filed 04/07/23   Page 24 of 34

omission of articles to render his or her opinion inadmissible on reliability grounds." *Huggins v. Stryker Corp.*, 932 F.Supp.2d 972, 994 (D. Minn. 2013). Such is the case here where Dr. Hruz omits key information, or worse, misrepresents facts that if properly disclosed would contradict his opinions and undermine their foundation. In such circumstances, the "potential to mislead" rather "than to enlighten" is too great. *In re Lipitor*, 892 F.3d at 632.

C. *Dr. Hruz's opinions are unreliable because they are not generally accepted in the scientific and medical community.*

General acceptance in the relevant scientific community is also relevant to the reliability inquiry. *Nease*, 848 F.3d at 229. Not only is widespread acceptance an important factor in assessing the reliability of an expert's opinions, but the fact that a known technique or theory "has been able to attract only minimal support within the community may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594. Here, Dr. Hruz's opinions are outside the mainstream of medical and scientific opinion and have been explicitly rejected by these relevant communities.

The provision of gender-confirming care has been accepted and endorsed, *inter alia*, by the: American Medical Association; American Psychiatric Association; American Psychological Association; Endocrine Society; Pediatric Endocrine Society; American Academy of Pediatrics; National Academies of Science, Engineering, and Medicine; and Dr. Hruz's own employer. Ex. C at 164:5-11; Ex. E at 70:25-71:22; *id.* 57:11-59:14; Ex. H at 361-363. The Fourth

22

Circuit has described it as "the consensus approach of the medical and mental health community." *Grimm*, 972 F.3d at 595; *Edmo v. Corizon, Inc.*, 935 F.3d 757, 771 (9th Cir. 2019) (the provision of gender-affirming care, consistent with the WPATH Standards of Care, represents "the ***broad medical consensus*** in the area of transgender health care," which "requires providers to individually diagnose, assess, and treat individuals' gender dysphoria.") (emphasis added); *see also Brandt v. Rutledge*, 551 F.Supp.3d 882, 890 (E.D. Ark. 2021) ("The consensus recommendation of medical organizations is that the only effective treatment for individuals at risk of or suffering from gender dysphoria is to provide gender-affirming care."), *aff'd*, 47 F.4th 661 (8th Cir. 2022); *Flack v. Wisconsin Dep't of Health Servs.*, 395 F.Supp.3d 1001, 1018 (W.D. Wis. 2019).

In fact, another federal district court found as much when it enjoined Arkansas' state law seeking to ban gender-confirming treatment for minors. *See Brandt*, 551 F.Supp.3d 882. In doing so, the *Brandt* court explicitly found that: (a) "Gender-affirming treatment is *supported by medical evidence* that has been *subject to rigorous study*;" and (b) "*Every major expert medical association* recognizes that gender-affirming care for transgender minors may be *medically appropriate and necessary* to improve the physical and mental health of transgender people." *Id.* at 891 (emphasis added). Notably, Dr. Hruz filed an expert declaration in the *Brandt* case that is virtually identical to the report he filed in this

23

Case 4:23-cv-00325-RH-MAF Document 136 Filed 04/07/23 Page 26 of 34

case. As such, the *Brandt* court's findings stand as a stark repudiation of Dr. Hruz's opinion that gender-affirming care is "experimental" and "not medically necessary." Ex. A at ¶¶137-138; Ex. D at 17. It is for these reasons that the Court in *Kadel* excluded much of Dr. Hruz's opinions in that case on these issues. *Kadel v. Folwell,* 2022 WL 3226731at *9.

Conversely, Dr. Hruz's opinions in support of reparative therapy or gender identity change efforts has also been rejected by the general scientific community, among others. Ex. C at 164:1-170:8; Ex. E at 118:7-19, 237:1-23. *See also King v. Governor of the State of New Jersey*, 767 F.3d 216, 221–22 (3d Cir. 2014); *Pickup v. Brown*, 740 F.3d 1208, 1223–24 (9th Cir. 2014). This again shows that Dr. Hruz's opinions are wildly outside the mainstream and his failure to notify the Court of the rejection of these purported alternative treatment renders his testimony unreliable.

D. *Dr. Hruz's opinions are unreliable because they have no support and are based on ipse dixit.*

As noted herein, Dr. Hruz's opinions are based on untested hypotheses and do not have any factual support. For example, Dr. Hruz opines that gender dysphoria *may be* caused by social contagion and social pressure. Ex. A at ¶131. But he offers no evidence for this hypothesis, which he admits has not been tested. *Id.* Of course, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only

24

by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

And this is one of those circumstances in which "there is simply too great an

analytical gap between the data and the opinion proffered." *Id*. In fact, the only

study to have looked at this hypothesis found no support for the hypothesis. Ex. N.

*   *   *

Given that Dr. Hruz's opinions fail to meet the most basic indicia of

reliability, the Court should exclude Dr. Hruz's opinions and testimony as

unreliable.

## IV. Dr. Hruz's opinions are so tainted by his personal bias as to render his opinions unreliable.

While Plaintiffs are cognizant of the fact that bias in an expert witness's

testimony is usually an issue of credibility as opposed to one of admissibility, when

an expert's opinions are based on bias as opposed to scientific or medical

knowledge, then the question of bias becomes one of reliability and admissibility.

Indeed, reliability is a flexible inquiry wherein "courts must ensure that an expert's

opinion is based on scientific, technical, or other specialized knowledge and not

on belief or speculation." *Sardis*, 10 F.4th at 281. Here, there is ample evidence

that Dr. Hruz's testimony is so permeated and tainted by his unscientific views and

personal bias as to render it unreliable. *See Kadel*, 2022 WL 3226731, at *9

("Plaintiffs have offered evidence that calls Hruz's motivations—and thereby, his

reliability—into serious question."); *cf. Sanchez v. Esso Standard Oil de Puerto*

25

*Rico, Inc.*, No. CIV 08-2151, 2010 WL 3809990, at *4 (D.P.R. Sept. 29, 2010).

More specifically, Dr. Hruz's testimony appears to be motivated by his personal and religious views regarding transgender people. To be clear, Plaintiffs do not seek to impugn or malign whatever moral or religious views Dr. Hruz may hold. However, to the extent Dr. Hruz's moral and religious views have influenced his purported expert opinions— indeed, they seem to be the motivating factor— that is something the Court must be aware of and should consider as it assesses the reliability of his testimony.

In his report, Dr. Hruz discusses meeting with Dr. Norman Spack, a noted pediatric endocrinologist and the co-founder of Boston Children's Hospital Gender Management Service Program, as someone he consulted when he first began to study issues relating to gender dysphoria from a scientific standpoint. Ex. Ex. A at ¶9; D at 6. But Dr. Spack's account of this encounter is quite different. Dr. Spack asserts that "Dr. Hruz did not discuss or mention that his issues or concerns were based on science." Ex. K at ¶ 13. To the contrary, Dr. Hruz expressed to Dr. Spack that he had "a significant problem with the entire issue" and "whole idea of transgender," and that for him, it was "a matter of [his] faith." *Id.* at ¶¶ 11-12. When confronted with Dr. Spack's account, Dr. Hruz notably did not deny he made such statements. Ex. C at 247:10-251:4.

Similarly, Dr. Hruz misrepresents the nature of his conversations with

26

Case 4:23-cv-00325-RH-MAF Document 136 Filed 04/07/23 Page 29 of 34

"dozens of parents of children with gender dysphoria" as that of seeking "to understand the unique difficulties experienced by this patient population." Ex. A at ¶9; Ex. D at 6. One of these parents gives quite a different account of meeting with Dr. Hruz, however. Dr. Hruz met with Kim Hutton, the mother of a transgender child, in 2013. Ex. E 102:24-103:9, 126:12-129:25. Dr. Hruz says he met with the parent of a transgender child who was affiliated with an organization called TransParent, during a "very early investigative phase" of his study of gender dysphoria. Ex. E 103:25-104-7, 102:24-103:9. By Ms. Hutton's account, the nature of Dr. Hruz's conversation with her revealed that that he was firmly opposed to gender-affirming care, as well as opposed to a having a Transgender Center at St. Louis Children's Hospital, and that this opposition was rooted in his personal moral and religious views. Indeed, Dr. Hruz reportedly told Ms. Hutton, "there will never be a pediatric gender center at St. Louis Children's Hospital. I won't allow it." Ex. L at 30:8-30:11. Dr. Hruz also told Ms. Hutton that her "child was not normal and would never be normal," Ex. L at 28:20-28:23; that "the idea of doing surgeries on transgender people is -- is wrong," *id.* at 21:21-27:24; and repeatedly encouraged Ms. Hutton to "read Pope John Paul II's writings on gender," because it would explain everything. *id.* at 29:17-29:20. And in response to Ms. Hutton's statement that transgender children "are at a 41 percent risk of suicide if they don't have acceptance and -- and care from their parents and -- and

Case 4:23-cv-00325-RH-MAF Document 136 Filed 04/07/23 Page 30 of 34

if they don't get their medical needs met," Dr. Hruz responded that, "Some children are born in this world to suffer and die." *Id.* at 29:21-30:4. As a result, Ms. Hutton left her conversation with Dr. Hruz—a conversation Dr. Hruz says he "was approaching [] in a purely investigative manner," Ex. E at 126:16-127:3—"perplexed" due to "the religious tone of the conversation," which she "figured [] would at least be based on science." Ex. L at 37:11-37:19.

The bias illuminated by Dr. Spack's and Ms. Hutton's testimony is further confirmed by the nature of Dr. Hruz's publications and presentations on this issue. With one exception, all of Dr. Hruz's publications pertaining to gender dysphoria have been in religiously affiliated, non-scientific publications. Ex. C at 42:10-49:19. Similarly, aside from a handful of grand rounds, Dr. Hruz has not made any presentations about this topic at scientific conferences, *id.* at 90:17-93:3; instead, presenting on this topic to religious organizations. For instance, in November 2017, Dr. Hruz gave a presentation at the Saint John Paul II Bioethics Center at the Holy Apostles College & Seminary, where he referred to being transgender as something that "probably goes back to some of the early heresies in the church," and to pictures of transgender people as "disturbing." Ex. E at 83:5-85:20. When confronted with these statements, Dr. Hruz did not disavow or deny making them. *Id.* And in February 2018, Dr. Hruz presented at an "International Conference on Gender, Sex and Education" that was billed as "the world's first great public

28

Case 4:23-cv-00325-RH-MAF   Document 136   Filed 04/07/23   Page 31 of 34

objection to totalitarian LGBTI laws," "a conference to oppose gender ideology," and "against the LGBTI doctrine… taking hold of Western Countries." Ex. M; Ex. C at 93:4-97:10.

The foregoing, coupled with Dr. Hruz's departure with generally accepted medical and scientific standards, demonstrates that Dr. Hruz's purported expert testimony lacks any indicia of reliability. And while the Federal Rules of Evidence state that "[e]vidence of a witness's religious beliefs or opinions is not admissible to attack or support the witness's credibility," Fed. R. Evid. 610, the Advisory Committee Notes to Rule 610 make clear that "an inquiry for the purpose of showing interest or bias because of them is not within the prohibition." Advisory Committee Notes to Rule 610. Indeed, "[w]ithout this critical information," the Court would be "deprived of the necessary facts from which it could appropriately draw inferences about [Dr. Hruz's] reliability." *State v. Heinz*, 485 A.2d 1321, 1328 (Conn. App. 1984). Here, it is evident that Dr. Hruz has not been candid regarding his experiences or the bases for his "opinions." The record evidence demonstrates a clear bias by Dr. Hruz against transgender people generally, which infects his reliability as a purported expert witness in this case.

## V.   Dr. Hruz's opinions lack probative value and are therefore inadmissible under Federal Rule of Evidence 403.

Finally, because of the potentially misleading effect of expert evidence, *see Daubert*, 509 U.S. at 595, on occasion expert opinions that otherwise meet

29

Case 4:23-cv-00325-RH-MAF Document 136 Filed 04/07/23 Page 32 of 34

admissibility requirements may still be excluded under Fed. R. Evid. 403. Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible expert testimony is substantially outweighed by its potential to confuse or mislead the jury, or if the testimony is cumulative or needlessly time consuming. *See, e.g., Hull v. Merck & Co., Inc.*, 758 F.2d 1474, 1477 (11th Cir.1985) (admission of speculative and "potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in Fed. R. Evid. 702"); *Tran v. Toyota Motor Corp.*, 420 F.3d 1310, 1316 (11th Cir. 2005) (affirming exclusion of expert testimony as cumulative). Consequently, "the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises *more* control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (cleaned up).

Accordingly, the Court should exclude Dr. Hruz's opinions because its introduction will result in unfair prejudice, confusion of the issues, or in misleading testimony. Fed. R. Evid. 403. Dr. Hruz offers opinions that are irrelevant to the issues in this case, and, in any event, the opinions he offers are speculative and unreliable. The testimony would also result in prejudice, as the testimony seeks to sow confusion about the propriety of gender- confirming care based on speculation, irrelevant, misleading, or biased opinions.

## **CONCLUSION**

For the foregoing reasons, the Court should exclude Dr. Hruz's report,

Case 4:23-cv-00325-RH-MAF    Document 136    Filed 04/07/23    Page 33 of 34

opinions, and testimony and limit his opinions to those permitted in *Kadel*.

Respectfully submitted this <u>7th day</u> of April, 2023.

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**
By: */s/ Shani Rivaux*
**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsburylaw.com
shani.rivaux@pillsburylaw.com

**William C. Miller***
**Gary J. Shaw***
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com
gary.shaw@pillsburylaw.com

**Joe Little***
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**
**Abigail Coursolle***
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee***
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27514
(919) 968-6308
mckee@healthlaw.org

**LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.**

**Omar Gonzalez-Pagan***
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles***
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

**Simone Chriss** (FBN 124062)
**Chelsea Dunn** (FBN 1013541)
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**FLORIDA HEALTH JUSTICE
PROJECT**

**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

* *Admitted pro hac vice.*

31

Case 4:23-cv-00325-RH-MAF    Document 136    Filed 04/07/23    Page 34 of 34

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of April 2023, a true copy of the foregoing has been filed with the Court utilizing its CM/ECF system, which will transmit a notice of electronic filing to counsel of record for all parties in this matter registered with the Court for this purpose.

## CERTIFICATE OF WORD COUNT

As required by Local Rule 7.1(F), I certify that this Memorandum of Law contains 7,463 words.

*/s/ Shani Rivaux*
Counsel for Plaintiffs

# TAB 138

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### Tallahassee Division

AUGUST DEKKER, *et al.*,

      *Plaintiffs*,

    v.

      Case No. 4:22-cv-00325-RH-MAF

JASON WEIDA, *et al.*,

      *Defendants*.

## PLAINTIFFS' MOTION TO EXCLUDE
## EXPERT TESTIMONY OF DR. KRISTOPHER KALIEBE

Now come, Plaintiffs, by and through their counsel, and respectfully move this Court to exclude the expert report, opinions, and testimony of Defendants' proposed expert, Dr. Kristopher Kaliebe, pursuant to Federal Rules of Civil Procedure 26 and 37, and Federal Rules of Evidence 104, 403, and 702.

