No. 23-12155

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

————————

AUGUST DEKKER, ET AL.,

*Plaintiffs-Appellees*

v.

SECRETARY, FLORIDA AGENCY FOR HEALTH CARE ADMINISTRATION, ET AL.,

*Defendants-Appellants*

On Appeal from the United States District Court for the
Northern District of Florida, No. 4:22-CV-00325-RH-MAF (Hinkle, J.)

---

## BRIEF OF *AMICI CURIAE* BIOMEDICAL ETHICS AND
## PUBLIC HEALTH SCHOLARS IN SUPPORT OF
## PLAINTIFFS-APPELLEES AND AFFIRMANCE

---

Katelyn Kang
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2103
Telephone: (212) 479-6000
kkang@cooley.com

Kathleen Hartnett
Zoë Helstrom
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
Telephone: (415) 693-2000
khartnett@cooley.com
zhelstrom@cooley.com

*Counsel for Amici Curiae*

*Dekker, et al. v. Secretary, Florida Agency for Health Care Administration, et al.*
*Record No. 23-12155*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1-1, the undersigned counsel for *amici curiae* Aziza Ahmed, Khiara M. Bridges, David S. Cohen, I. Glenn Cohen, Charlene Galarneau, Joanna Grossman, Lisa C. Ikemoto, Maya Manian, Michelle Oberman, Dara Purvis, Rachel Rebouché, Jessica Silbey, and Michael R. Ulrich certify that each *amicus curiae* is an individual.  They do not have a parent corporation and no publicly held corporation owns 10% or more of their stock.

*Amici curiae* further certify that the following persons and parties, in addition to the above-named *amici*, may have an interest in the outcome of this case:

1. Academic Pediatric Association, *Amicus*

2. Alstott, Anne, *Amicus*

3. Ahmed, Aziza, *Amicus*

1. Altman, Jennifer, *Counsel for Plaintiffs*

2. American Academy of Child and Adolescent Psychiatry, *Amicus*

3. American Academy of Family Physicians, *Amicus*

4. American Academy of Nursing, *Amicus*

5. American Academy of Pediatrics, *Amicus*

6. American College of Obstetricians and Gynecologists, *Amicus*

7. American College of Osteopathic Pediatricians, *Amicus*

8. American College of Pediatricians, *Amicus*

9. American College of Physicians, *Amicus*

*Dekker, et al. v. Secretary, Florida Agency for Health Care Administration, et al.*
*Record No. 23-12155*

10. American Medical Association, *Amicus*

11. American Pediatric Society, *Amicus*

12. American Psychiatric Association, *Amicus*

13. Anderson, Barrett, *Counsel for Amicus*

14. Antommaria, Armand, *Witness*

15. Association of American Medical Colleges, *Amicus*

16. Bailey, Andrew, *Counsel for Amicus*

17. Baker, Kellan, *Witness*

18. Bardos, Andy, *Counsel for Amicus*

19. Barnes, Brian, *Counsel for Amicus*

20. Beato, Michael, *Counsel for Defendants*

21. Biggs, Michael, *Witness*

22. Biomedical Ethics and Public Health Scholars, *Amicus*

23. Bird, Brenna, *Counsel for Amicus*

24. Boergers, Kathleen, *Counsel for Amicus*

25. Boulware, Susan, *Amicus*

26. Bowdre, Alexander Barrett, *Counsel for Amicus*

27. Brackett, John Matthew, *Witness*

28. Bridges, Khiara M., *Amicus*

29. Bronni, Nicholas J., *Counsel for Amicus*

30. Brown, Louis, Jr., *Amicus*

31. Burleigh, Clifton Francis, Jr., *Amicus*

32. Cameron, Daniel, *Counsel for Amicus*

33. Cantor, James, *Witness*

*Dekker, et al. v. Secretary, Florida Agency for Health Care Administration, et al.*
*Record No. 23-12155*

34. Carr, Chris, *Counsel for Amicus*

35. Chriss, Simone, *Counsel for Plaintiffs*

36. Chuang, Ming, *Counsel for Amicus*

37. Clark, Kaila, *Counsel for Amicus*

38. Cohen, David S., *Amicus*

39. Cohen, I. Glenn, *Amicus*

40. Commonwealth of Kentucky, *Amicus*

41. Commonwealth of Massachusetts, *Amicus*

42. Commonwealth of Virginia, *Amicus*

43. Cory, Alyssa L., *Counsel for Amicus*

44. Coursolle, Abigail, *Counsel for Plaintiffs*

45. Dalton, Ann, *Witness*

46. DeBriere, Katherine, *Counsel for Plaintiffs*

47. Dekker, August, *Plaintiff*

48. Ding, Michael, *Counsel for Witness/Third-Party Miriam Grossman*

49. District of Columbia, *Amicus*

50. Do No Harm, *Amicus*

51. Doe, Jane, *Plaintiff*

52. Doe, John, *Plaintiff*

53. Doe, Susan, *Plaintiff*

54. Donovan, Kevin, *Witness*

55. Dunn, Chelsea, *Counsel for Plaintiffs*

56. Edmiston, E. Kale, *Witness*

57. Endocrine Society, *Amicus*

*Dekker, et al. v. Secretary, Florida Agency for Health Care Administration, et al.*
*Record No. 23-12155*

58. English, Jeffrey, *Witness*

59. Ethics and Public Policy Center, *Amicus*
60. Figlio, Erik, *Counsel for Amicus*

61. Fitch, Lynn, *Counsel for Amicus*

62. Florida Agency for Health Care Administration, *Defendant*

63. Florida Chapter of the American Academy of Pediatrics, *Amicus*

64. Florida Policy Institute, *Amicus*

65. Florida Voices for Health, *Amicus*

66. Galarneau, Charlene, *Amicus*

67. Gibson, Benjamin J., *Counsel for Amicus*

68. Gonzalez-Pagan, Omar, *Counsel for Plaintiffs*

69. Griffin, Steven J., *Counsel for Amicus*

70. Griffin, Tim, *Counsel for Amicus*

71. Grossman, Joanna, *Amicus*

72. Grossman, Miriam, *Witness/Third-Party Discovery Producer*

73. Halley, Ted, *Amicus*

74. Hartnett, Kathleen, *Counsel for Amicus*

75. Hasson, Mary Rice, *Counsel for Amicus*

76. Helstrom, Zoe, *Counsel for Amicus*

77. Heyer, Walt, *Amicus*

78. Hilgers, Michael T., *Counsel for Amicus*

79. Hinkle, Robert, *U.S. District Court Judge*

80. Hruz, Paul William, *Witness*

81. Hussein, Abdul-Latif, *Amicus*

*Dekker, et al. v. Secretary, Florida Agency for Health Care Administration, et al.*
*Record No. 23-12155*

82. Hutton, Kim, *Witness*

83. Ikemoto, Lisa – *Amicus*

84. Isasi, William, *Counsel for Amicus*

85. Jacobs, Dylan L., *Counsel for Amicus*

86. Janssen, Aron Christopher, *Witness*

87. Jazil, Mohammad, *Counsel for Defendants*

88. K.F., *Plaintiff*

89. Kaliebe, Kristopher Edward, *Witness*

90. Kamody, Rebecca, *Amicus*

91. Kang, Katelyn, *Counsel for Amicus*

92. Karasic, Dan, *Witness*

93. Kiefel, Camille, *Witness*

94. Kline, Robert, *Counsel for Amicus*

95. Kniffin, Eric Nieuwenhuis, *Counsel for Amicus*

96. Knudsen, Austin, *Counsel for Amicus*

97. Kobach, Kris W., *Counsel For Amicus*

98. Krasovec, Joseph, *Counsel for Amicus*

99. Kuper, Laura, *Amicus*

100. Labrador, Raúl R., *Counsel for Amicus*

101. LaCour, Edmund G. Jr., *Counsel for Amicus*

102. Lannin, Cortlin, *Counsel for Amicus*

103. Laidlaw, Michael, *Witness*

104. Lappert, Patrick, *Witness*

105. Ladue, Jade, *Plaintiff*

*Dekker, et al. v. Secretary, Florida Agency for Health Care Administration, et al.*
*Record No. 23-12155*

