

Washington, D.C.
Virginia
Florida
Arizona
New York
**holtzmanvogel.com**

March 17, 2026

David J. Smith
Clerk of Court
U.S. Court of Appeals for the Eleventh Circuit
56 Forsyth St., N.W.
Atlanta, Georgia 30303

> RE:   *Dekker v. Secretary, Florida Agency for Health Care Administration*,
>         No. 23-12155 (Argued November 22, 2024)

Dear Mr. Smith,

The Secretary of the Florida Agency for Health Care Administration and the agency itself submit this letter under Federal Rule of Appellate Procedure 28(j). They do so to bring to this Court's attention the Fourth Circuit's decision in *Anderson v. Crouch*, No. 22-1927, 2026 WL 667919, 2026 U.S. App. LEXIS 7026 (4th Cir. Mar. 10, 2026). Attached Slip Opinion.

*Anderson* reversed a district court's decision that found West Virginia's refusal to cover sex-change surgeries under the Medicaid Act a violation of the Equal Protection Clause, the Affordable Care Act, and the Medicaid Act. It tethered the decision to *United States v. Skrmetti*, 605 U.S. 495 (2025), and *Medina v. Planned Parenthood South Atlantic*, 606 U.S. 357 (2025).

"*Skrmetti* compels the conclusion that the policy violates neither the Equal Protection Clause nor the Affordable Care Act," explained the Fourth Circuit. Slip op. at 5. There's no discrimination based on sex. Or transgender status. Or any protected trait. West Virginia instead made a distinction based on a medical diagnosis for gender dysphoria. Its reasons for making the distinction were rational. And, per the Fourth Circuit, because *Skrmetti* controls for purposes of the Affordable Care Act's analysis, there's no violation of that law.

"*Medina*, in turn, dictates that Plaintiffs lack a cause of action under the Medicaid Act['s]" availability and comparability requirements. *Id.* The availability requirement mandates that states cover certain categories of care under their Medicaid programs. 42 U.S.C. § 1396a(a)(10)(A). The comparability requirement prevents states from discriminating between certain groups of beneficiaries when covering care. 42 U.S.C. § 1396a(a)(10)(B). Neither includes clear and unambiguous rights-creating language that would allow for a private cause of action. The broader statutory context doesn't provide for one either.

*Skrmetti* and *Medina* should have the same effect in this case as they did in *Anderson*. Florida's distinctions based on medical diagnosis don't violate the Equal Protection Clause or the



Affordable Care Act. And there's no private cause of action for Plaintiffs' claims under the Medicaid Act's EPSDT and comparability requirements. *Anderson* goes to the core of the supplemental briefing this Court ordered on *Skrmetti* and *Medina*.

Respectfully submitted,

/s/ Mohammad O. Jazil
Mohammad O. Jazil
*Counsel for Secretary, Florida Agency for Health Care Administration and the Agency*

Encl.



## CERTIFICATE OF SERVICE

I certify that on March 17, 2026, I electronically filed this 28(j) letter with the Clerk of Court for the U.S. Court of Appeals for the Eleventh Circuit using the CM/ECF system. Counsel for the participants in this case were served through the CM/ECF system as well.

/s/ Mohammad O. Jazil
Mohammad O. Jazil
*Counsel for Secretary, Florida Agency for Health Care Administration and the Agency*

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-1927**

---

SHAUNTAE ANDERSON, individually and on behalf of all others similarly situated,

Plaintiffs – Appellees,

v.

WILLIAM CROUCH, in his official capacity as Cabinet Secretary of the West Virginia Department of Health and Human Resources; CYNTHIA BEANE, in her official capacity as Commissioner for the West Virginia Bureau for Medical Services; WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES, Bureau for Medical Services,

Defendants – Appellants.

------------------------------

STATE OF WEST VIRGINIA; COMMONWEALTH OF KENTUCKY; COMMONWEALTH OF VIRGINIA; STATE OF ALABAMA; STATE OF ALASKA; STATE OF ARKANSAS; STATE OF FLORIDA; STATE OF GEORGIA; STATE OF INDIANA; STATE OF IOWA; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF MISSISSIPPI; STATE OF MISSOURI; STATE OF MONTANA; STATE OF NEBRASKA; STATE OF NORTH DAKOTA; STATE OF OHIO; STATE OF OKLAHOMA; STATE OF SOUTH CAROLINA; STATE OF TEXAS; STATE OF UTAH,

Amici Supporting Appellants,

COLORADO; DELAWARE; DISTRICT OF COLUMBIA; FAIRNESS WEST VIRGINIA; MOUNTAIN STATE JUSTICE, INC.; NATIONAL HEALTH LAW PROGRAM; CENTER FOR MEDICARE ADVOCACY; CONSTITUTIONAL LAW PROFESSORS; AMERICAN MEDICAL ASSOCIATION; ENDOCRINE SOCIETY; NATIONAL ASSOCIATION OF NURSE PRACTITIONERS IN WOMEN'S HEALTH; AMERICAN PSYCHIATRIC ASSOCIATION; SOCIETY OF OB/GYN HOSPITALISTS; ILLINOIS; MAINE; MARYLAND; MASSACHUSETTS;

MINNESOTA; NEVADA; NEW JERSEY; NEW MEXICO; NEW YORK; OREGON; RHODE ISLAND; VERMONT; WASHINGTON,

Amici Supporting Appellees.

---

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington.  Robert C. Chambers, District Judge.  (3:20-cv-00740)

---

Argued:  December 9, 2025                          Decided:  March 10, 2026

---

Before NIEMEYER, RICHARDSON, and RUSHING, Circuit Judges.

---

Reversed and remanded by published opinion.  Judge Richardson wrote the opinion, in which Judges Niemeyer and Rushing joined.

---

**ARGUED:**  Caleb B. David, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Appellants.  Omar Francisco Gonzalez-Pagan, LAMBDA LEGAL DEFENSE & EDUCATION FUND, INC., New York, New York, for Appellees.  **ON BRIEF:**  Kimberly M. Bandy, Lou Ann S. Cyrus, Roberta F. Green, SHUMAN MCCUSKEY SLICER PLLC, Charleston, West Virginia, for Appellants. Avatara Smith-Carrington, Washington, D.C., Tara L. Borelli, Carl Charles, Decatur, Georgia, Nora Huppert, LAMBDA LEGAL DEFENSE AND EDUCATION FUND, INC., Chicago, Illinois; Anna P. Prakash, Nicole J. Schladt, NICHOLS KASTER, PLLP, Minneapolis, Minnesota; Walt Auvil, THE EMPLOYMENT LAW CENTER, PLLC, Parkersburg, West Virginia, for Appellees.  Patrick Morrisey, Attorney General, Lindsay S. See, Solicitor General, Michael R. Williams, Senior Deputy Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Amicus State of West Virginia.  Howard S. Suskin, Lillian M. McGuire, Chicago, Illinois, Matthew D. Cipolla, New York, New York, Christina M. Isnardi, JENNER & BLOCK LLP, Washington, D.C.; Shana L. Fulton, Sarah M. Saint, BROOKS PIERCE MCLENDON HUMPHREY & LEONARD, LLP, Greensboro, North Carolina, for Amici The American Medical Association and Four Additional Health Care Organizations.  Jah Akande, Alicia M. Penn, Evan X. Tucker, MCGUIREWOODS LLP, Richmond, Virginia, for Amici Fairness West Virginia and Mountain State Justice, Inc.  Letitia James, Attorney General, Barbara D. Underwood, Solicitor General, Ester Murdukhayeva, Deputy Solicitor General, Daniel S. Magy, Assistant Solicitor General, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, New York, New York, for Amicus State of New York.