Dr. Kaliebe is not a qualified expert on gender dysphoria or its treatment, and his opinions and testimony are neither relevant nor reliable, under Federal Rule of Evidence 702 and the standards set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny. His opinions and testimony are likewise inadmissible because any probative value they may have (and they have none) is substantially outweighed by the danger of unfair prejudice, confusion of the issues,

waste of time, undue delay, and needless presentation of cumulative evidence. *See* Fed. R. Evid. 403.

Based on Dr. Kaliebe's lack of qualifications and the unreliability and unhelpfulness of his testimony and opinions, at minimum, the Court should exclude any portions of the expert report, opinions, and testimony of Dr. Kaliebe that go beyond his experience regarding the diagnosis of gender dysphoria in children and adolescents.

A memorandum of law is filed contemporaneously herewith.

Dated this 7th day of April 2023.

Respectfully Submitted,

*/s/ Omar Gonzalez-Pagan*

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**

**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsbury.com
shani.rivaux@pillsbury.com

**William C. Miller**\*
**Gary J. Shaw**\*
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com

**Joe Little**\*
500 Capitol Mall, Suite 1800

**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**

**Omar Gonzalez-Pagan**\*
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles**\*
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue

Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**

**Abigail Coursolle***
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee***
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27541
(919) 968-6308
mckee@healthlaw.org

Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**FLORIDA HEALTH JUSTICE PROJECT**

**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

* *Admitted pro hac vice*

*Counsel for Plaintiffs*

Case 4:22-cv-00325-RH-MAF Document 138 Filed 04/07/23 Page 4 of 4

## LOCAL RULE 7.1(B) CERTIFICATION

The undersigned certifies that he attempted in good faith to resolve the issues raised in this motion through a meaningful conference with Defendants' counsel, including through a meet and confer Zoom conference on April 6, 2023.

> */s/ Omar Gonzalez-Pagan*
> Omar Gonzalez-Pagan
> *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of April 2023, a true copy of the foregoing has been filed with the Court utilizing its CM/ECF system, which will transmit a notice of electronic filing to counsel of record for all parties in this matter registered with the Court for this purpose.

> */s/ Omar Gonzalez-Pagan*
> Omar Gonzalez-Pagan
> *Counsel for Plaintiffs*

# TAB 139

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
Tallahassee Division

AUGUST DEKKER, *et al.*,

                *Plaintiffs*,

         v.

JASON WEIDA, *et al.*,

                *Defendants*.

Case No. 4:22-cv-00325-RH-MAF

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO
EXCLUDE EXPERT TESTIMONY OF DR. KRISTOPHER KALIEBE**

## TABLE OF CONTENTS

INTRODUCTION AND STATEMENT OF THE CASE .......................................1

LEGAL STANDARD.......................................................................................2

ARGUMENT ...................................................................................................4

   I.   Qualification – Dr. Kaliebe is not qualified to offer expert opinions on the treatment or causes of gender dysphoria, nor on the development of clinical practice guidelines. .........................................................................4

   II.    Reliability – Dr. Kaliebe's opinions and testimony are unreliable. ............11

    A. Dr. Kaliebe's opinions are unreliable because they are based on unsupported premises, untested hypotheses, and speculation. ....................13

    B. Dr. Kaliebe's opinions are unreliable because they are misleading, employ flawed methodologies, and do not serve to enlighten the trier of fact. .........18

    C. Dr. Kaliebe's opinions are unreliable because they are based on facts or data not typically relied on by physician or scientists. ................................23

    D. Dr. Kaliebe's opinions are unreliable because they are not generally accepted in the scientific and medical community. ......................................28

   III.  Helpfulness – Dr. Kaliebe's opinions and testimony are not relevant to this case....................................................................................................29

    A.  Dr. Kaliebe's opinions about "desistance" are irrelevant. ........................30

    B. Dr. Kaliebe's opinions about supposed controversies in other countries are irrelevant................................................................................................31

    C.  Dr. Kaliebe's musings about the causes of gender dysphoria are irrelevant. 32

   IV.  Dr. Kaliebe's opinions lack probative value and are therefore inadmissible under Rule 403............................................................................................33

CONCLUSION................................................................................................33

Plaintiffs respectfully submit this memorandum of law in support of their motion to exclude the expert testimony of Dr. Kristopher Kaliebe.[1]

## INTRODUCTION AND STATEMENT OF THE CASE

Plaintiffs are transgender Medicaid beneficiaries who have been diagnosed with gender dysphoria. In August 2022, Defendants adopted a rule, Florida Administrative Code 59G-1.050(7) (the "Challenged Exclusion"), prohibiting Medicaid coverage of services for the treatment of gender dysphoria. Defendants adopted the Challenged Exclusion after undergoing a process with a predetermined outcome that concluded that the provision of medical treatment for the treatment of gender dysphoria, including puberty blockers, hormone therapy, and surgery, "do not conform to GAPMS [("generally accepted professional medical standards")] and are experimental and investigational." Defendants thus deny equal treatment to Plaintiffs based on sex because they are transgender.

In response, Defendants have put forward an expert, Dr. Kristopher Kaliebe, a child and adolescent psychiatrist, who has no experience regarding the treatment of gender dysphoria, nor has ever studied or written any literature—alone scientific, peer-reviewed literature—on gender identity or gender dysphoria. However, Dr. Kaliebe is not a qualified expert on gender dysphoria or its treatment, and his

---

[1] Unless otherwise specified, all exhibits cited herein are attached to the contemporaneously filed Declaration of Omar Gonzalez-Pagan.

1

Case 4:22-cv-00325-RH-MAF Document 139 Filed 04/07/23 Page 4 of 37

opinions and testimony are neither relevant nor reliable, under Federal Rule of Evidence 702 and the standards set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny.

Accordingly, and for the reasons set forth below, the Court should exclude the expert report, opinions, and testimony of Dr. Kaliebe. At minimum, based on Dr. Kaliebe's lack of qualifications and the unreliability and unhelpfulness of his testimony and opinions, the Court should exclude any portions of the expert report, opinions, and testimony of Dr. Kaliebe that go beyond his experience regarding the diagnosis—not treatment—of gender dysphoria in children and adolescents.

## **LEGAL STANDARD**

"The admission of expert evidence is governed by Federal Rule of Evidence 702, as explained by *Daubert* and its progeny." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). "District courts are [thus] charged with [a] gatekeeping function." *Id.*; *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The importance of *Daubert*'s gatekeeping requirement cannot be overstated.").

In conducting their gatekeeping function, courts must "engage in a rigorous three-part inquiry" and determine whether

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of

2

fact, through the application of scientific, technical, or specialized
expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158
F.3d 548, 562 (11th Cir. 1998)). The Eleventh Circuit refers to these three
considerations separately as "qualification," "reliability," and "helpfulness" and has
emphasized they are "distinct concepts that courts and litigants must take care not to
conflate." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341
(11th Cir. 2003). "The party offering the expert has the burden of satisfying each of
these three elements by a preponderance of the evidence." *Rink*, 400 F.3d at 1292.

To be sure, "[i]mplementing Rule 702, *Daubert* requires district courts to
ensure that any and all scientific testimony or evidence admitted is both relevant and
reliable." *Claire v. Fla. Dep't of Mgmt. Servs.*, 2021 WL 5982330, at *1 (N.D. Fla.
Oct. 20, 2021). "[T]he trial judge must determine [this] ***at the outset***." *Daubert*, 509
U.S. at 592 (emphasis added). "Rule 702 applies whether the trier of fact is a judge
or a jury." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d
825, 832 (3d Cir. 2020). Even rigorous cross-examination is not a substitute for the
court's gatekeeping role. *See Nease v. Ford Motor Co.*, 848 F.3d 219, 231 (4th Cir.
2017). As such, the court's gatekeeping role and the test for admissibility of expert
testimony are applicable even at a bench trial or at the summary judgment stage. *See*,
*e.g.*, *Rink*, 400 F.3d at 1294 (finding no abuse of discretion by the district court in
motions to exclude in the context of summary judgment); *Kadel v. Folwell*, 2022

3

Case 4:22-cv-00325-RH-MAF   Document 139   Filed 04/07/23   Page 6 of 37

WL 3226731, at **5-17 (M.D.N.C. Aug. 10, 2022) (granting motions to exclude in the context of summary judgment); *Lo v. United States*, 2022 WL 1014902, at *12 (W.D. Wash. Apr. 5, 2022) (excluding unqualified expert evidence in the context of a bench trial); *cf. UGI Sunbury*, 949 F.3d at 833 (holding the district court abused its discretion in a bench trial when it "ignored rule [702]'s clear mandate" by "sidestepping Rule 702 altogether and declining to perform any assessment of [expert]'s testimony before trial").

Finally, because of the potentially misleading effect of expert evidence, *see Daubert*, 509 U.S. at 595, on occasion expert opinions that otherwise meet admissibility requirements may still be excluded under Fed. R. Evid. 403.

## ARGUMENT

I.   **Qualification – Dr. Kaliebe is not qualified to offer expert opinions on the treatment or causes of gender dysphoria, nor on the development of clinical practice guidelines.**

An expert witness may be qualified "by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "Determining whether a witness is qualified to testify as an expert requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." *Banuchi v. City of Homestead*, 606 F.Supp.3d 1262, 1272 (S.D. Fla. 2022) (cleaned up). "Whether [an expert] is qualified is a threshold question, and vigorous cross-examination is no substitute." *Griffin v. Coffee Cnty.*, 608 F.Supp.3d 1363, 1373 (S.D. Ga. 2022),

*objections overruled*, 2022 WL 2805037 (S.D. Ga. July 18, 2022). If not qualified, the expert's testimony is unreliable. *See Reliastar Life Ins. Co. v. Laschkewitsch*, 2014 WL 1430729, at *1 (E.D.N.C. Apr. 14, 2014).

However, "qualifications alone do not suffice." *Clark v. Takata Corp.*, 192 F.3d 750, 759 n.5 (7th Cir. 1999); *see also Patel ex rel. Patel v. Menard, Inc.*, 2011 WL 4738339, at *1 (S.D. Ind. Oct. 6, 2011). Even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under … *Daubert*." *Clark*, 192 F.3d at 759 n.5.

Moreover, "an expert's qualifications must be within the same technical area as the subject matter of the expert's testimony; in other words, a person with expertise may only testify as to matters within that person's expertise." *Martinez v. Sakurai Graphic Sys. Corp.*, 2007 WL 2570362, at *2 (N.D. Ill. Aug. 30, 2007); *see also Lebron v. Sec. of Fla. Dept. of Children and Families*, 772 F.3d 1352, 1369 (11th Cir. 2014) ("Expertise in one field does not qualify a witness to testify about others."). "Generalized knowledge of a particular subject will not necessarily enable an expert to testify as to a specific subset of the general field of the expert's knowledge." *Martinez*, 2007 WL 2570362, at *2.

This is particularly true in medicine where "no medical doctor is automatically an expert in every medical issue merely because he or she has graduated from

medical school or has achieved certification in a medical specialty." *O'Conner v. Commonwealth Edison Co.*, 807 F.Supp. 1376, 1390 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir. 1994); *see also*, *e.g.*, *Hartke v. McKelway*, 526 F.Supp. 97, 100-101 (D.D.C. 1981). For example, a clinical psychologist may not be necessarily qualified to testify about stress worsening a preexisting heart condition, and a pediatrician experienced as a children's accident preventionist may not be qualified to testify to the conduct of an adult driver. *See Diviero v. Uniroyal Goodrich Tire Co.*, 919 F.Supp. 1353, 1355–56 (D. Ariz. 1996) (citing *Kloepfer v. Honda Motor Co.*, 898 F.2d 1452, 1458–59 (10th Cir. 1990), and *Edmonds v. Illinois Central Gulf Railroad*, 910 F.2d 1284, 1287 (5th Cir. 1990), as examples).

Here, Dr. Kaliebe opines that: gender dysphoria has been rare until the last two decades; there is no consensus in the field regarding the treatment of gender dysphoria, nor is there an evidence-base sufficient to lead to any confident recommendations; the evidence for affirmative treatment is low-quality; spread of ideology combined with technologically induced contagion effects leading the recent increase in gender dysphoria; and on criticisms of medical associations as well as political criticisms. Ex. A, at ¶ 4. But Dr. Kaliebe, a child and adolescent psychiatrist, is not qualified to render most, if any, of the opinions he proffers.

Dr. Kaliebe (1) has never conducted any original, peer-reviewed research about gender identity, transgender people, or gender dysphoria, Ex. B, at 43:17-44:1;

6

Case 4:22-cv-00325-RH-MAF   Document 139   Filed 04/07/23   Page 9 of 37

(2) has not published any literature, let alone scientific, peer-reviewed literature, on gender dysphoria or transgender people, Ex. B, at 25:5-14; (3) has never treated a patient for gender dysphoria, Ex. B, at 33:18-21 ("So you wouldn't be providing treatment for the dysphoria at Silver Clinic?  A. I think we would not be directly addressing gender dysphoria in psychotherapy."); *id.* at 33:15-16 ("A. … I don't know that we would say we were giving therapy for gender dysphoria"); *id.* at 138:24-139:1 ("Q. You do not provide medical treatment for gender dysphoria; is that right?  A. Medicines, correct.");[2] and (4) is not an endocrinologist, pediatrician, adolescent medicine doctor, surgeon, or other kind of physician qualified to medically treat gender dysphoria. Ex. B, at 44:2-8; Curriculum vitae attached to Ex. A.

Given the above, the district court's decision in *Kadel*, 2022 WL 3226731, at **5-17, is most instructive here. Like other experts in *Kadel*, Dr. Kaliebe "has never … treated gender dysphoria, … conducted any original research about gender dysphoria diagnosis or its causes, or published any *scientific*, *peer-reviewed*

---

[2] At most, Dr. Kaliebe can claim that he has supervised psychiatric residents (Ex. B, at 29:9-10) in overseeing the care of twelve (12) patients with gender dysphoria (Ex. B, at 28:15-20) for "comorbidities," like "depression or anxiety or trauma or personality disorders or whatever," by "trying to provide them skills and sort of basic coping mechanisms, self-regulation, all the standard things you provide to someone who has emotional dysregulation or behavioral problems or, you know, emotional problems, standard care." Ex. B, at 33:21-34:5. But as Dr. Kaliebe has acknowledged, "[p]roviding treatment for comorbidities doesn't necessarily address a patient's gender dysphoria." Ex. B, 35:10-16.

Case 4:23-cv-00325-RH-MAF    Document 139    Filed 04/07/23    Page 10 of 37

literature on gender dysphoria." *Kadel*, 2022 WL 3226731, at *9 (emphasis added).

Dr. Kaliebe "is not an endocrinologist, nor has he ever treated a patient with hormone

therapies." *Id.* at at *13; Ex. B, at 32:15-17 ("A. … nor are we involved with

providing hormones or those type of things."); *id.* at 138:24-139:4. In fact, Dr.