106. Levine, Stephen, *Witness*

107. Little, Joseph, *Counsel for Plaintiffs*

108. Loewy, Karen L., *Counsel for Plaintiffs*

109. Manian, Maya, *Amicus*

110. Marshall, Steve, *Counsel for Amicus*

111. Marstiller, Simone, *Former Defendant*

112. Mauler, Daniel, *Counsel for Amicus*

113. McCotter, R. Trent, *Counsel for Amicus*

114. McKee, Catherine, *Counsel for Plaintiffs*

115. McNamara, Meredithe, *Amicus*

116. Meszaros, Marie Connelly, *Amicus*

117. Miller, William, *Counsel for Plaintiffs*

118. Miyares, Jason, *Counsel for Amicus*

119. Mondry, Emily, *Counsel for Amicus*

120. Morrisey, Patrick, *Counsel for Amicus*

121. Morrison, Rachel N., *Amicus*

122. Nangia, Geeta, *Witness*

123. National Association of Pediatric Nurse Practitioners, *Amicus*

124. Nordby, Daniel E., *Counsel for Witness/Third-Party Miriam Grossman* and *Counsel for Amicus*

125. Norohna, Maya, *Amicus*

126. North Central Florida Council of Child and Adolescent Psychiatry, *Amicus*

127. Oberman, Michelle, *Amicus*

128. Olezeski, Christy, *Amicus*

129. Olson-Kennedy, Johanna, *Witness*

*Dekker, et al. v. Secretary, Florida Agency for Health Care Administration, et al.*
*Record No. 23-12155*

130. Paxton, Ken, *Counsel for Amicus*

131. Pediatric Endocrine Society, *Amicus*

132. Perko, Gary, *Counsel for Defendants*

133. Polston, Ricky L., *Counsel for Amicus*

134. Pratt, Christine, *Amicus*

135. Pratt, Joshua E., *Counsel for Defendants*

136. Purvis, Dara, *Amicus*

137. Ramer, John, *Counsel for Amicus*

138. Rebouché, Rachel, *Amicus*

139. Reinhardt, Elizabeth, *Counsel for Amicus*

140. Reyes, Sean, *Counsel for Amicus*

141. Richards, Jay W., *Amicus*

142. Rivaux, Shani, *Counsel for Plaintiffs*

143. Rokita, Theodore E., *Counsel for Amicus*

144. Rothstein, Brit, *Plaintiff*

145. Samuels, Valerie, *Counsel for Amicus*

146. Schechter, Loren, *Witness*

147. Scott, Sophie, *Witness*

148. Severino, Roger, *Amicus*

149. Shaw, Gary, *Counsel for Plaintiffs*

150. Sheeran, Andrew, *General Counsel for Defendant AHCA*

151. Shumer, Daniel, *Witness*

152. Silbey, Jessica, *Amicus*

153. Skrmetti, Jonathan, *Counsel for Amicus*

*Dekker, et al. v. Secretary, Florida Agency for Health Care Administration, et al.*
*Record No. 23-12155*

154. Societies for Pediatric Urology, *Amicus*

155. Society for Adolescent Health and Medicine, *Amicus*

156. Society for Pediatric Research, *Amicus*

157. Society of Pediatric Nurses, *Amicus*

158. State of Alabama, *Amicus*

159. State of Arkansas, *Amicus*

160. State of California, *Amicus*

161. State of Delaware, *Amicus*

162. State of Georgia, *Amicus*

163. State of Idaho, *Amicus*

164. State of Illinois, *Amicus*

165. State of Indiana, *Amicus*

166. State of Iowa, *Amicus*

167. State of Kansas, *Amicus*

168. State of Louisiana, *Amicus*

169. State of Maryland, *Amicus*

170. State of Mississippi, *Amicus*

171. State of Missouri, *Amicus*

172. State of Montana, *Amicus*

173. State of Nebraska, *Amicus*

174. State of New York, *Amicus*

175. State of North Dakota, *Amicus*

176. State of Oregon, *Amicus*

177. State of Rhode Island, *Amicus*

*Dekker, et al. v. Secretary, Florida Agency for Health Care Administration, et al.*
*Record No. 23-12155*

178. State of South Carolina, *Amicus*

179. State of Tennessee, *Amicus*

180. State of Texas, *Amicus*

181. State of Utah, *Amicus*

182. State of West Virginia, *Amicus*

183. Szilagyi, Nathalie, *Amicus*

184. Thompson, David, *Counsel for Amicus*

185. Ulrich, Michael, *Amicus*

186. Veta, D. Jean, *Counsel for Amicus*

187. Van Meter, Quentin, *Witness*

188. Van Mol, Andre, *Witness*

189. Weida, Jason, *Defendant*

190. Wilson, Alan, *Counsel for Amicus*

191. World Professional Association for Transgender Health, *Amicus*

192. Zanga, Joseph, *Witness*

# TABLE OF CONTENTS

**Page(s)**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ..................................................................C1

TABLE OF CONTENTS ................................................................................ i

TABLE OF AUTHORITIES ......................................................................... ii

STATEMENT OF INTEREST OF *AMICI CURIAE* ................................. 1

STATEMENT OF THE ISSUES .................................................................. 2

SUMMARY OF THE ARGUMENT ............................................................ 3

ARGUMENT ................................................................................................ 5

I.  GENDER-AFFIRMING CARE IS SUPPORTED BY A
    SUBSTANTIAL BODY OF EVIDENCE THAT DOES NOT
    JUSTIFY SINGLING IT OUT FOR DIFFERENTIAL
    TREATMENT. ...................................................................................... 5

II. THE CHALLENGED EXCLUSION CONTRAVENES KEY
    TENETS OF BIOMEDICAL ETHICS. ............................................. 20

    A.  The Challenged Exclusion Forces Providers to Disregard
        Patients' Autonomy. .................................................................. 21

    B.  The Challenged Exclusion Forces Providers to Violate Their
        Duty of Beneficence. ................................................................. 27

    C.  The Challenged Exclusion Forces Providers to Violate Their
        Duty of Justice. .......................................................................... 30

CONCLUSION ........................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Brandt v. Rutledge*,
    47 F.4th 661 (8th Cir. 2022) .......................................................11, 29

*Brandt v. Rutledge*,
    551 F. Supp. 3d 882 (E.D. Ark. 2021)..................................................29

*Buckman Co. v. Pls.' Legal Comm.*,
    531 U.S. 341 (2001).......................................................................16, 17

*Eknes-Tucker v. Governor of Alabama*,
    80 F.4th 1205 (11th Cir. 2023) ....................................................8, 19

*L.W. v. Skrmetti*,
    83 F.4th 460 (6th Cir. 2023) ............................................19, 20, 21

*Planned Parenthood Cincinnati Region v. Taft*,
    444 F.3d 502 (6th Cir. 2006) ......................................................15, 16

**Statutes**

Fed. R. App. P.
    29(a)(2) ........................................................................................1
    29(a)(4)(E) ....................................................................................1

Fla. Admin. Code 59G-1.050(7) ...................................................*passim*

Fla. Stat.
    § 499.0295(2)(a)(3)........................................................................22
    § 766.103.....................................................................................21

Okla. Rev. Stat. § 63-1-2604 .................................................................17

Senate Bill 254 ..........................................................................*passim*

**Other Authorities**

Am. Cancer Soc'y, *Late Effects of Childhood Cancer Treatment*
    (Sept. 18, 2017)................................................................................26

Am. Cancer Soc'y, *Off-Label Drug Use* (Mar. 17, 2015) ........................16

Am. Med. Ass'n, *Code of Medical Ethics Opinion 1.1.1*, *Patient-Physician Relationships* .........................................................................28

Am. Med. Ass'n, *Code of Medical Ethics Opinion 2.1.1*, *Informed Consent* .........................................................................................25

Am. Med. Ass'n, *Code of Medical Ethics Opinion 2.2.1*, *Pediatric Decision Making* ...............................................................................23

Am. Soc'y of Clinical Oncology, *Recent Developments in Medicare Coverage of Off-Label Cancer Therapies*, 5 J. Oncology Practice (2009)..................................................................................................18

Am. Soc'y of Clinical Oncology, *Reimbursement for cancer treatment: Coverage of off-label drug indications*, 24 J. Clinical Oncology (2006) .................................................................................17

Aníbal Torres Bernal & Deborah Coolhart, *Treatment and Ethical Considerations with Transgender Children and Youth in Family Therapy*, 23 J. of Fam. Psychotherapy 296 (2012)............................25

Anthony J. Hatswell *et al.*, *Regulatory approval of pharmaceuticals without a randomised controlled study: analysis of EMA and FDA approvals 1999-2014*, BMJ Open (June 30, 2016) ............................14