2

Philip J. Weiser, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF COLORADO, Denver, Colorado, for Amicus State of Colorado. Kathleen Jennings, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF DELAWARE, Wilmington, Delaware, for Amicus State of Delaware. Kwame Raoul, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ILLINOIS, Chicago, Illinois, for Amicus State of Illinois. Aaron M. Frey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MAINE, Augusta, Maine, for Amicus State of Maine. Brian E. Frosh, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Amicus State of Maryland. Maura Healey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MASSACHUSETTS, Boston, Massachusetts, for Amicus Commonwealth of Massachusetts. Keith Ellison, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MINNESOTA, St. Paul, Minnesota, for Amicus State of Minnesota. Aaron D. Ford, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEVADA, Carson City, Nevada, for Amicus State of Nevada. Matthew J. Platkin, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY, Trenton, New Jersey, for Amicus State of New Jersey. Hector Balderas, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW MEXICO, Santa Fe, New Mexico, for Amicus State of New Mexico. Ellen F. Rosenblum, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OREGON, Salem, Oregon, for Amicus State of Oregon. Peter F. Neronha, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF RHODE ISLAND, Providence, Rhode Island, for Amicus State of Rhode Island. Susanne R. Young, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VERMONT, Montpelier, Vermont, for Amicus State of Vermont. Robert W. Ferguson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, Olympia, Washington, for Amicus State of Washington. Karl A. Racine, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF THE DISTRICT OF COLUMBIA, Washington, D.C., for Amicus District of Columbia. Katie R. Eyer, Professor of Law, RUTGERS LAW SCHOOL, Camden, New Jersey; Andrew Barr, Denver, Colorado, Kathleen Hartnett, COOLEY LLP, San Francisco, California, for Amici Constitutional Law Professors. Martha Jane Perkins, NATIONAL HEALTH LAW PROGRAM, Chapel Hill, North Carolina; Alice Bers, Wey-Wey Kwok, CENTER FOR MEDICARE ADVOCACY, Willimantic, Connecticut, for Amici The National Health Law Program and Center for Medicare Advocacy. Andrew Bailey, Attorney General, Joshua M. Divine, Solicitor General, Kenneth C. Capps, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MISSOURI, Jefferson City, Missouri, for Amicus State of Missouri. Steve Marshall, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALABAMA, Montgomery, Alabama, for Amicus State of Alabama. Treg Taylor, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ALASKA, Anchorage, Alaska, for Amicus State of Alaska. Tim Griffin, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ARKANSAS, Little Rock, Arkansas, for Amicus State of Arkansas. Ashley Moody, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF FLORIDA, Tallahassee, Florida, for Amicus State of Florida. Christopher M. Carr, Attorney General, OFFICE OF THE ATTORNEY

3

GENERAL OF GEORGIA, Atlanta, Georgia, for Amicus State of Georgia. Theodore E. Rokita, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF INDIANA, Indianapolis, Indiana, for Amicus State of Indiana. Brenna Bird, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF IOWA, Des Moines, Iowa, for Amicus State of Iowa. Kris W. Kobach, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF KANSAS, Topeka, Kansas, for Amicus State of Kansas. Daniel Cameron, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF KENTUCKY, Frankfort, Kentucky, for Amicus Commonwealth of Kentucky. Sean D. Reyes, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF UTAH, Salt Lake City, Utah, for Amicus State of Utah. Jeff Landry, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF LOUISIANA, Baton Rouge, Louisiana, for Amicus State of Louisiana. Lynn Fitch, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MISSISSIPPI, Jackson, Mississippi, for Amicus State of Mississippi. Austin Knudsen, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MONTANA, Helena, Montana, for Amicus State of Montana. Michael T. Hilgers, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEBRASKA, Lincoln, Nebraska, for Amicus State of Nebraska. Drew H. Wrigley, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NORTH DAKOTA, Bismarck, North Dakota, for Amicus State of North Dakota. Dave Yost, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbia, Ohio, for Amicus State of Ohio. Gentner Drummond, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OKLAHOMA, Oklahoma City, Oklahoma, for Amicus State of Oklahoma. Alan Wilson, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Amicus State of North Carolina. Ken Paxton, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF TEXAS, Austin, Texas, for Amicus State of Texas. Jason S. Miyares, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Amicus Commonwealth of Virginia.

RICHARDSON, Circuit Judge:

West Virginia's Medicaid plan does not provide coverage for sex-change surgeries. Although our Court previously affirmed a district court's decision that this policy violated the Equal Protection Clause, the Affordable Care Act, and the Medicaid Act, the Supreme Court vacated that decision and remanded for reconsideration.[1]  In light of the Supreme Court's recent decisions in *United States v. Skrmetti*, 605 U.S. 495 (2025) and *Medina v. Planned Parenthood South Atlantic*, 606 U.S. 357 (2025), we must reverse.  *Skrmetti* compels the conclusion that the policy violates neither the Equal Protection Clause nor the Affordable Care Act.  *Medina*, in turn, dictates that Plaintiffs lack a cause of action under the Medicaid Act.

## I.    BACKGROUND

West Virginia's Medicaid plan reimburses covered individuals for a variety of healthcare needs.  But the plan does not cover every attainable medical service.  West Virginia excludes a long list of treatments from coverage, including "infertility services," "cosmetic procedures . . . the primary purpose of which is to improve the member's appearance," and "weight reduction (obesity) clinics/programs," just to name a few.  J.A. 941–43.  Today's case concerns West Virginia's choice to exclude coverage for "transsexual" or "[s]ex change" surgeries.  J.A. 935, 941–43.  This Exclusion denies

---

[1] *Kadel v. Folwell*, 100 F.4th 122 (4th Cir. 2024) (en banc), *vacated by Folwell v. Kadel*, 145 S. Ct. 2838 (2025) *and Crouch v. Anderson*, 145 S. Ct. 2835 (2025).

Medicaid coverage of surgical treatments[2] for gender dysphoria, a mental disorder defined as "the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender."   Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 451 (5th ed. 2013); *see also Skrmetti*, 605 U.S. at 506.

Plaintiffs are participants in West Virginia's Medicaid program who have been diagnosed with gender dysphoria.   They wish to undergo surgery to treat their gender dysphoria but would be denied coverage under the Exclusion.[3]   So they sued West Virginia, alleging that the Exclusion violates the Equal Protection Clause, § 1557 of the Affordable Care Act, and certain provisions of the Medicaid Act.   The district court granted summary judgment to Plaintiffs on all three grounds, denied summary judgment to West Virginia, entered a declaratory judgment finding the Exclusion unlawful, and enjoined West Virginia from enforcing the Exclusion.   In *Kadel v. Folwell*, our en banc Court affirmed the district court's decision across the board.[4]   100 F.4th 122.   West Virginia

---

[2] West Virginia's Medicaid plan only excludes sex-change *surgeries* from coverage. It does not exclude other treatments for gender dysphoria, like therapy and hormonal treatments.

[3] Plaintiff Shauntae Anderson suffers from gender dysphoria.  Anderson wishes to undergo breast reconstruction surgery and a vaginoplasty to treat this condition.  Anderson represents a class of similarly situated transgender West Virginians who would like the Medicaid plan to cover surgeries to treat their gender dysphoria.

[4] Our en banc Court heard *Anderson v. Crouch* and *Kadel v. Folwell* together, since the cases involved nearly identical issues.  This panel considers only *Anderson*.  On remand from the Supreme Court, *Kadel v. Folwell* was remanded to the district court for further (Continued)

sought review by the Supreme Court, which granted certiorari, vacated our en banc judgment, and remanded the case for reconsideration in light of *Skrmetti*.[5]  *Kadel*, 145 S. Ct. 2838; *Anderson*, 145 S. Ct. 2835.  Consistent with standard procedure, our Court then referred the case to this panel.  Following the Supreme Court's guidance, we now reverse.

## II.     DISCUSSION

This appeal presents two issues.  First, Plaintiffs argue that the Exclusion violates the Equal Protection Clause and § 1557 of the Affordable Care Act.  These claims fail in light of *Skrmetti*.  Second, they argue that the Exclusion violates the Medicaid Act's comparability and availability requirements.  This claim fails given the Supreme Court's recent decision in *Medina*.

### A.     Discrimination Claims

#### 1.     Equal protection doctrine

The Equal Protection Clause commands that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  At

---

consideration in light of *Skrmetti*.  *Kadel v. Folwell*, No. 22-1721, 2025 WL 2740363, at *1 (4th Cir. Sept. 23, 2025).