Kaliebe had to consult his wife, an adult endocrinologist, ahead of his deposition in

order to familiarize with the effects of puberty-delaying medications and hormone

therapy. Ex. B, at 12:24-13:11, 139:5-8. Thus, Dr. Kaliebe "is not qualified to render

opinions about … the efficacy of puberty blocking medication or hormone

treatments, the appropriate standard of informed consent for … endocrinologists."

*Kadel*, 2022 WL 3226731, at *13. Additionally, Dr. Kaliebe "is not a surgeon and

has no experience with surgery for gender dysphoria and, therefore, is not qualified

to testify to the risks associated with surgery or the standard of care used by surgeons

for obtaining informed consent for surgery." *Id.* at *9.

Moreover, Dr. Kaliebe is not qualified to opine on the diagnosis and treatment

of gender dysphoria in adults. During his deposition, Dr. Kaliebe acknowledged that

he "definitely ha[s] more expertise and more experience in child psychiatry" and that

"would be more where I'm comfortable." Ex. B, at 44:16-17, 45:1. While Dr.

Kaliebe "was asked to review and opine generally," he "did [his] best to try to catch

up on adult literature and know more about adult issues." Ex. B, at 44:21-22. But

8

that is not enough. *See* Ex. B, at 86:1-2 ("And I will admit that I know less about and am less up to date everything about adult transgender care.").

Dr. Kaliebe "is also not qualified to opine on the efficacy of randomized clinical trials, cohort studies, or other longitudinal, epidemiological, or statistical studies of gender dysphoria." *Kadel*, 2022 WL 3226731, at *13; *see, e.g.*, Ex. A, at ¶¶ 47, 163, 164. "He is not a statistician or epidemiologist, and there is no evidence in his report or deposition that he has any experience, specialized training, or knowledge about crafting a research study, analyzing data, or conducting a clinical trial." *Id.* A psychiatrist "with little to no research experience is not qualified to opine on the veracity of statistical studies." *Id.*

In large part, Dr. Kaliebe bases his opinions on his review of other people's scholarship—in fact, on non-primary sources, those being non-peer reviewed reports about the scientific literature. But "[m]erely reading literature in a scientific field does not qualify a witness—even an educated witness—as an expert." *Kadel*, 2022 WL 3226731, at *9; *see also Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002) ("The *Daubert* test must be applied with due regard for the specialization of modern science. A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science."). Indeed, this is precisely the sort of "generalized knowledge of a particular subject" that courts have rejected as a qualification under

9

Case 4:23-cv-00325-RH-MAF   Document 139   Filed 04/07/23   Page 12 of 37

Rule 702. As with the disqualified expert in *Lebron* who "reached his opinion instead by relying on studies," this is not a sufficient qualification to serve as an expert witness. 772 F.3d at 1369.

Nor can Dr. Kaliebe claim to be qualified based on his conversations with the twelve (12) transgender minor patients, to whom he has provided no treatment for gender dysphoria and only supervised others' psychotherapeutic care of the patients. Such "reliance on anecdotal evidence" is a "red flag[] that caution[s] against certifying an expert." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012).

Moreover, Dr. Kaliebe, who opines at length about the development of clinical practice guidelines by WPATH and the Endocrine Society (*see, e.g.*, Ex. A, at ¶¶ 62-63; Ex. C, at ¶¶ 19-26, 31-33), admits he is not an expert on the development of clinical practice guidelines. Ex. B, at 101:3-10; s*ee Solaia Tech. LLC v. ArvinMeritor, Inc.*, 361 F.Supp.2d 797, 813–14 (N.D. Ill. 2005) (finding expert was not qualified "to testify about areas in which he has admitted he has no expertise"); *accord Lifewise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (affirming trial court's ruling that purported expert could not testify where the court noted, inter alia, that witness admitted that he was not expert in areas pertinent to damages modeling). And Dr. Kaliebe does not profess any training or experience on the development of clinical practice guidelines.

10

Case 4:23-cv-00325-RH-MAF    Document 139    Filed 04/07/23    Page 13 of 37

The Court should find that Dr. Kaliebe is not qualified to testify about gender dysphoria and its treatment, the conduct and efficacy of scientific studies and the weighing of these, and the promulgation of clinical practice guidelines. At most, based on his purported experience diagnosing twelve (12) patients with gender dysphoria over his career, Dr. Kaliebe could testify to the diagnosis of gender dysphoria in children and adolescents.

**II.    Reliability – Dr. Kaliebe's opinions and testimony are unreliable.**

An expert's testimony should only be admitted if it is sufficiently reliable. The requirement of reliability found in Rule 702 is "the centerpiece of any determination of admissibility." *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002). "To meet the reliability requirement, an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue." *In re 3M Combat Arms Earplug Products Liab. Litig.*, 3:19MD2885, 2022 WL 1262203, at *1 (N.D. Fla. Apr. 28, 2022). It must be based on "good grounds," *Daubert,* 509 U.S. at 590, and cannot be based on "leaps of faith." *Rider*, 295 F.3d at 1202.

Thus, when determining the reliability of proposed expert testimony, courts "consider, to the extent possible: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4)

11

Case 4:23-cv-00325-RH-MAF    Document 139    Filed 04/07/23    Page 14 of 37

whether the technique is generally accepted in the scientific community." *Quiet Tech.*, 326 F.3d at 1341. Other factors which may be relevant include (1) the nature of the field of claimed expertise, (2) the source of the expert's knowledge, (3) the expert's level of care in using the knowledge, and (4) the expert's consideration of alternative hypotheses. *See Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 578-79 (N.D. Fla. 2009), *aff'd sub nom. Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183 (11th Cir. 2010).

"At this stage, the court must undertake an independent analysis of each step in the logic leading to the expert's conclusions; if the analysis is deemed unreliable at any step the expert's entire opinion must be excluded." *Id.* at 578. And "proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig. (No II) MDL 2502*, 892 F.3d 624, 632 (4th Cir. 2018).

Here, Dr. Kaliebe's report, testimony, and opinions fail all indicia of reliability. Dr. Kaliebe's proffered opinions are based on nothing more than speculation, "untested" theories, uncorroborated anecdotes, and assumptions that are obsolete, flawed, unethical, or expressed opinions based upon "unsettled science." What is more, some of his opinions are patently false.

12

> A. *Dr. Kaliebe's opinions are unreliable because they are based on unsupported premises, untested hypotheses, and speculation.*

"While hypothesis is essential in the scientific community because it leads to advances in science, speculation in the courtroom cannot aid the fact finder in making a determination." *Dunn v. Sandoz Pharms. Corp.*, 275 F.Supp.2d 672, 684 (M.D.N.C. 2003). "[T]he courtroom is not the place for scientific guesswork, even of the inspired sort." *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996). Indeed, such "speculation is unreliable evidence and is inadmissible." *Dunn*, 275 F.Supp.2d at 684. "Where an expert's opinion testimony is founded on an unsupported premise, it gives rise to an inference that is based on speculation and has no evidentiary value." *Walker v. Blitz USA, Inc.*, 663 F.Supp.2d 1344, 1364 (N.D. Ga. 2009).

Here, several of Dr. Kaliebe's opinions are based on speculation, unsupported premises, or mere guesswork. Take the following examples:

**One.** Dr. Kaliebe opines that "Significant evidence points to a spread of ideology combined with technologically induced contagion effects leading the recent increase in gender dysphoria." Ex. A, at ¶ 4(e); *id.* at ¶¶ 30, 39-41. But Dr.

Kaliebe admits there is no evidence to support this opinion,[3] rather, in his words, "We are all *hypothesizing*, obviously." Ex. B, at 58:23-59:3 (emphasis added).[4]

    ***Two.*** Dr. Kaliebe repeatedly opines about a purported failure of the scientific and medical community to study what he calls "body affirmation" as a psychotherapeutic approach to treatment. Ex. A, at ¶ 66(a) ("SOC 8 makes no analysis of privileging gender affirmation over body affirmation."); Ex. C, at ¶ 12 ("Body positivity and body acceptance are laudable goals and should be compared against the use of hormones and surgeries in order to determine which is a more effective and humane treatment."), *id.* at ¶ 13 ("Further research may well find psychotherapies or mind-body approaches with better results than gender affirmation through hormones and surgery."). However, Dr. Kaliebe cites no literature—none—in support this hypothetical treatment modality he repeatedly proposes. In fact, he concedes there is no literature at all to support this hypothetical approach to therapy. Ex. B, at 111:20-21; Ex. C, at ¶ 13. In other words, it is a hypothesis built upon unsupported premises.

---

[3] For example, the literature to which Dr. Kaliebe cites to support his opinion does not relate to gender dysphoria, Ex. B, at 58:8-11, and the Littman article to which he cites "actually doesn't reach any conclusions as to social contagions," but rather "at best … raises hypotheses," Ex. B, at 71:15-18.

[4] To the extent Dr. Kaliebe points to two unscientific polls of the attendees to two conference panel sessions and a single personal anecdote, such evidence has no indicia of reliability. *See* Section II.C, *infra*.

14

Case 4:23-cv-00325-RH-MAF    Document 139    Filed 04/07/23    Page 17 of 37

Upon questioning, Dr. Kaliebe clarified that what he refers to as "body affirmation" has nothing to do with treating gender dysphoria or resolving a person's incongruence. At his deposition, Dr. Kaliebe explained that what he terms "body affirmation" "is purely about [a person] being comfortable with their body," such that "somebody that identifies as female" would be "completely comfortable with their stereotypically male body, notwithstanding that they identify as female." Ex. B, at 111:11-17. However, upon questioning Dr. Kaliebe admits that "part of somebody's gender dysphoria [is] the distress associated with that incongruence due in part to how they are perceived by others in the world." Ex. B, at 113:1-5. It is thus unclear how his hypothetical approach would treat gender dysphoria.

Indeed, Dr. Kaliebe posits that "if we could help people become more comfortable in the body that they are in, you know, perhaps, that would mean that they could be somewhat more comfortable and *maybe the gender dysphoria never goes away*, but we might be able to help them with their depression or anxiety or self-harm or other things." Ex. B, at 113:6-11 (emphasis added). But again, Dr. Kaliebe cites to nothing in support of this hypothetical, and until now unheard of, approach to treating gender dysphoria.

**Three.**  Dr. Kaliebe repeatedly makes broad assertions that "in private, but not in public, most psychiatrists will acknowledge their doubts regarding affirmative care," Ex. A, at ¶ 123; "[m]ost psychiatrists are willing to admit we don't have

15

Case 4:23-cv-00325-RH-MAF   Document 139   Filed 04/07/23   Page 18 of 37

enough research to really know how to proceed," *id.*; and "[m]ost physicians have doubts about a gender medicine," Ex. C, at ¶ 36. However, Dr. Kaliebe fails to cite to any study, literature, or evidence in support of such broad assertions in every instance in which he makes them. Instead, Dr. Kaliebe bases these opinions on a few conversations he has had and then extrapolates them to the population of physicians and psychiatrists at large. *See, e.g.*, Ex. B, at 60:17-61:6, 63:19-64:4, 127:8-10, 146:10-25. But when Dr. Kaliebe's opinions are based on a select few anecdotes, it is a circumstance where "there is simply too great an analytical gap between the data and the opinion proffered," such that the expert testimony must be excluded. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 144 (1997).

**Four.**  Dr. Kaliebe suggests that cognitive behavioral therapy (CBT) or yoga could be effective modes of psychotherapy for gender dysphoria. Ex. A, at ¶¶ 136, 142. But he admits he does not know if CBT could be effective to treat gender dysphoria (it cannot), because according to him it has not been studied. Ex. B, 152:7-22. Likewise, Dr. Kaliebe admits there are no studies on yoga as treatment of any mental health conditions, let alone gender dysphoria. Ex. B, at 164:21-165:9, 166:5-11. Such speculative opinions are wholly unreliable.

Similarly, Dr. Kaliebe suggests that "more specific and nuanced approaches for gender dysphoria exist," such as gender exploratory therapy. Ex. A, at ¶ 137 (citing to https://genderexploratory.com/). However, not only does he not cite to any

Case 4:23-cv-00325-RH-MAF   Document 139   Filed 04/07/23   Page 19 of 37

literature in support for this modality of treatment, but he admits that there is no evidence that gender exploratory therapy is safe or effective. Ex. B, at 159:2-4. Again, his opinion about gender exploratory therapy is speculative, at best.[5]

**Five.** Dr. Kaliebe opines in his rebuttal report that "[i]n childhood, most gender dysphoria spontaneously resolves without treatment." Ex. C, at ¶ 16. He provides no citation or evidence for this opinion, making it an unsupported premise that should be excluded as unreliable.

**Six.** Dr. Kaliebe opines that "it is clear the SOC 8 guidelines are at odds with the stated policies of most countries." Ex. C, at ¶ 6. He provides no citation or support for this extremely broad statement. What is more, he concedes he has no awareness "of which countries have adopted SOC 8." *Id.* The Court should reject this wholly unsupported opinion as unreliable.

**Seven.** Dr. Kaliebe's opinions about the innerworkings of WPATH or the motivations and opinions of its membership is wholly speculative and unreliable. *See*, *e.g.*, Ex. C, at ¶¶ 3-4. The same holds true for his criticisms of the Endocrine

---

[5] "Whereas gender-affirmative approaches follow the client's lead when it comes to gender, gender-exploratory therapy discourages gender affirmation in favor of exploring through talk therapy the potential pathological roots of youths' trans identities or gender dysphoria." Ex. D, at 472. "The surge of gender-exploratory therapy coincides with ongoing attempts to criminalize gender-affirming care for trans youths, sometimes masquerading as a compromise between gender-affirmative care and conversion practices and at other times functioning as the intellectual arm of political movements calling for the criminalization of gender-affirming care." *Id.* at 473.

Society. *E.g.*, Ex. A, at ¶ 105 ("While I have little direct experience with the Endocrine Society, my assessment is that many endocrinologists, and perhaps most, also believe their professional organization is also too strongly influenced by activist physicians."). Dr. Kaliebe has no experience with these organizations upon which to base his criticisms. "He is therefore not qualified to testify about the credibility of those organizations." *Kadel*, 2022 WL 3226731, at *10. Indeed, Dr. Kaliebe can "not offer[] any reliable testimony on this subject that will help the trier of fact." *Id.*

\*        \*        \*

Dr. Kaliebe lacks knowledge "of facts which enable him to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988). Indeed, much of Dr. Kaliebe's testimony and opinions "appears to be based more on supposition than science." *O'Neill v. Windshire-Copeland Assocs.*, 372 F.3d 281, 285 (4th Cir. 2004). And opinions based on "subjective belief or unsupported speculation" should be rejected. *Daubert*, 509 U.S. at 589-590.

## B. *Dr. Kaliebe's opinions are unreliable because they are misleading, employ flawed methodologies, and do not serve to enlighten the trier of fact.*

In addition, many of Dr. Kaliebe's opinions are misleading at best, or flat out false. Take the following examples:

***One.*** Dr. Kaliebe spends much ink criticizing the development of the WPATH Standards of Care, Version 7 and Version 8. Dr. Kaliebe does so by quoting

Case 4:23-cv-00325-RH-MAF   Document 139   Filed 04/07/23   Page 21 of 37

and repeating criticisms made by others. *See*, *e.g.*, Ex. A, at ¶¶ 62-63; Ex. C, at ¶¶ 19-26, 31-33. But these criticisms are unreliable for, at least, two independent reasons.