Ayden I. Scheim *et al.*, *Health and Health Care Among Transgender Adults in the United States*, 43 Annual Rev. of Pub. Health 503 (2021)....................................................................................................5

Benjamin Freedman, *Equipoise and the Ethics of Clinical Research*, 317 N. Engl. J. Med. 141 (1987) ......................................................10

Beth A. Clark, *Ethics in Child & Youth Care Practice with Transgender Youth*, 8 Int'l J. of Child, Youth & Fam. Studies 74 (2017).........................................................................................23, 30

Beth A. Clark & Alice Virani, *This Wasn't a Split-Second Decision: An Empirical Ethical Analysis of Transgender Youth Capacity, Rights, and Authority to Consent to Hormone Therapy*, 18 J. Bioethical Inquiry 151 (2021) ...........................................................24

Brendan J. Nolan *et al.*, *Early Access to Testosterone Therapy in Transgender and Gender-Diverse Adults Seeking Masculinization: A Randomized Clinical Trial*, JAMA Network Open (2023) ...................... 10-11

Carla Pelusi *et al.*, *Effects of Three Different Testosterone Formulations in Female-to-Male Transsexual Persons*, 11 J. Sex Med. 3002 (2014) ................................................................................9

Christopher M. Wittich *et al.*, *Ten common questions (and their answers) about off-label drug use*, 87 Mayo Clinic Proc. 982 (2012) ............................................................................. 16-17

Cong. Rsch. Serv., *Off-Label Use of Prescription Drugs* (Feb. 23, 2021) ..................................................................16

Denise Thomson *et al.*, *Controlled Trials in Children: Quantity, methodological quality and descriptive characteristics of Pediatric Controlled Trials published 1948-2006*, 5 PLoS One (2010) ....................... 9-10

Edward L. Hannan, *Randomized Clinical Trials and Observational Studies: Guidelines for Assessing Respective Strengths and Limitations*, 1(3) JACC: Cardiovascular Interventions 211 (2008) ...................9

Fla. Standard Jury Instruction No. 402.7 .................................................21

Gert Helgesson, *Children, Longitudinal Studies, and Informed Consent*, 8 Med., Health Care & Philos. 307 (2005).........................................12

Gesine Meyer *et al.*, *Safety and rapid efficacy of guideline-based gender-affirming hormone therapy: an analysis of 388 individuals diagnosed with gender dysphoria*, European J. of Endocrinology 155 (2020)..................................................................................5

*Good medical practice: Duties of a doctor registered with the General Medical Council*, Gen. Med. Council (2001) ....................................................28

H. Christine Allen *et al.*, *Off-Label Medication Use in Children, More Common Than We Think: A Systematic Review of the Literature*, 111 J. Okla. State Med. Assoc. 776 (2018) .......................................18

Holger Schünemann *et al.* (eds.), *Grading of Recommend., Assess., Dev. & Eval. Handbook* 14 (2013) .......................................12, 13, 14

Howard Balshem *et al.*, *GRADE guidelines: 3. Rating the quality of evidence*, 64(4) J. Clinical Epidemiol. 401 (2011) ......................................12, 14

J. R. Vevaina *et al.*, *Issues in biomedical ethics*, 39 Disease-a-Month 869 (1993) ..........................................................................................................1

Jack L. Turban *et al.*, *Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults*, 17(1) PLoS ONE 2 (2022) ......................................................................11

James M. Beck & Elizabeth D. Azari, *FDA, Off-Label Use, and Informed Consent: Debunking Myths and Misconceptions*, 53 Food & Drug L.J. 71 (1998) ................................................................................ 18-19

Jessica Kremen *et al.*, *Addressing Legislation That Restrict Access to Care for Transgender Youth*, 147 Pediatric Perspectives (2021).......................24

John J. Smith, *Physician Modification of Legally Marketed Medical Devices: Regulatory Implications Under the Federal Food, Drug, & Cosmetic Act*, 55 Food & Drug L.J. 251 (2000) ...........................................17

José A. Sacristán, *Clinical Research and Medical Care: Towards Effective and Complete Integration*, 15 BMC Med. Res. Methodol. (2015) ..........................................................................................................7

Katherine L. Kraschel *et al.*, *Legislation restricting gender-affirming care for transgender youth: Politics eclipse healthcare*, 3(8) Cell Reports Medicine 4 (2022) ................................................................11, 29, 31

Katrien Oude Rengerink *et al.*, *Pregnant women's concerns when invited to a randomized trial: A qualitative case control study*, 15 BMC Pregnancy and Childbirth 207 (2015).......................................................10

Kellan Baker, *The Future of Transgender Coverage*, 376 New Eng. J. Med. 19, 1801-04 (May 2017).............................................................................5

Kristina R. Olson *et al.*, *Mental health of transgender children who are supported in their identities*, Pediatric Collections: LGBTQ+: Support and Care (Part 3: Caring for Transgender Children) (2016).................29

Lois Snyder Sulmasy & Thomas A. Bledsoe, *American College of Physicians Ethics Manual* 170, Annals of Internal Medicine 86 (7th ed. 2019) ..........................................................................................22, 23

Luisa Kcomt *et al.*, *Healthcare avoidance due to anticipated discrimination among transgender*, 11(100608) SSM - Population Health 1 (2020) .......................................................... 31-32

Meredithe McNamara *et al.*, *A Critical Review of the June 2022 Florida Medicaid Report on the Medical Treatment of Gender Dysphoria*, Yale Sch. of Med. 1 (2022) ............................... 13

Nat'l Comm'n for the Protection of Hum. Subjects of Biomedical Rsch., *The Belmont Report: Ethical Principles and Guidelines for the Protection of Human Subjects of Research* (1978) ...................................... 7

Natalie S. Blencowe *et al.*, *Interventions in randomized controlled trials in surgery: issues to consider during trial design*, 16 Trials (2015) ...................................................................... 10

Norman P. Spack *et al.*, *Children and adolescents with gender identity disorder referred to a pediatric medical center*, 129 Pediatrics (2012) ............................................................... 28-29

Parth Shah *et al.*, *Informed Consent* (2021) ............................................. 23

Phillip E. Wagner *et al.*, 39.1 *Health (Trans)gressions: Identity and Stigma Management in Trans\* Healthcare Support Seeking* 51 (Oct. 2016) .................................................................. 31

Richard E. Redding, *Children's Competence to Provide Informed Consent for Mental Health Treatment*, 50 Wash. & Lee L. Rev. 695 (1993) ............................................................... 24-25

Robert J. Ligthelm *et al.*, *Importance of observational studies in clinical practice*, 29(6) Clinical Therapeutics 1284 (2007) .............................. 14

Tom L. Beauchamp & James F. Childress, *Principles of Biomedical Ethics* (8th ed. 2019) ........................................................... *passim*

U.S. Food & Drug Admin., *Clinical Research Versus Medical Treatment* (Mar. 22, 2018) ................................................................ 7

U.S. Food & Drug Admin., *The FDA's Drug Review Process: Ensuring Drugs Are Safe and Effective* (Nov. 24, 2017) ............................ 15-16

William Janssen, *A Historical Perspective on Off-Label Medicine: From Regulation, Promotion, and the First Amendment to the Next Frontiers*, SSRN Elec. J. (2014) ........................................................19

World Medical Association, *Declaration of Geneva* (1948) ...................................27

## STATEMENT OF INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* listed in the Appendix are professors of law, medicine, and public health who teach and write about biomedical ethics and health-related rights and discrimination.  Biomedical ethics, sometimes referred to as bioethics, is "the discipline of ethics dealing with moral problems arising in the practice of medicine and the pursuit of biomedical research."  J. R. Vevaina et al., *Issues in biomedical ethics*, 39 Disease-a-Month 869 (1993), https://pubmed.ncbi.nlm.nih.gov/8243220. *Amici* have a strong interest in ensuring that principles of biomedical ethics are accurately described and properly applied.  They submit this brief to explain how Florida Administrative Code 59G-1.050(7) and Senate Bill 254 are inconsistent with foundational principles of biomedical ethics.

---

[1] *Amici* certify that no person or entity, other than *amici curiae* or their counsel, made a monetary contribution to the preparation or submission of this brief or authored this brief in whole or in part.  Fed. R. App. P. 29(a)(4)(E).  The parties have consented to the filing of this brief.  Fed. R. App. P. 29(a)(2).