[5] In *Skrmetti*, the Supreme Court assessed the constitutionality of Tennessee's "Prohibition on Medical Procedures Performed on Minors Related to Sexual Identity" statute, also known as SB1.  605 U.S. at 505; Tenn. Code Ann. § 68-33-101 *et seq.*  SB1 bans "the use of certain medical procedures for treating transgender minors."  *Skrmetti*, 605 U.S. at 506.  In particular, it "prohibits a healthcare provider from '[s]urgically removing, modifying, altering, or entering into tissues, cavities, or organs of a human being,' or '[p]rescribing, administering, or dispensing any puberty blocker or hormone,' . . . for the purpose of (1) '[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex,' or (2) '[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identity.'"  *Id.* (quoting Tenn. Code Ann. § 68-33-102(5), § 68-33-103(a)(1)).

its core, the Clause prevents States from "treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Yet this prohibition's scope should not be exaggerated. "The Equal Protection Clause does not forbid classifications" categorically, and laws often deal in classifications to solve particular problems or to achieve targeted outcomes. *Nordlinger*, 505 U.S. at 10; *Skrmetti*, 605 U.S. at 509 ("The Fourteenth Amendment's command . . . 'must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons.'" (quoting *Romer v. Evans*, 517 U.S. 620, 631 (1996))). Ordinarily, classifications are valid so long as they have a rational basis. *Skrmetti*, 605 U.S. at 510; *City of Cleburne*, 473 U.S. at 440; *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979) ("When the basic classification is rationally based, uneven effects upon particular groups within a class are ordinarily of no constitutional concern."). "We generally afford such laws 'wide latitude' under this rational basis review, acknowledging that 'the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes.'" *Skrmetti*, 605 U.S. at 510 (quoting *City of Cleburne*, 473 U.S. at 440).

Yet this presumption gives way when a law treats people differently because of their membership in a protected class. Sex is one such protected class. When a law discriminates based on sex, we fear that it is rooted in "outmoded notions of the relative capabilities of men and women" or "traditional, often inaccurate, assumptions about the proper roles of men and women." *City of Cleburne*, 473 U.S. at 441; *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 726 (1982); *see also Skrmetti*, 605 U.S. at 510. At the

8

same time, "[p]hysical differences between men and women . . . are enduring." *United States v. Virginia*, 518 U.S. 515, 533 (1996). And recognizing biological reality is "not a stereotype." *Nguyen v. INS*, 533 U.S. 53, 68 (2001). So we subject sex-based classifications to only intermediate scrutiny, which requires the State to show its challenged law substantially relates to a sufficiently important government interest. *Skrmetti*, 605 U.S. at 510; *Virginia*, 518 U.S. at 533.

A law can classify based on sex in at least two ways: It can facially classify based on sex, or it can classify based on a proxy for sex.

Start with facial classification. A facial classification explicitly "distributes burdens or benefits on the basis of" membership in a protected class. *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007); *see also Shaw v. Reno*, 509 U.S. 630, 642 (1993) (describing a suspect facial classification as one that "explicitly distinguish[es] between individuals on [protected] grounds"); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213 (1995) (same). In other words, a law facially classifies when, by its own terms, it identifies sex as a ground for discriminatory treatment. *Skrmetti*, 605 U.S. at 514–15 (describing a law that facially classifies based on sex as one which "prohibit[s] conduct for one sex that it permits for the other"). Consider an obvious example. Suppose a health-insurance policy said: "Women may not receive reimbursement for heart transplants." This policy would be a facial classification based on sex because whether a person would receive reimbursement for a heart transplant would turn (at least in part) on the person's sex.

9

But not every law that references or relates to sex necessarily classifies on that basis. *Skrmetti*, 605 U.S. at 512 ("This Court has *never* suggested that mere reference to sex is sufficient to trigger heightened scrutiny." (emphasis added)). For instance, imagine a health-insurance policy that said: "Neither men nor women may receive reimbursement for heart transplants." This policy references sex, but its unartful wording does not transform it into a sex-based classification. It would treat both sexes the same, as neither could receive reimbursement for heart transplants. *See Vacco v. Quill*, 521 U.S. 793, 800 (1997) ("Generally speaking, laws that apply evenhandedly to all 'unquestionably comply' with the Equal Protection Clause." (quoting *N.Y.C. Transit Auth. v. Beazer*, 440 U.S. 568, 587 (1979))); *see also Skrmetti*, 605 U.S. at 515 (holding SB1 does not violate the Equal Protection Clause because "[u]nder SB1, *no* minor may be administered puberty blockers or hormones to treat gender dysphoria . . . ; minors of *any* sex may be administered puberty blockers or hormones for other purposes"). So the fact that a policy uses terms like "sex," "men," or "women" does not automatically mean that it facially classifies on these grounds. *See, e.g.*, *Adkins v. Rumsfeld*, 464 F.3d 456, 468 (4th Cir. 2006) (holding that a law providing retirement benefits to divorced military spouses and defining spouse as "the husband or wife . . . of a member" was not a facial classification). Determining whether a law facially classifies based on sex thus involves more than a mere word search for particular terms. Rather, we must examine whether the policy uses those terms to draw distinctions between the sexes. *See Nguyen*, 533 U.S. at 64 (noting that "[t]he issue is not the use of gender specific terms instead of neutral ones," because "[j]ust as neutral terms

10

can mask discrimination that is unlawful, gender specific terms can mark a permissible distinction.").

We break no new ground by saying this (and neither did the Supreme Court in *Skrmetti*). Over and over, the Supreme Court has said that sex-based facial classifications explicitly identify sex as the basis for favorable or unfavorable treatment. *See, e.g.*, *Reed v. Reed*, 404 U.S. 71, 73 (1971) (providing that "males must be preferred to females" when appointing a decedent's estate administrator); *Orr v. Orr*, 440 U.S. 268, 271 (1979) (requiring only men to pay alimony); *Sessions v. Morales-Santana*, 582 U.S. 47, 51 (2017) (establishing different immigration rules for fathers versus mothers).[6] These cases show that our task is not simply to note the words used in a law, but to determine what function those words serve in that law's operation.[7]

---

[6] The laws in some of these cases did not use the words "men" or "women" but used sex-identifying language such as "father," "mother," "husband," or "wife." Yet these were still facial classifications. A law that discriminates between mothers and fathers, for example, identifies a trait—being a parent—and expressly distinguishes between people who have that trait based on whether they are male or female. It therefore facially classifies based on sex, even though it also classifies based on a second characteristic (parenthood). *Morales-Santana*, 582 U.S. at 58 (explaining that discriminating between mothers and fathers discriminates "on the basis of the sex of the qualifying parent" (quoting *Califano v. Westcott*, 443 U.S. 76, 84 (1979)).

[7] To be clear, once a facial classification based on a protected trait has been shown, the government cannot evade heightened scrutiny by claiming that the law applies equally to everyone. *Skrmetti*, 605 U.S. at 514 ("[A] State may not circumvent the Equal Protection Clause by writing in abstract terms."). For instance, as noted by the Court in *Skrmetti*, even if the anti-miscegenation law in *Loving v. Virginia* technically applied to all citizens, it still would have facially classified based on race by prohibiting marriages for persons of one race that it permitted for persons of the other race. 388 U.S. 1, 8–9 (1967); *Skrmetti*, 605 U.S. at 514; *see also McLaughlin v. Florida*, 379 U.S. 184, 184–86, 191–92 (1964) (striking down a law that prohibited interracial couples from cohabitating).