First, Dr. Kaliebe admits that he is not an expert in the development of clinical practice guidelines. Ex. B, at 101:3-10. And an expert, "however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty." *Dura Auto. Sys.*, 285 F.3d at 614. Indeed, because Dr. Kaliebe is not qualified "to testify about areas in which he has admitted he has no expertise," such testimony is unreliable. *Solaia Tech.*, 361 F.Supp.2d at 813–14.

Second, while an expert may properly rely on the opinion of another expert, an expert cannot simply repeat or adopt the findings of other experts without investigating them. *See In re Polypropylene Carpet Antitrust Litig.*, 93 F.Supp.2d 1348, 1357 (N.D. Ga. 2000) (citing *In re TMI Litig.*, 193 F.3d 613, 715–16 (3d Cir. 1999) (finding blind reliance by expert on other expert opinions demonstrates flawed methodology under *Daubert*); *TK–7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732–33 (10th Cir. 1993) (excluding expert opinion relying on another expert's report because witness failed to demonstrate a basis for concluding report was reliable and showed no familiarity with methods and reasons underlying the hearsay report)).

***Two.*** Dr. Kaliebe opines throughout his reports on the efficacy of gender-affirming medical treatment. However, Dr. Kaliebe does not discuss any single

19

original, peer-reviewed study in detail and in fact, only cites four original studies in the references for his original report. *See* Ex. B, at 88:2-22; Ex. A, at 69-75. Specifically, he cites to four studies Branstrom, et al. (2020), Chen, et al. (2023), Dhejne, et al. (2011), and Kaltiala, et al. (2020). However, the universe of original peer-review research looking into the safety and effectiveness of gender-affirming medical treatments is orders of magnitude larger.

For example, a systematic literature review of peer-reviewed studies published in English between 1991 and 2017 looked at 56 original peer-reviewed studies into whether gender transition, including medical treatments such as hormone therapy and surgeries, improves the overall well-being of transgender adults. *See* Exs. E and F.[6] Similarly, a review from 1998 looked at data from 80 studies spanning 30 years. Ex. G (Expert Report of Johanna Olson-Kennedy, M.D., M.S.), at ¶ 44. In other words, *a meta-analysis review from 25 years looked at 20 times the number of studies that Dr. Kaliebe reviewed for his report*. There is likewise a multitude of original peer-reviewed studies looking into the effect of gender-affirming medical treatment on the mental health and well-being of transgender adolescents with gender dysphoria. *See, e.g.*, Ex. G, at ¶¶ 25-30, 33-39,

---

[6] Though not relevant for purposes of this Motion to Exclude, it is worth noting that this systematic literature review "found a robust international consensus in the peer-reviewed literature that gender transition, including medical treatments such as hormone therapy and surgeries, improves the overall well-being of transgender individuals." Ex. E.

Case 4:23-cv-00325-RH-MAF  Document 139  Filed 04/07/23  Page 23 of 37

46 (discussing over 13 original peer-reviewed studies looking specifically at transgender adolescents); Ex. H (Expert Report of Daniel Shumer), at ¶¶ 82, 86 (discussing over 15 original peer-reviewed studies looking specifically at transgender adolescents); Ex. I (discussing 16 original peer-reviewed studies examining the impacts of gender-affirming medical care for transgender adolescents).

Plaintiffs do not point to the aforementioned vast expanse of scientific literature to argue the merits of Dr. Kaliebe's opinions (as wrong as they are), but to illustrate the lack of reliability of Dr. Kaliebe's opinions based on his methodology (or lack thereof). Dr. Kaliebe is unfamiliar with and does not reference—let alone, discuss—the original peer-reviewed studies that he criticizes. Rather, Dr. Kaliebe parrots the criticisms of others. His references are primarily opinion pieces and literature reviews by others, not original peer-reviewed studies. *See generally* Ex. A, at 69-75. But Dr. Kaliebe cannot serve as a mouthpiece for others. His criticisms of the scientific evidence supporting gender-affirming medical care must be based on his own review of that evidence. The fact that Dr. Kaliebe is unfamiliar with the expansive universe of literature at issue here demonstrates the lack of reliability for his opinions about the effectiveness of gender-affirming medical care.

***Three.***  Dr. Kaliebe disputes that gender identity has a biological basis. He cites to an article by Marianowicz-Szczygiel (2022) outlining an apparent rise of

21

people presenting to gender clinics and an article by Littman (2018) discussing the perceptions of the non-affirming parents of transgender adolescents. Ex. C, at ¶ 10. But neither article disputes there is a biological basis for gender identity. For example, Dr. Kaliebe conceded that "the fact that more people have been showing up at clinics could be explained by the fact that, A, the care is more available; and, B, more people feel comfortable seeking the care." Ex. B, at 54:5-10. And Dr. Kaliebe conceded that the Littman article, given its multiple limitations, could not reach any conclusions regarding social contagion and, at most, raised hypotheses. Ex. B, at 71:16-18. What is more, scientific, peer-reviewed literature that Dr. Kaliebe has encountered shows the opposite, namely, that "there is empirical evidence that there is a biological basis for a person's gender identity." Ex. J; *see also* Ex. B, at 150:17 ("A. I've seen it cited.").

Dr. Kaliebe's opinions about whether there is a biological basis for gender identity are unreliable because (a) he employed a flawed methodology that omitted discussion of existing, on point peer-reviewed scientific literature, and (b) his opinions are based on unproven hypotheses and not any data. While usually the factual basis of an expert opinion goes to credibility, "it is possible for an experts' omission of articles to render his or her opinion inadmissible on reliability grounds." *Huggins v. Stryker Corp.*, 932 F.Supp.2d 972, 994 (D. Minn. 2013). Such is the case

22

Case 4:23-cv-00325-RH-MAF   Document 139   Filed 04/07/23   Page 25 of 37

here where Dr. Kaliebe omits key information, or worse, misrepresents facts that if properly disclosed would contradict his opinions and undermine their foundation.

*     *     *

The Court "must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Here, Dr. Kaliebe has employed flawed methodologies and misrepresented or omitted information that goes to the heart of his opinions, all of which calls into question the reliability of his opinions. In such circumstances, the "potential to mislead" rather "than to enlighten" is too great. *In re Lipitor*, 892 F.3d at 632.

### C. *Dr. Kaliebe's opinions are unreliable because they are based on facts or data not typically relied on by physician or scientists.*

Rule 703 requires that "[t]he facts or data … upon which an expert bases an opinion or inference" must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703.

**One.**  Based on his alleged "review of the research," Dr. Kaliebe opines "that the evidence base for gender dysphoria treatment is mixed and generally low quality." Ex. A, at ¶ 45. However, Dr. Kaliebe bases his opinions on his review of reports of government entities in Finland, Sweden, and the United Kingdom, as well as the GAPMS Report. Ex. B, at 86:25-87:8. But, as Dr. Kaliebe acknowledges, none of those are published, peer-reviewed literature. *Id.*; *see also* Ex. B, at 99:17-25. And

23

Case 4:23-cv-00325-RH-MAF    Document 139    Filed 04/07/23    Page 26 of 37

such unpublished, non-peer-reviewed reports *are not* the types of materials reasonably relied upon by experts in any field of medicine. When asked what actual peer-reviewed, original studies he reviewed, he could not identify any and his original report cites to only four (4) original studies (none of which relate to the provision of puberty-delaying medications as treatment for an adolescent's gender dysphoria). Ex. B, at 86:21-88:22.

**Two.** As noted above, Dr. Kaliebe *hypothesizes* that "direct social influences and online and social media contagion" are "major contributors" to a rise in gender dysphoria. *E.g.*, Ex. A, at ¶ 30; *see also id.* at ¶¶ 40, 41. However, he points to no *reliable* evidence to support his *hypothesis* (which itself is an unreliable basis for an expert opinion, *see* Section II.A, *supra*). For example, Dr. Kaliebe points to a single case anecdote in support for his hypothesis. Ex. B, 59:13-16. But such "anecdotal information … is scientifically unreliable and not supported by any … scientifically reliable studies." *Soldo v. Sandoz Pharms. Corp.*, 244 F.Supp.2d 434, 571 (W.D. Pa. 2003);[7] *see also McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1252, 1253-54 (11th Cir. 2005).

In addition, Dr. Kaliebe relies on two non-published, non-peer-reviewed, unscientific polls of the attendees of two conference panel sessions to support his

---

[7] In *Soldo*, the excluded expert's testimony was based on anecdotal evidence contained *in published case reports*. Here, Dr. Kaliebe has not even attempted to publish his anecdotal evidence as a case report.

24

Case 4:23-cv-00325-RH-MAF Document 139 Filed 04/07/23 Page 27 of 37

opinion that "Psychiatrists also believe social media has significantly contributed to the rise in gender dysphoria." Ex. A, at ¶ 41; *see also id.* at ¶¶ 42-43. Dr. Kaliebe admits that he did not do any regression or statistical significance analysis regarding these polls, Ex. B, at 66:15-19, and that all the polls tell us "is the views of the attendees of that particular seminar." Ex. B, at 67:1-4. Indeed, there are about 45,000 psychiatrists in the United States, Ex. B, at 63:15-18, and as Dr. Kaliebe admits his "conversations are not a representative sample of all childhood adolescent psychiatrists." Ex. B, at 64:8-11.

Dr. Kaliebe also cites as a support a *press release* from the French Academies, Ex. A, at ¶ 40, but admits that "a press release is not peer-reviewed or scientific literature." Ex. B, at 68:7-13.

Of course, it should be noted that, as Dr. Kaliebe admits, "it is not shocking that teens find like-minded teens online and they speak to each other about their similar experiences," and "that, in particular, small populations that tend to be isolated and/or discrete tend to turn to social media actually as a way to connect and find one another." Ex. B, at 67:21-68:6.

In sum, none of the sources upon which Dr. Kaliebe relies for his opinions are of reliable or of the type upon which any serious physician or scientist would rely on.

***Three.*** Dr. Kaliebe also spends much ink discussing the apparent politicized nature of conversations surrounding the treatment of gender dysphoria and *hypothesizes* that such politicization and moralization has led to the silencing of contrary views. *See, e.g.,* Ex. A, at ¶¶ 71-89 (discussing apparent "lack of consensus"); *id.* at ¶¶ 90-124 (discussing "breakdown in scholarly dialogue"). Dr. Kaliebe bases these opinions on conjecture and anecdotes he has purportedly collected based on a few conversations. However, neither of these are the type of "facts or data" other experts in psychiatry or medicine "would reasonably rely on … in forming an opinion in the subject." Fed. R. Evid. 703. Indeed, "broad opinions [that] are based solely on … generalized views, anecdotal accounts, and speculation … are not reliable." *In re 3M*, 2021 WL 684183, at *3 (N.D. Fla. Feb. 11, 2021). Similarly, opinions "based on mere conjecture, assumption, credibility calls, and amounting to no more than ipse dixit" are "neither reliable nor helpful." *Day v. Edenfield*, 2022 WL 972430, at *10 (N.D. Fla. Mar. 31, 2022).

What is more, in some instances, some of these opinions are demonstrably false. For example, Dr. Kaliebe states that "skeptical voices have been difficult to find within any of the journals of the Endocrine Society, American Academy of Pediatrics, American Psychiatric Association or American Academy of Child and Adolescent Psychiatry" and that he "ha[s] not found a single skeptical or even ideologically balanced article in any of these journals." Ex. A, at ¶ 82. But

notwithstanding that Dr Kaliebe was aware of two letters to the editor published in the *Journal of the Endocrine Society* that were critical of gender-affirming medical care, he still made the false statement.[8] *See* Ex. B, at 131:15-132:13.

In sum, none of Dr. Kaliebe's "opinions" about the politicized nature of the debate surrounding transgender issues and the treatment of gender dysphoria are medical or scientific opinions. They do not require "the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Frazier*, 387 F.3d at 1260. To the contrary, they are at best personal opinions and gripes with those with whom he disagrees. They are both unreliable and irrelevant, and at times, outright false. Allowing Dr. Kaliebe to testify "based on limited personal accounts and information relayed to [him] by an unspecified number of third parties would be to sanction [his] use as a vehicle for introducing hearsay testimony." *In re 3M*, 2021 WL 684183, at *2.

\* \* \*

Dr. Kaliebe's opinions are thus "unsupported by reliable principles and methods and lack[s] hallmarks of scientific rigor: peer-reviewed research, studies, or experiments in support of his opinions." *United States v. Geanakos*, 2017 WL 4883294, at *3 (E.D. Cal. Oct. 30, 2017).

---

[8] To be sure, neither of these two letters were based on original research or were peer-reviewed.

27

Case 4:23-cv-00325-RH-MAF    Document 139    Filed 04/07/23    Page 30 of 37

D. *Dr. Kaliebe's opinions are unreliable because they are not generally accepted in the scientific and medical community.*

General acceptance in the relevant scientific community is also relevant to the reliability inquiry. *Nease*, 848 F.3d at 229. Not only is widespread acceptance an important factor in assessing the reliability of an expert's opinions, but the fact that a known technique or theory "has been able to attract only minimal support within the community may properly be viewed with skepticism." *Daubert*, 509 U.S. at 594. Here, Dr. Kaliebe's opinions are outside the mainstream of medical and scientific opinion and have been explicitly rejected by these relevant communities.

The provision of gender-affirming medical care has been accepted and endorsed, *inter alia*, by the: American Medical Association; American Psychiatric Association; American Psychological Association; Endocrine Society; Pediatric Endocrine Society; American Academy of Pediatrics; and the National Academies of Science, Engineering, and Medicine. *See* Ex. K at 361.

In fact, another federal district court found as much when it enjoined Arkansas' state law seeking to ban gender-confirming treatment for minors. *See Brandt v. Rutledge*, 551 F.Supp.3d 882 (E.D. Ark. 2021), *aff'd*, 47 F.4th 661 (8th Cir. 2022). In doing so, the *Brandt* court explicitly found that: (a) "Gender-affirming treatment is *supported by medical evidence* that has been *subject to rigorous study*;" and (b) "*Every major expert medical association* recognizes that gender-affirming care for transgender minors may be *medically appropriate and necessary* to improve

28

the physical and mental health of transgender people." *Id.* at 891 (emphasis added). The *Brandt* court's findings stand as a stark repudiation of Dr. Kaliebe's opinion that the provision of gender-affirming medical care to adolescents with gender dysphoria is an "experiment," for which "there is clearly no consensus of opinion." Ex. A, at ¶¶ 11, 21-22.

*   *   *

Given that Dr. Kaliebe's opinions fail to meet the most basic indicia of reliability, the Court should exclude Dr. Kaliebe's opinions and testimony as unreliable.