1

## STATEMENT OF THE ISSUES

Whether the District Court correctly enjoined Defendants-Appellants from enforcing Rule 59G-1.050(7) of the Florida Administrative Code and Senate Bill 254.

## SUMMARY OF THE ARGUMENT

From flu shots to cancer treatments, medical providers regularly support patients (and their parents, when the patients are minors) in deciding whether a given medical treatment is necessary and appropriate for them, without any undue interference from the State.

The Florida statute at issue in this appeal, Rule 59G-1.050(7) of the Florida Administrative Code and Senate Bill 254 (collectively, the "Challenged Exclusion" or the "Exclusion"), upend that normal operation of medical practice for a specific, targeted group of patients:  transgender Medicaid beneficiaries seeking gender-affirming medical care for gender dysphoria.  The Exclusion outlaws the normal course of medical decision-making for these individuals, under which a patient and their medical providers carefully deliberate to make an informed, individualized decision about whether gender-affirming care is medically appropriate and in the best interest of the particular patient.  The State imposed this sweeping Exclusion even though every major medical organization in the United States has concluded that gender-affirming care, including for minors, is not only safe and effective, but is the *only* evidence-based treatment for gender dysphoria.

Categorically barring patients from accessing evidence-based treatment is irreconcilable with foundational precepts of biomedical ethics, particularly where, as here, that treatment is the *only* evidence-based treatment available for a given

3

medical need and the prohibition applies *only* to a group of patients singled out because of their identity.

As explained further below, core principles of biomedical ethics include respect for autonomy, beneficence, and justice. Because a denial of Medicaid coverage is effectively a denial of care for Medicaid beneficiaries, the Challenged Exclusion deprives economically disadvantaged transgender patients of their ability to receive medically necessary and appropriate treatment to which they have given informed consent (autonomy). It forces providers to deny their patients care that is known to alleviate suffering, and thus to abandon their patients to serious physical and mental harm (beneficence). And it compels providers to deny care that only patients who are transgender need, thereby exacerbating stigma and inequity and damaging trust in the medical profession (justice).

Florida tries to justify these harms by suggesting that gender-affirming care lacks a sound evidentiary base. That position is unfounded and badly misunderstands how medical knowledge is credibly generated. Randomized control trials are not, and have never been, requisite for medical care to be considered appropriate, and in fact are ill-suited for many types of treatment. Nor must longitudinal studies always be of a particular duration to be reliable. And off-label use is legal, commonplace, and often necessary to serve a patient's best interest. The

gender-affirming care prohibited by the Exclusion has been developed through rigorous and appropriate methods and rests on a strong evidentiary basis.

In sum, the Challenged Exclusion singles out and effectively bans gender-affirming care for economically disadvantaged transgender patients based on false notions of science, public health, and biomedical ethics, without considering the grave harm that will come from denying vulnerable patients critical health care. This Court should affirm the District Court's Findings of Fact and Conclusions of Law.

## ARGUMENT

### I.    GENDER-AFFIRMING CARE IS SUPPORTED BY A SUBSTANTIAL BODY OF EVIDENCE THAT DOES NOT JUSTIFY SINGLING IT OUT FOR DIFFERENTIAL TREATMENT.

The gender-affirming care prohibited by the Challenged Exclusion was developed through rigorous and appropriate methods and is recommended by every major medical association in the United States. Kellan Baker, *The Future of Transgender Coverage*, 376 New Eng. J. Med. 19, 1801-04 (May 2017); Ayden I. Scheim et al., *Health and Health Care Among Transgender Adults in the United States*, 43 Annual Rev. of Pub. Health 503, 510 (2021); *see also* Gesine Meyer et al., *Safety and rapid efficacy of guideline-based gender-affirming hormone therapy: an analysis of 388 individuals diagnosed with gender dysphoria*, European J. of Endocrinology 155 (2020). Nonetheless, the State characterizes gender-affirming care as "experimental" and questionable treatment that has not been sufficiently

vetted, pointing to the lack of randomized control trials supporting the efficacy of hormone therapy, the duration of the longitudinal studies completed to date, and what they call "low quality" or "very low quality" evidence on gender affirming care. *See* Defs.' Br. 1, 7-8, 11-12, 14-15, 38. Likewise, the State's putative experts also emphasize that using puberty blockers and hormone therapy for gender-affirming care is not approved by the U.S. Food and Drug Administration ("FDA"). Doc. 246 at 49.

These claims about gender affirming care are wrong. As the District Court found, the medical care targeted by the Exclusion is supported by a strong evidentiary base, both in and of itself and in comparison to the evidentiary basis underlying many other forms of commonly provided care. Such attempts to justify the Exclusion reflect a fundamental misunderstanding of medical practice and the ways medical knowledge and treatment guidelines are generated, particularly in the context of pediatric care. Medical providers are not and have never been restricted to providing only those treatments that have been generated via randomized control trial and received FDA approval for the particular indication. Indeed, as explained herein, such restrictions would be impractical and unethical. The medical care targeted by the Exclusion is based on appropriate, ethical study and medical knowledge—it is not "experimental."

To start, the State conflates clinical care with clinical research and fails to engage with the ethical standards attendant to each. Medical care delivered by a clinician to a patient and clinical research have distinct purposes and processes. *See, e.g.*, Nat'l Comm'n for the Protection of Hum. Subjects of Biomedical Rsch., *The Belmont Report: Ethical Principles and Guidelines for the Protection of Human Subjects of Research* (1978) (discussing the importance of distinguishing between research and clinical practice); U.S. Food & Drug Admin., *Clinical Research Versus Medical Treatment* (Mar. 22, 2018), https://www.fda.gov/patients/clinical-trials-what-patients-need-know/clinical-research-versus-medical-treatment (describing differences between clinical research and medical treatment in terms of intent, intended benefit, funding, timeframe, and other factors). In the clinical care setting, the provider's aim is to improve a patient's health, and the provider is duty bound to act in that patient's best interest. By contrast, the aim of a research study is to generate knowledge useful for *future* patients. *See* José A. Sacristán, *Clinical Research and Medical Care: Towards Effective and Complete Integration*, 15 BMC Med. Res. Methodol. (2015), https://www.ncbi.nlm.nih.gov /pmc/articles/PMC4323129/. A research study's protocols must be ethically designed and administered, but there is no obligation to do what is in each participant's best interest. Importantly, receiving gender-affirming care does not automatically render a patient a subject of a research study (and certainly not a

7

subject of experimentation unmoored from ethical standards); gender-affirming medical care has been known to advance individual patients' best interests and is provided as clinical care for that purpose. The very use of the label "experimental" in this context is thus misleading.

Further, opponents of gender-affirming care like the State often misunderstand how medical knowledge is credibly and rigorously generated, and so, among other things, wrongly suggest that the lack of randomized control trials means the care has not been appropriately vetted. *See, e.g.*, *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1217 (11th Cir. 2023) (citing witness emphasizing lack of randomized studies). Not so. There is no one method used to generate medical knowledge in all contexts, and no one method is considered requisite to a treatment being deemed medically appropriate. Rather, medical knowledge and practice are informed by a range of research and clinical inputs that are often dependent on the type of care, context, and state of development. Here, for example, the District Court found that "there is now extensive clinical experience showing excellent results from treatment [of gender dysphoria in minors] with GnRH agonists and cross-sex hormones." Doc. 246 at 40.

A randomized control trial—where some participants are randomly assigned to a treatment group and others are randomly assigned to a control group—is one of many types of credible research designs used to evaluate a medical intervention.

Medical interventions also can be and often are evaluated through observational studies, which include cross-sectional studies (based on data collected from a single point in time), and longitudinal studies (based on data collected from particular individuals over time). *See, e.g.*, Edward L. Hannan, *Randomized Clinical Trials and Observational Studies: Guidelines for Assessing Respective Strengths and Limitations*, 1(3) JACC: Cardiovascular Interventions 211–217 (2008), https://www.sciencedirect.com/science/article/pii/S1936879808001702. In addition, randomized *clinical* trials, which compare different established interventions to one another, may be used to inform medical treatment. For example, a randomized clinical trial has been used to evaluate sex hormone treatment for gender dysphoria, comparing different, established pharmacological treatments to one another. *See* Carla Pelusi et al., *Effects of Three Different Testosterone Formulations in Female-to-Male Transsexual Persons*, 11 J. Sex Med. 3002–3011 (2014), https://www.jsm.jsexmed.org/article/S1743-6095(15)30626-3/fulltext.