But even a facially neutral classification may warrant heightened scrutiny if it uses a proxy to camouflage intentional discrimination based on a protected trait. *See Skrmetti*, 605 U.S. at 518–19; *Kadel*, 100 F.4th at 168–70 (Richardson, J., dissenting). To find proxy discrimination, a court must determine that a "discriminatory purpose has, at least in some measure, shaped" the challenged legislation. *Feeney*, 442 U.S. at 276, 279. Discriminatory purpose or intent is usually proved through a fact-intensive inquiry. Sometimes, though, a law uses a classification that is so obviously a proxy for a suspect class that "an intent to disfavor that class can be readily presumed." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993). But that presumption doesn't come easy. We can only presume discriminatory intent when a law *both* overwhelmingly affects a suspect class *and* there's no logical reason for the distinction the law makes other than targeting that suspect class. *See Feeney*, 442 U.S. at 275 ("If the impact of [the] statute could not be plausibly explained on a neutral ground, [the] impact itself would signal that the real classification made by the law was in fact not neutral.").

Indeed, the Supreme Court has made clear that the mere fact that a law primarily—or even exclusively—affects a protected class cannot alone establish an equal protection claim. *Washington v. Davis,* 426 U.S. 229, 242 (1976) ("Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution."). Furthermore, "where a law's classifications are neither covertly nor overtly based on sex, . . . we do not subject the law to heightened review unless it was motivated by an invidious discriminatory purpose." *Skrmetti*, 605 U.S. at 516. So if we can identify rational, nondiscriminatory reasons why the law targets who or what it does,

12

then we cannot presume an intent to discriminate. *See Kadel*, 100 F.4th at 170–71 (Richardson, J., dissenting).

This brings us to *Geduldig v. Aiello*, 417 U.S. 484 (1974). *Geduldig* involved an equal protection challenge to California's disability-insurance system, which excluded coverage for "any injury or illness caused by or arising in connection with pregnancy." *Id.* at 489. The dissenting Justices argued that the exclusion discriminated on the basis of sex "by singling out for less favorable treatment a gender-linked disability peculiar to women." *Id.* at 501 (Brennan, J., dissenting). But the Supreme Court disagreed. California had not, the Court found, denied insurance eligibility to any group of persons; it had simply chosen to underinsure a particular risk (*i.e.*, pregnancy). *Id.* at 494 (majority opinion). Its reasons for doing so—maintaining a self-supporting, cost-effective, and affordable insurance program—were legitimate, given the substantial cost of insuring pregnancy, and provided "an objective and wholly noninvidious basis" for the exclusion. *Id.* at 496. And what risk coverage California did afford was afforded equally to both men and women. *Id.* at 496–97. As the Court explained:

> The California insurance program does not exclude anyone from benefit eligibility because of gender but merely removes one physical condition—pregnancy—from the list of compensable disabilities. While it is true that only women can become pregnant it does not follow that every legislative classification concerning pregnancy is a sex-based classification . . . . Normal pregnancy is an objectively identifiable physical condition with unique characteristics. Absent a showing that distinctions involving pregnancy are mere pretexts designed to effect an invidious discrimination against the members of one sex or the other, lawmakers are constitutionally free to include or exclude pregnancy from the coverage of legislation such as this on any reasonable basis, just as with respect to any other physical condition.

13

> The lack of identity between the excluded disability and gender as such under this insurance program becomes clear upon the most cursory analysis.   The program divides potential recipients into two groups— pregnant women and nonpregnant persons.   While the first group is exclusively female, the second includes members of both sexes.   The fiscal and actuarial benefits of the program thus accrue to members of both sexes.

*Id.* at 496 n.20.   The Court therefore held that the plan did not violate the Equal Protection Clause.   *Id.* at 497.

Geduldig was no outlier.   For one, the Court has repeatedly reaffirmed its holding. *See Skrmetti*, 605 U.S. at 518; *Bray*, 506 U.S. at 271; *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 136 (1976);[8] *Nashville Gas Co. v. Satty*, 434 U.S. 136, 145 (1977); *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 236 (2023).  The Court most recently reaffirmed *Geduldig* in *Skrmetti*, holding that Tennessee's ban on certain treatments for gender dysphoric minors did not violate the Equal Protection Clause, even though "only transgender individuals seek treatment for gender dysphoria."  605 U.S. at 519.  Invoking *Geduldig*, the Court explained that Tennessee's statute, like California's insurance program, "does not exclude any individual from medical treatments on the basis of" a protected characteristic, like transgender status or sex, "but rather removes one set of diagnoses," including gender dysphoria, "from the range of treatable conditions."  *Id.* at 518–19.  Because the plaintiffs in *Skrmetti* failed to show the statute's "prohibitions are mere pretexts designed to effect an invidious discrimination against transgender individuals," it did not matter that only

---

[8] *Gilbert* was superseded by statute.  *See* Pregnancy Discrimination Act of 1978, Pub. L. No. 95-555, 92 Stat. 2076; *see also Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 685 (1983).

transgender people seek gender dysphoria treatments.  *Id.*  The statute did not treat transgender people as a class differently from anyone else, just as California's insurance program did not treat women as a class differently from anyone else.

Under equal protection doctrine, then, a state plan's refusal to cover a medical condition that only members of one sex experience does not necessarily mean that it facially classifies based on sex.  *Skrmetti*, 605 U.S. at 518; *Geduldig*, 417 U.S. at 496 n.20.  Nor does such a refusal establish a presumption of discriminatory intent when a State has legitimate interests in maintaining an effective and affordable healthcare program.  *Geduldig*, 417 U.S. at 496 n.20; *cf. Skrmetti*, 605 U.S. at 522–24.  Some additional evidence of discriminatory intent beyond underinclusive risk coverage is required to trigger heightened scrutiny.  *Skrmetti*, 605 U.S. at 518 ("[A] State does not trigger heightened constitutional scrutiny by regulating a medical procedure that only one sex can undergo unless the regulation is a mere pretext for invidious sex discrimination."); *see also Dobbs*, 597 U.S. at 236.

### 2.    The challenged Exclusion does not violate the Equal Protection Clause

We now turn to the case before us.  To prevail on the equal protection claim, Plaintiffs must first show that the challenged Exclusion discriminates because of sex or transgender status.[9]  But they fail to make this showing.  West Virginia's Exclusion does

---

[9] We need not dwell on whether discrimination based on transgender status merits intermediate scrutiny, *see Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 607 (4th Cir. 2020), because the Exclusion does not discriminate on this basis.  *See, e.g.*, *Skrmetti*, 605 U.S. at 517–18 (noting that the Supreme Court "has not previously held that transgender individuals are a suspect or quasi-suspect class" and that a regulation turning on medical use "does not raise that question because [it] does not classify on the basis of transgender status").

not facially classify based on either.    Rather, it classifies based on medical diagnosis and applies evenhandedly to everyone.    And using medical diagnosis as the distinguishing factor is not so irrational that we can presume the Exclusion discriminates by proxy.  *See Skrmetti*, 605 U.S. at 524–25.  Put simply, whether West Virginia Medicaid patients receive coverage for medical services does not turn on their sex or transgender status.    As a result, the Exclusion does not violate the Equal Protection Clause.

We begin with the facial-classification inquiry.    At first blush, one might think that the Exclusion at issue here is a sex- or transgender-based classification.    After all, it collectively denies coverage for certain "sex change" or "transsexual" treatments.  And in the past, transgender people were sometimes called "transsexuals."    *See, e.g.*, *Transsexual*, Merriam-Webster's Collegiate Dictionary (10th ed. 1993) ("[A] person with a psychological urge to belong to the opposite sex that may be carried to the point of undergoing surgery to modify the sex organs to mimic the opposite sex.").    So surely, as Plaintiffs argue, policies that use the words "sex change" and "transsexual" facially discriminate based on sex or transgender status, right?

Not so.  The Exclusion uses the terms "sex change" and "transsexual" as adjectives to describe "treatment" or "surgery," not to describe types of people who cannot receive coverage.  Mere mention of these words does not constitute facial discrimination.  *Skrmetti*, 605 U.S. at 511–12.  On its face, therefore, the Exclusion does not deny someone coverage for medical services based on the person's sex or transgender status.    Rather, it denies coverage to *everyone* for certain services when sought to treat a given *medical diagnosis*. *See id*.