### III. Helpfulness – Dr. Kaliebe's opinions and testimony are not relevant to this case.

Helpfulness "goes primarily to relevance." *Daubert*, 509 U.S. at 580; *see also Prosper v. Martin*, 989 F.3d 1242, 1249 (11th Cir. 2021) ("The touchstone of this inquiry is the concept of relevance."). Under the helpfulness prong, the "court must satisfy itself that the proffered testimony is relevant to the issue at hand, for that is a precondition to admissibility." *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 282 (4th Cir. 2021) (cleaned up). Relevant expert testimony "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004). Thus, "expert testimony which does not relate to any issue in the case is not relevant and non-

Case 4:23-cv-00325-RH-MAF   Document 139   Filed 04/07/23   Page 32 of 37

helpful." *Knight v. Boehringer Ingelheim Pharms., Inc.*, 323 F.Supp.3d 837, 846 (S.D. W.Va. 2018).

In order to be relevant, an opinion needs to "fit" with the facts at issue. *Simmons v. Augusta Aviation, Inc.*, 596 F.Supp.3d 1363, 1374 (S.D. Ga. 2022) "To satisfy this requirement, the testimony must concern matters beyond the understanding of the average lay person and logically advance a material aspect of the proponent's case." *Id.* Testimony that "offers nothing more than what lawyers for the parties can argue in closing arguments" or that consists of "subjective portrayals of factual information" "generally will not help the trier of fact." *Giusto v. Int'l Paper Co.*, 2021 WL 3603374, at *4 (N.D. Ga. Aug. 13, 2021).

This case is about whether Defendants' exclusion of coverage for medical treatments for gender dysphoria violates Plaintiffs' rights under the equal protection clause, Section 1557 of the Affordable Care Act, and the Medicaid Act. Dr. Kaliebe's opinions are not relevant to this inquiry as they will not help the trier of fact to understand the evidence or to determine a fact in issue. His opinions do not "fit" because they are not sufficiently tied to the facts of the case so that they will aid a factfinder.

A. *Dr. Kaliebe's opinions about "desistance" are irrelevant.*

Dr. Kaliebe's opinion that "[i]n childhood, most gender dysphoria spontaneously resolves without treatment" is wholly irrelevant. Ex. C, ¶ 16. But no

medical or surgical treatment is recommended or provided to *prepubertal* children. And this case is about the coverage for medical treatment for gender dysphoria. Dr. Kaliebe's (unsupported) opinions about "spontaneous desistance" are thus irrelevant to this case.[9]

> B. *Dr. Kaliebe's opinions about supposed controversies in other countries are irrelevant.*

Likewise, Dr. Kaliebe's opinions about "controversies" regarding the provision of medical treatment for gender dysphoria in other countries, such as Finland, Sweden, and the United Kingdom, are both misleading and wholly irrelevant. *See, e.g.,* Ex. A, at ¶¶ 49-60, 160, 161. Dr. Kaliebe failed to disclose that each of these countries *provides and covers* gender-affirming hormonal and surgical treatment for gender dysphoria for adolescents in certain circumstances and adults, without any restriction, whereas Defendants exclude coverage for treatments for both these populations categorically. *See, e.g.,* Ex. B, at 100:17-101:2; Ex. L; *see also Brandt*, 47 F.4th at 671; *Eknes-Tucker v. Marshall*, 603 F.Supp.3d 1131, 1146 (M.D. Ala. 2022) ("According to Dr. Cantor, Defendants' own expert witness, no state or country in the entire world has enacted a blanket ban of these medications other than Alabama.").

---

[9] These opinions are methodologically flawed and unreliable because Dr. Kaliebe cites to no authority and provides no basis for his opinion.

Case 4:23-cv-00325-RH-MAF    Document 139    Filed 04/07/23    Page 34 of 37

Moreover, each of the reports and reviews of the provision of gender-affirming care in these three countries pertained to medical care for minors and not adults, unlike the Challenged Exclusion. Ex. B, at 100:1-16.

In the end, how care is provided and covered in countries with nationalized health care systems is not relevant to whether coverage of gender-affirming medical care should be provided by Medicaid in Florida.[10]

> C. _Dr. Kaliebe's musings about the causes of gender dysphoria are irrelevant._

As noted above, Dr. Kaliebe *hypothesizes*, without any evidence, that gender dysphoria *may be* caused by social contagion and social pressure. But whether gender dysphoria is caused by social contagion is both wholly unsupported, as described above, and irrelevant to the case at hand. It is undisputed that gender dysphoria is a recognized medical condition that necessitates treatment. *See, e.g.*, Ex. B, at 34:9-11 ("Q. … Would you agree with me that gender dysphoria is a very real condition?  A. Yes."); *see also Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 594-95 (4th Cir. 2020); *Eknes-Tucker*, 603 F.Supp.3d at 1138 ("Gender dysphoria is a clinically diagnosed incongruence between one's gender identity and assigned gender. If untreated, gender dysphoria may cause or lead to anxiety,

---

[10] For example, in Sweden standards of care are developed through legislation and thus part of a political process. *See* Socialstyrelsen, *About the National Board of Health and Welfare*, https://www.socialstyrelsen.se/en/about-us/ (accessed Apr. 7, 2023) (noting that standards are based on legislation).

Case 4:23-cv-00325-RH-MAF    Document 139    Filed 04/07/23    Page 35 of 37

depression, eating disorders, substance abuse, self-harm, and suicide." (citations omitted)).

*   *   *

The opinions expressed by Dr. Kaliebe are insufficiently tied to the facts of this case so that they will aid a factfinder and should be excluded as irrelevant.

## IV.  Dr. Kaliebe's opinions lack probative value and are therefore inadmissible under Rule 403.

Finally, the Court should exclude Dr. Kaliebe's opinions because their introduction will result in unfair prejudice, confusion of the issues, or in misleading testimony. Fed. R. Evid. 403. Dr. Kaliebe offers no opinions relevant to the issues in this case, and, in any event, the opinions he offers are unfounded, speculative, and unreliable. The testimony would also result in prejudice, as the testimony seeks to sow confusion about the propriety of gender-confirming care based on speculation, irrelevant, misleading, or biased opinions.

<b><u>CONCLUSION</u></b>

For the foregoing reasons, the Court should exclude Dr. Kaliebe's report, opinions, and testimony. More specifically, at minimum, the Court should limit Dr. Kaliebe's opinions and testimony solely to those regarding the diagnosis of gender dysphoria in children and adolescents, and otherwise exclude Dr. Kaliebe's report, opinions, and testimony in full.

Dated this 7th day of April 2023.

33

Respectfully Submitted,

/s/ Omar Gonzalez-Pagan

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**

**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsbury.com
shani.rivaux@pillsbury.com

**William C. Miller***
**Gary J. Shaw***
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com

**Joe Little***
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**

**Abigail Coursolle***
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee***
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27541
(919) 968-6308
mckee@healthlaw.org

**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**

**Omar Gonzalez-Pagan***
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles***
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**FLORIDA HEALTH JUSTICE PROJECT**

**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

* *Admitted pro hac vice*

*Counsel for Plaintiffs*

34

## LOCAL RULE 7.1(B) CERTIFICATION

The undersigned certifies that he attempted in good faith to resolve the issues raised in this motion through a meaningful conference with Defendants' counsel, including through a meet and confer Zoom conference on April 6, 2023.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan
*Counsel for Plaintiffs*

## LOCAL RULE 7.1(F) WORD COUNT CERTIFICATION

As required by Local Rule 7.1(F), I certify that this Opposition contains 7,948 words.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of April 2023, a true copy of the foregoing has been filed with the Court utilizing its CM/ECF system, which will transmit a notice of electronic filing to counsel of record for all parties in this matter registered with the Court for this purpose.

*/s/ Omar Gonzalez-Pagan*
Omar Gonzalez-Pagan
*Counsel for Plaintiffs*

# TAB 141

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF
## FLORIDA
### Tallahassee Division

AUGUST DEKKER, *et al.*,

        *Plaintiffs*,

v.

        Case No. 4:22-cv-00325-RH-MAF

JASON WEIDA, *et al.*,

        *Defendants*.

---

## PLAINTIFFS' MOTION TO EXCLUDE EXPERT
## TESTIMONY OF STEPHEN B. LEVINE, M.D.

Now come, Plaintiffs, by and through their counsel, and respectfully move this Court to exclude the expert report, opinions, and testimony of Defendants' proposed expert, Stephen B. Levine, M.D., pursuant to Federal Rules of Civil Procedure 26 and 37, and Federal Rules of Evidence 104, 403, and 702.

Dr. Levine's opinions should be excluded because (1) many are unhelpful as they are not opposed to the relief Plaintiffs seek and (2) the remaining opinions are unreliable because they are not based on scientifically valid principles, reasoning, and methodology as required under Federal Rule of Evidence 702 and the standards set forth in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny. His opinions and testimony are likewise inadmissible because any

1

probative value they may have is substantially outweighed by the danger of unfair prejudice, confusion of the issues, waste of time, undue delay, and needless presentation of cumulative evidence. *See* Fed. R. Evid. 403.

Based on the unhelpfulness and unreliability of Dr. Levine's testimony and opinions, at minimum, the Court should exclude any portions of his expert report, opinions, and testimony that go beyond (1) identifying risks associated with prescribing medication and surgery to adolescents, (2) and criticizing the quality of the research on treatments for gender dysphoria.

A memorandum of law is filed contemporaneously herewith.

Dated this 7th day of April 2023.

Respectfully Submitted,

*/s/ Carl S. Charles*

**PILLSBURY WINTHROP SHAW PITTMAN, LLP**

**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsbury.com
shani.rivaux@pillsbury.com

**William C. Miller**\*
**Gary J. Shaw**\*
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com

**Joe Little**\*
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**

**Abigail Coursolle**\*
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee**\*
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27541
(919) 968-6308
mckee@healthlaw.org

**LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC.**

**Omar Gonzalez-Pagan**\*
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles**\*
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**
**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**FLORIDA HEALTH JUSTICE PROJECT**

**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059

\* *Admitted pro hac vice*

*Counsel for Plaintiffs*

3

## LOCAL RULE 7.1(B) CERTIFICATION

The undersigned certifies that Plaintiffs' counsel attempted in good faith to resolve the issues raised in this motion through a meaningful conference with Defendants' counsel, including through a meet and confer Zoom conference on April 6, 2023.

*/s/ Carl S. Charles*
Carl S. Charles
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of April 2023, a true copy of the foregoing has been filed with the Court utilizing its CM/ECF system, which will transmit a notice of electronic filing to counsel of record for all parties in this matter registered with the Court for this purpose.

*/s/ Carl S. Charles*
Carl S. Charles
*Counsel for Plaintiffs*

# TAB 145

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### Tallahassee Division

AUGUST DEKKER *et al.,*

               *Plaintiffs*,

        v.

JASON WEIDA, *et al.,*

               *Defendants*.

Case No. 4:22-cv-00325-RH MAF

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO EXCLUDE EXPERT TESTIMONY OF STEPHEN B. LEVINE, M.D.**

Case 4:22-cv-00325-RH-MAF    Document 145    Filed 04/07/23    Page 2 of 34

# TABLE OF CONTENTS

I.   INTRODUCTION ...................................................................................... 1

II.  LEGAL STANDARD ................................................................................ 2

III. ARGUMENT ............................................................................................. 6

   A.  Many Of Dr. Levine's Opinions Will Not Help the Trier of Fact Because
They Support Plaintiffs' Position. ........................................................... 8

   B.  Dr. Levine's Opinions That Do Not Support Plaintiffs' Position Are
Methodologically Unreliable and Scientifically Unsupported. ............ 12

     1.   Dr. Levine's Assertion that the WPATH SOC Version 8 Is Not the Widely
Accepted and Authoritative Protocol for the Treatment of Gender Dysphoria Is
Misleading and Unreliable Because It Is Demonstrably False ......................... 13

     2.   Dr. Levine's Opinions That Gender-Affirming Medical Care Is
Experimental, Is Provided Without Mental Health Assessments or Sufficiently
Informed Consent, and Is Without Lasting Benefit are Inaccurate and
Unsupported ..................................................................................................... 17

     3.   Dr. Levine's Opinions About Gender Dysphoria "Naturally Resolving" in
Children and Adolescents Are Not Based In Fact ............................................ 22

     4.   Dr. Levine's Assertion that "Rapid Onset Gender Dysphoria," as a Cause
of Gender Dysphoria or the Concept of "Detransition" Justifies Denying
Treatment to Florida Medicaid Beneficiaries Is Unsupported By Scientific
Evidence ........................................................................................................... 24

   C.  Dr. Levine Is Not Qualified To Offer Opinions About Puberty-Delaying
Treatment or the Treatment of Prepubertal Children Generally. ......... 27

   D.  Dr. Levine's Report, Opinions, and Testimony Lack Probative Value and
Are Thus Inadmissible Under Federal Rule Of Evidence 403. ........... 29

IV. CONCLUSION ....................................................................................... 30

Case 4:22-cv-00325-RH-MAF    Document 145    Filed 04/07/23    Page 3 of 34

## I.    INTRODUCTION

Plaintiffs are transgender Medicaid beneficiaries who have been diagnosed with gender dysphoria. In August 2022, Defendants adopted a rule, Florida Administrative Code 59G-1.050(7) (the "Challenged Exclusion"), prohibiting Medicaid coverage of services for the treatment of gender dysphoria. Defendants adopted the Challenged Exclusion after undergoing a process with a predetermined outcome that concluded that the provision of medical treatment for the treatment of gender dysphoria, including puberty blockers, hormone therapy, and surgery, "do not conform to GAPMS [("generally accepted professional medical standards")] and are experimental and investigational." Defendants thus deny equal treatment to Plaintiffs based on sex because they are transgender.

In response, Defendants have put forward an expert, Dr. Stephen Levine, a psychiatrist, whose opinions other federal courts have significantly narrowed, excluded in part, and in one case, dismissed altogether. The same is true here. Dr. Levine's opinions should be excluded because (1) many are unhelpful because they are not opposed to the relief Plaintiffs seek and (2) the remaining opinions are unreliable because they are not based on scientifically valid principles, reasoning, and methodology. The Court should therefore, with narrow exception, exclude Dr.

1

~~Case 4:22-cv-00325-RH-MAF    Document 145    Filed 04/07/23    Page 4 of 34~~

Levine's opinions.[1]

## II.    LEGAL STANDARD

The admission of expert testimony is governed by Federal Rule of Evidence 702, as explained by *Daubert* [v. *Merrell Dow Pharm.*, *Inc.*, 509 U.S. 579, 597 (1993)] and its progeny." *Rink* v. *Cheminova*, Inc., 400 F.3d 1286, 1291 (11th Cir. 2005). "District courts are [thus] charged with [a] gatekeeping function." *Id.*; see also *United States* v. *Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) ("The importance of *Daubert*'s gatekeeping requirement cannot be overstated."). In conducting their gatekeeping function, courts must "engage in a rigorous three-part inquiry and determine whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, at 1260; *see also City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998), *cert. denied*, 528 U.S. 812 (1999). The Eleventh Circuit refers to these three considerations separately as "qualification," "reliability," and "helpfulness" and has emphasized that they are "distinct concepts that courts and

---

[1] Excerpts of the Expert Disclosure of Stephen B. Levine, M.D., signed February 16, 2023, is attached as Exhibit A to the concurrently filed Declaration of Carl S. Charles ("Charles Decl.")