Study methods other than randomized control trials and extended longitudinal studies may be preferable in some circumstances, given that these are not always feasible, appropriate, or the most reliable way to evaluate a medical intervention. For instance, randomized control trials are rarely used for interventions focused on children or pregnant people, or for surgical interventions. *See, e.g.*, Denise Thomson et al., *Controlled Trials in Children: Quantity, methodological quality and*

*descriptive characteristics of Pediatric Controlled Trials published 1948–2006*, 5 PLoS One (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2948021/; Katrien Oude Rengerink et al., *Pregnant women's concerns when invited to a randomized trial: A qualitative case control study*, 15 BMC Pregnancy and Childbirth 207 (2015), https://bmcpregnancychildbirth.biomedcentral.com/ articles/10.1186/s12884-015-0641-x; Natalie S. Blencowe et al., *Interventions in randomized controlled trials in surgery: issues to consider during trial design*, 16 Trials (2015), https://doi.org/10.1186/s13063-015-0918-4. Randomized control trials also are only ethical when there is clinical "equipoise," which means they are only appropriate when there is genuine uncertainty about whether the intervention will be more effective than the control. *See* Benjamin Freedman, *Equipoise and the Ethics of Clinical Research*, 317 N. Engl. J. Med. 141–145 (1987), https://www.nejm.org/doi/full/10.1056/NEJM198707163170304. That is because it is unethical to knowingly expose participants to an inferior intervention or control. For example, in acknowledging limitations to its analysis, a 2023 open-label randomized clinical trial assessing the effect of testosterone therapy compared with no treatment on gender dysphoria, depression, and suicidality explained that the trial was limited to three months in order to insure that "participants would not be disadvantaged by waiting longer than standard of care waiting times of 3 months for an initial consultation." Brendan J. Nolan et al., *Early Access to Testosterone*

10

*Therapy in Transgender and Gender-Diverse Adults Seeking Masculinization: A Randomized Clinical Trial*, JAMA Network Open (2023), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2809058.

This principle plainly applies to the excluded treatments for gender dysphoria: performing randomized, placebo-controlled trials on the efficacy of that treatment would be unethical, because the prevailing view among the medical community is that for patients who need it, hormone therapy is superior to a lack of pharmacological treatment. *See id.*

Likewise, opponents of gender-affirming care critique the lack of "long-term studies" regarding its safety and efficacy. This too is wrong. In reality, there are many long-term studies supporting the provision of gender-affirming care to treat gender dysphoria, including for minors.[2] Moreover, the underlying premise of this argument—that long-term studies are necessary to prove a treatment's efficacy and

---

[2] *See, e.g.*, Jack L. Turban et al., *Access to gender-affirming hormones during adolescence and mental health outcomes among transgender adults*, 17(1) PLoS ONE 2 (2022), https://doi.org/10.1371/journal.pone.0261039 (collecting studies); Katherine L. Kraschel et al., *Legislation restricting gender-affirming care for transgender youth: Politics eclipse healthcare*, 3(8) Cell Reports Medicine 4 (2022), https://doi.org/10.1016/j.xcrm.2022.100719 ("Over a dozen studies have collectively linked [gender affirming care] to improvements in depression, anxiety, and suicidality."); *see also Brandt v. Rutledge*, 47 F.4th 661, 671 (8th Cir. 2022) ("According to surveys of the research on hormone treatment for adolescents done by the British National Institute for Health & Care Excellence, several studies have shown statistically significant positive effects of hormone treatment on the mental health, suicidality, and quality of life of adolescents with gender dysphoria. None has shown negative effects.").

11

safety—is mistaken.  Longitudinal studies need not last for some unspecified "long-term" period to be reliable, nor are such studies always the most ethically and legally appropriate.  Often, other reliable and trustworthy methods are preferable.  For example, before conducting longitudinal studies involving children, researchers must consider a child's privacy and autonomy all while maintaining data integrity—a sometimes difficult balancing act that can be avoided by using an alternative study design.  *See, e.g.*, Gert Helgesson, *Children, Longitudinal Studies, and Informed Consent*, 8 Med., Health Care & Philos. 307 (2005), https://doi.org/10.1007/s11019-005-0978-4.

The State also betrays its erroneous understanding of what it means for evidence to be graded as "low-quality."  Defs.' Br. 29.  Under the GRADE system, which is often used for presenting summaries of scientific evidence and making clinical practice recommendations, the level of quality ascribed to evidence is based on the type of research methodology used— evidence generated via a randomized control trial is typically labeled "high quality" and evidence generated via an observational study is typically labeled "low quality."  Howard Balshem et al., *GRADE guidelines: 3. Rating the quality of evidence*, 64(4) J. Clinical Epidemiol. 401 (2011); Holger Schünemann et al. (eds.), *Grading of Recommend., Assess., Dev. & Eval. Handbook* 14 (2013) ("GRADE Handbook").  Randomized trials with limitations such as inconsistent results or publication bias will go down in quality,

and observational studies with a dose-response gradient (relationship between a stimulus and a response) or large magnitude of effect will go up in quality. GRADE Handbook at 13.

These "high quality" and "low quality" labels under GRADE thus are descriptive of the underlying method, but they do not necessarily reflect the reliability of the evidence generated. As noted, observational studies are sometimes favored for both ethical and practical reasons. For example, despite their "low quality" technical category, observational studies have been used in forming the Cholesterol Guidelines of the American College of Cardiology and the American Heart Association. *See* Meredithe McNamara et al., *A Critical Review of the June 2022 Florida Medicaid Report on the Medical Treatment of Gender Dysphoria*, Yale Sch. of Med. 1, 16 (2022). The same is true for a range of other treatments, from gall bladder surgery to the determination that aspirin is not appropriate to treat fevers in children. *See id.* at 14, 16. And with gender-affirming medical care, randomized control trials are not appropriate for the reasons described above. Because randomized control trials are often inappropriate or infeasible, research that falls in the technical category of "low quality" as that term is used in the GRADE system can still be reliable and valuable when it comes to clinical practice. *See* McNamara at 15.

As the District Court found, "low-quality" evidence may be and often is sufficient to justify a strong recommendation for clinical care under that same grading system. Doc. 246 at 40 ("The record includes unrebutted testimony that only about 13.5% of accepted medical treatments across all disciplines are supported by 'high' quality evidence on the GRADE scale."); *see also* GRADE Handbook at 5; Balshem at 402-04 ("A particular level of quality does not imply a particular strength of recommendation. Sometimes, low or very low quality evidence can lead to a strong recommendation."). Accordingly, the treatment for many other conditions, such as drugs for cancer and hematologic disorders, are widely recommended and used based on similarly "low-quality" evidence, without having been studied through randomized, controlled clinical trials. *See* Anthony J. Hatswell et al., *Regulatory approval of pharmaceuticals without a randomised controlled study: analysis of EMA and FDA approvals 1999-2014*, BMJ Open (June 30, 2016), https://pubmed.ncbi.nlm.nih.gov/27363818/. Indeed, if the "low-quality" label were enough to render care suspect, whole swaths of modern care for which randomized control trials are inappropriate for ethical and/or practical reasons would be called into question. *See* Robert J. Ligthelm et al., *Importance of observational studies in clinical practice*, 29(6) Clinical Therapeutics 1284 (2007), https://pubmed.ncbi.nlm.nih.gov/18036390/ (noting that observational evidence is sometimes favored for both ethical and practical reasons). As the District Court

explained, "the fact that research-generated evidence supporting these treatments gets classified as 'low' or 'very low' quality on the GRADE scale does not mean the evidence is not persuasive, or that it is not the best available research-generated evidence on the question of how to treat gender dysphoria, or that medical treatments should not be provided consistent with the research results and clinical evidence." Doc. 246 at 39.

Furthermore, a medication need not be approved by the FDA for a particular indication to be safe and effective for that indication. Off-label drug use is legal, accepted, and, when medically indicated, safe and in service of a patient's best interest. *See Planned Parenthood Cincinnati Region v. Taft*, 444 F.3d 502, 505 (6th Cir. 2006) (observing that off-label use is "a widely employed practice"); Doc. 90 at 38 (similar). Thus, as the District Court explained, "[t]hat the FDA has not approved these drugs for treatment of gender dysphoria says precisely nothing about whether the drugs are safe and effective when used for that purpose." Doc. 246 at 49.