16

An example shows the difference.   Suppose an individual sought a hysterectomy to treat uterine cancer.   West Virginia's Medicaid program would cover the surgery.   And it would do so whether the person was male or female, transgender or not.  But if that same person did not have uterine cancer and instead sought the hysterectomy to treat a non-covered diagnosis, like gender dysphoria, then that person would not get coverage for the procedure.  Indeed, Christopher Fain, a former plaintiff, received Medicaid coverage for a hysterectomy based on a diagnosis unrelated to Fain's transgender status.   J.A. 1327 (testifying that the surgery was "not related to . . . being transgender").   If the Exclusion truly applied to all surgeries for transgender people, Fain would not have received Medicaid coverage for this procedure.

Thus, West Virginia's Medicaid program does not cover certain medical services if a patient seeks the service as treatment for gender dysphoria.  But if the patient seeks the same service for a different, qualifying diagnosis, West Virginia covers it—regardless of sex or transgender status.  Every person—regardless of that person's sex, gender identity, or combination thereof—will be covered when seeking that service for a qualifying diagnosis.  And no person—regardless of that person's sex, gender identity, or combination thereof—will be covered when seeking that service for a diagnosis that's not on the list, such as gender dysphoria.  *Cf. Skrmetti*, 605 U.S. at 515 ("Under SB1, *no* minor may be administered puberty blockers or hormones to treat gender dysphoria, gender identity disorder, or gender incongruence; minors of *any sex* may be administered puberty blockers or hormones for other purposes.").  So the Exclusion does not facially classify based on sex or transgender status.

Plaintiffs insist otherwise. They argue that gender dysphoria is a diagnosis exclusively tied to transgender identity. Accordingly, by excluding gender dysphoria, the Exclusion really classifies based on transgender identity itself.

But *Skrmetti* and *Geduldig* foreclose this argument.[10] As in *Skrmetti*, the Exclusion does not deny coverage to anyone because of sex or transgender status. *See* 605 U.S. at 511–22. Rather, it merely declines coverage for a particular medical use: gender dysphoria. *See id.* at 511. *Geduldig* held that a health plan that declines to cover a risk (pregnancy) experienced only by members of a protected class (women) does not facially classify people based on their membership in that class. 417 U.S. at 496 n.20; *see also Dobbs*, 597 U.S. at 236. And *Skrmetti*, applying *Geduldig*, held that a prohibition on certain medical interventions when used to treat gender dysphoria does not facially classify people based on transgender status, even though only transgender people experience gender dysphoria. *Skrmetti*, 605 U.S. at 518–19. Just as Tennessee's SB1 regulated treatments, not people, so too does West Virginia's Exclusion. The fact that only transgender individuals experience gender dysphoria does not mean the Exclusion discriminates based on transgender status, any more than the fact that "only women can become pregnant" made the exclusion in *Geduldig* facially discriminatory. 417 U.S. at 496; *Skrmetti*, 605 U.S. at

---

[10] *Geduldig* refused to find sex discrimination where an insurance plan split people into two groups: (1) pregnant women, and (2) everyone else (a group that includes both men and women). In the same way, *Skrmetti* refused to find transgender discrimination where SB1 "divides minors into two groups: those who might seek [certain drugs] to treat the excluded diagnoses, and those who might seek [those drugs] to treat other conditions" because even though "the first group includes only transgender individuals; the second group, in contrast, encompasses both transgender and nontransgender individuals." 605 U.S. at 519. The same logic applies to West Virginia's Exclusion in this case.

519 ("[A]lthough only transgender individuals seek treatment for gender dysphoria . . . — just as only biological women can become pregnant—there is a 'lack of identity' between transgender status and the excluded medical diagnoses" and therefore, the statute at issue does not "exclude any individuals on the basis of transgender status."). Rather, the dispositive question is whether the Exclusion provides equal risk coverage for all persons. *Geduldig*, 417 U.S. at 496–97. And that is the case here—the Exclusion "does not [deny coverage] for one sex that it [provides] for the other." *Cf. Skrmetti*, 605 U.S. at 514–15. Likewise, it does not deny treatment coverage for transgender persons that it provides for non-transgender persons, or vice versa. *See id.*

Still, Plaintiffs contend that West Virginia's Medicaid plan really does provide unequal risk coverage, because it allegedly denies coverage to transgender individuals for medical treatments that it provides to others. For example, under the plan, women can receive coverage for a vaginoplasty to treat the congenital absence of a vagina, but transgender women cannot receive a vaginoplasty to treat gender dysphoria. West Virginia similarly covers chest surgery for men who experience gynecomastia, but not for transgender men who experience gender dysphoria. *See Gynecomastia*, Dorland's Illustrated Medical Dictionary (28th ed. 1993) (defining gynecomastia as "excessive growth of the male mammary glands"). It also covers surgery to reconstruct a feminine chest contour following cancer treatment, but not if needed to treat gender dysphoria.

Yet these examples actually demonstrate that West Virginia's plan does not provide unequal access to medical treatments based on sex or transgender status. They instead show that for every medical service, the State has established a list of diagnoses that qualify

19

someone for that service. To suggest otherwise is to "contort the meaning of the term 'medical treatment.'" *Skrmetti*, 605 U.S. at 513. "The underlying medical condition the treatment is intended to address" is "a key aspect of any medical treatment." *Id.* Vaginoplasty and chest surgery "can be used to treat certain overlapping [conditions] (such as gender dysphoria), and each can be used to treat a range of other conditions." *Id.* "These combinations" of medical services and conditions "give rise to various medical treatments." *Id.* In other words, "[f]or the term 'medical treatment' to make sense of these various combinations, it must necessarily encompass both a given" medical service *and* the specific condition "for which it is being administered." *Id.* And because "[s]ome medical treatments and procedures are uniquely bound up in sex," it would be "inappropriate" to find sex-based medical treatments are inherently discriminatory, without more. *Id.* at 512.[11]

With this in mind, West Virginia's plan does not single out people of a particular sex or transgender status. Rather, the State determines which diagnoses qualify based on the risks it is willing to cover. Here, West Virginia chose to cover alterations of a person's breasts or genitalia only if the person experiences physical injury, disease, or congenital

---

[11] "When, for example" a transgender man "(whose biological sex is female)" seeks to undergo chest surgery "to treat . . . gender incongruence," that person "receives a different medical treatment" than a man who undergoes the same surgery to treat painful gynecomastia. *Skrmetti*, 605 U.S. at 513–14. West Virginia's plan, "in turn, restricts which of these medical treatments" it covers for Medicaid patients. *Id.*

absence of genitalia.[12]  As Plaintiffs' examples demonstrate, anyone who has a diagnosis of this kind can receive coverage for such medical services, regardless of that person's sex or transgender status.  That the plan does not also cover additional risks, like conditions that only manifest themselves through psychological or psychosocial symptoms (including gender dysphoria), does not change the fact that what coverage it does provide is provided equally to all.  *See Skrmetti*, 605 U.S. at 513–15, 517–20; *Geduldig*, 417 U.S. at 496–97.

Next, Plaintiffs contend that the Exclusion unlawfully discriminates because it promotes sex stereotypes by punishing transgender people for nonconformity.  A sex stereotype is a generalization about the relative capabilities of, or socially acceptable behavior for, members of each sex.  *See Skrmetti*, 605 U.S. at 516; *Hogan*, 458 U.S. at 724–25.  But that's not what's happening here.  *See Skrmetti*, 605 U.S. at 516–17 (rejecting claim of sex-based stereotyping).  West Virginia's plan does not condition coverage based on whether a treatment aligns with or departs from a patient's sex.  Nor does it bar patients

---

[12] Each example Plaintiffs identify for support involves treatment for physical injury, disease, or congenital absence of genitalia.  First, West Virginia covers vaginoplasty for the congenital absence of a vagina.  Second, it covers hysterectomies for certain conditions, including endometriosis, cancer treatment, and high-risk hereditary cancer syndromes—all of which relate to physical injury or disease.  Third, West Virginia provides chest surgery to men with excessive chest tissue (*i.e.*, gynecomastia), but only "if the patient has actual physical pain."  J.A. 2527.  By contrast, "psychosocial symptoms"—without physical ones—"are not sufficient to meet the coverage criteria for surgical treatment of gynecomastia."  J.A. 1819.  Fourth, the plan covers chest reconstruction surgery as part of the treatment for those who have undergone cancer treatment, but not for unrelated cosmetic purposes.  Thus, far from showing that West Virginia's plan provides unequal risk coverage, Plaintiffs' examples show a consistent trend:  The State provides equal coverage to everyone for certain treatments to redress physical injury, disease, or congenital absence of genitalia, but it does not cover such treatments for anyone experiencing a condition with only psychosocial or emotional symptoms, like gender dysphoria.