2

Case 4:22-cv-00325-RH-MAF   Document 145   Filed 04/07/23   Page 5 of 34

litigants must take care not to conflate." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003). "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." *Rink*, 400 F.3d at 1292.

To be sure, "[i]mplementing Rule 702, *Daubert* requires district courts to ensure that any and all scientific testimony or evidence admitted is both relevant and reliable." *Claire v. Fla. Dep't of Mgmt. Servs.*, 2021 WL 5982330, at *1 (N.D. Fla. Oct. 20, 2021). "[T]he trial judge must determine [this] ***at the outset***." *Daubert*, 509 U.S. at 592 (emphasis added). The court's gatekeeping role and the test for admissibility of expert testimony are applicable even at a bench trial or at the summary judgment stage. *See*, *e.g.*, *Rink v. Cheminova*, 400 F.3d 1286 (11th Cir.) (granting motions to exclude in the context of summary judgment); *Kadel v. Folwell*, 2022 WL 3226731, at **5-17 (M.D.N.C. Aug. 10, 2022) (same); *Lo v. United States*, 2022 WL 1014902, at *12 (W.D. Wash. Apr. 5, 2022) (excluding unqualified expert evidence in the context of a bench trial); *cf. UGI Sunbury*, 949 F.3d at 833 (holding the district court abused its discretion in a bench trial when it "ignored rule [702]'s clear mandate" by "sidestepping Rule 702 altogether and declining to perform any assessment of [expert]'s testimony before trial").

It is axiomatic that "[a] witness may be qualified as an expert by virtue of his 'knowledge, skill, experience, training, or education.'" *Quiet Technology DC-8, Inc.*,

3

Case 4:22-cv-00325-RH-MAF    Document 145    Filed 04/07/23    Page 6 of 34

326 F.3d at 1342. However, credentials are not dispositive when determining qualification. In conducting the *Daubert* inquiry, each of the three analytical prongs is assessed in reference to the matter to which the expert seeks to testify—i.e., "to the task at hand." *Daubert*, 509 U.S. at 597. It is for that reason that "expertise in one field does not qualify a witness to testify about others." *Lebron v. Sec'y of Fla. Dep't of Children & Families*, 772 F.3d 1352, 1368 (11th Cir. 2014) (holding that a psychiatrist was properly prevented from opining on rates of drug use in an economically vulnerable population because he had never conducted research on the subject, and instead relied on studies to form his opinion). If a proposed expert witness does not "propose to testify about matters growing naturally and directly out of research he had conducted independent of the litigation," such an expert should be disqualified. *Lebron*, 772 F.3d at 1369 (quoting Fed. R. Evid. 702 (cleaned up)).

An expert's testimony should only be admitted if it is sufficiently reliable. "To meet the reliability requirement, an expert's opinion must be based on scientifically valid principles, reasoning, and methodology that are properly applied to the facts at issue." *In re 3M Combat Arms Earplug Products Liab. Litig.*, 3:19MD2885, 2022 WL 1262203, at *1 (N.D. Fla. Apr. 28, 2022). The requirement of reliability found in Rule 702 is "the centerpiece of any determination of admissibility." *Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1197 (11th Cir. 2002). In making this determination the court can consider a variety of factors, including whether the

4

Case 4:22-cv-00325-RH-MAF    Document 145    Filed 04/07/23    Page 7 of 34

purported expert's theory has been tested, whether it has been subjected to peer review and publication, and whether the theory has been generally accepted in the scientific community. *See Daubert*, 509 U.S. at 593-94; *Rink*, 400 F.3d at 1291-92.[2] To be reliable the expert's testimony must always be based on "good grounds." *Daubert,* 509 U.S. at 590. Moreover, *Daubert* requires that reliable expert testimony be more than scientifically unsupported "leaps of faith." *Rider* v. *Sandoz Pharm. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002).

To satisfy the helpfulness requirement, the testimony must have a justified scientific relationship to the facts at issue. *Daubert*, 509 U.S. at 591. Thus, helpfulness, "goes primarily to relevance." *Id.* at 580. Relevant expert testimony "logically advances a material aspect of the proposing party's case" and "fits" the disputed facts. *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004). "The relationship must be an appropriate 'fit' with respect to the offered opinion and the facts of the case." *Id.* Expert testimony does not "fit" when there is "too great an analytical gap" between the facts and the opinion offered. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997) (offering animal studies showing one type of cancer in mice to establish causation of another type of cancer in humans is "simply too great

---

[2] Other factors that may be relevant include (1) the nature of the field of claimed expertise, (2) the source of the expert's knowledge, (3) the expert's level of care in using the knowledge, and (4) the expert's consideration of alternative hypotheses. *Hendrix*, 255 F.R.D. at 578-79.

5

Case 4:22-cv-00325-RH-MAF     Document 145     Filed 04/07/23     Page 8 of 34

an analytical gap between the data and the opinion offered"); *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir.2009) ("if an expert opinion does not have a 'valid scientific connection to the pertinent inquiry' it should be excluded because there is no 'fit.'").

Finally, because of the potentially misleading effect of expert evidence, *see Daubert*, 509 U.S. at 595, expert opinions that otherwise meet admissibility requirements may still be excluded under Fed. R. Evid. 403. Exclusion under Rule 403 is appropriate if the testimony is cumulative or needlessly time consuming. *See, e.g., Hull v. Merck & Co., Inc.*, 758 F.2d 1474, 1477 (11th Cir.1985) (admission of speculative and "potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in Fed. R. Evid. 702"); *Tran v. Toyota Motor Corp.*, 420 F.3d 1310, 1316 (11th Cir. 2005) (affirming exclusion of expert testimony as cumulative). Consequently, because "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it…[T]he judge in weighing possible prejudice against probative force under Rule 403…exercises *more* control over experts than over lay witnesses." *Daubert,* 509 U.S. at 595 (cleaned up) (emphasis added).

## III.   ARGUMENT

As noted above, other federal courts have narrowed, excluded, and in one case, entirely dismissed Dr. Levine's opinions about transgender people and the

Case 4:22-cv-00325-RH-MAF    Document 145    Filed 04/07/23    Page 9 of 34

treatment of gender dysphoria.[3] This began several years ago with district court's holding in *Norsworthy v. Beard*, that "the Court gives very little weight to the opinions of Levine, whose report misrepresents the Standards of Care; overwhelmingly relies on generalizations about gender dysphoric prisoners, rather than an individualized assessment of Norsworthy; contains illogical inferences; and admittedly includes references to a fabricated anecdote." 87 F. Supp. 3d 1164, 1188 (N.D. Cal. 2015). This holding was echoed in *Edmo v. Idaho Dep't of Corr.*, 358 F. Supp. 3d 1103, 1125-1126 (D. Idaho 2018) (holding that Dr. Levine "is considered an outlier in the field of gender dysphoria" and gave "virtually no weight" to his opinions), *vacated in part on other grounds sub nom. in Edmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019). Dr. Levine's opinions were likewise excluded in *Hecox v. Little,* where the Court dismissed his opinion that "gender-affirming policies … are … harmful to transgender individuals," and instead "accept[ed] Plaintiffs' evidence regarding the harm forcing transgender individuals to deny their gender identity can cause." 479 F. Supp. 3d 930, 977 n.33 (D. Idaho 2020).

Of most relevance to this case, several of Dr. Levine's proposed opinions were

---

[3] Because of the numerical limitation on the parties depositions, Plaintiffs opted not to depose Dr. Levine and instead rely on his prior deposition and trial testimony in cases similar to this one, where his expert reports and proffered opinions have been nearly identical to his report submitted here. *See Brandt et al.*, v. *Rutledge et al.* No. 4:21-cv-00450-JM (E.D. Ark., 2022); *Fain et al.*, v. *Crouch et al.*, No. CV 3:20-0740, 2022 WL 3051015 (S.D.W. Va. Aug. 2, 2022); *Kadel et al.,* v. *Folwell et al.*, No. 1:19CV272, 2022 WL 3226731 (M.D.N.C. Aug. 10, 2022).

7

excluded based on irrelevance and unreliable methodology by the U.S. District Court for the Middle District of North Carolina in *Kadel* v. *Folwell*, No. 1:19CV272, 2022 WL 3226731 (M.D.N.C. Aug. 10, 2022). Judge Loretta C. Biggs granted in part a motion to exclude Dr. Levine's testimony, noting that he would be limited to offering opinions primarily to the following matters: (1) identifying risks associated with prescribing medication and surgery to adolescents, (2) and criticizing the quality of the research on treatments for gender dysphoria.[4] At a minimum, Dr. Levine's proposed opinions in this matter should be so limited as well, with his remaining testimony, opinions and content of reports otherwise excluded.

### A. Many Of Dr. Levine's Opinions Will Not Help the Trier of Fact Because They Support Plaintiffs' Position.

Many of Dr. Levine's opinions do not "logically advance a material aspect *of the proposing party's case*" and do not "fit" the disputed facts because his proposed opinions do not oppose the relief Plaintiffs seek. *McDowell v. Brown*, 392 F.3d 1283, 1298-99 (11th Cir. 2004) (emphasis added). For that reason, Dr. Levine's opinions "fit" with the facts relevant to resolving this matter in favor of Plaintiffs' claims, not those of Defendants. *Id*. And even though several of Dr. Levine's opinions, and the clinical experience upon which they are based, do not stand in opposition to the relief

---

[4] The court in *Kadel* also found that Dr. Levine was permitted to testify as to his opinions of WPATH but for the reasons stated herein, infra, this Court should not so permit.

Case 4:23-cv-00325-RH-MAF    Document 145    Filed 04/07/23    Page 11 of 34

Plaintiffs seek, many do, and admitting this unreliable and unhelpful testimony wholesale would not meet the standard set forth by *Daubert* and its progeny.

Significantly, several of Dr. Levine's proposed opinions regarding gender-affirming medical care, and his clinical experience upon which those opinions are based, are not contrary to the relief Plaintiffs seek in this case: that Florida Medicaid beneficiaries diagnosed with gender dysphoria receive appropriate medical care. Charles Decl., Ex. A at ¶6. On November 28, 2022, Dr. Levine testified at length about his proposed opinions regarding gender-affirming care at the bench trial in *Brandt* v. *Rutledge,* No. 4:21-cv-00450-JM (E.D. Ark., 2022).[5] There, as here, Dr. Levine was Defendants' only expert witness to have ever treated patients for gender dysphoria, and he testified that removing gender affirming medical care from patients currently receiving it would have "shocking and devastating" psychological consequences. Charles Decl. Ex. B at 912:3-19. Dr. Levine testified there, as he does in his report in this matter, that "there is no evidence beyond anecdotal reports that psychotherapy can enable a return to male identification for genetically male boys, adolescents, and men, or return to female identification for genetically female girls, adolescents, and women." Charles Decl., Ex. A at ¶49; Charles Decl., Ex. B at 920:18-24. And to be sure, "broad opinions [that] are based solely on … anecdotal accounts, and speculation … are not reliable." *In re 3M Combat Arms Earplug Prod.*

---

[5] The Plaintiffs in *Brandt* did move to exclude or limit Dr. Levine's testimony.

9

Case 4:23-cv-00325-RH-MAF   Document 145   Filed 04/07/23   Page 12 of 34

*Liab. Litig.*, 2021 WL 684183, at *3. Dr. Levine also testified that reliance on self-report from the patients and information from parents is not unique to the diagnosis of gender dysphoria and is "ideally" how psychiatry works. Charles Decl. Ex. B at 894:24-895:6. He also testified that the use of medications to treat gender dysphoria is off-label—meaning not FDA approved for this specific indication—does not mean the drugs are experimental. Charles Decl. Ex B. at 930:14-17. And while Dr. Levine agreed that the "overwhelming majority" of his patients have been adults, he testified that he has written letters of authorization for hormone therapy for some patients under 18 and, going forward, would consider doing so on a case-by-case basis. Charles Decl. Ex. B at 886:13-18, 897:1-898:18, 900:21-902:15, 902:25-903:6.

Similarly, in *Fain* v. *Crouch*, No. CV 3:20-0740, 2022 WL 3051015 (S.D.W. Va. Aug. 2, 2022), where plaintiffs challenged a Medicaid coverage restriction of gender-affirming care in West Virginia, similar to the one at issue in this case, Dr. Levine testified at deposition that in the previous seven months he had provided several letters of approval for gender-affirming surgeries for transgender people incarcerated at Framingham, a correctional institution in Massachusetts. Charles Decl. Ex. C at 84:4-85:4. Dr. Levine has also previously testified that he has written similar letters for gender-affirming hormones and surgery in accordance with the medical community's widely accepted and authoritative guidance for transgender care, World Professional Association of Transgender Health ("WPATH") Standards

10

of Care ("SOC"). Charles Decl., Ex. C. at 139:14-19; Ex. D at 55:13-17; 56:2-5; 112:16-21; 176:8-16; Ex. E at 1-90:15-22. He also testified that he does not provide such letters unless he has sufficiently informed his patients of possible risks and received a reasonable assurance that they understand. Charles Decl., Ex. D at 176: 8-16; 225:24-226:17. For almost 50 years, Dr. Levine's clinical practice has generally adhered to the WPATH SOC. Charles Decl. Ex. C at 136:8-11. And, as WPATH's former Chairman of the SOC Committee, Dr. Levine helped to write Version 5 of the SOC, recognized his own writing in Version 7, and asked if he could help draft the recently published Version 8. Charles Decl., Ex. A at ¶5; Ex. C at 147:12-149:18. He testified at deposition in *Fain*, and under oath previously, that he "is not advocating denying endocrine treatment or surgical treatment" to transgender people, a position he described as "draconian."[6]

Finally, Dr. Levine testified at deposition in *Fain* and that he was not offering

---

[6] Charles Decl., Ex. C at 88:10-13; Ex. D at 73:4-7 ("Q: Is the worrisomeness about a patient's future health, is that a reason to ban all medical care for gender dysphoria? A: Absolutely not."); 84:21-85:1 ("Q: Given all those concerns you have, is that a reason to deny all medical interventions to people with gender dysphoria? A: No …."); 85:4-11 ("Q: Are those concerns you raised justifications in your mind for denying medical interventions to people who have gender dysphoria? A: You know, I'm not advocating denying endocrine treatment or surgical treatment."); 152:1-6 ("Q: Do you think because that study showed that some people committed suicide after gender affirming surgery that no patient should be able to access gender affirming surgery? A: That would be illogical"); 154:3-5 ("Q: But you're not recommending total bans on gender affirming surgery? A: I'm not recommending total bans."); 160:23-25 ("I did not say that gender affirming treatment in general should be stopped. I've never said that.").

any opinions about whether Defendants should have an exclusion in their Medicaid program for coverage of gender-affirming medical care. Charles Decl. Ex. C at 86:25-87:19. He also testified that he does not feel his "expertise extends to how the insurance industry works and how governments and legislatives work," nor "does he consider himself an expert" on whether the West Virginia Medicaid exclusion should exist. Charles Decl., Ex. C at 87:14-22. Nevertheless, Dr. Levine has testified that he is "an agent of the patient, I want what's best for the patient, and especially if the patient couldn't otherwise afford it, I would wish for my patient to have it, yes." Charles Decl., Ex. F at 157:7.