An understanding of the FDA approval process makes clear why there is nothing unsafe or inappropriate about off-label use. Garnering the FDA's approval of a drug requires showing that it is both safe—*i.e.*, the benefits outweigh the potential risks—and effective for its intended use. *See* U.S. Food & Drug Admin., *The FDA's Drug Review Process: Ensuring Drugs Are Safe and Effective* (Nov. 24, 2017), https://www.fda.gov/drugs/information-consumers-and-patients-drugs/fdas-

drug-review-process-ensuring-drugs-are-safe-and-effective. It is well-established practice that once a drug has been approved by the FDA, health care providers may then prescribe it for other medically appropriate uses and in other dosages at their discretion without pharmaceutical companies first having to return to the FDA and seek approval for each indication. *See Taft*, 444 F.3d at 505. Such off-label use occurs because medical knowledge about how a drug might be beneficial in a different context or a different dosage continues to develop after FDA approval, but it is often too costly and impractical for drug makers to put each possible use of a drug through the FDA's "formal, lengthy, and expensive" approval process. Am. Cancer Soc'y, *Off-Label Drug Use* (Mar. 17, 2015), https://www.cancer.org/treatment/treatments-and-side-effects/treatment-types/off-label-drug-use.html (noting that off-label drug use is "well-documented and very common in" oncology, "pediatrics and HIV/AIDS care"); Doc. 246 at 49-50. In addition, providers often prefer that drug makers *not* seek approval for every off-label use, given that it could increase the cost of the drug and limit the scope of its clinical application, all of which would make it less available to their patients. *See id.*; Cong. Rsch. Serv., *Off-Label Use of Prescription Drugs* 4 (Feb. 23, 2021), https://sgp.fas.org/crs/misc/R45792.pdf.

Off-label use of medication is common and "generally accepted." *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 351 (2001); Christopher M. Wittich et al.,

16

*Ten common questions (and their answers) about off-label drug use*, 87 Mayo Clinic Proc. 982–990 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3538391/ (discussing off-label drug uses that have "become widely entrenched in clinical practice and become predominant treatments for a given clinical condition" and citing studies showing that in a group of commonly used medications, 21% of prescriptions were for off-label use). For example, about half of drugs used to treat cancer are prescribed off label. *See* Am. Soc'y of Clinical Oncology, *Reimbursement for cancer treatment: Coverage of off-label drug indications*, 24 J. Clinical Oncology 3206–3208 (2006), https://ascopubs.org/doi/10.1200/JCO.2006.06.8940.

Off-label use is legal because FDA approval only limits how a drug can be marketed—*i.e.*, a drug cannot be marketed for a use different from its FDA-approved use—but not how a physician can prescribe it. *See Buckman*, 531 U.S. at 351 & n.5 (explaining that "[o]ff-label usage . . . is an accepted and necessary corollary of the FDA's mission to regulate in this area without directly interfering with the practice of medicine"); John J. Smith, *Physician Modification of Legally Marketed Medical Devices: Regulatory Implications Under the Federal Food, Drug, & Cosmetic Act*, 55 Food & Drug L.J. 251–252 (2000) (discussing off-label use and noting that "regulatory efforts are directed primarily at device marketing by manufacturers, not device use by physicians").

17

In fact, multiple federal and state laws have been enacted in recent years to promote and protect off-label prescriptions. *See, e.g.*, Okla. Rev. Stat. § 63-1-2604 (prohibiting health insurers from excluding coverage of off-label cancer treatments); Am. Soc'y of Clinical Oncology, *Recent Developments in Medicare Coverage of Off-Label Cancer Therapies*, 5 J. Oncology Practice 18–20 (2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2790627/ (discussing 1993 legislation requiring Medicare to cover off-label uses of anti-cancer drugs and an expansion of Medicare's off-label coverage in 2008).

Off-label use is especially common and important in treating minors. Minors are often excluded from clinical drug studies, including for ethical reasons. *See* Wittich (citing study finding that nearly 80% of children discharged from pediatric hospitals were taking at least one off-label medication and discussing range of widely practiced off-label drug uses in pediatric population); H. Christine Allen et al., *Off-Label Medication Use in Children, More Common Than We Think: A Systematic Review of the Literature*, 111 J. Okla State Med. Assoc. 776–783 (2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6677268 (surveying ten years of literature and finding that "[t]he use of off-label medications in children remains a common practice for pediatric providers").

Finally, and critically, off-label use is often essential for delivering the best care. James M. Beck & Elizabeth D. Azari, *FDA, Off-Label Use, and Informed*

*Consent: Debunking Myths and Misconceptions*, 53 Food & Drug L.J. 71–104 (1998), https://pubmed.ncbi.nlm.nih.gov/11795338/ ("Off-label use is widespread in the medical community and often is essential to giving patients optimal medical care, both of which medical ethics, FDA, and most courts recognize."); William Janssen, *A Historical Perspective on Off-Label Medicine: From Regulation, Promotion, and the First Amendment to the Next Frontiers*, SSRN Elec. J. (2014), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2519223 (explaining that in some circumstances, "a physician's failure to prescribe the medical product for such an unapproved use can constitute medical malpractice").

Thus, off-label use is legal, common, and often essential for delivering medically necessary care. Any suggestion otherwise—including the Sixth Circuit's contention, embraced by the Eleventh Circuit, that off-label use signals that "the FDA is not prepared to put its credibility and testing protocols behind the [drug's] use," *L.W.*, 83 F.4th at 478; *see also Eknes-Tucker*, 80 F.4th at 1225 n.19—greatly misunderstands and misstates how the FDA works.

\* \* \*

In sum, none of the State's proclaimed "justifications" for the Challenged Exclusion hold up to scrutiny. Contrary to the State's claims, the Challenged Exclusion does not prohibit treatment that is "experimental." The State's arguments are based on a fundamental misunderstanding of both how scientific knowledge is

generated and the FDA approval process. Treatment methods do not require a randomized control trial, observational studies of a specific length, exclusively "high quality" evidence, or on-label use to be safe and effective. Indeed, were the State's erroneous arguments an acceptable basis for excluding medical care coverage, a significant portion of modern medical practice could be excluded from coverage, including almost all forms of pediatric health care, much of adult health care, and a significant portion of cancer care, and would inflict unjustifiable harm on transgender Medicaid beneficiaries.

## II.    THE CHALLENGED EXCLUSION CONTRAVENES KEY TENETS OF BIOMEDICAL ETHICS.

The Challenged Exclusion eliminates a patient's ability to make a decision, together with their medical providers, about whether accessing a safe and effective form of treatment is in their best interest. As a result, the Exclusion is directly at odds with key tenets of biomedical ethics: respect for autonomy, beneficence, and justice. Tom L. Beauchamp & James F. Childress, *Principles of Biomedical Ethics*, 13 (8th ed. 2019). These universal principles, which are the cornerstones of modern-day healthcare standards, guide providers' treatment decisions regardless of the type of medical care they are providing, and can provide "meaningful guidance" to courts assessing wholesale bans on and/or exclusions of coverage for care. *Contra L.W.*, 83 F.4th at 478. To be clear, *amici* do not invoke these principles to suggest that they provide the legal test pursuant to which judges should "assess the validity of

20

[the Exclusion]." *Id*. Rather, *amici* discuss how the Exclusion compromises these principles rather than protecting them. *Amici* have a strong interest in ensuring that courts and policymakers alike have an accurate understanding of bioethics, and the discussion that follows accordingly explains why the Exclusion is irreconcilable with bioethical principles and therefore why any asserted interest in advancing bioethics should not be credited.

### A. The Challenged Exclusion Forces Providers to Disregard Patients' Autonomy.

As a general matter, Florida has repeatedly acknowledged the importance of obtaining informed consent and respecting patient decision making, reflecting the core biomedical ethical principle of respect for autonomy. That principle requires that patients have the ability to decide whether to receive appropriate medical care within the framework of informed consent. Beauchamp & Childress at 105. For example, Florida has rendered the failure to adequately obtain informed consent tortious and has created a standard jury instruction on how to evaluate the negligent failure to obtain informed consent. Fla. Stat. § 766.103 (discussing medical malpractice claim involving lack of informed consent); Fla. Standard Jury Instruction No. 402.7. Florida also has enacted a "Right to Try" law, which allows a terminally ill patient, in consultation with their physician, to give "informed

consent" to use non-FDA approved drugs and medical products in order to treat their illness. Fla. Stat. § 499.0295(2)(a)(3).[3]

In stark contrast to these laws reflecting the core principle of autonomy, the Challenged Exclusion attacks autonomy by preventing individuals from pursuing, and health care professionals from providing, beneficial medical treatment with due regard for a patient's interests.