21

from certain treatments if they don't identify with their sex.  Instead, the plan grants or withholds coverage based on a patient's diagnosis, *i.e.*, a certain physical condition with unique causes, risks, and susceptibility to treatment.  *See id.* at 516–17.  The different coverage accorded to treatments for different diagnoses is therefore based on medical judgment of biological reality, which is "not a stereotype."  *Nguyen*, 533 U.S. at 68; *see also Skrmetti*, 605 U.S. at 516–17; *Virginia*, 518 U.S. at 533.

Furthermore, while "a law that classifies on the basis of sex may fail heightened scrutiny if the classifications rest on impermissible stereotypes," if "a law's classifications are neither covertly nor overtly based on sex," then "we do not subject the law to heightened review unless it was motivated by an invidious discriminatory purpose."  *Skrmetti*, 605 U.S. at 516.  Here, since the plan does not classify based on sex or transgender status and since there is no evidence of invidious discrimination, we need not even reach the sex stereotype analysis.  So Plaintiffs fail on this basis, too.[13]

---

[13] Plaintiffs posit that "*Skrmetti* . . . supports, rather than undermines, this Court's [previous] sex stereotyping analysis" in *Kadel*.  Appellee Suppl. Br. at 28.  But that's wrong.  Plaintiffs argue that because a man can receive surgery to masculinize his chest, but a female who identifies as a man cannot, the Exclusion perpetuates the stereotype that females are supposed to have breasts and males are not.  *Id.* at 28–29.  But this adopts reasoning the Supreme Court explicitly rejected in *Skrmetti*.  First, the Court emphasized that laws that do not classify based on protected characteristics do not face heightened scrutiny absent invidious discrimination.  *Skrmetti*, 605 U.S. at 516.  Second, what Plaintiffs say about the Exclusion was also said about the statute at issue in *Skrmetti*: Because SB1 allows little boys to receive testosterone to masculinize themselves but does not allow little girls to do the same, it perpetuates the stereotype that girls should not have masculine physical traits.  *Id.* at 512–13.  But the Court rejected this characterization, and we do too.  Instead, the Supreme Court found that SB1 did not classify based on sex or transgender status, and that regardless, Tennessee's proffered reasons for passing the statute, including the desire to help children appreciate their biological sex and to protect (Continued)

Finally, the plan does not use gender dysphoria as a proxy for transgender persons. *See Kadel*, 100 F.4th at 168–70, 176–77 (Richardson, J., dissenting). As explained above, we cannot presume discriminatory intent from the fact that gender dysphoria "happen[s] to [occur] in exclusively" transgender persons. *See Bray*, 506 U.S. at 270. The fact that a law targets something closely or exclusively associated with a protected class cannot alone support a presumption of discriminatory intent. *See Skrmetti*, 605 U.S. at 518; *Feeney*, 442 U.S. at 274–75; *Geduldig*, 417 U.S. at 496 n.20; *Bray*, 506 U.S. at 270; *Dobbs*, 597 U.S. at 236. Rather, the classification a law uses must also be inexplicable on grounds other than an intent to discriminate against a suspect class. *See Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886); *Guinn v. United States*, 238 U.S. 347, 364–65 (1915); *Gomillion v. Lightfoot*, 364 U.S. 339, 342 (1960). So to establish a presumption that the Exclusion discriminates by proxy, Plaintiffs must show that the choice to exclude gender dysphoria from coverage is so irrational that nothing could explain it other than an intent to discriminate against transgender persons. *Bray*, 506 U.S. at 270; *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

No matter one's view of the Exclusion, West Virginia has put forth legitimate, nondiscriminatory reasons for denying coverage for certain gender-dysphoria treatments, including cost and efficacy concerns. Since legitimate, nondiscriminatory explanations for

---

them from risky procedures, was neither invidiously discriminatory nor based in sex stereotypes. *Id.* at 516–17. If Tennessee's reasoning is not discriminatory or stereotypical, it is hard to see how West Virginia's more limited policy, rooted primarily in concerns about cost and the experimental nature of these procedures, is invidiously discriminatory and promotes sex stereotypes.

the Exclusion exist, as described in the next subsection, it cannot be said that the plan obviously uses gender dysphoria to discriminate by proxy against transgender persons.

### 3.    West Virginia's Exclusion passes rational basis review

Under rational basis review, we "will uphold a statutory classification so long as there is 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'"  *Skrmetti*, 605 U.S. at 522 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).  That means that the challenger bears the burden "to negative every *conceivable* basis which might support" the law.  *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973) (emphasis added and internal quotation marks omitted).  And this showing is especially challenging to make "in areas where there is medical and scientific uncertainty" because the Supreme Court commands that "[w]e afford States 'wide discretion to pass legislation.'"  *Skrmetti*, 605 U.S. at 524 (quoting *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007)).

Plaintiffs failed to make this showing.  West Virginia put forth at least two legitimate reasons for its policy: cost and concerns about medical efficacy and necessity.  These reasons are certainly sufficient to establish a rational basis for the Exclusion.

West Virginia's cost concerns alone carry the Exclusion over the rational-basis threshold.  The State has finite resources to spend on healthcare.  If it must spend money to cover surgeries for gender dysphoria, then it must either cut spending (*e.g.*, take away coverage for other diagnoses) or raise taxes.  And covering just one sex-change surgery

24

can be extremely expensive.[14]  Here, West Virginia can reasonably decide that certain

gender-dysphoria services are not cost-justified, especially because they question the

services' medical efficacy and necessity.  The evidence on record shows that there is an

ongoing debate over this issue.  *See* J.A. 1860–1935 (Expert Disclosure Report of Dr.

Stephen B. Levine, M.D.).

West Virginia also cites efficacy and necessity concerns as one of its reasons for the

Exclusion—concerns which the Supreme Court cites approvingly in *Skrmetti*.  605 U.S. at

522–23 (stating Tennessee's finding "that it was likely that not all harmful effects

associated with [sex-change procedures] are fully known" provided a rational basis for SB1

(internal quotation marks and citations omitted)).[15]  The fact that these procedures may be

---

[14] *See, e.g.*, Jae Downing, et al., *Spending and Out-of-Pocket Costs for Genital Gender-Affirming Surgery in the US*, 157 JAMA Surgery 799, 802 (2022) (finding the median total cost was $59,673 for a male-to-female vaginoplasty and $148,540 for a female-to-male phalloplasty).

[15] While *Skrmetti* involved sex-change treatments for minors, disagreement among experts about the efficacy and necessity of transgender surgeries extends to treatment of gender dysphoria in adults.  For example, "like West Virginia, a majority of States do not cover 'genital gender-affirming surgery' under their Medicaid programs," demonstrating a lack of consensus in this area.  Amicus Curiae Br. of State of W. Va. at 2 (citing Michael Zaliznyak, et al., *Which U.S. States' Medicaid Programs Provide Coverage for Gender-Affirming Hormone Therapy and Genital Gender-Affirming Surgery for Transgender Patients?:  A State-by-State Review, and a Study Detailing the Patient Experience to Confirm Coverage of Service*, 18 J. Sex. Med. 410 (2021)); *see also* Richard Bränström & John E. Pachankis, *Reduction in Mental Health Treatment Utilization Among Transgender Individuals After Gender-Affirming Surgeries: A Total Population Study*, 177 Am. J. Psychiatry 727, 734 (2020) (finding "no advantage of surgery in relation to subsequent mood or anxiety disorder-related healthcare visits or prescriptions or hospitalizations following suicide attempts" when comparing "individuals diagnosed with gender incongruence who had received gender-affirming surgical treatments" with "those diagnosed with gender incongruence who had not").
(Continued)

25

ineffective, or worse, harmful to the citizens of West Virginia is rationally related to the decision to exclude these procedures from Medicaid coverage. It makes sense that the State would choose to focus on covering medical care that it has determined is safer and more effective. It does not matter that some experts believe these procedures are safe and effective. Others insist they are dangerous and ineffective. The widespread disagreement and "[r]ecent developments" in transgender medicine "only underscore the need for legislative flexibility in this area." *Skrmetti*, 605 U.S. at 524.