At bottom, Dr. Levine has repeatedly and consistently testified in federal court that he does not support banning the provision or coverage of gender-affirming medical care, that for 50 years he has and continues to provide letters of authorization for gender affirming medical treatments for adult and minor patients, and that he is not an expert about insurance coverage of gender-affirming medical care. *See* e.g. Charles Decl., Ex. D at 86:1-8. Many of his opinions do not "logically advance a material aspect *of the proposing party's case*," do not "fit" the disputed facts, and will ultimately not assist the trier of fact because his proposed opinions do not oppose the relief Plaintiffs seek. *McDowell*, 392 F.3d at 1298-99 (emphasis added).

### B. Dr. Levine's Opinions That Do Not Support Plaintiffs' Position Are Methodologically Unreliable and Scientifically Unsupported.

An expert's opinion should only be admitted if it is based on scientifically

Case 4:23-cv-00325-RH-MAF   Document 145   Filed 04/07/23   Page 15 of 34

valid methodology that is properly applied to the facts.  *In re 3M*, 2022 WL 1262203, *at \*1*.  Dr. Levine's opinions fall far short of the reliability standard, a reality he has admitted to as recently as November 2022. Dr. Levine admits in his report submitted here, at trial in *Brandt*, and at deposition in *Fain* and other recent cases, that theories upon which he relies lack *any* scientific support and have not been tested or subjected to peer review or publication. Charles Decl., Ex. A at ¶49; Ex. B 797:8-19, 887:19-888:25, 921:21-922:7, 924:12-25, 949:24-954:22; Ex. C at 140:12-143:2, 145:19-25; Ex. D at 109:20-25; 116:4-7, 122:8-124:22, 200:11-201:25.

Even putting that aside, although Dr. Levine claims many times that his "experience" is sufficient foundation for his opinions, he fails to address how this purported experience leads to his conclusions and how such experience is reliably applied to the facts here. Afterall, "At this stage, the court must undertake an independent analysis of each step in the logic leading to the expert's conclusions; if the analysis is deemed unreliable at any step the expert's entire opinion must be excluded." *Hendrix v. Evenflo Co., Inc.*, 255 F.R.D. 568, 578 (N.D. Fla. 2009), *aff'd sub nom. Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183 (11th Cir. 2010).

1.  **Dr. Levine's Assertion that the WPATH SOC Version 8 Is Not the Widely Accepted and Authoritative Protocol for the Treatment of Gender Dysphoria Is Misleading and Unreliable Because It Is Demonstrably False.**

Chief among Dr. Levine's many unreliable opinions is his assertion that the

13

widely-accepted and utilized WPATH SOC are not widely-accepted and considered to be authoritative treatment protocols for gender dysphoria. Contradicting himself, Dr. Levine has repeatedly testified that he generally adheres to the WPATH SOC in his own clinical practice. Charles Decl., Ex. C at 136:8-11; Ex. D at 55:13-17; 56:2-5; 112:16-21; 176:8-16; 225:24-226:17; Ex. F at 29:10-18; 37:2-13; 47:22-49:3; 103:11-19. Nevertheless, Dr. Levine's attempt to undermine the WPATH SOC fail because he lacks evidence to support his assertions, contradicts his assertions with other binding testimony, misrepresents sources in his report, and fails to include relevant information that is contrary to his assertion—ultimately undermining the reliability and overall admissibility of his opinions.

First, Dr. Levine alleges that "reviews" of the 7th Version of the SOC ("SOC 7") "published in 2021 by Dahlen et al [sic] and Sapir in 2022 have clarified the low reliability and bias inherent in its recommendations. (Dahlen et al 2022)." The Dahlen et al. 2021 article does not characterize the SOC 7 as having "low reliability" or "inherent bias." Charles Decl., Ex. A at ¶69; Ex. G. The article does state that the SOC 7 are due for an update and acknowledges that evaluations of clinical practice guidelines in other medical areas including cancer, diabetes, pregnancy, and depression "tend to show room for improvement," and that "finding poor quality CPGs is not confined to this area of healthcare." Charles Decl., Ex. G at 8. Again, without evidence, Dr. Levine claims the 8th Version of the SOC ("SOC 8") has "not

14

Case 4:23-cv-00325-RH-MAF   Document 145   Filed 04/07/23   Page 17 of 34

gained additional confidence in its scientific merit." Charles Decl., Ex. A ¶69. He

also claims that the presence of transgender participants at WPATH meetings

"makes it difficult for professionals to raise their concerns." Charles Decl., Ex. A

¶69. But Dr. Levine admits he has not been a member of WPATH for more than 20

years and does not provide evidence to support these claims. *Id.* at ¶66.[7] The reality

is that no one, not transgender people or other health professionals (whether

transgender or cisgender), are preventing Dr. Levine from "raising his concerns." As

Dr. Levine testified, he presented alongside other panelists with dissenting views,

without interruption, at an American Psychiatric Association conference in 2022.

Charles Decl., Ex. B at 925:16-926:23, 927:10-17.

Second, Dr. Levine makes inaccurate statements about other countries'

treatment protocols for gender dysphoria in youth to support his claim that "opinions

---

[7] Dr. Levine claims in his report that "Two groups of individuals that I regularly work with have attended recent and separate WPATH continuing education sessions. There, questions about alternative approaches were quickly dismissed with 'There are none. This is how it is done.'" Charles Decl. Ex. A at ¶68. But Dr. Levine fails to name these groups he works with, the people who attended the WPATH sessions, the dates, times and other identifying information about the alleged sessions, or the people who supposedly "quickly dismissed" questions. This assertion is mere conjecture, and methodologically unreliable. Not only is such "reliance on anecdotal evidence" a "red flag[] that caution[s] against certifying an expert," *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012), but the Court should not countenance Dr. Levine testifying "based on limited personal accounts and information relayed to [him] by an unspecified number of third parties," as doing so "would be to sanction [his] use as a vehicle for introducing hearsay testimony." *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2021 WL 684183, at *2.

and practices vary widely with respect to puberty blockers and hormones" and as evidence that the WPATH SOC 8 are not authoritative. Charles Decl., Ex. A at ¶82. However, Dr. Levine admitted in his *Brandt* trial testimony that in Finland, gender affirming medical care is provided to adolescents with gender dysphoria when indicated under their guidelines. Charles Decl., Ex. B at 938:16-939:3. He also testified that France does not have a prohibition on minors receiving gender affirming medical care, nor does Canada. Charles Decl., Ex. B at 939:23-940:9, 944:2-5. And Dr. Levine conceded he does not know how the provision of gender affirming care for minors works in Sweden but agreed that the Swedish National Board of Health stated puberty blockers and cross sex hormones may be given in exceptional cases in accordance with their guidelines criteria. Charles Decl., Ex. B at 960:1-17, 961:11-962:1. Dr. Levine has admitted these facts when asked at deposition in *Fain*. Ex. C at 106:4-108:8. Dr. Levine also acknowledged that the United Kingdom's Cass Review, which is still underway and not final, begins from the premise that some youth experience gender dysphoria and will need clinical support and medical interventions and that such care is not prohibited in their health system. Charles Decl., Ex H; Ex. C at 191:20-192:16.

Dr. Levine's own testimony at trial and at deposition contradict the opinions offered by his expert report here, which underscores serious flaws in his methodology and demonstrates that his opinions about the WPATH SOC do not

Case 4:23-cv-00325-RH-MAF Document 145 Filed 04/07/23 Page 19 of 34

meet the reliability burden under *Daubert* or related standards for admissibility of expert testimony.

### 2. Dr. Levine's Opinions That Gender-Affirming Medical Care Is Experimental, Is Provided Without Mental Health Assessments or Sufficiently Informed Consent and Is Without Lasting Benefit are Inaccurate and Unsupported.

Dr. Levine opines that gender-affirming medical care is experimental, is provided without mental health assessments or sufficiently informed consent and is without lasting benefit. Charles Decl., Ex. A at VIII, X, ¶73, ¶176. But Dr. Levine has, and continues to, write letters authorizing gender affirming medical care for his patients, including for hormone therapy for some patients under 18 and, going forward, would consider doing so on a case-by-case basis. Charles Decl., Ex. B at 897:1-898:18, 900:21-902:15, 902:25-903:6. The *Kadel* court cites to an opinion that Dr. Levine has identically asserted here: that it is impossible "to make a single, categorical statement about the proper treatment of children presenting with gender dysphoria or other gender-related issues." Charles Decl., Ex. A at ¶61. As a result, the *Kadel* court observed, "Notably, Levine does not testify that medical or surgical care for gender dysphoria is categorically inappropriate." *Kadel*, 2022 WL 322673, at *15. And when asked if based on his publication from March 2022 "Reconsidering Informed Consent for Trans-Identified Children, Adolescents, and Young Adults," he claimed that "gender affirming medical care, specifically hormone therapy or

17

blockers or surgeries, should be categorically prohibited for minors," he replied "No, I don't." Charles Decl., Ex. B at 905:11-16. Dr. Levine is "not motivated to prohibit care." *Id.* at 906:11-14.

Dr. Levine asserts repeatedly that gender-affirming medical care is provided by doctors who encourage patients to identify as transgender and provide hormones without assessing patients and addressing other mental health conditions or without informing patients and their parents of the risks and limitations of the evidence regarding treatments. Charles Decl. Ex. A at ¶¶50, 64, 74, 83. As an initial matter, Dr. Levine admits in his report that he cannot confirm if any practitioners engage in this "affirmation care/therapy model" he describes. Charles Decl. Ex. A at ¶53. And he confirmed his lack of support for this assertion during his testimony in *Brandt*, when on cross-examination, he admitted that he does not know how common it is for doctors to provide care the way he described, which is contrary to WPATH SOC 8 and Endocrine Society clinical guideline, both of which require comprehensive psychological assessments prior to initiation of any medical treatment for adolescents. Charles Decl., Ex. B at 887:19-888:21, 890:24, 933:2-7; Charles Decl. Ex. I at 3870, 3876-3878; Charles Decl. Ex. J at S48-51.

Finally, the *Kadel* court also recognized that Dr. Levine's assertions that healthcare providers are prescribing treatment without due caution or informed consent were not admissible:

18

Case 4:23-cv-00325-RH-MAF    Document 145    Filed 04/07/23    Page 21 of 34

> Fourth, as discussed, it does not appear that he offers any categorical opinion as to the medical necessity of medical and surgical treatments of gender dysphoria, nor does he testify that healthcare providers are prescribing such treatment without due caution and informed consent beyond his anecdotal "experience." To the extent that Defendants seek to introduce testimony from Levine to that effect, he has not provided the Court with any data or methodology from which such claims could be made. Levine has conducted no research to identify which physicians are proceeding as he does, and which do not, rendering any broader opinion about the practice of such healthcare providers pure speculation.

*Kadel*, 2022 WL 322673, at *17. This is no less true here.

Dr. Levine's opinions that gender-affirming medical care is without lasting benefit also fail the reliability test because he ignores studies contrary to his personal belief or distorts studies' findings beyond the authors' explicit intentions, conclusion, or study design. Significantly, he omits recent studies demonstrating that medical treatments for transgender adolescents and adults have favorable outcomes across many measures. Charles Decl., Ex. K at ¶55. A plethora of studies show that transgender people experience pervasive stigma and discrimination, resulting in health disparities. But Dr. Levine omits any reference to that evidence and instead suggests that "long-term life in a transgender identity, however, correlates with very high rates of completed suicide," and goes on to discuss four studies that reviewed the rate of suicide among transgender adults who received gender-affirming medical care. Charles Decl., Ex. A at ¶¶166-171. While Dr. Levine admits, as he must, that "None of the studies demonstrated the hormonal or surgical intervention *caused* [sic]

19

Case 4:23-cv-00325-RH-MAF   Document 145   Filed 04/07/23   Page 22 of 34

suicide," he goes on in the same paragraph to assert a different unsupported conclusion, that "what these studies demonstrate" is that transgender people "are in need of extensive psychological care they don't receive," and that "neither hormonal nor surgical transition and 'affirmation' resolve their underlying problems and put them on the path to a stable and healthy life." *Id.* at ¶172. This is unreliable methodology at its finest. First, none of the four studies purport to analyze the efficacy of "hormonal or surgical transition," or whether gender-affirming medical care "resolves underlying problems" or "puts [people] on a path to a stable and healthy life." As least one of the studies' authors, Cecilia Dhejne, has explicitly said as much, both in the study itself (it is not designed to "address whether sex reassignment is an effective treatment or not.") and in direct response to Dr. Levine's misuse of her work. Charles Decl., Ex. L at 2; Charles Decl., Ex. M at 65. Another major flaw in Dr. Levine's methodology is that three of the studies' control groups were comprised of the general Dutch population, not of other transgender people with gender dysphoria who did not receiving any gender-affirming medical care. In other words, it is comparing apples to oranges. But Dr. Levine has acknowledged that the Dhejne study does not lend the study to be used to draw any conclusions about the efficacy of gender-affirming care. Charles Decl., Ex. D at 156:7-11. Finally, Dr. Levine's description of the Hall et al. 2021 study obscures the study's actual rate of suicide for the cohort by, without explanation but presumably to

20

support his description of a "rather shocking result," focusing on the number of

transgender women in the group who died by suicide, rather than the total number

of deaths by suicide for the entire cohort—which was 3 out of 175 participants, or

1.7%. Charles Decl., Ex. A at ¶171.

Furthermore, as the *Kadel* court observed, Dr. Levine himself has conceded

that:

> he does not know how often medical or surgical care helps alleviate
> symptoms of gender dysphoria and does not offer an opinion as to the
> portion of these procedures that are necessary and unnecessary. (*Id.* at
> 67:24–68:3 ("It is not our [clinic's] knowledge base to know who's
> going to do better and who's going to do worse and who is not going to
> have any difference at all with hormones or with surgery.").)

*Kadel*, 2022 WL 322673, at *15.

Ultimately, Dr. Levine fails to cite any literature or clinical experience of his

own to support this opinion, and regardless, he has testified that studies like these

should not prevent youth and adults with gender dysphoria from receiving gender

affirming care. When asked recently if he believes that because a study showed that

some people committed suicide *no patient* should be able to access gender-affirming

surgery, Dr. Levine responded, "that would be illogical." Charles Decl., Ex. D at

151:25-152:6. And when asked if his concerns justify denying medical interventions

to all people with gender dysphoria, he responded "I'm not advocating denying

endocrine treatment or surgical treatment." *Id.* at 85:4-11.

At bottom, Dr. Levine's report and the opinions contained therein are wildly

Case 4:23-cv-00325-RH-MAF    Document 145    Filed 04/07/23    Page 24 of 34

inconsistent with his oral testimony, making both unreliable.

> **3.    Dr. Levine's Opinions About Gender Dysphoria "Naturally Resolving" in Children and Adolescents Are Not Based In Fact.**

Another unreliable opinion presented by Dr. Levine is that "the large majority" of *prepubertal* children diagnosed with gender dysphoria will, absent intervention, cease to be transgender (or "desist") through puberty. Charles Decl., Ex. A at ¶¶109-111, 113-114. Putting aside that Dr. Levine has almost no clinical experience with children during his 50-year career treating patients with gender dysphoria to support this opinion, it is unreliable and methodologically unsound for other reasons.