Empowering a patient's autonomy is essential to the integrity of the provider-patient relationship, as well as the patient's individual liberty and ability to determine the course of their life. In keeping with that bioethical principle, "the physician's professional role [is] to make recommendations on the basis of the best available medical evidence and to pursue options that comport with the patient's unique health needs, values, and preferences." Lois Snyder Sulmasy & Thomas A. Bledsoe, *American College of Physicians Ethics Manual* 170, Annals of Internal Medicine 86 (7th ed. 2019) ("ACP *Ethics Manual*"), https://www.acpjournals.org/doi/10.7326/m18-2160; *see also* Beauchamp & Childress at 105 (respect for autonomy requires health care professionals "to disclose information, to probe for and ensure understanding and voluntariness, and to foster adequate decision making"). Informed consent is a crucial mechanism for

---

[3] Florida's "Right to Try" law also undermines the State's argument that off-label usage is problematic and therefore a sufficient justification to prohibit care.

ensuring respect for autonomy. In all non-emergency encounters, the provider is obligated to offer the patient material information and guidance, but the patient must be trusted and empowered to make the informed and voluntary decision that best advances their interests. *See* Parth Shah et al., *Informed Consent* (2021), https://www.ncbi.nlm.nih.gov/books/NBK430827/. After the patient makes their decision, the provider's duty is to "protect and foster [the] patient's free, uncoerced choices." ACP *Ethics Manual* at 74.

Where, as here, the patients at issue include minors, the informed consent process usually involves the provider, the minor patient, and the minor's parents. When that is so, each actor has an important role to play: the provider offers medical instruction, the parents provide stewardship and consent, and the minor—assisted by that medical instruction and parental stewardship—provides assent. *See* Am. Med. Ass'n ("AMA"), *Code of Medical Ethics Opinion 2.2.1*, *Pediatric Decision Making*, https://www.ama-assn.org/delivering-care/ethics/pediatric-decision-making (discussing the importance of "[r]espect and shared decision making" between parents and minors "in the context of decisions for minors"); Beth A. Clark, *Ethics in Child & Youth Care Practice with Transgender Youth*, 8 Int'l J. of Child, Youth & Fam. Studies 74 (2017), http://dx.doi.org/10.18357/ijcyfs82201716754 (discussing relational ethics).

The process of informed consent (which, for minors, also frequently includes their parents) involves five core elements: 1) patient competence, 2) disclosure, 3) comprehension, 4) voluntariness, and 5) consent. Beauchamp & Childress at 122. As to the first element, parents generally have competence to participate in the informed consent process on behalf of their minor children, and many adolescent patients also have the competence to participate in the informed consent process, including in the context of gender-affirming care. *See* Jessica Kremen et al., *Addressing Legislation That Restrict Access to Care for Transgender Youth*, 147 Pediatric Perspectives (2021), https://pubmed.ncbi.nlm.nih.gov/33883246/ (minor patients who are transgender "possess decisional capacity, and with guardian consent and the support of a multidisciplinary team, [] are able to contribute to decisions in their own best interests about [Gonadotropin Releasing Hormones] and gender-affirming hormones"); Beth A. Clark & Alice Virani, *This Wasn't a Split-Second Decision: An Empirical Ethical Analysis of Transgender Youth Capacity, Rights, and Authority to Consent to Hormone Therapy*, 18 J. Bioethical Inquiry 151–164 (2021), https://pubmed.ncbi.nlm.nih.gov/33502682/ (concluding, based on qualitative empirical analysis, that "trans[gender] youth demonstrated the understandings and abilities characteristic of the capacity to consent to hormone therapy and that they did consent to hormone therapy with positive outcomes"); Richard E. Redding, *Children's Competence to Provide Informed Consent for*

24

*Mental Health Treatment*, 50 Wash. & Lee L. Rev. 695, 707 (1993), https://scholarlycommons.law.wlu.edu/cgi/viewcontent.cgi?article=1759&context=wlulr ("Research . . . indicates that children often are capable of making important life decisions in a rational manner, including decisions about medical and psychological treatment.").

Once competence has been established, the elements of disclosure and comprehension require the provider to accurately and sensitively present relevant information about any diagnosis; the nature and purpose of recommended interventions; the burdens, risks, and expected benefits of all options, including forgoing treatment; and any limitations to the medical community's knowledge regarding burdens, risks, and expected benefits.  AMA, *Code of Medical Ethics Opinion 2.1.1, Informed Consent*, https://www.ama-assn.org/delivering-care/ethics/informed-consent; Aníbal Torres Bernal & Deborah Coolhart, *Treatment and Ethical Considerations with Transgender Children and Youth in Family Therapy*, 23 J. of Fam. Psychotherapy 296, 287–303 (2012), http://dx.doi.org/10.1080/08975353.2012.735594.

For the fourth element, voluntariness, the provider must then assess the patient's (and, if not a mature minor, the parents') ability to understand relevant medical information and the implications of treatment alternatives and to make an independent, voluntary decision.  AMA *Informed Consent*.  Fifth, and finally, the

patient—and, where the patient is a minor, usually the parents as well—decides how to proceed.

From the perspective of biomedical ethics, a decision that is made by a patient (and, when a minor, jointly with a parent/guardian) through a process of informed consent and that aligns with a provider's recommendation should be fully respected. Indeed, medical professionals and patients are regularly entrusted to together decide the best course of treatment, including when the treatment has significant risks or permanent effects. Pediatric chemotherapy or radiation, for example, are subject to principles of informed consent, despite the potential lasting effects on growth development and reproductive capabilities. *See, e.g.*, Am. Cancer Soc'y, *Late Effects of Childhood Cancer Treatment* (Sept. 18, 2017), https://www.cancer.org/treatment/children-and-cancer/when-your-child-has-cancer/late-effects-of-cancer-treatment.html. Pediatric breast reduction performed to address excess breast tissue, back pain, or social anxiety; pediatric rhinoplasty; and orthopedic surgery on minors following sports injuries likewise can have enduring impacts. There is nothing unique about gender-affirming care that justifies denying coverage even though the provider, and the patient (and the patient's parents, when a minor) all agree about the best course of action.

By prohibiting health care providers from offering medically necessary and appropriate treatment to economically disadvantaged patients with gender dysphoria

and denying patients the ability to access such care when they have given informed consent, the Challenged Exclusion disrespects autonomy and undermines the provider-patient relationship.

### B. The Challenged Exclusion Forces Providers to Violate Their Duty of Beneficence.

The duty to act in the best interest of the patient is called beneficence, and is best understood as "a group of norms pertaining to relieving, lessening, or preventing harm and providing benefits and balancing benefits against risks and costs." Beauchamp & Childress at 13; *see also id.* at 217 ("[M]orality requires that we treat persons autonomously and refrain from harming them, but morality also requires that we contribute to their welfare.").[4]  Medical professionals in the United States and around the world take oaths and are held to duties that encompass beneficence. The World Medical Association's "Modern Hippocratic Oath" requires physicians to attest upon admission to the medical profession that the "health of [their] patient[s] will be [their] first consideration."  World Medical Association, *Declaration of Geneva* (1948).  Likewise, the United Kingdom's General Medical Council requires

---

[4] A related principle, nonmaleficence, concerns avoiding the causation of harm. Nonmaleficence thus prohibits action while beneficence requires it.  The Challenged Exclusion contravenes both principles.

physicians to "make the care of your patient your first concern." *Good medical practice: Duties of a doctor registered with the General Medical Council*, Gen. Med. Council 70–78 (2001), https://www.gmc-uk.org/ethical-guidance/ethical-guidance-for-doctors/good-medical-practice/duties-of-a-doctor.   And the AMA recognizes that "[t]he practice of medicine, and its embodiment in the clinical encounter between a patient and a physician, is fundamentally a moral activity that arises from the imperative to care for patients and to alleviate suffering."   AMA, *Code of Medical Ethics Opinion 1.1.1*, *Patient-Physician Relationships*, https://www.ama-assn.org/system/files/code-of-medical-ethics-chapter-1.pdf.