In *Skrmetti*, the Supreme Court found that the Tennessee legislature did not have to take any third party—on either side of the debate—at its word to find a good reason to ban certain procedures. The legislature could look at the evidence and decide for itself which plan would best promote the flourishing of Tennesseans. If the Tennessee legislature can legitimately prohibit these treatments, then the West Virginia legislature may legitimately determine that providing Medicaid coverage for these procedures is not worth the cost to its taxpayers. Simply put, if a State can reasonably ban it, of course a State can reasonably refuse to pay for it.

---

Furthermore, these surgeries, especially genital surgeries, may involve serious complications for adults and children alike. For example, one study found that "[g]ender-affirming phalloplasty has a complication rate as high as 76.5%." Bashar Hassan, et al., *Complications Following Gender-Affirming Phalloplasty: A NSQIP Review*, 9 J. of Reconstructive Microsurgery Open e34, e34 (2024). These complications include sepsis, wound dehiscence, necrosis, and urologic dysfunction. *Id.* at e39–e40. Another study found that 53.7% of male-to-female vaginoplasty recipients experienced complications in the first 30 days after surgery and 38.9% required revision surgeries. Kayla Blickensderfer, et al., *Gender-Affirming Vaginoplasty and Vulvoplasty: An Initial Experience*, 176 Urology 232 (2023). States certainly have a legitimate interest in protecting their citizens from such medical procedures. *See Skrmetti*, 605 U.S. at 522–23.

It is not irrational for a legislature to forgo Medicaid coverage of arguably ineffective and dangerous procedures and allocate its limited resources to covering other treatments. What's more, States may legitimately recognize and "celebrat[e]" the "inherent differences between men and women." *Virginia*, 518 U.S. at 533 (internal quotation marks omitted). And it is not irrational for a legislature to encourage citizens "to appreciate their sex" and not "become disdainful of their sex" by refusing to fund experimental procedures that may have the opposite effect. *Skrmetti*, 605 U.S. at 516–17.

The Supreme Court's decision in *Skrmetti* forecloses any argument to the contrary. By holding that SB1 passed rational basis review, the Supreme Court made clear that prohibitions on sex-change treatments are not inherently irrational. And West Virginia provided legitimate reasons that rationally related to its policy. Therefore, we find West Virginia's Exclusion easily passes rational basis review.

### 4. The Affordable Care Act discrimination claim

Plaintiffs also challenge the Exclusion under the Affordable Care Act's provision forbidding sex discrimination. Section 1557 of the Act states that "an individual shall not, on the ground prohibited under . . . title IX of the Education Amendments of 1972 . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a). So the Affordable Care Act ties its antidiscrimination provision directly to Title IX's, which in turn prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a).

27

This Court uses interpretations of Title VII to "guide[] our evaluation of claims under Title IX," and we have held that the Supreme Court's *Bostock* approach to sex discrimination in Title VII extends to Title IX. *Grimm*, 972 F.3d at 616. The text of the Affordable Care Act instructs us to interpret § 1557 in line with our interpretation of sex discrimination in Title IX. 42 U.S.C. § 18116(a). It follows that under Fourth Circuit precedent that binds this panel, interpretations of Title VII also inform our understanding of § 1557.

In *Skrmetti*, the Supreme Court declined to consider whether *Bostock*'s reasoning applied to the Equal Protection Clause, but proceeded to explain why even under *Bostock*'s reasoning, SB1 did not discriminate because of sex. 605 U.S. at 520–21. Even though *Skrmetti* did not address Title VII, Title IX, or the Affordable Care Act, we are still bound to follow the Supreme Court's instructions about the correct way to apply *Bostock*. Since, under Fourth Circuit precedent, *Bostock* controls our analysis of Title IX, and by extension, the Affordable Care Act, we apply *Bostock* here in the same way the Supreme Court did in *Skrmetti* and find that the Exclusion does not violate the Affordable Care Act's antidiscrimination provision.[16]

*Bostock*'s "traditional but-for causation standard" instructs us "to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause."

---

[16] Recently, the Eleventh Circuit, sitting en banc, held that excluding certain transgender treatments from employer-provided insurance did not violate Title VII in light of *Skrmetti*. *Lange v. Houston Cnty.*, 152 F.4th 1245, 1255 (11th Cir. 2025) ("Lange's Title VII challenge is foreclosed by the portion of the Supreme Court's recent opinion in *United States v. Skrmetti* that addresses and explains its earlier decision in *Bostock v. Clayton County*.") (Newsom, J., concurring) (internal citations omitted).

*Skrmetti*, 605 U.S. at 520 (quoting *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020)). By now, it should be clear why Plaintiffs cannot show that sex or transgender status was a but-for cause of any injury they suffered. Under *Bostock*, "if changing the [patient's] sex would have yielded a different choice by the [State]," then the patient's sex would be a but-for cause of their discrimination. *Bostock*, 590 U.S. at 659–60. But here, "changing [a Plaintiff's] sex or transgender status does not alter" West Virginia's choice to decline coverage for the requested services. *Skrmetti*, 605 U.S. at 520.

For example, even if we changed Plaintiff Anderson's biological sex from male to female, West Virginia would still deny Anderson coverage for a vaginoplasty and breast augmentation, because Anderson would still "lack a qualifying diagnosis" for the treatments. *Id.* The only way Anderson could get these treatments is if Anderson had some other diagnosis, like breast cancer, that was covered. But if Anderson had that other diagnosis, Anderson "could obtain" treatment "regardless of sex or transgender status." *Id.* at 521. Thus, "[u]nder the reasoning of *Bostock*," a patient's diagnosis—not sex or transgender status—is the but-for cause of the ability or inability to obtain coverage under the plan. *Id.*; *see also Kadel*, 100 F.4th at 181–82 (Richardson, J., dissenting).

Since *Skrmetti*'s approach to *Bostock* controls[17] our Affordable Care Act analysis, we hold that West Virginia's Exclusion does not violate § 1557.

---

[17] Plaintiffs' argument that *Geduldig* and *Skrmetti* do not apply to statutory claims does not work. It relies on the notion that a combination of the Pregnancy Discrimination Act and the Supreme Court's decision in *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669 (1983), somehow forbid us from applying *Skrmetti* and *Geduldig* to Title VII, and by extension, to *any* statutory claims. But this argument overextends the
(Continued)

29

**B.    The Medicaid Act Claims**

Plaintiffs assert two claims under the Medicaid Act.  First, they allege that West Virginia's program violates the Act's "availability requirement," which—in broad terms—requires States to cover certain categories of care under their Medicaid programs.  *See* 42 U.S.C. § 1396a(a)(10)(A).  Second, they contend that the Exclusion violates the Act's "comparability requirement," which prevents States from discriminating between certain groups of Medicaid beneficiaries when covering care.  *See* 42 U.S.C. § 1396a(a)(10)(B).  Both claims fail because there is no private cause of action for violations of either requirement in light of the Supreme Court's decision in *Medina v. Planned Parenthood South Atlantic*, 606 U.S. 357 (2025).

As a threshold matter, Plaintiffs argue that Defendants waived the argument that there is no cause of action under the Medicaid Act, and therefore, we must assume one exists.  That is wrong.  Defendants' failure to question the existence of a cause of action sooner was not waiver—which requires the intentional relinquishment of a known right—but merely forfeiture.  *United States v. Olano*, 507 U.S. 725, 733 (1993).  And we have the authority to address this issue despite Defendants' forfeiture.