First, Dr. Levine has conceded that some children are and will continue to be transgender and that as they progress into adolescence and adulthood, they would need medical care that he has, and would, authorize. Charles Decl., Ex. D. at 173:7-15, 137:14-23, 173:22-174:5, 53:2-10. Second, as the scholarly basis for this opinion, Dr. Levine cites three articles that share the same core characteristic that reveals the methodological flaw in Dr. Levine's analysis: they rely on previous studies whose underlying data included gender non-conforming children who never identified as a sex different from their birth-assigned sex in the first place. In other words, they included children who were never transgender. That is because the diagnosis at the time these studies were conducted— "Gender Identity Disorder in

Children" —did not include a cross-gender identification or clinically significant distress requirement for the diagnosis. *See*, *e.g.*, Diagnostic Statistical Manuals ("DSM") III, III-R, IV, and IV-R. Under these outdated diagnostic criteria, most of the children diagnosed with "Gender Identity Disorder in Children" were not actually transgender but were gender non-conforming boys who grew up to be gay or bisexual. Because the years of initial visits in the study samples were from 1952-2008, none of these children were diagnosed under the current, and relevant to the case at hand, diagnostic criteria for "Gender Dysphoria in Children," in the DSM 5, published in 2013, which requires for diagnosis "a strong desire to be of the other gender or an insistence that one is the other sex" and "clinically significant distress or impairment in social, school, or other important areas of functioning."[8] Charles Decl., Ex. N at 452. Dr. Levine confirmed this fact as to these and others of the "11 studies," at his deposition in *Fain*. Charles Decl., Ex. C at 221:2-229:14. Therefore, the "desistance rates" from the studies upon which Dr. Levine bases his opinion reflect children who, while they exhibited gender non-conforming behaviors, were

---

[8] Based on Dr. Levine's failure to identify at deposition in *Kadel* any of the underlying "11 studies" upon which this opinion is based, the court found his methodology to be unreliable and therefore inadmissible: "Levine's testimony regarding desistance rates does not appear to be based on reliable methodology. During deposition, Levine was unable to recall many of the studies that purportedly support his conclusion. (ECF No. 213-3 at 191:20-192:14.)" *Kadel*, 2022 WL 322673, at *16.

not transgender, or suffering from gender dysphoria.

> ### 4. Dr. Levine's Assertion that "Rapid Onset Gender Dysphoria," as a Cause of Gender Dysphoria or the Concept of "Detransition" Justifies Denying Treatment to Florida Medicaid Beneficiaries Is Unsupported By Scientific Evidence.

A stark example of one of Dr. Levine's opinions failing to meet methodological reliability is the assertion that "rapid onset gender dysphoria" is a credible phenomenon caused by "social influences through friend groups or through the internet." Charles Decl., Ex. A at II(1)(f), ¶38, ¶96, ¶114. Dr. Levine admitted at the *Brandt* trial, just six months ago, that such a conclusion is based on speculation, not science. Ex. B at 797:8-19. Furthermore, "rapid onset gender dysphoria" ("ROGD") is a scientifically unsupported hypothesis and the only article Dr. Levine routinely cites or discusses regarding ROGD was withdrawn and republished with a significant correction. Dr. Levine testified at deposition in *Kadel* he had not read the correction. Charles Decl., Ex. D at 116:22-117:9. Had he done so, Dr. Levine would be forced to acknowledge the correction's explicit disclaimers that "rapid onset gender dysphoria is not a formal mental health diagnosis," "the report did not collect data from adolescents and young adults or clinicians and therefore does not validate the phenomenon," and "the use of the term, 'rapid onset gender dysphoria' should be used cautiously by clinicians and parents to describe youth." Charles Decl., Ex. O at 1. Despite this, at deposition in *Fain*, Dr. Levine attempted to conflate an

24

Case 4:23-cv-00325-RH-MAF    Document 145    Filed 04/07/23    Page 27 of 34

increased number of transgender young people presenting to clinics for care with the theory of "rapid onset gender dysphoria" and asserted, without evidence, it is not a hypothesis but "a fact," that he "assumes everyone understands [this] is true." Charles Decl. Ex. C at 151:18-152:6, 152:22-153:5. When pressed to provide peer-reviewed articles, sources, or studies as scientific support he referenced presentations without title or date, admitted he could not remember the names of "authors from Europe" but asserted it had been documented by "DiAngelo and Clayton in Australia." To date, the only peer-reviewed study that interrogates this hypothesis using adolescent clinical data "did not support the ROGD hypothesis." Charles Decl., Ex. P at 1.

Similarly, Dr. Levine's opinions that there is "a growing number of detransitioners [sic]," or that the number of detransitioners is "accelerating," are also methodologically unreliable, largely because he lacks any evidence to support this belief. Charles Decl., Ex. A at ¶120. The three papers he cites for support of this assertion, "Entwistle 2020, Littman 2021, and Vandenbussche 2021," are purely descriptive, not statistical, or quantitative studies. These, respectively, include a description of anecdotal experiences of "detransitioners," describe the results of "a survey of 100 detransitioners," and report on responses from an online survey about the needs and support for people who detransition. None of the three articles purports to establish that the rate of detransition is growing or accelerating, a fact

Dr. Levine admitted as to two of the studies at deposition in *Fain*. Charles Decl., Ex. C at 155:8-163:24. Indeed, Dr. Levine's own clinical experience is contrary to this assertion—in 50 years of seeing patients with gender dysphoria, he is aware of only two patients who detransitioned. Charles Decl., Ex. B at 920:25-921:5. Nevertheless, Dr. Levine doubles down in his expert rebuttal report, relying on a reference to a "detransition subreddit" with 16,000 members as evidence that "the assumption that [detransition] was a rare occurrence began to lose traction." Ex. Q at ¶30. When confronted about this so-called evidence at deposition in *Kadel*, Dr. Levine admitted he had no evidence that *even one* of the 16,000 members of the subreddit had actually "detransitioned." Charles Decl., Ex. D at 200:6-201:25. Unsurprisingly, the *Kadel* court found such testimony lacking:

> His anecdotal testimony concerning adults and adolescents who regret their transitions appears to be based on a misreading of an article that reviewed entries on the website Reddit. (See ECF No. 215-1 ¶¶ 35, 56, 98.) He admitted during deposition that the article referred to 16,000 entries—not 60,000, as he repeatedly stated in his report—and that he had no knowledge of the content of those entries or whether any of the authors actually de-transitioned or regret their transitions. (Id. at 196:3-7, 201:12-25).

*Kadel*, 2022 WL 3226731, at *16.

Similarly, when asked in *Fain* about his opinion that there is "evidence that *a growing number* of young people regret transition and wish to reverse it," Dr. Levine admitted he lacked any scientific support for such an opinion. Charles Decl., Ex. C at 158:8-159:2; 160:25-161:9; 163:9-24. Dr. Levine did not point to his own

experience as a basis for this opinion and conceded three times that the sources he cited in his report did not provide relevant evidence. *Id.*

Given that these hypotheses about "rapid onset gender dysphoria" and ideas about "detransition" are unverified or unsupported, Dr. Levine cannot claim the use of reliable methodology. His reliance on his own *ipse dixit* fails to establish a basis upon which to assert these opinions. Indeed, case law establishes that "broad opinions [that] are based solely on … generalized views, anecdotal accounts, and speculation … are not reliable." *In re 3M Combat Arms Earplug Prod. Liab. Litig.*, 2021 WL 684183, at *3 (N.D. Fla. Feb. 11, 2021). And that opinions "based on mere conjecture, assumption, credibility calls, and amounting to no more than ipse dixit" are "neither reliable nor helpful." *Day v. Edenfield*, 2022 WL 972430, at *10 (N.D. Fla. Mar. 31, 2022).

**C.    Dr. Levine Is Not Qualified To Offer Opinions About Puberty-Delaying Treatment or the Treatment of Prepubertal Children Generally.**

Dr. Levine has repeatedly admitted, most recently at the *Brandt* trial six months ago, and at depositions for the last several years, that he has virtually no experience administering psychiatric treatment to prepubertal children and no experience performing research or publishing studies about them. Charles Decl., Ex. A at ¶5; Ex. B at 887:5-8; Ex. C at 26:10-13; Ex. D at 23:1-8. When asked whether he has treated any children with gender dysphoria, he admitted, "I have only on rare

27

occasion personally treated or directly or indirectly treated a child." Charles Decl.

Ex. C at 28:23-29:6; 62:6-14. Dr. Levine also confirmed his testimony from March

30, 2022, that over the course of his nearly 50-year career, he had only seen an

estimated six prepubertal children, and not for more than one visit. Charles Decl.,

Ex. B at 887:5-8; Ex. R at 87:1-7. When asked if he had helped to develop guidelines

for the treatment of prepubertal children or adolescents with gender identity issues

he responded "the answer is no." Charles Decl., Ex. C at 51:10-16. Dr. Levine is not

recognized as an expert in providing treatment to prepubertal children by his private

employer who by his own admission does not refer children to him as patients, nor

by the University Hospitals' LGBTQ and Gender Care Program--the Cleveland

hospital affiliated with Case Western Reserve University Medical School where Dr.

Levine is a clinical professor—which he previously admitted did not consult with

him as part of its formation or their ongoing work. Charles Decl., Ex. R at 113:19-

114:4. Nor does he write or research about providing treatment to prepubertal

children or deliver any psychiatric care to them in his day-to-day practice.[9]

    While lacking a reliable methodology for his proposed opinions about the

---

[9] Notably, the *Kadel* court held that "Levine's opinions on mental health approaches to social transition are irrelevant as well, as Defendants maintain that the Plan's exclusion of coverage for mental health treatments of gender dysphoria has never been given effect and is no longer part of the Plan. (*See* ECF Nos. 137 n.2; 137-4 ¶ 27.)" *Kadel,* 2022 WL 3226731, at *16. Dr. Levine has also testified that he has counseled some parents to support their minor child's social transition. Charles Decl., Ex. B at 896:23-25.

Case 4:23-cv-00325-RH-MAF    Document 145    Filed 04/07/23    Page 31 of 34

treatment of prepubertal children, Dr. Levine does not hesitate to offer his personal beliefs about their care. Dr. Levine would "consider banning puberty blocking hormones even for children who have been cross-gender identified for four years to give them a chance to desist." Charles Decl., Ex. D at 186:20-25. But Dr. Levine acknowledges the unscientific nature of this opinion, admitting he does not know where it comes from or "to what extent it's from my politics, or from my being a parent or a doctor, I don't know." Charles Decl., Ex. D at 187:20-24.

In short, given his proposed testimony and experience, Dr. Levine is not qualified under the *Daubert* standards to offer opinions on matters relating to the care of prepubertal children, and he cannot use his personal beliefs as reliable evidence. Nor is any of this testimony relevant. This case concerns coverage of gender-affirming medical care, and no clinical practice guideline recommends the provision of medical treatments, like puberty delaying medications or hormones, until after the onset of puberty.[10]

### D. Dr. Levine's Report, Opinions, and Testimony Lack Probative Value and Are Thus Inadmissible Under Federal Rule Of Evidence 403.

Finally, the Court should exclude Dr. Levine's opinions because their

---

[10] The *Kadel* court also found that Dr. Levine's criticism of medical or surgical treatment of gender dysphoria in prepubescent children was not relevant because "Plaintiffs conceded that such treatments are not medically necessary until the onset of puberty. *See* Section II.B, *supra*." *Kadel*, 2022 WL 322673, at *16.

introduction will result in unfair prejudice, confusion of the issues, or in misleading testimony. Fed. R. Evid. 403. Most of Dr. Levine's opinions are unreliable and unhelpful. The testimony would also result in prejudice, as the testimony seeks to sow confusion about the veracity of Plaintiffs' gender identity, gender dysphoria diagnosis, and treatment they have been undergoing for years—issues unrelated to whether the Florida Medicaid Program can deny coverage of the same kinds of treatments to transgender people that it provides cisgender people.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant the instant motion and limit Dr. Levine's opinions and testimony, at a minimum, to his opinions (1) identifying risks associated with prescribing medication and surgery to adolescents, and (2) criticizing the quality of the research on treatments for gender dysphoria and that Dr. Levine's report, opinions, and his testimony be otherwise excluded in full.

Dated this 7th day of April 2023.

Respectfully Submitted,

/s/ Carl S. Charles

**PILLSBURY WINTHROP SHAW
PITTMAN, LLP**

**Jennifer Altman** (Fl. Bar No. 881384)
**Shani Rivaux** (Fl. Bar No. 42095)
600 Brickell Avenue, Suite 3100
Miami, FL 33131
(786) 913-4900
jennifer.altman@pillsbury.com
shani.rivaux@pillsbury.com

**William C. Miller\***
**Gary J. Shaw\***
1200 17th Street N.W.
Washington, D.C. 20036
(202) 663-8000
william.c.miller@pillsburylaw.com

**Joe Little\***
500 Capitol Mall, Suite 1800
Sacramento, CA 95814
(916) 329-4700
joe.little@pillsburylaw.com

**NATIONAL HEALTH LAW PROGRAM**

**Abigail Coursolle\***
3701 Wilshire Boulevard, Suite 315
Los Angeles, CA 90010
(310) 736-1652
coursolle@healthlaw.org

**Catherine McKee\***
1512 E. Franklin Street, Suite 110
Chapel Hill, NC 27541
(919) 968-6308
mckee@healthlaw.org

**LAMBDA LEGAL DEFENSE
AND EDUCATION FUND, INC.**

**Omar Gonzalez-Pagan\***
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
ogonzalez-pagan@lambdalegal.org

**Carl S. Charles\***
1 West Court Square, Suite 105
Decatur, GA 30030
(404) 897-1880
ccharles@lambdalegal.org

**SOUTHERN LEGAL COUNSEL, INC.**

**Simone Chriss** (Fl. Bar No. 124062)
**Chelsea Dunn** (Fl. Bar No. 1013541)
1229 NW 12th Avenue
Gainesville, FL 32601
(352) 271-8890
Simone.Chriss@southernlegal.org
Chelsea.Dunn@southernlegal.org

**FLORIDA HEALTH JUSTICE PROJECT**

**Katy DeBriere** (Fl. Bar No. 58506)
3900 Richmond Street
Jacksonville, FL 32205
(352) 278-6059
debriere@floridahealthjustice.org

\* *Admitted pro hac vice*

*Counsel for Plaintiffs*

31

Case 4:23-cv-00325-RH-MAF Document 145 Filed 04/07/23 Page 34 of 34

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of April 2023, a true copy of the foregoing has been filed with the Court utilizing its CM/ECF system, which will transmit a notice of electronic filing to counsel of record for all parties in this matter registered with the Court for this purpose.

/s/ Carl S. Charles
Carl S. Charles
*Counsel for Plaintiffs*

## CERTIFICATE OF WORD COUNT

As required by Local Rule 7.1(F), I certify that this Memorandum contains 7,636 words.

/s/ Carl S. Charles
Carl S. Charles
*Counsel for Plaintiffs*

32