Medicaid embodies the principal of beneficence by ensuring the welfare of economically disadvantaged individuals.  The program provides individuals with increased access to and better quality of health care.  The government thus prevents harm by providing patients with safe and beneficial health care.  Conversely, the denial of such care results in serious harm to individuals and negatively impacts the health, safety, and well-being of a community.

Applying the principle of beneficence to the treatment of Medicaid beneficiaries with gender dysphoria is straightforward.  When untreated, gender dysphoria has serious mental and physical consequences, including anxiety, depression, self-harm, and suicidality. *See, e.g.*, Norman P. Spack et al., *Children and adolescents with gender identity disorder referred to a pediatric medical center*,

28

129 Pediatrics (2012), https://pubmed.ncbi.nlm.nih.gov/22351896; Kristina R. Olson et al., *Mental health of transgender children who are supported in their identities*, Pediatric Collections: LGBTQ+: Support and Care (Part 3: Caring for Transgender Children) (2016) https://publications.aap.org/pediatrics/articleabstract/137/3/e20153223/81409/Mental-Health-of-Transgender-Children-Who-Are; Doc. 246 at 21 (crediting testimony that denying gender-affirming care "will cause needless suffering for a substantial number of patients and will increase anxiety, depression, and the risk of suicide"); Doc. 246 at 40. By contrast, evidence from both research and clinical experience makes clear that gender-affirming care improves patients' health and alleviates their suffering. *See, e.g.*, *Brandt*, 47 F.4th at 671; *Brandt v. Rutledge*, 551 F. Supp. 3d 882, 891 (E.D. Ark. 2021); Kraschel at 4. In order to practice beneficence, practitioners must act for the benefit of the patient and promote their welfare. This is not possible when the State denies Medicaid coverage to transgender beneficiaries. The Challenged Exclusion prohibits providers from administering care that would relieve their patient's suffering. Withholding care for gender dysphoria thus can result in serious harm to patients, contrary to the core principle of beneficence.

In sum, the principle of beneficence obligates providers to remove conditions that will cause harm to others. Beauchamp & Childress at 219. By mandating that providers deny care to their economically disadvantaged patients with gender

dysphoria when the patient seeks that care and the provider deems it medically indicated, the Challenged Exclusion forces providers to cause harm to their patients and, thus, to violate their core duty of beneficence.

### C. The Challenged Exclusion Forces Providers to Violate Their Duty of Justice.

A third core principle of bioethics—justice—requires providers to acknowledge inequalities in the delivery of medical care and to work toward fair, equitable, and appropriate treatment for all. Beauchamp & Childress at 267–68; Clark, *Ethics in Child & Youth Care Practice with Transgender Youth* at 79. The Challenged Exclusion undermines this ethical duty of providers by barring transgender Medicaid beneficiaries from receiving gender-affirming care. Specifically, the Exclusion denies care to a certain class of economically disadvantaged patients based on their transgender identity: coverage for care is banned only if it is for treatment of gender dysphoria, which is care that only transgender individuals seek. Moreover, by limiting access to care for only Medicaid beneficiaries, the Exclusion requires providers to differentiate between their economically disadvantaged transgender patients and all other patients seeking the same care. The Exclusion thus imposes medical strain and financial costs on only those patients who rely on Medicaid.

For example, the Exclusion, if allowed to go into effect, may force Medicaid beneficiaries who are transgender to consider moving out of state or to endure the

negative health effects from stopping hormone therapy and to fear for their ability to survive without treatment.  *See* Doc. 1, Compl. ¶¶ 213, 248.  These potential costs are on top of the many socioeconomic and geographic barriers to gender-affirming care that transgender youth often already face.  *See* Phillip E. Wagner et al., 39.1 *Health (Trans)gressions: Identity and Stigma Management in Trans\* Healthcare Support Seeking* 51 (Oct. 2016) (noting "[t]he difficult decisions trans\* individuals make in regard to their healthcare have been well documented" and include "[f]inancial barriers, insurance issues, and access to services").  The Exclusion exacerbates and reinforces these already significant challenges by preventing transgender Medicaid beneficiaries from accessing the gender-affirming healthcare they require.

Also, being denied coverage for gender-affirming care may lead transgender people to avoid seeking medical care altogether, or to choose between their health care, their food, their safety, or their housing.  Compl. ¶¶ 145, 148, 150, 152, 243-244; s*ee also* Kraschel at 5 (noting potential of legislative restrictions on gender-affirming care to disproportionally affect marginalized communities).  Avoiding or delaying care leads "to poorer physical and mental health outcomes."  Luisa Kcomt et al., *Healthcare avoidance due to anticipated discrimination among transgender*, 11(100608)      SSM      -      Population      Health      1      (2020), https://www.sciencedirect.com/science/article/pii/S2352827320302457.

Medical practitioners must not cause patients to fear seeking care, nor deny them care that, by definition, only people who are transgender need. The Challenged Exclusion forces health care providers to violate the core biomedical ethics principle of justice by mandating discrimination against a vulnerable, economically disadvantaged, and stigmatized population. By prohibiting transgender Medicaid beneficiaries from accessing treatment for gender dysphoria simply because they are transgender and economically disadvantaged, the Challenged Exclusion deprives them of their autonomy and signals that they are not worthy of beneficence. Without autonomy and beneficence, only injustice can occur.

* * *

The Challenged Exclusion is unsupported by biomedical ethics or any of its core principles. To the contrary, the Exclusion commands their violation, for no legitimate purpose, resulting in physical and emotional suffering.

## CONCLUSION

Unwarranted restrictions on the provision of health care by the State are unethical and detrimental to public health. The Challenged Exclusion contravenes multiple, fundamental principles of biomedical ethics and requires providers to harm their transgender patients who are Medicaid beneficiaries. Were the State permitted to enforce the Challenged Exclusion, it would open the door to unprecedented State

32

intrusion into medicine and patient rights.  This Court should reject such a result and

affirm the District Court's Findings of Fact and Conclusion of Law.

Dated November 29, 2023                          Respectfully Submitted,

                                                 /s/ Kathleen Hartnett

Katelyn Kang                                     Kathleen Hartnett
COOLEY LLP                                       Zoë Helstrom
55 Hudson Yards                                  COOLEY LLP
New York, NY 10001-2103                          3 Embarcadero Center, 20th Floor
Telephone: (212) 479-6000                        San Francisco, California 94111-4004
kkang@cooley.com                                 Telephone: (415) 693-2000
                                                 khartnett@cooley.com
                                                 zhelstrom@cooley.com

                                                 *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on November 29, 2023, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Eleventh Circuit and served through CM/ECF upon all counsel of record in this case.

Dated: November 29, 2023                    */s/ Kathleen Hartnett*
                                             Kathleen Hartnett

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations set forth in Fed. R. App. P. 32(a)(7)(B)(i) because it contains 6,420 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: November 29, 2023

*/s/ Kathleen Hartnett*
Kathleen Hartnett

## APPENDIX

<u>List of *Amici Curiae*</u>

*Amici* include the following individuals, whose affiliations are provided for identification purposes only:

**Aziza Ahmed**
Professor of Law
Boston University School of Law

**Khiara M. Bridges**
Professor of Law
University of California, Berkeley School of Law

**David S. Cohen**
Professor of Law
Drexel University, Thomas R. Kline School of Law

**I. Glenn Cohen**
Deputy Dean, James A. Attwood and Leslie Williams Professor of Law, and Faculty Director, Petrie-Flom Center for Health Law Policy, Biotechnology & Bioethics
Harvard Law School

**Charlene Galarneau**
Senior Lecturer, Department of Global Health and Social Medicine
Faculty Member, Center for Bioethics
Harvard Medical School

Associate Professor Emerita
Women's and Gender Studies Department
Wellesley College

Affiliate Researcher, Center for Antiracist Research
Boston University

**Joanna Grossman**
Ellen K. Solender Endowed Chair in Women and the Law and Professor of Law
SMU Dedman School of Law

**Lisa C. Ikemoto**
Martin Luther King Jr. Professor of Law
University of California, Davis School of Law

**Maya Manian**
Professor of Law
American University Washington College of Law

**Michelle Oberman**
Katharine and George Alexander Professor of Law
Santa Clara University School of Law

**Dara Purvis**
Professor of Law
Penn State Law

**Rachel Rebouché**
Dean and Peter J. Liacouras Professor of Law
Temple University Beasley School of Law

**Jessica Silbey**
Professor of Law
Boston University School of Law

**Michael R. Ulrich**
Assistant Professor
Boston University School of Public Health and School of Law