---

Pregnancy Discrimination Act and *Newport News*.  The Pregnancy Discrimination Act statutorily mandated that discrimination because of pregnancy qualifies as sex discrimination under Title VII.  *Newport News* interpreted this statute.  But neither goes beyond that.  Neither addresses medical conditions unrelated to pregnancy.  Neither compels the conclusion that discrimination on the basis of medical conditions that only impact one sex constitutes sex discrimination under Title VII, let alone all other statutes.  And certainly neither requires us to find that discrimination on the basis of any medical condition that only one protected group experiences automatically constitutes discrimination against that group.

"In our adversarial system of adjudication, we follow the principle of party presentation." *Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (per curiam) (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020)).  But the party presentation principle "is . . . not ironclad."  *Sineneng-Smith*, 590 U.S. at 376.  The duty of jurists "to decide cases correctly, even if that means considering arguments raised for the first time on appeal (or not raised by the parties at all)" is an important exception to this principle.  *Moreno v. Bosholm*, 151 F.4th 543, 558 (4th Cir. 2025) (quoting *Meyers v. Lamer*, 743 F.3d 908, 912 (4th Cir. 2014)); *see also Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991).  Just because the parties agree on the answer to a "predicate legal question" and "dispute only subsequent, dependent issues" does not mean that we should ignore that answer if it is erroneous.  *Wideman v. Innovative Fibers LLC*, 100 F.4th 490, 494 n.3 (4th Cir. 2024).  As the Supreme Court has explained, "a court may consider an issue 'antecedent to . . . and ultimately dispositive of' the dispute before it, even an issue the parties fail to identify and brief."  *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993) (quoting *Arcadia v. Ohio Power Co.*, 498 U.S. 73, 77 (1990)).  To suggest otherwise would be to "permit litigants, by agreeing on the legal issue presented, to extract the opinion of a court . . . that would be difficult to characterize as anything but advisory."  *Id*.

We exercise our discretion to reach this antecedent question for three reasons.  First, separation of powers principles favor addressing whether a cause of action exists here.  *Medina* made clear that enforcing provisions like the availability and comparability requirements rests within the discretion of the Executive Branch—not the courts or private individuals.  606 U.S. at 367–69.  We should not answer a question allocated to the

31

Executive Branch in a situation like this where the Supreme Court has spoken clearly. Second, we have recognized that it is appropriate to "resolve an issue not passed on below" where "there is an intervening change in the case law." *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 105 (4th Cir. 2020). The antecedent question here involves a newly resolved Supreme Court case. Before the Supreme Court reversed our court in *Medina*, panel precedent dictated that a cause of action existed. But, as we will discuss, *Medina* places the absence of a cause of action here beyond any doubt. *See Singleton v. Wulff*, 428 U.S. 106, 121 (1976). And third, given the parties' supplemental briefing on this issue, we are not concerned with any prejudice. *United States v. White*, 836 F.3d 437, 442–44 (4th Cir. 2016), *abrogated on other grounds by United States v. Stitt*, 586 U.S. 27 (2018).

We now turn to the question of whether a private cause of action exists for violations of the Medicaid Act's availability and comparability requirements. "To prove that a statute secures an enforceable right, privilege, or immunity, and does not just provide a benefit or protect an interest, a plaintiff must show that the law in question clearly and unambiguously uses rights-creating terms" and "display[s] an unmistakable focus on individuals like the plaintiff." *Medina*, 606 U.S. at 368 (internal quotation marks and brackets omitted) (quoting *Gonzaga University v. Doe*, 536 U.S. 273, 284, 290 (2002)). "[S]pending-power statutes like Medicaid are especially unlikely" to satisfy this "stringent" and "demanding" test. *Id.* at 368–69.

Applying these principles, the Supreme Court held that § 1396a(a)(23)(A) of the Medicaid Act, also known as the "any-qualified-provider provision," did not confer a privately enforceable right. *Id.* at 380. We find that the availability and comparability

requirements, located in the same section of the Medicaid Act as the any-qualified-provider provision, do not create a private cause of action either.

First, like the Medicaid Act provision at issue in *Medina*, neither the comparability nor availability requirement uses "clear and unambiguous rights-creating language." *Id.* at 377–78 (quoting *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 186 (2023) (internal quotation marks omitted)).  Instead, the availability requirement "indicates that state Medicaid plans" must "provide for making medical assistance available . . . to" eligible individuals, "including at least" an enumerated list of "care and services."[18]  *Id.* at 377;  § 1396a(a)(10)(A).    And the comparability requirement, found in the next subparagraph, "indicates that state Medicaid plans" must "provide . . . that the medical assistance made available to any individual" covered by the availability requirement "shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual."  *Medina*, 606 U.S. at 377; § 1396a(a)(10)(B).  Just like the any-qualified-provider provision, these requirements "speak[] to what a State must do to participate in Medicaid" and to ensure it does not "lose federal funding."  *Medina*, 606 U.S. at 377.  But they do not mention rights, of patients or anyone else.  Even if the requirements exist for the "benefit" of "patients," this fact alone does not create a right—especially where the statutory language does not mention rights of any kind and focuses solely on the

---

[18] That list is described in a different part of the statute and includes broad categories of care, like "inpatient hospital services," "outpatient hospital services," "rural health clinic services," "laboratory and X-ray services," etc.  *See* § 1396d(a)(1)–(5), (13)(B), (17), (21), (28)–(30).

obligations of a State in the context of a spending-power bargain. *Medina*, 606 U.S. at 377–78.

Second, broader statutory context "only serves to confirm our conclusion"— especially since the availability and comparability requirements share the *same* statutory context described in *Medina. Id.* at 378. For example, the Medicaid Act says that "a State need only 'comply substantially' with" the comparability and availability requirements— just as with the any-qualified-provider provision—to "continue receiving federal funding." *Id.* at 379 (quoting 42 U.S.C. § 1396c). This "focus on 'aggregate' compliance suggests that a statute addresses a State's obligations to the federal government, not the rights 'of any particular person.'" *Id.* (quoting *Gonzaga*, 536 U.S. at 288). Similarly, we read the availability and comparability requirements in conjunction with the "reasonability provision," 42 U.S.C. § 1396a(a)(17),[19] found in the same section of the Act. *Beal v. Doe*, 432 U.S. 438, 444 (1977). The reasonability provision "confers broad discretion on the States to adopt standards for determining the extent of medical assistance, requiring only that such standards be 'reasonable' and 'consistent with the objectives' of the Act." *Id.* This broad grant of discretion is inconsistent with the creation of privately enforceable rights.

The availability and comparability requirements are also found in the same broader subsection of the Medicaid Act as the any-qualified-provider provision: in "a subsection

---

[19] This provision instructs States to "include reasonable standards . . . for determining eligibility for and the extent of medical assistance under the plan which" do not contradict "the objectives" of the Act and meet other enumerated requirements. § 1396a(a)(17).

titled 'Contents'" which "outlines scores of things a state plan must include to qualify for federal funding." *Medina*, 606 U.S. at 379. Notably, the list is "directed to the Secretary of Health and Human Services," not to individuals. These similarities between the any-qualified-provider provision and the comparability and availability requirements make clear that if the any-qualified-provider provision does not create a privately enforceable right, then the requirements here do not either.

Since the requirements do not create a privately enforceable right, Plaintiffs cannot bring a cause of action under these provisions, and we need not address the merits of their Medicaid Act claims.

*    *    *

The judgment below cannot stand in light of *Skrmetti* and *Medina*. The Supreme Court has made clear that States can reasonably regulate treatments for gender dysphoria without discriminating against any protected class, and that these regulations are not inherently irrational. And there is no cause of action to bring Plaintiffs' Medicaid Act claims. We therefore reverse the district court's grant of summary judgment to Plaintiffs, vacate the injunction and declaratory judgment, and remand with instructions to enter summary judgment for Defendants.

*REVERSED AND REMANDED*

35